SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Paul D. Leake
Jason N. Kestecher
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

– and –

James J. Mazza, Jr. (*pro hac vice* pending)
Justin M. Winerman (*pro hac vice* pending)
155 North Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel to Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRIDENT HOLDING COMPANY, LLC,** *et al.*, | **Case No. 19-10384 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING
DEBTORS  (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C.
§§ 105, 361, 362, 363, AND 364 AND (B) TO UTILIZE CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES PURSUANT TO
11 U.S.C. §§ 361, 362, 363, 364 AND 507(b) AND (III) SCHEDULING FINAL HEARING
PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Trident Holding Company, LLC (6396); American Diagnostics Services, Inc. (2771); Community Mobile Diagnostics, LLC (9341); Community Mobile Ultrasound, LLC (3818); Diagnostic Labs Holdings, LLC (8024); FC Pioneer Holding Company, LLC (6683); JLMD Manager, LLC (8470); Kan-Di-Ki LLC (6100); Main Street Clinical Laboratory, Inc. (0907); MDX-MDL Holdings, LLC (2605); MetroStat Clinical Laboratory – Austin, Inc. (4366); MX Holdings, LLC (8869); MX USA, LLC (4885); New Trident Holdcorp, Inc. (4913); Rely Radiology Holdings, LLC (3284); Schryver Medical Sales and Marketing, LLC (9620); Symphony Diagnostic Services No. 1, LLC (8980); Trident Clinical Services Holdings, Inc. (6262); Trident Clinical Services Holdings, LLC (1255); TridentUSA Foot Care Services LLC (3787); TridentUSA Mobile Clinical Services, LLC (0334); TridentUSA Mobile Infusion Services, LLC (5173); U.S. Lab & Radiology, Inc. (4988). The address of the Debtors' corporate headquarters is 930 Ridgebrook Road, 3rd Floor, Sparks, MD 21152.

New Trident Holdcorp Inc., Trident Clinical Services Holdings, Inc., and Schryver Medical Sales and Marketing, LLC (each a "**Borrower**" and collectively, the "**Borrowers**") and their affiliated debtors, each as a debtor and debtor-in-possession (each a "**Debtor**" and collectively, the "**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"), hereby move (this "**Motion**") this Court for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "**Interim Order**") and a final order, granting the relief described below. In support thereof, the Debtors refer to the contemporaneously filed (i) *Declaration of David F. Smith, III Pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and First-Day Papers* (the "**First-Day Declaration**") and (ii) *Declaration of Mark Buschmann In Support Of DIP Financing Motion* (the "**Buschmann Declaration**") attached hereto as **Exhibit B**:

**PRELIMINARY STATEMENT**

1.      The Debtors commence these Chapter 11 Cases with a $50 million new money commitment from their senior secured lender, SPCP Group, LLC (the "**Priority First Lien Lender**") in the form of a debtor-in-possession two-draw term loan facility (the "**DIP Facility**"), providing access to the liquidity the Debtors need to fund these Chapter 11 Cases; implement a financial restructuring; and galvanize their operational turn-around efforts. In conjunction with its DIP Facility commitment, the Priority First Lien Lender also has executed a prepetition restructuring support agreement (the "**RSA**")[2] pursuant to which it has agreed to support the general terms of a chapter 11 plan.[3]

---

[2]      The RSA is attached hereto as **Exhibit C**.

[3]      The Debtors are <u>not</u> seeking this Court's approval to assume the RSA. Termination of the RSA, however, would trigger a default under the DIP Facility.

2.      As is customary, the RSA contains certain milestones for the Debtors'
advancement of these cases.[4]  In particular, under the RSA, the Debtors will deliver a five-year
business plan within the first thirty-seven days of these Chapter 11 Cases. That business plan will
serve as the foundation for the valuation contained in the Debtors' chapter 11 plan.  Unless the
Debtors determine, based on their valuation, that the Priority First Lien Lender's prepetition
senior secured claims of approximately $257 million are oversecured, then the Debtors will
proceed with confirmation of a chapter 11 plan providing: (i) the Priority First Lien Lender with
certain takeback debt and 100% of the equity in the reorganized Debtors; (ii) junior lienholders
with 5% warrants at a strike price[5] that accrues at a rate of LIBOR plus 9.5%; and (iii) general
unsecured creditors with a *pro rata* share of a $100,000 cash pool.  If, however, the Debtors
determine that the Priority First Lien Lender's prepetition senior secured claims are oversecured,
then the Debtors would have the opportunity to propose a plan providing additional value to
junior stakeholders, provided that such plan is acceptable to the Priority First Lien Lender.
Consistent with the Debtors' fiduciary duties, nothing in the RSA restricts the Debtors from
exploring alternative chapter 11 plan structures if one should materialize. *See* RSA § 8(b)(ii).

3.      The Debtors believe that the DIP Facility provides them with the best – indeed
only viable – path to maximize the value of their estates as a going-concern.  Based on the
Debtors' extensive prepetition capital raising efforts and their most recent restructuring

---

[4]    As set forth in the chart below.

[5]    The strike price of the warrants is equal to the price per share that would result in a full return on invested
capital to the Priority First Lien Lender calculated as of the effective date of the chapter 11 plan.

negotiations with the vast majority of their prepetition secured lenders,[6] it was abundantly clear

that no party would provide the Debtors with new capital except on a priming basis.

4.      The Priority First Lien Lender was the only party willing to extend additional

financing to the Debtors; and then only on an in-court basis. While an *ad hoc* group of

Prepetition First Lien Lenders (the "**Ad Hoc Group**") submitted certain proposals for a potential

restructuring, none offered to provide the Debtors with any financing (in or out of court)

notwithstanding the Debtors' requests for such proposals.  In fact, the Ad Hoc Group's various

proposals were premised on *the Priority First Lien Lender's* extension of further credit to the

Debtors, as well as the equitization of a portion of the Priority First Lien Lender's prepetition

senior secured claims to which it would have to consent.

5.      The Priority First Lien Lender did not consent. Thus, the Debtors focused their

attention on negotiating the terms of this self-priming DIP Facility with the Priority First Lien

Lender, to which only it could consent.[7]  After several rounds of negotiations, the Debtors submit

that this two-draw, budget-based DIP Facility is in the best interests of the estates.[8] Without the

DIP Facility, the Debtors' business would face immediate and irreparable harm as the Debtors

would be unable to meet their operational expenses and face the immediate threat of a liquidation

that would severely jeopardize creditor recoveries, particularly given the services nature of the

Debtors' enterprise. At bottom, the DIP Facility shores up the Debtors' liquidity position,

provides them the runway to complete their business plan work, propose a confirmable plan of

---

[6]     Other than the Priority First Lien Lender, the Company has held discussions with lenders holding over 70% of the loans under each of their secured credit facilities.

[7]     Pursuant to the terms of the Intercreditor Agreement (defined below), junior lienholders are deemed to have consented to the provision of a $50 million DIP Facility by the Priority First Lien Lender. *See* Intercreditor Agreement § 2.07(iv).

[8]     The Debtors are seeking interim authority to access $12.5 million in funds, with the balance to be drawn following the hearing to approve this Motion on a final basis.

reorganization, and continue to engage in negotiations with their various creditor constituents that pre-date the filing of these Chapter 11 Cases to attempt to achieve further consensus. Thus, this Court should approve the Debtors' request for interim and final relief to enter into the DIP Facility.

## CONCISE STATEMENTS PURSUANT TO BANKRUPTCY RULE 4001(B) AND LOCAL BANKRUPTCY RULE 4001-2

6.      The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant documents, as required by Bankruptcy Rules 4001(b)(1)(B) and Local Bankruptcy Rule 4001-2.[9]

| Bankruptcy Rule/ Local Rule | Summary of Material Terms[10] |
|---|---|
| **Borrowers** <br> *Bankr. R. 4001(c)(1)(B)* | New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., and Schryver Medical Sales and Marketing, LLC <br><br> *See* DIP Credit Agreement preamble, p. 1. |
| **Guarantors** <br> *Bankr. R. 4001(c)(1)(B)* | Trident Holding Company, LLC and each Subsidiary of each Borrower <br><br> *See* DIP Credit Agreement § 1.01; "Guarantors" and "Collateral and Guarantee Requirement." |
| **DIP Lenders** <br> *Bankr. R. 4001(c)(1)(B)* | SPCP Group, LLC <br><br> *See* DIP Credit Agreement preamble, p. 1; DIP Credit Agreement § 1.01, "Lenders"; Schedule 2.01 to the DIP Credit Agreement. |

---

[9]      This statement is qualified in its entirety by reference to the applicable provisions of the Senior Secured, Super Priority Debtor in Possession Credit Agreement, among the Borrowers, the Guarantors, the lenders from time to time party thereto, including SPCP Group, LLC (collectively, the "**DIP Lenders**"), and Silver Point Finance, LLC (the "**DIP Agent**" and together with the DIP Lenders, the "**DIP Secured Parties**"), substantially in the form attached hereto **Exhibit D** (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Credit Agreement**" and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments and/or amendments executed and delivered in connection therewith (collectively, the "**DIP Documents**"). To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Credit Agreement, the provisions of the DIP Credit Agreement, as applicable, shall control.

[10]      Capitalized terms used but not otherwise defined in this chart shall have the meanings ascribed to them in the Interim Order or the DIP Credit Agreement, as applicable.

| | |
|---|---|
| **Agent**<br>*Bankr. R. 4001(c)(1)(B)* | Silver Point Finance, LLC<br><br>*See* DIP Credit Agreement preamble, p. 1; § 1.01 "DIP Agent." |
| **Entities with Interests in Cash Collateral**<br>*Bankr. R. 4001(b)(1)(B)(i)* | The Prepetition Secured Parties, subject to interests of any Senior Permitted Lien holder<br><br>*See* Interim Order ¶ 4 |
| **Commitment**<br>Bankr. R. *4001(c)(1)(B)*<br>*L.R. 4001-2(a)(1), (a)(7)* | Commitments total $50 million in the aggregate, $12.5 million of which is available in connection with the Interim Order.<br><br>*See* DIP Credit Agreement § 1.01, "Commitment"; Schedule 2.01 to the DIP Credit Agreement; Interim Order ¶ 6. |
| **Cash Collateral**<br>*L.R. 4001-2(a)(1)* | Subject to the terms and conditions contained in the DIP Credit Agreement and the DIP Orders, the Prepetition Secured Parties consent (or are deemed to consent) to the use of their "cash collateral" as defined in section 363(a) of the Bankruptcy Code.<br><br>*See* Interim Order ¶ 5(e). |
| **Term/Maturity**<br>*Bankr. R. 4001(c)(1)(B)* | The Maturity Date is July 23, 2019, which date is 163 days from the Petition Date.<br><br>*See* DIP Credit Agreement § 1.01, "Maturity Date." |
| **Interest Rates**<br>*Bankr. R. 4001(c)(1)(B)*<br>*L.R. 4001-2(a)(3)* | LIBOR plus 8% or Base Rate plus 7%<br><br>*See* DIP Credit Agreement §1.01, "Applicable Rate", "Base Rate", "Eurodollar Rate", § 2.08(a) |
| **Default Rate**<br>*Bankr. R. 4001(c)(1)(B)*<br>*L.R. 4001-2(a)(3)* | 2% in excess of the interest rate set forth above.<br><br>*See* DIP Credit Agreement §1.01, "Default Rate"; § 2.08(b) |
| **Expenses and Fees**<br>*Bankr. R. 4001(c)(1)(B)*<br>*L.R. 4001-2(a)(3)* | Closing Premium: 2% of the Commitment<br><br>Agency Fee: $62,500<br><br>*See* DIP Credit Agreement §2.09; Interim Order ¶ 13 |
| **Use of Proceeds**<br>*Bankr. R. 4001(b)(1)(B)(ii), (c)(1)(B)*<br>*L.R. 4001-2(a)(2)* | Payment of costs and expenses in connection with the DIP Facility and the Chapter 11 Cases and for general corporate purposes in accordance with the Approved Budget subject to Permitted Variances.<br><br>*See* DIP Credit Agreement § 6.16; Interim Order ¶ 12 |
| **13-Week Budget**<br>*Bankr. R. 4001(c)(1)(B)*<br>*L.R. 4001-2(a)(2)* | The Budget to be delivered pursuant to the DIP Credit Agreement shall be a 13-week forecast with respect to the Loan Parties and shall set forth on a weekly basis, in form reasonably satisfactory to the Required Lenders in their reasonable discretion, the (1) (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Loan Parties' professionals and advisors), asset sales and any other fees and expenses relating to the DIP Documents), (iii) projected net cash flow and (iv) total ending book cash balance, and (2) other information reasonably requested by the DIP Agent |

| | or the Required Lenders.<br><br>*See* DIP Credit Agreement §§ 1.01, "Budget", "Budget Variance Report"; 6.20 |
|---|---|
| **Liens and Priorities Other Than Adequate Protection Liens**<br>*Bankr. R. 4001(c)(1)(B)(i), (xi), L.R. 4001-2(a)(4)* | As security for the DIP Obligations, each Loan Party shall grant to the DIP Lenders a security interest in and continuing lien on the DIP Collateral.<br><br>All of the claims of the DIP Agent and the DIP Lenders under the DIP Facility with respect to the DIP Loans and the DIP Obligations shall at all times (subject to the Senior Permitted Liens):<br><br>1.    be entitled to superpriority claim status in the Chapter 11 Cases;<br><br>2.    be secured by a perfected first priority lien on all Unencumbered Property;<br><br>3.    be entitled to a first priority senior priming security interest in and lien upon all Prepetition Collateral that secures any or all of the Prepetition Debt; and<br><br>4.    be entitled to a junior security interest in and lien upon all tangible and intangible pre- and postpetition property of each Loan Party subject to valid, binding and unavoidable liens (other than Primed Liens) on the Petition Date that are senior to the liens securing the Prepetition Debt.<br><br>*See* Interim Order ¶¶ 7, 8 |
| **Adequate Protection**<br>*Bankr. R. 4001(b)(1)(B)(iv), (c)(1)(B)(ii) L.R. 4001-2(a)(2)* | Each Prepetition Agent will be entitled to receive adequate protection as follows (subject to the Intercreditor Agreement):<br><br>1.    the Priority Adequate Protection Liens, the First Lien Adequate Protection Liens, and the Second Lien Adequate Protection Liens; and<br><br>2.    certain allowed superpriority administrative expense claims as provided for in section 507(b) of the Bankruptcy Code.<br><br>The Prepetition Priority Agent will also be entitled to receive adequate protection as follows:<br><br>1.    payment in an amount equal to all accrued and unpaid prepetition and post-petition interest due and payable and required to be paid in cash under the Existing Priority Agreements, calculated based on the non-default contract rate;<br><br>2.    the reasonable and documented professional fees and expenses incurred by the Prepetition Priority Secured Parties.<br><br>*See* Interim Order ¶ 13 |
| **Carve-Out**<br>*L.R. 4001-2(a)(5), (a)(9)* | The Carve-Out is the amount equal to the sum of (i) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000 (without regard to the notice set forth in (iii) herein); and (iii) accrued and unpaid claims for fees, costs, disbursements and expenses to the extent allowed at any time of persons or firms retained by the Debtors pursuant to Bankruptcy Code sections 327, 328 or 363 or the Committee in these Cases or any independent director appointed |

| | |
|---|---|
| | to the Board of Managers of FC Pioneer Holding Company, LLC (collectively, the "Professional Fees") (x) incurred at any time on or prior to the Trigger Date plus (y) any success or transaction fee that is earned and payable prior to the Trigger Date pursuant to an engagement letter between the Debtors and a Professional (collectively, the "Pre-Trigger Amount"), plus (B) Professional Fees incurred after the Trigger Date in an amount not to exceed $2,000,000.<br><br>*See* DIP Credit Agreement,  § 1.01 "Carve-Out"; Interim Order ¶ 7(b) |
| **Cross Collateralization**<br>*L.R. 4001-2(a)(6)* | The DIP Credit Agreement does not provide for cross-collateralization. |
| **Events of Default**<br>*Bankr. R. 4001(c)(1)(B)*<br>*L.R. 4001-2(a)(10)* | The DIP Credit Agreement contains certain usual and customary events of default for facilities of this type (subject in certain cases to customary grace periods), including but not limited to:<br><br>1.    The failure by the Borrowers to pay, when due, principal and interest on any Loan;<br><br>2.    The failure by the Loan Parties to perform, observe or comply with any term, covenant, or agreement contained in the DIP Loan Documents or any of the DIP Orders;<br><br>3.    (i) The failure by a Loan Party (or any of its Subsidiary) (a) to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than under the DIP Credit Agreement) having an aggregate outstanding principal amount not less than $500,000 and (b) to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any default thereunder by any Loan Party), the effect of which default or such other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity or (ii) any default by a Loan Party under any Material Contract, which default would cause or permit the termination, cancellation or non-renewal of such Material Contract or permit the counterparty thereto to terminate, cancel or not renew such Material Contract;<br><br>4.    Other than with respect to a general unsecured claim, there is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money or a settlement for the payment of money, in an aggregate amount exceeding $500,000  (to the extent, in each case, not covered by independent third-party insurance or third-party indemnification as to which the insurer or indemnifying party has been notified of such judgment, settlement or order and has not denied coverage thereof), which judgment or order is not stayed pursuant to an order of the Bankruptcy Court, and such judgment, settlement or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal, for a period of 60 consecutive days;<br><br>5.    The occurrence of certain ERISA events;<br><br>6.    Invalidation of any material provision of the DIP Documents or revocation or invalidation of provisions of the Priority/First Lien/Second Lien Intercreditor Agreement; |

7.      (i) Any Collateral Document after delivery thereof pursuant to the DIP Credit Agreement ceases to create, or any Lien purported to be created by any Collateral Document is asserted in writing by any Loan Party not to be, a valid and perfected Lien or (ii) any of the Equity Interests of the Borrowers shall cease to be pledged pursuant to the Collateral Documents free of Liens;

8.      There occurs a permanent non-appealable Exclusion Event which has or could reasonably be expected to have a Material Adverse Effect;

9.      The taking of any action by any of the Loan Parties: (i) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Credit Agreement; (ii) to grant any Lien other than those permitted under the DIP Credit Agreement; or (iii) except as provided in the Interim Order or Final Order, to use "cash collateral", as defined in the DIP Orders;

10.      The filing of or amendment to any plan of reorganization or disclosure statement or any amendment thereto by a Loan Party that does not provide for repayment in full in cash the Obligations under the DIP Credit Agreement, or any of the Loan Parties or their Subsidiaries support or fail to contest in good faith the filing or confirmation of any such plan;

11.      The entry of any order of the Bankruptcy Court authorizing any claims or charges (i) entitled to superpriority administrative expense claim status in any Chapter 11 Case which is pari passu with or senior to the superpriority claims of the DIP Agent and the Secured Parties or (ii) granting any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted in the DIP Credit Agreement or in the DIP Orders;

12.      The DIP Orders cease to create a valid and perfected Lien on the Collateral or to be in full force and effect;

13.      Any Loan Party supports entry of an order (i) charging any of the Collateral under section 506(c) of the Bankruptcy Code against the DIP Agent and the Secured Parties or (ii) limiting the extension under section 552(b) of the Bankruptcy Code of the Liens of the Priority Administrative Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Debtor after the Petition Date;

14.      The failure of the Final Order to include a waiver of (i) the right to surcharge the Collateral under section 506(c) of the Bankruptcy Code and (ii) any ability to limit the extension under section 552(b) of the Bankruptcy Code of the Liens of the Priority Administrative Agent on the Collateral to any proceeds or profits of the Collateral acquired by any Loan Party after the Petition Date;

15.      The Bankruptcy Court's entry of an order denying or terminating use of "cash collateral" by the Loan Parties;

16.      Any Loan Party makes any payment on account of any pre-petition Indebtedness other than (i) in respect of accrued payroll and related expenses as of the Petition Date, (ii) in respect of certain creditors, (iii) permitted under the DIP Credit Agreement, or (iv) authorized or required by one or more "first day" or "second day" orders or the DIP Orders; or

17.      The RSA terminates for any reason in accordance with its terms, except by mutual agreement of the parties.

9

| | See DIP Credit Agreement § 8.01 |
|---|---|
| **Mandatory Prepayments** *L.R. 4001-2(a)(11)* | Mandatory prepayment of the DIP Loans will be required: (i) (a) if a Borrower or Subsidiary Disposes of property other than as permitted under the DIP Credit Agreement, or (b) a Casualty Event occurs, and in each such case which results in the receipt by such Borrower or such Subsidiary of Net Cash Proceeds, (iii) any Borrower or any Subsidiary incurs any Indebtedness not permitted pursuant to the DIP Credit Agreement, or (iii) any parent of any Borrower sells or issues any Qualified Equity Interests, in each case subject to certain thresholds set forth in the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement §§ 1.01, "Net Cash Proceeds", "Casualty Event", 2.05(b) |
| **Affirmative and Negative Covenants** *Bankr. R. 4001(c)(1)(B)* *L.R. 4001-2(a)(8)* | The DIP Credit Agreement contains affirmative and negative covenants customary and appropriate for similar debtor-in-possession financings of this type and where appropriate, subject to agreed materiality thresholds, carve-outs and exceptions.<br><br>*See* DIP Credit Agreement Arts. VI & VII |
| **Milestones**[11] *Bankr. R. 4001(c)(1)(B)(vi)* *L.R. 4001-2(a)(10), (12)* | Within 2 days of the Petition Date, the Interim Order shall be entered;<br><br>Within 30 days of entry of the Interim Order, the Final Order shall be entered;<br><br>Within 36 days of the Petition Date, the Business Plan shall be delivered to the Priority First Lien Lender and shall be reasonably acceptable to the Priority First Lien Lender;<br><br>Within 7 days of delivering the Business Plan, the Company shall file the Chapter 11 Plan and Disclosure Statement consistent with the RSA unless the Company has delivered the Oversecured Priority Claim Determination to counsel to the Priority First Lien Lender, in which case it may file an alternative Chapter 11 Plan that is acceptable to the Priority First Lien Lender;<br><br>Within 38 days after the Company has filed the Chapter 11 Plan and Disclosure Statement, the Bankruptcy Court has entered the Disclosure Statement Order;<br><br>Within 45 days entry of the Disclosure Statement Order, the Bankruptcy Court shall have entered the Confirmation Order; and<br><br>Within 5 business days after entry of the Confirmation Order, the Effective Date of the Chapter 11 Plan shall have occurred.<br><br>*See* DIP Credit Agreement § 6.18; Schedule 6.18; RSA § 8(a)(iii)-(x) |
| **Borrowing Conditions** *Bankr. R. 4001(c)(1)(B)* *L.R. 4001-2(a)(2)* | Usual and customary for financings of this type, including, among other things, with respect to the initial extension of credit, delivery of executed DIP Credit Agreement and other DIP Documents, receipt of closing officer's certificates, lien searches, receipt of physical collateral, receipt of the Initial Budget, payment of fees, entry of the Interim Order, entry of certain first day orders including the Cash Management Order, and receipt of the fully executed RSA; and, with respect to credit extensions after the Closing Date, the entry of the Final Order, the Borrowers' compliance with the Budget subject to |

---

[11]    Certain of these milestones are set forth in the RSA, the termination of which would constitute an Event of Default under the DIP Credit Agreement.

| | |
|---|---|
| | any Permitted Variances, no Material Adverse Effect since the Petition Date, and payment of fees.<br><br>*See* DIP Credit Agreement §§ 4.01, 4.02 |
| **Joint Obligations**<br>*L.R. 4001-2(a)(14)* | Each Guarantor jointly and severally guarantees to each Lender and the DIP Agent the prompt payment and performance when due of the principal of and interest on the Loans made by the Lenders to the Borrowers, and all other amounts and Obligations owing to the Lenders or the DIP Agent by the Loan Parties under any DIP Documents to the DIP Agent, any Lender, or Agent-Related Party. Each Guarantor further agrees to promptly pay the Guaranteed Obligations if the Borrowers shall fail to pay in full when due.<br><br>*See* DIP Credit Agreement § 12.01 |
| **Material Terms, Including Duration and Use of Cash Collateral**<br>*Bankr. R.*<br>*4001(b)(1)(B)(iii)* | Upon entry of the Interim Order, subject to the Interim Order and the Approved Budget (subject to Permitted Variances), the Loan Parties are authorized to use Cash Collateral and the DIP Loans. The Debtors shall use the proceeds of the DIP Facility and Cash Collateral in a manner consistent with the Interim Order and the DIP Documents and in accordance with the Approved Budget (subject to Permitted Variances). An Event of Default shall occur and terminate the right of the Debtors to use the proceeds of DIP Loans or Cash Collateral under the Interim Order if: the Debtors fail to make any payment under the Interim Order to any of the Prepetition Secured Parties when due; the Debtors fail to perform any of the material terms or comply with any material covenant contained in the Interim Order; there are any modifications of the Interim Order; an order is entered converting to chapter 7 or dismissing any of these Cases or appointing a chapter 11 trustee or an examiner with enlarged powers in these Cases; and the sale of all or substantially all of the assets of the Loan Parties (except as permitted under the DIP Documents) which does not provide for the repayment in full in cash of all DIP Obligations (other than any contingent indemnification or expense reimbursement obligations for which no claim has been made); and the termination of the Restructuring Support Agreement.<br><br>*See* Interim Order ¶¶ 12, 16 |
| **Waiver/Modification of the Automatic Stay**<br>*Bankr. R.*<br>*4001(c)(1)(B)(iv)*<br>*L.R. 4001-2(a)(10)* | Any automatic stay applicable to the DIP Agent and the DIP Lenders is vacated and modified as necessary to permit the DIP Agent and the DIP Lenders to enforce all of their rights under the Interim Order and under the DIP Documents including the right (i) immediately upon the occurrence of an Event of Default (subject to any applicable grace or notice provisions), to declare (A) the termination of any further Commitments, (B) all DIP Obligations to be immediately due and payable, without any further notice of any kind, and (C) that the Debtors' use of Cash Collateral, borrowing under the DIP Facility, or withdrawal of DIP loan proceeds from the Proceeds Account is restricted; and (ii) upon the occurrence of an Event of Default and the giving of five business days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) via email to counsel to the Debtors, counsel to the Committee, and the U.S. Trustee to (A) withdraw consent to the Loan Parties' continued use of Cash Collateral and (B) exercise all other remedies provided for in the DIP Documents, the Interim Order, or applicable law, including rights of set off. The automatic stay is further modified to the extent necessary to permit the DIP Agent to take all actions authorized to perfect liens and rights granted under the DIP Documents.<br><br>*See* Interim Order ¶¶ 9(d), 15 |
| **Indemnification**<br>*Bankr. R.* | The Borrowers shall indemnify and hold harmless the Indemnitees from and against all liabilities arising out of or in connection with (but in the case of legal fees and expenses, |

| | |
|---|---|
| *4001(c)(1)(B)(ix)* | limited to the reasonable and documented out-of-pocket fees of one counsel for all Indemnitees taken as a whole and, if necessary, one firm of regulatory counsel and one firm of local counsel in each relevant jurisdiction, and solely in the case of a conflict of interest, one additional counsel), amongst other things, (i) the Chapter 11 Cases, the RSA, the execution, delivery, enforcement, performance or administration of any DIP Document, the DIP Orders, (ii) any "exit financing" requested by the Debtors in the Chapter 11 Cases or any other agreement or instrument delivered in connection with the transactions contemplated thereby, (iii) any Loan or the use of proceeds therefrom, or (iv) any actual or alleged presence or Release or threat of Release of Hazardous Materials on or from any property owned or operated by the Borrowers, any Subsidiary or any other Loan Party, or any Environmental Liability of any Loan Party, or (v) any actual or prospective claim, litigation, or investigation relating to any of the foregoing (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, or litigation), in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory, or sole negligence of such indemnitee; provided that such indemnity shall not be available to the extent that such liabilities resulted from the gross negligence or willful misconduct of such Indemnitee or of any Related Indemnified Person, as determined by a final, non-appealable judgment of a court of competent jurisdiction.<br><br>*See* DIP Credit Agreement § 10.05 |
| **Debtors' Stipulations**<br>*Bankr. R.*<br>*4001(c)(1)(B)(iii)*<br>*L.R. 4001-2(a)(18)* | Without prejudice to the rights of any parties in interest (other than the Debtors) otherwise set forth in the Interim Order, the Debtors stipulate that:<br><br>1.    As of the Petition Date, the Borrowers and the Prepetition Guarantors  were indebted and liable to the Prepetition Secured Parties in the aggregate principal amounts set forth in the Interim Order in respect of loans made and outstanding on account of Prepetition Debt obligations;<br><br>2.    The Prepetition Debt constitutes the legal, valid and binding obligations of the Borrowers and the Prepetition Guarantors, enforceable against them (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (ii) no portion of the Prepetition Debt or any payments made to the Prepetition Secured Parties or paid on account of the obligations owing under the Existing Agreements prior to the Petition Date, is subject to any  defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim of any nature, other than as provided in the Intercreditor Agreements;<br><br>3.    The Prepetition Priority Obligations, the Prepetition First Lien Obligations, and the Prepetition Second Lien Obligations are secured by the Prepetition Liens pursuant to the Existing Agreements, which are: (i) valid, binding, perfected (subject to the limitations set forth in the Interim Order), enforceable  liens and security interests in the Prepetition Collateral; (ii) not subject to avoidance, recharacterization, subordination, recovery, counterclaim, defense or claim under applicable law (subject to the Intercreditor Agreements); and (iii) as of the Petition Date are subject and subordinate only to valid, perfected and unavoidable liens permitted to exist and to have priority under the Existing Agreements;<br><br>4.    The Prepetition Debt and the Prepetition Liens are subject to the Intercreditor Agreements;<br><br>5.    None of the Prepetition Secured Parties control the Debtors, their properties, or operations, or have authority to determine the manner in which any Debtor's operations |

|  | are conducted or are control persons or insiders of the Debtors; |
|---|---|
|  | 6.      Upon entry of the Interim Order, but subject to paragraph 17 thereof, the Debtors unconditionally release and discharge the Released Parties from all Released Claims of any kind arising in law or equity out of or related to the Existing Agreements that the Debtors or their successors at any time had, now have, or may have against any of the Released Parties for or by reason of any act or omission arising prior to the entry of the Interim Order; |
|  | 7.      All or substantially all cash or other property of the Loan Parties (and the proceeds therefrom) as of the Petition Date were either subject to rights of set-off, valid first priority liens under the Existing Agreements, or constituted proceeds of the Prepetition Collateral and therefore are "cash collateral" of the Prepetition Secured Parties. |
|  | *See* Interim Order ¶ 4 |
| **Effect of Debtors' Stipulations** <br> *Bankruptcy Rule 4001(c)(1)(B)(iii), (viii)* | The Debtors' stipulations in the Interim Order  are  binding upon the Debtors and any successor thereto (including any chapter 7 or 11 trustee or examiner appointed) on all other parties in interest unless: (a) a party in interest with requisite standing has filed an adversary proceeding or contested matter by no later than the expiration of the applicable Challenge Period, (A) objecting to or challenging the amount, validity, or priority of the Prepetition Debt or the Prepetition Liens, or (B) otherwise prosecuting any causes of action (collectively, the "Challenges") against any of the Prepetition Secured Parties or their respective subsidiaries, officers, directors, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives in connection with matters related to the Existing Agreements, the Prepetition Debt, the Prepetition Liens, and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; provided, however, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If or to the extent no such Challenge is timely and properly filed during the Challenge Period or (to the extent) the Court does not rule in favor of the plaintiff in any such proceeding then (except as expressly filed or ruled): (a) the Debtors' stipulations and releases contained in the Interim Order shall be binding on all parties in interest, (b) the obligations of the Loan Parties under the Existing Agreements shall constitute allowed claims not subject to defense or recharacterization, offset or avoidance, for all purposes in these Cases and any subsequent chapter 7 case(s); (c) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, perfected, security interests and liens, not subject to recharacterization or other defense; and (d) the Prepetition Debt and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other challenge by any party in interest acting on behalf of the Debtors' estates, including, any chapter 7 or 11 trustee or examiner appointed for any of the Debtors and any causes of action against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Existing Agreements or the Interim Order shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations and releases contained in the Interim Order  remain binding and preclusive on any committee formed in these Cases and on any other person except to the extent that such stipulations and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. <br><br> *See* Interim Order ¶ 17 |

| | |
|---|---|
| **Section 506(c) Waiver**<br>*Bankr. R.*<br>*4001(c)(1)(B)(x)*<br>*Bankr. R*<br>*4001(c)(1)(B)(viii)* | Subject to entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of these Cases or any future proceeding that may result therefrom  shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, and nothing contained in the Interim Order shall be deemed to be a consent to any charge, lien, assessment or claim against the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.<br><br>*See* Interim Order ¶ 10 |
| **Section 552(b) Waiver**<br>*L.R. 4001-2(a)(4)*<br>*Bankr. R*<br>*4001(c)(1)(B)(viii)* | Upon entry of the Final Order, the "equities of the case" exception in section 552(b) of the Bankruptcy Code shall not apply to the secured claims of the Prepetition Secured Parties.<br><br>*See*  Interim Order ¶ 9(d) |
| **Liens on Avoidance Actions**<br>*Bankr. R*<br>*4001(c)(1)(B)(xi)* | The DIP Collateral shall not include any causes of actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, but shall include the proceeds of any Avoidance Actions upon entry of a Final Order.<br><br>*See*  Interim Order ¶¶ 7, 8 |

## RELIEF REQUESTED

7.     By this Motion, the Debtors request, pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2: (i) entry of  the Interim Order and (ii) following a final hearing, entry of the final order (the "**Final Order**" and together with the Interim Order, the "**DIP Orders**").

## JURISDICTION AND VENUE

8.     This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.). This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

9.      The legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Bankruptcy Rule 4001-2.

## BACKGROUND

### I.    The Chapter 11 Cases

10.     On February 10, 2019 (the "**Petition Date**"), each of the Debtors commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have requested that the Chapter 11 Cases be jointly administered.

11.     The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

12.     To date, the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") has not appointed a creditors' committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed therein.

13.     Trident is the leading national provider of bedside diagnostic and related services in the United States, with operations in more than 35 states serving more than 12,000 post-acute care, assisted living facilities, and correctional facilities. Trident provides a high volume of services – executing more than 1 million transactions per month, ranging from visits by x-ray technicians, ultrasound sonographers, registered nurses, nurse practitioners and phlebotomists to serve its customers' patients. The Company's business operations, corporate and capital structures, and restructuring efforts are described in greater detail in the First-Day Declaration.

## II.   The Debtors' Prepetition Capital Structure and Intercreditor Agreement

14.     The approximate amount of the Debtors' prepetition indebtedness outstanding as of February 8, 2019 in order of lien / structural priority is summarized as follows:



15.     In connection with the April 2018 Recapitalization Transaction (as defined in the First-Day Declaration), the Debtors' secured lenders entered into the Intercreditor Agreement, with the unanimous consent of the Prepetition First Lien Secured Parties. Pursuant to Section 2.07(iv) of the Intercreditor Agreement, the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties (collectively, the "**Junior Secured Parties**") have agreed not to oppose or object to (and to consent, solely in their capacity as secured creditor to) the DIP Facility provided by the Priority First Lien Lender.

16.    Notably, the Prepetition First Lien Obligations and Prepetition Second Lien
Obligations are *both* lien subordinated and payment subordinated to the Prepetition Priority
Obligations. The Junior Secured Parties have agreed "under no circumstances" to assert that they
have any claim to any assets of the Debtors that is "on parity with or prior to" the Priority First
Lien Lender's claims. *See* Intercreditor Agreement §§ 2.13(ii)(v), 2.14(ii)(v). The Intercreditor
Agreement specifically provides for a grant of injunctive relief in the event that the Junior
Secured Parties "in any way take, attempt to or threaten to take any action with respect to the
Collateral." *See id.* at § 2.11.

### III.    The Debtors' Need to Access DIP Financing and Prepetition Collateral

17.    The Debtors have an immediate need to access the fresh capital provided by the
DIP Facility because the Company has simply exhausted alternative sources of funding. Despite
diligent efforts to address their debt maturities and liquidity needs, including the refinancing
transactions undertaken in 2018, the Debtors face declining earnings amidst intense capital
requirements and substantial leverage. Substantially all of the Debtors' assets are encumbered
under their existing capital structure, which, along with the Debtors' unsustainable prepetition
financial condition, restricts the availability of, and options for, postpetition financing. Further,
the Debtors are currently in default under the Prepetition Debt, having missed an interest
payment due on January 31, 2019.

18.    In addition, the Debtors' ability to continue operating requires using cash that is
currently subject to the Prepetition Secured Parties' liens and thus constitutes Prepetition
Collateral. Without immediate access to postpetition financing and Cash Collateral, the Debtors
will be unable to pay wages or the invoices of vendors critical to operations and will be unable to
continue running their businesses. To prevent creditors from exercising remedies that may
destroy the value of the Debtors' assets, the Debtors reached agreement with the Priority First

Lien Lender on the terms and conditions set forth in the DIP Credit Agreement, which will

provide the liquidity necessary to continue operations and fund the administration of these

Chapter 11 Cases.

**IV.    Efforts to Obtain DIP Financing**

19.    As described in the Buschmann Declaration, the DIP Facilities are the product of

an extensive arms'-length process. In connection with their liquidity situation and the prospect of

a chapter 11 filing, the Debtors, with the assistance of Ankura Consulting Group, LLC

("**Ankura**") and PJT Partners LP ("**PJT**") analyzed their projected cash needs and prepared a

preliminary budget to fund a chapter 11 case.[12] In December 2018, the Company invited lenders

to enter into confidentiality agreements to negotiate transaction terms and conduct due diligence.

Many lenders accepted this invitation, and over the weeks leading up to the Petition Date, the

Debtors and their advisors negotiated with their constituents regarding restructuring and

financing terms, as set forth in further detail in the First-Day Declaration. PJT solicited offers for

debtor-in-possession financing as well as out-of-court bridge funding to allow further

negotiations on a potentially consensual restructuring transaction.

20.    As described in greater detail in the Buschmann Declaration, the Debtors had

discussions with many of their existing lenders during the prepetition process, including a

substantial majority of the Prepetition Secured Parties. Given their high degree of leverage, the

Debtors did not (and could not) obtain financing on a junior secured or unsecured basis. The

Debtors therefore focused their efforts on negotiating the terms of the DIP financing proposal

with the Priority First Lien Lender as the only option fund these Chapter 11 Cases. Moreover,

---

[12]    The Company's management, Ankura, and PJT continued to refine the budget over the course of the following
weeks leading up to the Petition Date.

despite the ability under the Intercreditor Agreement of the Junior Secured Parties to provide debtor-in-possession financing on a junior basis, none were willing to do so.

21.      The Debtors and their advisors negotiated over a number of weeks regarding the structure and economics of the proposed DIP Facility. Ultimately, the Debtors and the Priority First Lien Lender agreed to a set of terms that provide the Debtors with necessary access to liquidity during the pendency of these Chapter 11 Cases. That financing proposal contemplates entrance into the RSA, pursuant to which the Debtors will deliver a business plan within the first 36 days of these Chapter 11 Cases. That business plan will serve as the foundation for the valuation contained in the Debtors' chapter 11 plan.

22.      As set forth in the Buschmann Declaration, the Debtors believe the fees and rates associated with the DIP Facility are consistent with cases of similar size and complexity. Based on the DIP Facility's terms and the related benefits provided by the Priority First Lien Lender, the Debtors determined that entry into the DIP Facility is reasonable, fair, and in the best interests of the Debtors and their estates.

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

## I.      Entry Into the DIP Facility Is An Exercise of Sound Business Judgment.

23.      The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral in accordance with the Interim Order.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts

will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment.").

24.    Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code."  *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513-514 (Bankr. D. Utah.  Oct 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar

decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007

WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

25.    In determining whether the Debtors have exercised sound business judgment in

entering into the applicable DIP Documents, the Court should consider the economic terms of

the DIP Facility under the totality of circumstances.  *See* Hr'g Tr. at 734-35:24, *In re Lyondell*

*Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. February 27, 2009) (recognizing that "the terms that

are now available for DIP financing in the current economic environment aren't as desirable" as

in the past); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986)

(recognizing a debtor may have to enter into "hard" bargains to acquire funds for its

reorganization).  Moreover, the Court may appropriately take into consideration non-economic

benefits to the Debtors offered under the proposed postpetition facility.  *See In re ION Media*

*Networks, Inc.,* No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009)

(courts may consider ability of DIP financing to establish creditor support in addition to

economic terms).

26.    The Debtors' decision to enter into the DIP Facility is an exercise of their sound

business judgment.  As further discussed in the Buschmann Declaration, the DIP Facility was a

product of hard-nosed, arm's length negotiations.  The Debtors and their advisors determined

that the DIP Facility was the best—indeed the only—available financing under the

circumstances.  Accordingly, the Court should authorize the Debtors' entry into the DIP

Documents as a reasonable exercise of their business judgment.

## II.    The Debtors Should Be Authorized To Obtain Postpetition Financing On A Senior Secured Superpriority Basis.

27.    The Debtors propose grant the priming security interests, liens, and superpriority

claims as set forth in the DIP Documents and described above.  The Debtors satisfy the

requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to

incur secured or superpriority debt under certain circumstances. Specifically, section 364(c) of

the Bankruptcy Code provides that:

> (c)    If the trustee is unable to obtain unsecured credit allowable
> under section 503(b)(1) of this title as an administrative expense,
> the court, after notice and a hearing, may authorize the obtaining of
> credit or the incurring of debt —
>
> (1)    with priority over any or all administrative expenses
> of the kind specified in section 503(b) or 507(b) of
> this title;
>
> (2)    secured by a lien on property of the estate that is not
> otherwise subject to a lien; or
>
> (3)    secured by a junior lien on property of the estate
> that is subject to a lien[.]

11 U.S.C. § 364(c).

28.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor

need only demonstrate "by a good faith effort that credit was not available" to the debtor on an

unsecured or administrative expense basis. *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549

(Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is

authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained);

*Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th

Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before

concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v.

Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses

authorized where debtor could not obtain credit as an administrative expense). When few

lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be

unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for

financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*,

*Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected most favorable of two offers it received).

29.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, the courts look to whether:

(a)     the debtor cannot obtain credit unencumbered or without superpriority status;

(b)     the credit transactions are necessary to preserve assets of the estate; and

(c)     the terms of the credit agreements are fair, reasonable and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *10; *see also In re Crouse Group*, Inc., 71 B.R. 544 (Bankr. E.D. Pa. 1987) ; *In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

30.     Furthermore, in the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or

507(b) of the Bankruptcy Code; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."

31.     As stated in the Buschmann Declaration, the efforts to obtain unsecured financing given the Debtors' high leverage would have been futile. Therefore, approving a superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

32.     Moreover, the DIP Documents provide for liens on previously unencumbered assets of the Debtors and the junior liens on assets otherwise by senior liens (other than the Primed Liens). Such liens are appropriate under section 364(c) and should be approved.

33.     Furthermore, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  Consent by secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility because (a) Prepetition Secured Parties consent to the priming (or are deemed to have consented pursuant to the Intercreditor Agreement) or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

34.     Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code is satisfied.

**III.     The Prepetition Secured Parties Are Adequately Protected.**

35.     Under section 361 of the Bankruptcy Code, the Debtors may provide adequate protection by making a cash payment or periodic cash payments "to such entity, to the extent that . . . any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(1). Adequate protection may also be provided by providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property.  11 U.S.C. § 361(2).

36.     The Debtors request that the Court approve certain protections of the Prepetition Secured Parties' interests in the Prepetition Collateral from any diminution in value resulting from (i) the use, sale, or lease of the Prepetition Collateral, including the Cash Collateral, (ii) the priming of their security interests and liens in the applicable Prepetition Collateral, and (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code. Such protections include, among other things (subject to the Intercreditor Agreement):

(a)     valid and automatically perfected replacement liens on all DIP Collateral;

(b)     superpriority claims, including superpriority administrative claims under section 507(b) of the Bankruptcy Code;

(c)     with respect to Prepetition Priority Agent, for the benefit of the Prepetition Priority Lenders, payment of all accrued and unpaid prepetition and post-petition interest due and payable and required to be paid in cash under the Existing Priority Agreements, calculated based on the non-default contract rate; and

(d)     with respect to the Prepetition Priority Secured Parties, payment of the reasonable and documented professional fees and expenses incurred by the Prepetition Priority Secured Parties.

37.      Moreover, without the DIP Facility, the Debtors would face the prospect of liquidation. Thus, the new money DIP Facility provides adequate protection against the diminution in value by maximizing the going concern value of the Debtors' enterprise.

38.      The Debtors submit that the proposed adequate protection obligations for the Prepetition Secured Parties are appropriate to protect the Prepetition Secured Parties from any diminution in the value of their interest in the Prepetition Collateral. Moreover, the Prepetition Secured Parties have consented to (or are deemed to have consented pursuant to the Intercreditor Agreements) the Debtors' proposed adequate protection as sufficient to protect against any diminution in the value of the Prepetition Collateral.

**IV.      The Debtors Should be Authorized to Use Cash Collateral.**

39.      Section 363 of the Bankruptcy Code generally governs the use of estate property and permits a debtor in possession to use cash collateral with the consent of the secured party. 11 U.S.C. § 363(c). Specifically, section 363(c)(2) of the Bankruptcy Code provides that the Debtors may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Therefore, the Debtors may not use the Cash Collateral without the consent of the Prepetition Secured Parties or authority granted by the Court. Further, Bankruptcy Code section 363(e) provides that on request of an entity that has an interest in property to be used by a debtor, the Court shall prohibit or condition such use as necessary to provide adequate protection of such interest.

40.      Here, the Debtors require use of Cash Collateral to (a) pay vendors and service providers necessary to maintain their business operations consistent with prepetition practices; (b) pay certain prepetition obligations as further described in the Debtors' motions filed contemporaneously herewith; and (c) pay disbursements as described in the Approved Budget.

The Debtors have satisfied the requirements of sections 363(c)(2) and 363(e), and should be authorized to use Prepetition Collateral (as defined in the Interim Order), including Cash Collateral. Here, the Prepetition Secured Parties have consented to (or are deemed to have consented pursuant to the Intercreditor Agreements) the use of the Cash Collateral pursuant to the Approved Budget, under the proposed Interim Order, and in other DIP Documents. Further, as described in more detail above, solely to the extent of any postpetition diminution in value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral, the Debtors are providing, or causing to be provided, the Prepetition Secured Parties with certain adequate protections. The Debtors submit that the adequate protection to be provided to the Prepetition Secured Parties, as detailed herein, is sufficient to approve the use of the Cash Collateral under section 363 of the Bankruptcy Code.

41.     Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to use the Cash Collateral in accordance with the terms set forth in the Interim Order.

**V.     The DIP Secured Parties Are Entitled to the Protections under Section 364(e) of the Bankruptcy Code.**

42.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

27

11 U.S.C. § 364(e).

43.     Because "good faith" is not defined in the Bankruptcy Code, courts often look to

case law under section 363(m). 7 Collier on Bankruptcy, 16th ed. ¶ 364.08, ("Section 364(e) is

consistent with section 363(m), which provides similar protection to a buyer or lessee of property

of the estate in a section 363 transaction."). As one court in this district explained, "the

misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud,

collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly

unfair advantage of other bidders." *In re Pan Am Corp.*, No. 91 CIV. 8319 (LMM), 1992 WL

154200, at *4 (S.D.N.Y. June 18, 1992) (*citing In re Rock Indus. Mach. Corp.*, 572 F.2d 1195,

1198 (7th Cir. 1978)); *accord In re Gen. Growth Props., Inc.*, 423 B.R. 716, 722 (S.D.N.Y.

2010).

44.     The terms of the DIP Facility were negotiated in good faith and at arms'-length

between the Debtors and the DIP Secured Parties, and all of the DIP Facility obligations will be

extended by the DIP Lenders in good faith (as such term is used in section 364(e) of the

Bankruptcy Code). Furthermore, no consideration is being provided to any party to, or guarantor

of, obligations arising under the DIP Facility, other than as disclosed in the DIP Credit

Agreement. Finally, the DIP Facility has been extended in express reliance upon the protections

offered by Bankruptcy Code section 364(e), and the DIP Lenders should be entitled to the full

protection of section 364(e) in the event that the Interim Order or any provision thereof is

vacated, reversed, or modified on appeal or otherwise.

**VI.    The DIP Facility's Fees Were Negotiated in Good Faith, at Arms'-Length and Should be Approved.**

45.    As described above, the Debtors have agreed, subject to Court approval, to pay certain fees described in the DIP Credit Agreement and reasonable costs and expenses to the DIP Secured Parties.

46.    These fees and other obligations under the DIP Documents were negotiated in good faith and at arms'-length and represent the most favorable terms available to the Debtors or on which the Priority First Lien Lender would agree to make the DIP Facility available. The Debtors considered the fees described above when determining in their sound business judgment that the DIP Facility constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations, right-size their balance sheet, and successfully emerged from bankruptcy poised for growth, and that paying these fees in order to obtain the DIP Facility is a proper exercise of the Debtors' business judgment and in the best interests of the Debtors' estates, creditors, and other parties-in-interest. As set forth in the Buschmann Declaration, the all-in yield associated with the DIP Facility is below the median of DIP transactions of similar size and complexity.

47.    Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Credit Agreement in connection with entering into those agreements.

**VII.    Modification of the Automatic Stay is Warranted.**

48.    The relief requested contemplates a modification of the automatic stay to permit the DIP Secured Parties to enforce their rights under the DIP Documents and the proposed Interim Order.  Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances. *See, e.g.*, *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD)

(Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88]; *In re Chassix Holdings, Inc.*, Case No. 15-10578 (MW) (Bankr. S.D.N.Y. Mar. 13, 2015) [Docket No. 67]; *In re The Reader's Digest Assoc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) [Docket No. 26]; *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 7, 2009) [Docket No. 59].

## VIII.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

49.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code or to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen days after the service of such motion. Upon request, however, pursuant to Bankruptcy Rules 4001(b) and (c) and Local Bankruptcy Rule 4001-2, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.

50.    The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008). In explaining the standards governing preliminary injunctions, the Second Circuit instructed that irreparable harm "'is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'" *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir. 1975)). Further, the "harm must be shown to be actual and imminent, not remote or speculative." *Id.*; *see also Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1998). The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral

is stayed until the expiration of fourteen days after entry of the order, unless the court orders

otherwise." Fed. R. Bankr. P. 6004(h).

51.     Here, the Debtors seek authorization to borrow under the DIP Facility and to use

the Cash Collateral immediately. The Debtors will use the loan proceeds and cash to, among

other things, fund the administration of these Chapter 11 Cases and the operation of their

business in accordance with the Approved Budget. In short, the Debtors' ability to administer

these Chapter 11 Cases through access to the DIP Facilities and use of Cash Collateral is vital to

preserve and maximize the value of the Debtors' estates.

**IX.    Interim Approval Should be Granted.**

52.     Bankruptcy Rule 4001(c) provides that:

> The court may commence a final hearing on a motion for authority to obtain credit no
> earlier than 14 days after service of the motion. If the motion so requests, the court may
> conduct a hearing before such 14-day period expires, but the court may authorize the
> obtaining of credit only to the extent necessary to avoid immediate and irreparable harm
> to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

53.     Generally, courts find "immediate and irreparable harm" exists where loss of the

business threatens ability to reorganize. *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 36 n.2.

Approval of the DIP Facility on an interim basis under Rule 4001(c)(2) is left to the discretion of

the court as informed by the facts of each case. In examining requests for interim relief under this

rule, courts apply the same business judgment standard applicable to other business decisions,

and a debtor should be entitled to borrow those amounts that it believes prudent in the operation

of its business. *See In re Trans World Airlines, Inc.*, 163 B.R. at 974; *In re Ames Dep't Stores,

Inc.*, 115 B.R. at 40. After the 14-day period, the request for financing is not limited to those

amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled

to borrow those amounts that it believes are prudent to the operation of its business. *In re Ames Dep't Stores, Inc.*, 115 B.R. at 36.

54.     Courts in this district have repeatedly recognized the importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate in similar circumstances. *See, e.g., In re Synergy Pharm. Inc.,* Case No. 18-14010 (JLG) (Bankr. S.D.N.Y. Dec. 14, 2018) (order approving postpetition financing on an interim basis); *In re Eastman Kodak Co.*, Case No. 12-10202 (MEW) (Bankr. S.D.N.Y. Jan. 20, 2012) (same).

55.     The Debtors seek expedited approval of the relief requested in the Motion in light of the immediate and irreparable harm that the Debtors' estates will incur unless they obtains the financing necessary to sustain their businesses. Absent sufficient funds to support the Debtors' operating business, the Company's revenue streams will erode at a time when cash collection is most critical, to the detriment of the Debtors' estates and creditors. For the reasons set forth above, the Debtors submit that immediate access to $12.5 million under the DIP Facility is necessary to preserve the value of the Debtors' estates for the benefit of their creditors and other parties-in-interest.

## RESERVATION OF RIGHTS

56.     Nothing in this Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim; (d) granting third-party-beneficiary status or bestowing any additional rights on any third party; or (e) being otherwise enforceable by any third party.

32

## NOTICE

57.     Notice of this Motion will be given to: (a) the U.S. Trustee, (b) counsel to the administrative agent under the Debtors' Prepetition Priority First Lien Facility, (c) counsel to the administrative agent under the Debtors' Prepetition First Lien Facility, (d) counsel to the administrative agent under the Debtors' Prepetition Second Lien Facility, (e) counsel to the administrative agent under the Debtors' DIP Facility, (f) counsel to the investor representative under the Tranched PIK Notes, (g) counsel to the investor representative under the Original PIK Note Facility, (h) the Internal Revenue Service, (i) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors, (j) the United States Attorney of the Southern District of New York, and (k) all parties entitled to notice pursuant to Local Bankruptcy Rule 9013-1(b). The Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

58.     No previous request for the relief sought herein has been made to this Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

The Debtors respectfully request that this Court enter the Interim Order, substantially in the form annexed hereto, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: February 11, 2019
      New York, New York

                          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                          */s/ Paul D. Leake*
                          Paul D. Leake
                          Jason N. Kestecher
                          Four Times Square
                          New York, New York 10036-6522
                          Telephone: (212) 735-3000
                          Fax: (212) 735-2000

                          – and –

                          James J. Mazza, Jr.  (*pro hac vice admission pending*)
                          Justin M. Winerman (*pro hac vice admission pending*)
                          155 North Wacker Drive
                          Chicago, Illinois 60606-1720
                          Telephone: (312) 407-0700
                          Fax: (312) 407-0411

                          *Proposed Counsel to Debtors*
                          *and Debtors-in-Possession*

**<u>Exhibit A</u>**

Interim Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRIDENT HOLDING COMPANY, LLC,** *et al.*, | **Case No. 19-10384 (___)** |
| **Debtors.**[1] | |

## INTERIM ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364 AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(b) AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)

Upon the motion (the "Motion") of New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., and Schryver Medical Sales and Marketing, LLC (each a "Borrower" and collectively, the "Borrowers") and their affiliated debtors, each as a debtor and debtor-in-possession (each a "Debtor" and collectively, the "Debtors") in the above captioned chapter 11 cases (collectively, the "Cases"), pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the

---

[1]       The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Trident Holding Company, LLC (6396); American Diagnostics Services, Inc. (2771); Community Mobile Diagnostics, LLC (9341); Community Mobile Ultrasound, LLC (3818); Diagnostic Labs Holdings, LLC (8024); FC Pioneer Holding Company, LLC (6683); JLMD Manager, LLC (8470); Kan-Di-Ki LLC (6100); Main Street Clinical Laboratory, Inc. (0907); MDX-MDL Holdings, LLC (2605); MetroStat Clinical Laboratory – Austin, Inc. (4366); MX Holdings, LLC (8869); MX USA, LLC (4885); New Trident Holdcorp, Inc. (4913); Rely Radiology Holdings, LLC (3284); Schryver Medical Sales and Marketing, LLC (9620); Symphony Diagnostic Services No. 1, LLC (8980); Trident Clinical Services Holdings, Inc. (6262); Trident Clinical Services Holdings, LLC (1255); TridentUSA Foot Care Services LLC (3787); TridentUSA Mobile Clinical Services, LLC (0334); TridentUSA Mobile Infusion Services, LLC (5173); U.S. Lab & Radiology, Inc. (4988). The address of the Debtors' corporate headquarters is 930 Ridgebrook Road, 3rd Floor, Sparks, MD 21152.

Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules")
promulgated by the United States Bankruptcy Court for the Southern District of New York (the
"Court"), seeking, among other things:

A.      authorization for the Borrowers to obtain a senior secured postpetition, two-draw
term loan credit facility (the "DIP Facility"), and for each Debtor that is a guarantor (each a
"Guarantor" and collectively, the "Guarantors"; the Guarantors collectively with the Borrowers,
the "Loan Parties") to unconditionally guaranty, on a joint and several basis, the Borrowers'
obligations under the DIP Facility, in an aggregate principal amount of up to $50 million (the
actual available principal amount at any time being subject to the terms and conditions set forth
in the DIP Documents and the Interim Order or the Final Order (each as defined below), as
applicable) to be provided by the DIP Lenders (as defined below), with up to $12.5 million to be
provided on an interim basis;

B.      authorization for the Loan Parties to enter into the Senior Secured, Super Priority
Debtor in Possession Credit Agreement, among the Borrowers, the Guarantors, the lenders from
time to time party thereto, including SPCP Group, LLC (collectively, the "DIP Lenders"), and
Silver Point Finance, LLC, as administrative agent and collateral agent (in such capacities, the
"DIP Agent", and together with the DIP Lenders, the "DIP Secured Parties"), substantially in the
form attached to the Motion as Exhibit C (as amended, supplemented or otherwise modified
from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement"
and, together with the schedules and exhibits attached thereto and all agreements, documents,
instruments and/or amendments executed and delivered in connection therewith (collectively, the
"DIP Documents")) and to perform all such other and further acts as may be required in
connection with the DIP Documents;

2

C.        the grant of superpriority administrative status claim pursuant to section 364(c)(1)

of the Bankruptcy Code with respect to the DIP Obligations (as defined below), which DIP

Obligations shall be secured by first priority liens (subject to the Senior Permitted Liens (as

defined below)) pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming

liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition

property of the Loan Parties' estates (the "DIP Collateral"), including, subject to entry of the

Final Order, any Avoidance Proceeds (as defined below), but excluding certain excluded assets

as provided herein and in the DIP Documents;

D.        subject to the restrictions set forth in the DIP Documents and this Interim Order,

including compliance with the Budget (as defined in the DIP Credit Agreement), the initial form

of which is attached hereto in truncated form as Exhibit 1 (the "Initial Budget" together with any

supplemental, modified, or extended budgets approved from time to time in accordance herewith

and with the DIP Documents, the "Approved Budget"), authorization for the Loan Parties to use

Cash Collateral (as defined below) and all other Prepetition Collateral (as defined below) in

which any of the Prepetition Secured Parties have an interest, the granting of adequate protection

to the Prepetition Agents and the Prepetition Secured Lenders (each as defined below) under or

in connection with the Existing Agreements (as defined below) for any diminution in the value

of their respective interests in the Prepetition Collateral as a result of the Debtors' use of Cash

Collateral and the other Prepetition Collateral as provided for herein and the granting of the DIP

Liens on a priming basis;

E.        subject to certain challenge rights of parties in interest set forth herein, approval

of certain stipulations by the Debtors with respect to the Existing Agreements and the liens and

security interests related thereto;

3

F.      subject only to and effective upon entry of the Final Order, the waiver of the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

G.      modification of the automatic stay to the extent set forth herein and in the DIP Documents;

H.      pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of an order granting the Motion on an interim basis (this "Interim Order"); and

I.      that this Court schedule a final hearing (the "Final Hearing") to be held no later than the date that is thirty (30) days after the entry of the Interim Order to consider entry of a final order (the "Final Order") approving the relief granted herein on a final basis and authorizing the Borrowers to forthwith borrow from the DIP Lenders under the DIP Documents up to the full amount of the DIP Facility and the Guarantors to unconditionally guaranty all DIP Obligations owing to the DIP Lenders under the DIP Documents on a joint and several basis; and due and appropriate notice of the Motion and the Interim Hearing having been served by the Debtors on the parties identified in the Motion; and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Interim Hearing having been held by this Court on February [●], 2019; and the relief requested in the Motion being in the best interests of the Debtors, their creditors and their estates and all other parties-in-interest in these Cases; and the Court having determined that the relief requested in the Motion is necessary to avoid immediate and irreparable harm; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon

4

the record made by the Debtors in the Motion, in the *Declaration of Mark Buschmann in Support of the Motion* (attached to the Motion as Exhibit B), in the *Declaration Of David F. Smith, III Pursuant To Local Bankruptcy Rule 1007-2 And In Support Of Chapter 11 Petitions And First Day Pleadings* (Docket No. [●]) and at the Interim Hearing and after due deliberation and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Disposition.*  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

2.    *Jurisdiction*.  This Court has core jurisdiction over these Cases (as defined below), this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    *Notice*.  Proper, timely, adequate and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and no other or further notice of the Motion or the entry of this Interim Order shall be required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

4.    *Debtors' Stipulations*.  Without prejudice to the rights of any parties in interest (other than the Debtors) contained in paragraph 17 below, the Debtors admit, stipulate and agree that:

5

(a)    as of the date (the "Petition Date") of the filing of these Cases, the Borrowers and the Prepetition Priority Guarantors (as defined below) were justly and lawfully indebted and liable to the Prepetition Priority Secured Parties (as defined below), without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $257,264,239.61 in respect of loans made and outstanding as of the Petition Date pursuant to, and in accordance with the terms of that certain Priority First Lien Credit Agreement, dated as of April 30, 2018 (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Priority Credit Agreement"), by and among the Borrowers, the guarantors party thereto (in such capacity, the "Prepetition Priority Guarantors"), the lenders party thereto from time to time (collectively, in such capacities, the "Prepetition Priority Lenders"), and Silver Point Finance, LLC, as administrative agent (the "Prepetition Priority Agent", and together with the Prepetition Priority Lenders, the "Prepetition Priority Secured Parties"), plus accrued and unpaid interest thereon and any fees, premiums, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Existing Priority Agreements (as defined below)), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Existing Priority Agreements (the "Prepetition Priority Obligations"), including the aggregate amount of any Prepayment Fee due under the Prepetition Priority Credit Agreement;

(b)    as of the Petition Date, the Borrowers and the Prepetition First Lien Guarantors (as defined below) were justly and lawfully indebted and liable to the Prepetition First Lien Secured Parties (as defined below), without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $219,823,788.37 in respect of loans made and outstanding as of the Petition Date pursuant to, and in accordance with the terms of

6

that certain First Lien Credit Agreement, dated as of July 31, 2013 (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition First Lien Credit Agreement"), by and among the Borrowers, the guarantors party thereto (in such capacity, the "Prepetition First Lien Guarantors"), the lenders party thereto from time to time (collectively, in such capacities, the "Prepetition First Lien Lenders"), and Cortland Capital Market Services LLC, as administrative agent (the "Prepetition First Lien Agent", and together with the Prepetition First Lien Lenders, the "Prepetition First Lien Secured Parties"), plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Existing First Lien Agreements (as defined below)), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Existing First Lien Agreements (the "Prepetition First Lien Obligations");

(c)    as of the Petition Date, the Borrowers and the Prepetition Second Lien Guarantors (as defined below) were justly and lawfully indebted and liable to the Prepetition Second Lien Secured Parties (as defined below), without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $175,567,909.46 in respect of loans made and outstanding as of the Petition Date pursuant to, and in accordance with the terms of that certain Second Lien Credit Agreement, dated as of July 31, 2013 (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Second Lien Credit Agreement", together with the Prepetition Priority Credit Agreement and the Prepetition First Lien Credit Agreement, the "Prepetition Credit Agreements"), by and among the Borrowers, the guarantors party thereto (in such capacity, the "Prepetition Second Lien Guarantors", and together with the Prepetition Priority Guarantors and the Prepetition First Lien Guarantors, the

7

"Prepetition Guarantors"), the lenders party thereto from time to time (collectively, in such capacities, the "Prepetition Second Lien Lenders", and together with the Prepetition Priority Lenders and the Prepetition First Lien Lenders, the "Prepetition Lenders"), and Ares Capital Corporation, as administrative agent (the "Prepetition Second Lien Agent", and together with the Prepetition Second Lien Lenders, the "Prepetition Second Lien Secured Parties"; the Prepetition Second Lien Agent together with the Prepetition Priority Agent and the Prepetition First Lien Agent, the "Prepetition Agents"; the Prepetition Second Lien Secured Parties together with the Prepetition First Lien Secured Parties and the Prepetition Priority Secured Parties, the "Prepetition Secured Parties") plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Existing Second Lien Agreements (as defined below)), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Existing Second Lien Agreements (the "Prepetition Second Lien Obligations" and collectively with the Prepetition Priority Obligations and the Prepetition First Lien Obligations, the "Prepetition Debt");

(d)        (i) the Prepetition Debt constitutes the legal, valid and binding obligations of the Borrowers and the Prepetition Guarantors, as applicable, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (ii) no portion of the Prepetition Debt or any payments made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Existing Agreements prior to the Petition Date, in each case, is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination (subject to the Intercreditor Agreements (as defined below)),

recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law;

(e)        the Prepetition Priority Obligations are secured by liens and security interests granted to the Prepetition Priority Agent, for the benefit of the Prepetition Priority Secured Parties (the "Prepetition Priority Liens"), pursuant to and in connection with that certain Priority First Lien Security Agreement, dated as of April 30, 2018, among the Borrowers, the Prepetition Priority Guarantors, and the Prepetition Priority Agent (the "Prepetition Priority Security Agreement" and collectively with the Prepetition Priority Credit Agreement, and all other agreements and documentation executed in connection therewith, the "Existing Priority Agreements"), which Prepetition Priority Liens are: (i) valid, binding, perfected (subject to the limitations set forth in the Collateral and Guarantee Requirement (as defined in the Prepetition Priority First Lien Credit Agreement)), enforceable, first-priority liens and security interests (subject to clause (iii) of this paragraph) in the Collateral (as defined in the Prepetition Priority Credit Agreement) (the "Prepetition Priority Collateral") and as further described in the Motion; (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iii) as of the Petition Date are subject and subordinate only to valid, perfected and unavoidable liens permitted under the Existing Priority Agreements to the extent that such permitted liens are senior to or *pari passu* with the Prepetition Priority Liens;

(f)        the Prepetition First Lien Obligations are secured by liens and security interests granted to the Prepetition First Lien Agent, for the benefit of the Prepetition Fist Lien Secured Parties (the "Prepetition First Liens"), pursuant to and in connection that certain First Lien Security Agreement, dated as of July 31, 2013, among the Borrowers, the Prepetition First

Lien Guarantors, and the Prepetition First Lien Agent (the "Prepetition First Lien Security Agreement" and collectively with the Prepetition Priority Credit Agreement, and all other agreements and documentation executed in connection therewith, the "Existing First Lien Agreements"), which Prepetition First Lien Liens are: (i) valid, binding, perfected (subject to the limitations set forth in the Collateral and Guarantee Requirement (as defined in the Prepetition First Lien Credit Agreement)), enforceable liens and security interests in the Collateral (as defined in the Prepetition First Lien Credit Agreement) and as further described in the Motion (the "Prepetition First Lien Collateral"); (ii) not subject to avoidance, recharacterization, subordination (subject to the Intercreditor Agreements), recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iii) as of the Petition Date are subject and subordinate only to the Prepetition Priority Liens and to valid, perfected and unavoidable liens permitted under the Existing First Lien Agreements to the extent that such permitted liens are senior to or *pari passu* with the Prepetition First Liens;

(g)      the Prepetition Second Lien Obligations are secured by liens and security interests granted to the Prepetition Second Lien Agent, for the benefit of the Prepetition Second Lien Lenders (the "Prepetition Second Liens", together with the Prepetition Priority Liens and the Prepetition First Liens, the "Prepetition Liens") pursuant to and in connection with that certain Second Lien Security Agreement, dated as of July 31, 2013, among the Borrowers, the Prepetition Second Lien Guarantors, and the Prepetition Second Lien Agent (the "Prepetition Second Lien Security Agreement" and collectively with the Prepetition Second Lien Credit Agreement, and all other agreements and documentation executed in connection therewith, the "Existing Second Lien Agreements", and the Existing Second Lien Agreements together with the Existing Priority Agreements and the Existing First Lien Agreements, the "Existing

Agreements"), which Prepetition Second Liens are: (i) valid, binding, perfected (subject to the limitations set forth in the Collateral and Guarantee Requirement (as defined in the Prepetition Second Lien Credit Agreement)) enforceable liens and security interests in the Collateral (as defined in the Prepetition Second Lien Credit Agreement) and as further described in the Motion (the "Prepetition Second Lien Collateral", together with the Prepetition Priority Collateral and the Prepetition First Lien Collateral, the "Prepetition Collateral"); (ii) not subject to avoidance, recharacterization, subordination (subject to the Intercreditor Agreements), recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iii) as of the Petition Date are subject and subordinate only to the Prepetition Priority Liens, the Prepetition First Liens, and valid, perfected and unavoidable liens permitted under the Existing Second Lien Agreements to the extent that such permitted liens are senior to or *pari passu* with the Prepetition Second Liens;

(h)      the Prepetition Debt and the Prepetition Liens, as applicable, are subject to (i) that certain Priority/First Lien/Second Lien Intercreditor Agreement dated as of April 30, 2018, by and among the Prepetition Priority Agent, the Prepetition First Lien Agent, the Prepetition Second Lien Agent and each of the grantors party thereto (as amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "Priority/First Lien/Second Lien Intercreditor Agreement"), pursuant to which the Prepetition Priority Liens are afforded priority over and are senior in all respects to the Prepetition First Liens and the Prepetition Second Liens, and (ii) that certain First Lien/Second Lien Intercreditor Agreement dated as of July 31, 2013, by and among the Prepetition First Lien Agent, the Prepetition Second Lien Agent and each of the grantors party thereto (as amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "First

11

Lien/Second Lien Intercreditor Agreement", together with the Priority/First Lien/Second Lien Intercreditor Agreement, the "Intercreditor Agreements"), pursuant to which the Prepetition First Liens are afforded priority over and are senior in all respects to the Prepetition Second Liens;

(i)      by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Existing Agreements, none of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors;

(j)      effective as of the date of entry of this Interim Order, but subject, for the avoidance of doubt, to the provisions of paragraph 17 hereof, the Debtors hereby absolutely and unconditionally release and forever discharge and acquit the Prepetition Secured Parties and their respective Representatives (as defined below) (collectively, the "Released Parties") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the date of this Interim Order (collectively, the "Released Claims") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or otherwise, arising out of or related to (as applicable) the Existing Agreements, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order, whether such Released Claims are matured or unmatured or known or unknown;

(k)    all or substantially all cash, securities or other property of the Loan Parties (and the proceeds therefrom) as of the Petition Date, including, without limitation, all cash, securities or other property (and the proceeds therefrom) and other amounts on deposit or maintained by the Loan Parties in any account or accounts with any depository institution, were either subject to rights of set-off, valid, perfected, enforceable, first priority liens under the Existing Agreements and applicable law, or constituted proceeds of the Prepetition Collateral and therefore are "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

5.    *Findings Regarding the DIP Facility and Cash Collateral.*

(a)    Good and sufficient cause has been shown for the entry of this Interim Order.

(b)    The Loan Parties have an immediate need to obtain the financing provided for under the DIP Facility and to use Prepetition Collateral (including Cash Collateral) to allow for, among other things, the orderly continuation of the Debtors' businesses, to maintain relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures permitted by the DIP Credit Agreement, and to satisfy other working capital and operational needs.  The Loan Parties' access to sufficient working capital and liquidity through the DIP Facility and use of Cash Collateral and other Prepetition Collateral is necessary and vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative

expense.  The Debtors are also unable to obtain secured credit allowable under section 364 of the

Bankruptcy Code without the Debtors granting to the DIP Agent and the DIP Lenders, the DIP

Liens and the DIP Superpriority Claims (as defined below) under the terms and conditions set

forth in this Interim Order and in the DIP Documents.

(d)     Based on the Motion, the declarations filed in support of the Motion, and

the record presented to the Court at the Interim Hearing, the terms of the DIP Facility, the terms

of the Adequate Protection Provisions (as defined below) granted to the Prepetition Secured

Parties, and the terms on which the Loan Parties may continue to use the Prepetition Collateral

and Cash Collateral pursuant to this Interim Order and the DIP Documents are fair and

reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their

fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The Prepetition Secured Parties have consented (or are deemed to have

consented pursuant to the Intercreditor Agreements) to the use of Cash Collateral and the other

Prepetition Collateral, the priming of the Prepetition Liens pursuant to section 364(d)(1) of the

Bankruptcy Code, and the Debtors' entry into the DIP Documents in accordance with and

subject to the terms of this Interim Order and the DIP Documents.

(f)     The terms and conditions of the DIP Facility, the Adequate Protection

Provisions, and the use of the Prepetition Collateral and Cash Collateral have been negotiated in

good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition

Secured Parties and therefore all of the Debtors' obligations and indebtedness arising under, in

respect of, or in connection with, the DIP Facility and the DIP Documents, including, without

limitation: (i) all loans made to and guarantees issued by the Loan Parties pursuant to the DIP

Documents (collectively, the "DIP Loans"), and (ii) any "Obligations" or "Guaranteed

14

Obligations" (each as defined in the DIP Credit Agreement) of the Loan Parties owing to the DIP

Agent, any DIP Lender or any of their respective affiliates, in accordance with the terms of the

DIP Documents, including any obligation, to the extent provided for in the DIP Documents, to

indemnify the DIP Secured Parties and to pay any fees, expenses (including any attorneys',

accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable by the

Loan Parties under the DIP Documents), charges, costs, and other obligations that are chargeable

or reimbursable by the Loan Parties under this Interim Order, the Final Order or the DIP

Documents (the foregoing in clauses (i) and (ii) collectively, the "DIP Obligations"), shall be

deemed to have been extended by the DIP Agent and the DIP Lenders and their respective

affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in

express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the

DIP Agent and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the

full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or

any provision hereof is vacated, reversed or modified, on appeal or otherwise.  The Prepetition

Secured Parties have also acted in good faith regarding the DIP Facility and the Loan Parties'

continued use of the Prepetition Collateral (including the Cash Collateral) to fund the

administration of the Debtors' estates and continued operation of their businesses (including the

incurrence and payment of the Adequate Protection Obligations and the granting of the Adequate

Protection Liens), in accordance with the terms hereof, and therefore the Prepetition Secured

Parties (and the successors and assigns thereof) shall be entitled to the full protection of section

363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is

vacated, reversed or modified, on appeal or otherwise.

(g)    The Prepetition Secured Parties are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral including Cash Collateral and the priming of the Prepetition Liens by the DIP Liens; *provided*, that nothing in this Interim Order or the other DIP Documents shall (i) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Prepetition Collateral including Cash Collateral, other than on the terms set forth in this Interim Order and in the context of the DIP Facility authorized by this Interim Order, (ii) be construed as a consent by any party to the terms of any other financing, or (iii) prejudice, limit or otherwise impair the rights, if any, of any of the Prepetition Secured Parties to seek new, different or additional adequate protection.

(h)    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility and the use of Prepetition Collateral, including Cash Collateral, in accordance with this Interim Order and the DIP Documents are in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

6.    *Authorization of the DIP Facility and the DIP Documents.*

(a)    The Loan Parties are hereby authorized to execute, enter into and perform all obligations under the DIP Documents.  The Borrowers are hereby authorized on an interim

16

basis to borrow money pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to guaranty the Borrowers' obligations with respect to such borrowings, in an aggregate principal or face amount not to exceed $12.5 million, subject to any additional limitations on borrowing under the DIP Documents, which borrowing shall be used for purposes permitted hereunder, the Approved Budget (subject to any Permitted Variance (as defined in the DIP Credit Agreement)), and under the DIP Documents and for other general corporate purposes of the Debtors, including the payment of expenses of administration of these Cases, subject to the terms and conditions set forth herein and therein.

(b)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees that may be reasonably required or necessary for the Loan Parties' performance of their obligations under or related to the DIP Facility, including, without limitation:

(i)    the execution and delivery of, and performance under, each of the DIP Documents;

(ii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents, supplements or other modifications to and under the DIP Documents, in each case, in such form as the Loan Parties, the DIP Agent and the requisite DIP Lenders may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest or fees payable thereunder;

(iii)    the non-refundable payment to the DIP Secured Parties of all fees including, without limitation, any closing premium or agency fee (which fees shall be, and shall be deemed to have been, approved upon entry of this Interim Order and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise), and any amounts due (or that may become due) in respect of the indemnification obligations and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained by any of the DIP Agent or DIP Lenders, in each case, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party, except as expressly set forth herein; and

(iv)    the performance of all other acts required under or in connection with the DIP Documents and this Interim Order, including the granting of the DIP Liens and DIP Superpriority Claims and perfection of the DIP Liens and the DIP Superpriority Claims as provided for herein and therein.

(c)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid, binding and unavoidable obligations of the Loan Parties, enforceable against each Loan Party in accordance with the terms of the DIP Documents and this Interim Order.  No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order to the DIP Agent and/or the DIP Lenders shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code, any applicable Uniform

18

Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or other similar state statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim or counterclaim.

       7.    *DIP Superpriority Claims.*

       (a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Loan Parties (without the need to file any proof of claim) with priority over any and all claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) (including the Prepetition 507(b) Claim (as defined below)) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b) or 726 of the Bankruptcy Code (including the Adequate Protection Obligations (as defined below)), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Loan Parties and all proceeds thereof (excluding the Loan Parties' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), but, subject only to and effective upon entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("Avoidance Proceeds")),

subject only to payment of the Carve-Out.  The DIP Superpriority Claims shall be entitled to the

full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or

any provision hereof is vacated, reversed or modified, on appeal or otherwise.

           (b)       For purposes hereof, the "Carve-Out" is an amount equal to the sum of (i)

all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee

under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate

(without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses

incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to

exceed $100,000 (without regard to the notice set forth in (iii) below) (the "Chapter 7 Trustee

Fee Cap"); and (iii) (A) all accrued and unpaid claims for fees, costs, disbursements and

expenses to the extent allowed at any time, whether by interim order, final order, procedural

order or otherwise of persons or firms retained by the Debtors pursuant to sections 327, 328 or

363 of the Bankruptcy Code or any official committee of unsecured creditors (the "Committee")

in these Cases or any independent director appointed to the Board of Managers of FC Pioneer

Holding Company, LLC (collectively, the "Professional Fees") (x) incurred at any time on or

prior to the Trigger Date plus (y) any success or transaction fee that is earned and payable prior

to the Trigger Date pursuant to an engagement letter between the Debtors and a Professional

(collectively, the "Pre-Trigger Amount"), plus (B) Professional Fees incurred after the Trigger

Date in an amount not to exceed $2,000,000 as provided in clause (c) below (the "Post-Trigger

Cap"), in each case subject to any limits imposed by this Interim Order, the Final Order (if and

when entered) or otherwise, on Professional Fees permitted to be incurred in connection with any

permitted investigation of the claims, liens and defenses against any Prepetition Priority Secured

Party; *provided*, that nothing herein shall be construed to impair the ability of any party to object

to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any other grounds.  "Trigger Notice" shall mean a written notice delivered by the DIP Agent describing the event of default that is alleged to continue under the DIP Documents and invoking the Carve-Out. Upon delivery of a Trigger Notice, the Debtors shall deposit, in a segregated account not subject to the control of the DIP Agent or any Prepetition Agent (the "Carve-Out Account"), an amount equal to the Chapter 7 Trustee Fee Cap plus the Pre-Trigger Amount (based upon the Approved Budget) plus the Post-Trigger Cap, less any applicable retainers, to be held in trust to pay the respective amounts included in the Carve-Out. The funds on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, *provided* that the DIP Agent and each Prepetition Agent, in accordance with the priorities set forth herein, shall have a security interest upon any residual interest in the Carve-Out Account available following satisfaction in cash in full of all obligations benefitting from the Carve-Out.  The Trigger Notice shall be deemed to constitute a demand to the Debtors to utilize cash on hand to fund the Carve-Out Account.  On or after the date of a Trigger Notice, the DIP Agent shall not foreclose on cash of the Debtors (including cash received as a result of the sale or other disposition of any assets) until the Carve-Out Account has been fully funded.  For the avoidance of doubt, Professional Fees shall exclude fees and expenses of any third party professionals employed by any individual member of the Committee.

(c)    For purposes hereof, the "Trigger Date" shall mean the date following delivery of the Trigger Notice upon the earlier of (i) the first business day after the occurrence of an Event of Default (as defined in the DIP Credit Agreement) and after giving effect to any notice or applicable grace period set forth in the DIP Documents, or (ii) the Maturity Date (as

21

defined in the DIP Credit Agreement), and delivery (including via email) of the Trigger Notice to the Borrowers' lead restructuring counsel, the office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), and the Committee's lead counsel.

(d)    Notwithstanding the foregoing, (i) the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (A) the investigation (other than, prior to the Trigger Date, as permitted under paragraph 18 of this Interim Order), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation, or assertions of any defense or counterclaim, against any of the DIP Lenders, the DIP Agent, or the Prepetition Secured Parties, each in such capacity, and their respective agents, attorneys, advisors or representatives, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Documents or the Existing Agreements (whether in such capacity or otherwise), including, in each case, without limitation, for lender liability or pursuant to section 105, 506(c), 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (B) attempts to modify any of the rights granted to the DIP Lenders, the DIP Agent or the Prepetition Secured Parties hereunder or under the DIP Documents, as applicable; (C) attempts to prevent, hinder or otherwise delay any of the DIP Lenders' or the DIP Agent's assertion, enforcement or realization upon any DIP Collateral in accordance with the DIP Documents or the Interim or Final Order other than to seek a determination that an Event of Default has not occurred or is not continuing; or (D) paying any amount on account of any claims arising before the commencement of these Cases unless such payments are included in the Approved Budget and approved by an order of the Court, and (ii) prior to the Trigger Date, the Carve-Out shall not be reduced by the payment or incurrence of

Professional Fees allowed at any time by the Court.  Further, notwithstanding anything to the contrary in this Interim Order, (A) the failure of the Carve-Out Account to satisfy the Professional Fees in full shall not affect the priority of the Carve-Out and (B) in no way shall the Carve-Out, the Trigger Notice, the Post-Trigger Cap, or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable in these Cases.

8.    *DIP Liens*.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation of filings by the Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, any notation of certificates of title for a titled good, or the possession or control by the DIP Agent, the following security interests and liens are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders on the following (all property identified in clauses (a), (b) and (c) below, together with any other "Collateral" as defined in the DIP Documents, being collectively referred to herein as the "DIP Collateral") (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

(a)    First Lien On Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest (subject only to the Senior Permitted Liens) in and lien upon all tangible and intangible pre- and postpetition property of the Loan Parties, whether existing on the Petition Date or thereafter existing or acquired, that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien (collectively, "Unencumbered Property"), including, without limitation, any and all unencumbered cash of the Loan Parties (whether maintained with the DIP

Agent or otherwise) and any investment of such cash, inventory, accounts receivable, other rights

to payment whether arising before or after the Petition Date, contracts, real or personal

properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments,

securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents,

copyrights, trademarks, trade names, rights under license agreements and other intellectual

property, capital stock of subsidiaries, motor or titled vehicles, or rolling stock, wherever located,

and the proceeds, products, rents and profits of the foregoing, whether arising under section

552(b) of the Bankruptcy Code or otherwise, of all the foregoing, in each case other than: (i)

Excluded Assets (as defined herein or in the DIP Credit Agreement), but including any proceeds

of Excluded Assets that do not otherwise constitute Excluded Assets; and (ii) the Avoidance

Actions, but subject to entry of the Final Order, the DIP Collateral shall include Avoidance

Proceeds;

        (b)    <u>Priming Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a

valid, binding, continuing, enforceable, fully-perfected, first priority senior priming security

interest (subject only to the Senior Permitted Liens) in and lien upon all Prepetition Collateral

that secures any or all of the Prepetition Debt, which DIP Liens shall be senior in all respects to

such Prepetition Liens.  Subject to <u>subparagraph (c)</u> below, such security interests and liens shall

be senior in all respects to the interests in such property of the Prepetition Secured Parties arising

from current and future liens of the Prepetition Secured Parties (including, without limitation, the

Adequate Protection Liens granted to the Prepetition Secured Parties hereunder and liens upon

the Proceeds Account (as defined in the DIP Credit Agreement)) (collectively, the "<u>Primed</u>

<u>Liens</u>") and to any liens and security interests to which such Primed Liens are senior or *pari*

*passu*.

24

(c)    <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all tangible and intangible pre- and postpetition property of each Loan Party subject to valid, binding and unavoidable liens (other than Primed Liens) on the Petition Date, which DIP Liens shall be junior and subordinate to (i) the Carve-Out, (ii) any such valid, perfected and unavoidable liens (other than the Primed Liens) in existence immediately prior to the Petition Date to the extent such liens are senior or *pari passu* to the Prepetition Liens, (iii) any such valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and (iv) any other Senior Permitted Liens as set forth in the DIP Credit Agreement (collectively, the "<u>Senior Permitted Liens</u>"); and

(d)    <u>Liens Senior to Certain Other Liens</u>.  Other than the  Senior Permitted Liens, the DIP Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Loan Parties and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, or (C) any intercompany or affiliate liens of the Debtors; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code.  The right of a seller of goods to reclaim goods under section 546(c) of the Bankruptcy Code is expressly subject to the DIP Liens and Prepetition Liens.

9.      *Protection of DIP Lenders' Rights.*

(a)      So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding Commitments (as defined in the DIP Credit Agreement) under the DIP Credit Agreement, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted pursuant to the Existing Agreements or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against or with respect to the DIP Collateral, the Prepetition Collateral, or the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, the DIP Collateral or the Prepetition Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the Commitments), to the extent such transfer, disposition, sale or release is authorized under the DIP Documents and the Intercreditor Agreements; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Agent or the DIP Lenders also file financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date; and (iv) deliver or cause to be delivered, at the Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or disposition authorized or permitted under the DIP Documents.

(b)    To the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders, and the Prepetition Agents shall comply with the instructions of the DIP Agent with respect to the exercise of such control.

(c)    Any proceeds of Prepetition Collateral or DIP Collateral subject to the Primed Liens received by any Prepetition Agent or Prepetition Secured Party in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral, the DIP Collateral, or otherwise shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  The DIP Agent is hereby authorized to make any such endorsements as agent for each of the Prepetition Agents or any such Prepetition Secured Party.  This authorization is coupled with an interest and is irrevocable.

(d)    The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to enforce all of their rights hereunder and under the DIP Documents including the right (i) immediately upon the occurrence of an Event of Default (subject to any applicable grace or notice provisions), to declare (A) the termination, reduction or restriction of any further Commitments to the extent any such Commitments remain outstanding, (B) all DIP Obligations

27

to be immediately due and payable, without any further presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Loan Parties, and (C) that the Debtors' use of Cash Collateral or borrowing under the DIP Facility is restricted; and (ii) upon the occurrence of an Event of Default and the giving of five (5) business days' prior written notice (the "Remedies Notice Period") (which shall run concurrently with any notice required to be provided under the DIP Documents) via email to counsel to the Debtors, counsel to the Committee, and the U.S. Trustee to (A) withdraw consent to the Loan Parties' continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in the DIP Documents, and under this Interim Order or under applicable law, including rights of set off. The Debtors will request that the Final Order provide that (i) in no event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, and (ii) in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition Secured Parties.

(e)    No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Loan Parties' continued use of Cash Collateral or the provision of adequate protection to any party.

10.    *Limitation on Charging Expenses Against Collateral*.    Subject only to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no costs or

expenses of administration of these Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the Prepetition Agents, or the Prepetition Lenders, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Lenders, as applicable, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to any charge, lien, assessment or claim against the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.

11.    *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders pursuant to the provisions of this Interim Order or Final Order (if and when entered) or the DIP Documents shall be received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (subject to the entry of the Final Order approving the waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code), whether asserted or assessed by, through or on behalf of the Debtors.

12.    *Use of Cash Collateral and DIP Loans*.

(a)    The Loan Parties are hereby authorized, subject to the terms and conditions of this Interim Order and the Approved Budget, to use Cash Collateral and the DIP Loans, subject to any Permitted Variances (as defined in the DIP Credit Agreement).

(b)     The Debtors shall use the proceeds of the DIP Facility and Cash Collateral in a manner consistent with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the Approved Budget (subject to any Permitted Variances) solely for: (i) working capital; (ii) the payment of costs of administering these Cases; (iii) payment of other fees, costs and expenses contemplated by the DIP Documents; (iv) the payment of certain prepetition obligations permitted under the DIP Documents and approved by the Court; (v) the payment of interest, fees, expenses, and other amounts (including professional fees) provided for under this Interim Order; (vi) the payment of adequate protection amounts to the Prepetition Priority Secured Parties as set forth herein; and (vii) other general corporate purposes of the Debtors permitted by the Approved Budget and the DIP Documents.

(c)     As contemplated by the DIP Credit Agreement, the Initial Budget depicts, on a weekly and line item basis, among other things, (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees), any other fees and expenses relating to the DIP Documents and any non-operating disbursements), and (iii) projected net cash flow for a thirteen (13) week period commencing with the week in which the Closing Date (as defined in the DIP Credit Agreement) occurs.   At the end of the fourth week following the Petition Date (and every four weeks thereafter), the Debtors shall furnish a supplement to the Initial Budget (or the previously supplemented Approved Budget), extending the period covered by the Initial Budget (or previously supplemented Approved Budget) for a period of four or five weeks, as necessary, so that it covers the period ending 13 weeks from the week in which the supplement is delivered, together with a variance analysis from the Approved Budget (or the previously supplemented Approved Budget).   Such monthly supplements to the Approved Budget shall become the

30

Approved Budget upon the earlier of (i) written acknowledgement from the DIP Agent that the proposed supplement is in form and substance reasonably acceptable to and is approved by the DIP Agent and Required Lenders, or (ii) within ten (10) Business Days after receipt of such proposed supplement by the DIP Agent, so long as the DIP Agent has not provided a written objection to the proposed supplement. The Initial Budget (or the previously supplemented Approved Budget) shall remain the Approved Budget if the DIP Agent objects to the proposed supplement and until such time as the DIP Agent provides written acknowledgement that a revised version of the proposed supplement is otherwise in form and substance reasonably acceptable to and is approved by the DIP Agent. A copy of any Approved Budget shall be delivered to counsel for the Committee and the U.S. Trustee following its approval by the DIP Agent.

(d)     As required under the DIP Credit Agreement and in a manner consistent with Schedule 6.20 to the DIP Credit Agreement, the Debtors shall also deliver to the DIP Agent by no later than 5:00 p.m. on Thursday of every week commencing with the second full week following the Closing Date a budget variance report (the "Budget Variance Report") setting forth (i) on a rolling four-week and cumulative basis Actual Cash Receipts, Actual Disbursements (each as defined in the DIP Credit Agreement) and the total ending book cash balance (as described under the heading the "Total Ending Book Cash Balance" in the Approved Budget), through or as of Friday of the prior week then ended, and (ii) all variances as compared to the corresponding budgeted amounts set forth for such period in the Approved Budget, and an explanation, in reasonable detail, for any material variance, certified by the Responsible Officer of the Borrower Representative (each as defined in the DIP Credit Agreement).

31

13.     *Adequate Protection of Prepetition Secured Parties*.  Each Prepetition Agent, on behalf of itself and the Prepetition Secured Parties it represents, is entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of its respective interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of such Prepetition Secured Agent's interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Debtors of the Prepetition Collateral, including Cash Collateral, the priming of such Prepetition Secured Agent's security interests and liens in the Prepetition Collateral by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "Prepetition Adequate Protection Obligations").  In consideration of the foregoing, the Prepetition Agents, for the benefit of  the Prepetition Lenders, as applicable, are hereby granted the following (collectively, the "Adequate Protection Provisions"):

(a)     Prepetition Adequate Protection Liens.

(i)     The Prepetition Priority Agent (for itself and for the benefit of the Prepetition Priority Lenders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the Prepetition Adequate Protection Obligations owing to it, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral including, without limitation, Unencumbered Property and, subject to entry of the Final Order, the Avoidance Proceeds, in each case subject and

32

subordinate only to (A) the Carve-Out, and (B) the DIP Liens and any liens to which the DIP

Liens are junior (including Senior Permitted Liens) (collectively, the "Priority Adequate

Protection Liens").

        (ii)        The Prepetition First Lien Agent (for itself and for the benefit of

the Prepetition First Lien Lenders) is hereby granted (effective and perfected upon the date of

this Interim Order and without the necessity of the execution of any mortgages, security

agreements, pledge agreements, financing statements or other agreements), in the amount of the

Prepetition Adequate Protection Obligations owing to it, a valid, perfected replacement security

interest in and lien upon all of the DIP Collateral including, without limitation, Unencumbered

Property and, subject to entry of the Final Order, the Avoidance Proceeds, in each case subject

and subordinate only to (A) the Carve-Out, (B) the DIP Liens and any liens to which the DIP

Liens are junior (including Senior Permitted Liens), (C) the Priority Adequate Protection Liens,

and (D) the Prepetition Priority Liens (collectively, the "First Lien Adequate Protection Liens").

        (iii)        The Prepetition Second Lien Agent (for itself and for the benefit of

the Prepetition Second Lien Lenders) is hereby granted (effective and perfected upon the date of

this Interim Order and without the necessity of the execution of any mortgages, security

agreements, pledge agreements, financing statements or other agreements), in the amount of the

Prepetition Adequate Protection Obligations owing to it, a valid, perfected replacement security

interest in and lien upon all of the DIP Collateral including, without limitation, Unencumbered

Property and, subject to entry of the Final Order, the Avoidance Proceeds, in each case subject

and subordinate only to (A) the Carve-Out, (B) the DIP Liens and any liens to which the DIP

Liens are junior (including Senior Permitted Liens), (C) the Priority Adequate Protection Liens

and the Prepetition Priority Liens, and (D) the First Lien Adequate Protection Liens and the

Prepetition First Liens (collectively, the "Second Lien Adequate Protection Liens", and together with the Priority Adequate Protection Liens and the First Lien Adequate Protection Liens, the "Adequate Protection Liens"); *provided* that in no event shall the DIP Loans, whether held in the Proceeds Account or otherwise, be subject to the First Lien Adequate Protection Liens or the Second Lien Adequate Protection Liens.

(b)    Adequate Protection Payments.    The Borrowers are directed and authorized to pay to the Prepetition Priority Agent, for the benefit of the Prepetition Priority Lenders, on or about the last business day of each month, adequate protection payments in an amount equal to all accrued and unpaid prepetition and post-petition interest due and payable and required to be paid in cash under the Existing Priority Agreements, calculated based on the non-default contract rate set forth in the Existing Priority Agreements, it being understood for purposes of this clause that both the default rate and the amounts that may be Paid In Kind (as defined in the Existing Priority Agreements) will accrue to the fullest extent permitted under the Bankruptcy Code, with all rights to object thereto fully preserved.

(c)    Prepetition Section 507(b) Claims.

(i)    The Prepetition Priority Agent (for itself and the benefit of the Prepetition Priority Lenders) is hereby granted, subject to the Carve-Out and the DIP Superpriority Claims, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Obligation owing to it, with priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "Prepetition Priority 507(b) Claims"); which Prepetition Priority 507(b) Claims shall have recourse to and be payable from all of the DIP Collateral including, without limitation, subject to entry of the Final Order,

34

the Avoidance Proceeds.  The Prepetition Priority 507(b) Claims shall be subject and subordinate only to the Carve-Out and the DIP Superpriority Claims.  Except to the extent expressly set forth in this Interim Order or the DIP Credit Agreement, the Prepetition Priority Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition Priority 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all Commitments have been terminated.

(ii)    The Prepetition First Lien Agent (for itself and the benefit of the Prepetition First Lien Lenders) is hereby granted, subject to the priorities set forth in clause (d) below, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Obligation owing to it, with priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "Prepetition First Lien 507(b) Claims"); which Prepetition First Lien 507(b) Claims shall have recourse to and be payable from all of the DIP Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds.

(iii)   The Prepetition Second Lien Agent (for itself and the benefit of the Prepetition Priority Lenders) is hereby granted, subject to the priorities set forth in clause (d) below, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Obligation owing to it, with priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "Prepetition Second Lien 507(b) Claims", together with the Prepetition Priority 507(b) Claims and the Prepetition First Lien 507(b) Claims,

35

the "Prepetition 507(b) Claims"); which Prepetition Second Lien 507(b) Claims shall have recourse to and be payable from all of the DIP Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds.

(d)    Priority of Adequate Protection Liens and Prepetition 507(b) Claims.  The Priority Adequate Protection Liens and the Prepetition Priority 507(b) Claims shall be senior in all respects to (i) the First Lien Adequate Protection Liens and the Prepetition First Lien 507(b) Claims, and (ii) the Second Lien Adequate Protection Liens and the Prepetition Second Lien 507(b) Claims.  The First Lien Adequate Protection Liens and the Prepetition First Lien 507(b) Claims shall be senior in all respects to the Second Lien Adequate Protection Claims and the Prepetition Second Lien 507(b) Claims.  For the avoidance of doubt, the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition First Lien 507(b) Claims and the Prepetition Second Lien 507(b) Claims, as applicable, unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), the Prepetition Priority 507(b) Claims, the Prepetition Priority Obligations, and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in cash in full and all Commitments have been terminated.

(e)    Prepetition Priority Secured Parties' Fees and Expenses.  Without duplication of amounts required to be paid pursuant to the DIP Documents, (i) upon entry of this Interim Order, the Loan Parties shall pay in cash all reasonable and documented professional fees, expenses and disbursements payable to the advisors to the Prepetition Priority Secured Parties in accordance with the Prepetition Priority Credit Agreement or the Restructuring Support Agreement (including without limitation, the fees and expenses of Paul, Weiss, Rifkind,

36

Wharton & Garrison LLP, and Houlihan Lokey, Inc. that are accrued but remain unpaid as of the Petition Date), and (ii) the Loan Parties shall pay in cash all reasonable and documented professional fees, expenses and disbursements payable to the advisors to the Prepetition Priority First Lien Group under the Prepetition Priority Credit Agreement or the Restructuring Support Agreement (including without limitation, the fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Houlihan Lokey, Inc.), that accrue on or after the Petition Date.  The payment of the fees, expenses and disbursements set forth in clause (i) of the foregoing sentence shall be paid on or about the Closing Date and the fees and expenses set forth in clause (ii) of the foregoing sentence shall be made within ten (10) days (which time period may be extended by the applicable professional) after the receipt by the Debtors, the Committee (if any) and the U.S. Trustee (the "Review Period") of invoices therefor (the "Invoiced Fees") being delivered to the Debtors, the Committee, and the U.S. Trustee and in either case without the necessity of filing formal fee applications.  The invoices for such Invoiced Fees shall include the number of hours billed (except for financial advisors compensated on other than an hourly basis) and a reasonably detailed description of services provided and the expenses incurred by the applicable professional; *provided*, however, that any such invoice: (i) may be redacted to protect privileged, confidential or proprietary information, and (ii) shall not be required to contain individual time detail (*provided* that such invoice shall contain (except for financial advisors compensated on other than an hourly basis), at a minimum, summary data regarding hours worked by each timekeeper for the applicable professional).  The Debtors, the Committee (if any) and the U.S. Trustee may object to any portion of the Invoiced Fees (the "Disputed Invoiced Fees") within the Review Period by filing with the Court a motion or other pleading, on at least ten (10) days' prior written notice to counsel to the Prepetition Priority Secured Parties of any hearing on such

motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees in reasonable narrative detail and the bases for such objections; *provided*, that payment of any undisputed portion of Invoiced Fees shall be paid within the time frame set forth above and shall not be delayed based on any objections thereto; *provided, further,* that the applicable parties shall endeavor in good faith to consensually resolve any such dispute prior to the filing of any such motion or pleading.

(f)     Information Rights.  The Debtors shall promptly provide the Prepetition Agents, on behalf of themselves and the Prepetition Lenders, with all required written financial reporting and other periodic reporting that is required to be provided to the DIP Agent or the DIP Lenders under the DIP Credit Agreement.

14.     *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties and any other parties' holding interests that are secured by Primed Liens; *provided*, that any of the Prepetition Secured Parties, upon a change in circumstances, may request further or different adequate protection, and the Debtors or any other party may contest any such request.

15.     *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     The DIP Agent and, subject to paragraph 9(a)(iii) hereof, the Prepetition Agents are hereby authorized, but not required, to file or record (and to execute in the name of the Loan Parties, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or

38

control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent, on behalf of the DIP Lenders or any of the Prepetition Agents shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to Senior Permitted Liens), at the time and on the date of entry of this Interim Order.  Upon the request of the DIP Agent, each Prepetition Secured Party and Loan Party, without any further consent of any other party, is authorized (in the case of the Loan Parties) and directed (in the case of the Prepetition Secured Parties) to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)       A certified copy of this Interim Order may, in the discretion of the DIP Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

(c)       Notwithstanding anything to the contrary in the Motion, the DIP Documents or this Interim Order, for purposes of this Interim Order, in no event shall the DIP

39

Collateral include, or the DIP Liens or Adequate Protection Liens attach to, any lease, license, contract or agreement or other property right to which any Debtor is a party, or any such relevant Debtor's rights or interests thereunder, if and for so long as the grant of such security interest would constitute or result in: (i) the abandonment, invalidation, unenforceability or other impairment of any right, title or interest of any Debtor therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract or agreement or other property right pursuant to any provision thereof, unless, in the case of either of clauses <u>(i)</u> and <u>(ii)</u>, the applicable provision is ineffective under applicable non-bankruptcy law or rendered ineffective by operation of the Bankruptcy Code (such leases, licenses, contracts or agreements or other property rights are collectively referred to as the "<u>Excluded Assets</u>"); *provided*, that the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, Adequate Protection Obligations and shall in all events attach to or have recourse against all proceeds, products, offspring or profits from any and all Excluded Assets (including from the sale, transfer, disposition or monetization thereof).

16. *Preservation of Rights Granted Under This Interim Order.*

(a) Other than the Senior Permitted Liens, or as expressly permitted under the DIP Documents, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Agent or the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in this Interim Order or permitted under the DIP Documents, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Loan Parties' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with

any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Loan Parties, unless expressly permitted under the DIP Documents; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the Debtors.  No lien or security interest shall be granted to any other party in any of the Excluded Assets without first granting such lien or security interest to the DIP Agent, and the Prepetition Agents (solely with respect to the Adequate Protection Obligations).

(b)     The Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the Debtors to use the proceeds of DIP Loans or Cash Collateral hereunder if any of the Debtors, without the prior written consent of the Required Lenders (as defined in the DIP Credit Agreement) seeks, proposes or supports (whether by way of motion or other pleadings filed with the Court or any other writing executed by any Debtor or by oral argument), or if there is entered or confirmed (in each case, as applicable), or if there occurs:

(i)     a failure of the Debtors to make any payment under this Interim Order to any of the Prepetition Secured Parties when due;

(ii)     a failure of the Debtors to (x) observe or perform any of the material terms or provisions contained in this Interim Order or (y) comply with any covenant or agreement in this Interim Order in any material respect;

(iii)     any modifications, amendments, reversal or extensions of this Interim Order, and no such consent shall be implied by any other action, inaction or acquiescence by any party;

(iv)     an order converting to chapter 7 or dismissing any of these Cases;

(v)     an order appointing a chapter 11 trustee in these Cases;

      (vi)    an order appointing an examiner with enlarged powers in these Cases (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code);

      (vii)    the sale of all or substantially all of the assets of the Loan Parties (except to the extent permitted under the DIP Documents), which does not provide for the repayment in full in cash of all DIP Obligations (other than any contingent indemnification or expense reimbursement obligations for which no claim has been made); and

      (viii)    the termination of the Restructuring Support Agreement.

Notwithstanding any order that may be entered dismissing any of these Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered: (i) the DIP Superpriority Claims, the Adequate Protection Obligations, the Adequate Protection Provisions, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect as provided herein and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash (and that such DIP Superpriority Claims, Adequate Protection Obligations, the Adequate Protection Provisions, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

      (c)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacation, or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens.

Notwithstanding any such reversal, modification, vacation or stay, the DIP Obligations, DIP Liens, the Adequate Protection Provisions, Adequate Protection Obligations, and Adequate Protection Liens incurred by the Loan Parties to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Documents with respect thereto.

(d)    Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Provisions, the Adequate Protection Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, as applicable, granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of these Cases to a case under chapter 7, dismissing any of these Cases, terminating the joint administration of these Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral or Prepetition Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a plan in any of these Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly

administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP

Liens, the DIP Superpriority Claims, the Adequate Protection Provisions, the Adequate

Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the

DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this

Interim Order and the DIP Documents shall continue in full force and effect until the DIP

Obligations or Adequate Protection Obligations are indefeasibly paid in full in cash, as set forth

herein and in the DIP Documents, and the Commitments have been terminated.

17.    *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions,

agreements and releases contained in this Interim Order, including, without limitation, in

paragraph 4 of this Interim Order, shall be binding upon the Debtors and any successor thereto

(including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or

elected for any of the Debtors) in all circumstances and for all purposes.    The Debtors'

stipulations, admissions, agreements and releases contained in this Interim Order, including,

without limitation, in paragraph 4 of this Interim Order, shall be binding upon all other parties in

interest, including, without limitation, any statutory or non-statutory committees appointed or

formed in these Cases (including the Committee, if any) and any other person or entity acting or

seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or

examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes

unless: (a) such party in interest with requisite standing (subject in all respects to any agreement

or applicable law that may limit or affect such entity's right or ability to do so), has timely filed

an adversary proceeding or contested matter (subject to the limitations contained herein,

including, *inter alia*, in this paragraph 17) by no later than (i) (A) with respect to parties in

interest with requisite standing (other than the Committee), the earlier of the date an order

44

confirming a chapter 11 plan for the Debtors has been entered and 75 calendar days after entry of this Final Order and (B) with respect to the Committee, the earlier of the date an order confirming a chapter 11 plan for the Debtors has been entered and 60 calendar days after the entry of the Final Order, (ii) any such later date as has been agreed to, in writing, by the relevant Prepetition Agent, and (iii) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in this paragraph (the time period established by the foregoing clauses (i), (ii), and (iii), the "Challenge Period"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Debt or the Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against any of the Prepetition Secured Parties or their respective subsidiaries, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each a "Representative" and, collectively, the "Representatives") in connection with matters related to the Existing Agreements, the Prepetition Debt, the Prepetition Liens, and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If or to the extent no such Challenge is timely and properly filed during the Challenge

Period or (to the extent) the Court does not rule in favor of the plaintiff in any such proceeding

then (except as expressly filed or ruled): (a) the Debtors' stipulations, admissions, agreements

and releases contained in this Interim Order, including, without limitation, those contained in

paragraph 4 of this Interim Order, shall be binding on all parties in interest, including, without

limitation, the Committee (if any); (c) the obligations of the Loan Parties under the Existing

Agreements, including the Prepetition Debt, shall constitute allowed claims not subject to

defense, claim, counterclaim, recharacterization, subordination (other than as provided in the

Intercreditor Agreements and this Interim Order), offset or avoidance, for all purposes in these

Cases, and any subsequent chapter 7 case(s); (d) the Prepetition Liens on the Prepetition

Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected,

security interests and liens, not subject to recharacterization, subordination, avoidance or other

defense but subject to the priorities described herein; and (e) the Prepetition Debt and the

Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or

challenge by the Committee (if any), any non-statutory committees appointed or formed in these

Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates,

including, without limitation, any successor thereto (including, without limitation, any chapter 7

trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any

defenses, claims, causes of action, counterclaims and offsets, whether arising under the

Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their

Representatives arising out of or relating to any of the Existing Agreements or this Interim Order

shall be deemed forever waived, released and barred.  If any such Challenge is timely filed

during the Challenge Period, the stipulations, admissions, agreements and releases contained in

this Interim Order, including, without limitation, those contained in paragraph 4 of this Interim

Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of
this paragraph) on any statutory or nonstatutory committee appointed or formed in these Cases,
including the Committee (if any), and on any other person or entity, except to the extent that
such stipulations, admissions, agreements and releases were expressly and successfully
challenged in such Challenge as set forth in a final, non-appealable order of a court of competent
jurisdiction.  Nothing in this Interim Order vests or confers on any Person (as defined in the
Bankruptcy Code), including the Committee (if any) or any other statutory or non-statutory
committees appointed or formed in these Cases, standing or authority to pursue any claim or
cause of action belonging to the Debtors or their estates, including, without limitation,
Challenges with respect to the Existing Agreements, the Prepetition Debt, or the Prepetition
Liens.

18.    *Limitation on Use of DIP Facility and Collateral*.  Notwithstanding any other
provision of this Interim Order or any other order entered by the Court, without the consent of
the DIP Agent, no DIP Loans, DIP Collateral, Prepetition Collateral, Cash Collateral, or any
portion of the Carve-Out, may be used directly or indirectly by any Debtor, any Guarantor, any
official committee appointed in these Cases, or any trustee appointed in these Cases or any
successor case, including any chapter 7 case, or any other person, party or entity (a) in
connection with the investigation, initiation or prosecution of any claims, causes of action,
adversary proceedings or other litigation (i) against any of the DIP Agent, the DIP Lenders, or
the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates,
representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of
the Prepetition Debt, Prepetition Liens on the Prepetition Collateral, DIP Obligations, DIP Liens,
DIP Superiority Claims and/or the Adequate Protection Obligations, Adequate Protection

Liens and superpriority claims granted to the Prepetition Secured Parties under the Interim Order

or the Final Order, as applicable, or (ii) challenging the amount, validity, perfection, priority or

enforceability of or asserting any defense, counterclaim or offset with respect to, the Prepetition

Debt, the DIP Obligations and/or the liens, claims, rights, or security interests granted under this

Interim Order, the Final Order, the DIP Documents or the Existing Agreements  including, in

each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548,

549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) to

prevent, hinder, or otherwise delay the Prepetition Secured Parties', the DIP Agent's or the DIP

Lenders', as applicable, enforcement or realization on the Prepetition Debt, Prepetition

Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such

parties under the Interim or Final Orders, each to the extent permitted under the DIP Documents,

the Existing Agreements, the Intercreditor Agreements, and this Interim Order; (c) to seek to

modify any of the rights and remedies granted to the Prepetition Secured Parties, the DIP Agent

or the DIP Lenders under this Interim Order, the Existing Agreements or the DIP Documents, as

applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens

(other than the liens permitted pursuant to the DIP Documents) or security interests in the DIP

Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP

Superpriority Claims, Adequate Protection Liens and superpriority claims and liens granted to

the Prepetition Secured Parties hereunder, unless all DIP Obligations and Adequate Protection

Obligations have been refinanced or paid in full in cash (including the cash collateralization of

any letters of credit); or (e) to seek to pay any amount on account of any claims arising prior to

the Petition Date (other than with respect to the Adequate Protection Provisions) unless such

payments are otherwise included in the Approved Budget and approved by the Court; *provided*

that, notwithstanding the foregoing or anything else to the contrary herein, advisors to the Committee, if any, may incur fees and expenses in investigating, but not litigating, the claims and liens of the Prepetition Secured Parties prior to the expiration of the Challenge Period in an amount not to exceed $35,000 in the aggregate; provided that any fees, expenses or costs incurred by the advisors to the Committee in excess of $35,000 shall not constitute an allowable administrative expense claim, including for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

19.     *Loss or Damage to Collateral*.  Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any DIP Lender or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.  So long as the DIP Agent and the DIP Lenders comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral (the DIP Agent shall be deemed to have exercised reasonable care in the custody and preservation of any DIP Collateral in its possession if such DIP Collateral is accorded treatment substantially equal to that which it accords its own property), (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the Loan Parties.

49

20.     *Interim Order Governs*.  In the event of any inconsistency between the provisions

of this Interim Order and the DIP Documents or any other order entered by this Court, the

provisions of this Interim Order shall govern.  Notwithstanding anything to the contrary in any

other order entered by this Court, any payment made pursuant to any authorization contained in

any other order entered by this Court shall be consistent with and subject to the requirements set

forth in this Interim Order and the DIP Documents, including, without limitation, the Approved

Budget.

21.     *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions

of this Interim Order, including all findings herein, shall be binding upon all parties in interest in

these Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Prepetition

Secured Parties, the Committee (if any), any other statutory or non-statutory committees

appointed or formed in these Cases, the Debtors and their respective successors and assigns

(including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of

any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or

any other fiduciary appointed as a legal representative of any of the Debtors or with respect to

the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent,

the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors

and assigns; *provided*, that the DIP Agent, the DIP Lenders and the Prepetition Secured Parties

shall have no obligation to permit the use of the Prepetition Collateral (including Cash

Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar

responsible person appointed for the estates of the Debtors).

22.     *Limitation of Liability*.  In determining to make any loan or other extension of

credit under the DIP Credit Agreement, to permit the use of Cash Collateral or DIP Collateral or

in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agent and the DIP Lenders shall not (a) be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

23.     *Master Proof of Claim.*  The Prepetition Agents shall not be required to file proofs of claim in these Cases or any successor case in order to assert claims on behalf of itself and the Prepetition Secured Parties for payment of the Prepetition Debt arising under the Existing Agreements, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts under the respective Existing Agreements.  The statements of claim in respect of the Prepetition Debt set forth in this Interim Order, together with any evidence accompanying the Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status.  However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the applicable Prepetition Agents is authorized to file in the Debtors' lead chapter 11 case *In re Trident Holding Company, LLC,* Case No. 19-10384, a single, master proof of claim on behalf of the Prepetition Secured Parties, as applicable, on account of any and all of their respective claims arising under the applicable Existing Agreements and hereunder (each, a "Master Proof of Claim") against each of the Debtors.  The provisions of this paragraph 23 and each Master Proof of Claim are intended solely for the

51

purpose of administrative convenience and shall not affect the right of each Prepetition Secured

Party (or its successors in interest) to vote separately on any plan proposed in these Cases. The

Master Proofs of Claim shall not be required to attach any instruments, agreements or other

documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition

Secured Parties, which instruments, agreements or other documents will be provided upon

written request to counsel to the relevant Prepetition Agent.

24.    *Insurance*. To the extent that the Prepetition Agents are listed as loss payee under

the Borrowers' or Guarantors' insurance policies, the DIP Agent is also deemed to be the loss

payee under such insurance policies on a senior basis and shall act in that capacity and distribute

any proceeds recovered or received in respect of any such insurance policies, <u>first</u>, to the

payment in full of the DIP Obligations (other than contingent indemnification obligations as to

which no claim has been asserted), and <u>second</u>, to the payment of the Prepetition Debt.

25.    *Effectiveness*. This Interim Order shall constitute findings of fact and conclusions

of law and shall take effect and be fully enforceable <u>nunc pro tunc</u> to the Petition Date

immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h),

6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of

the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and

enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim

Order.

26.    *Headings*. Section headings used herein are for convenience only and are not to

affect the construction of or to be taken into consideration in interpreting this Interim Order.

27.    *Payments Held in Trust*. Except as expressly permitted in this Interim Order or

the DIP Documents, in the event that any person or entity receives any payment on account of a

security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

28.    *Credit Bidding*.    (a) The DIP Agent shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral, and (b) subject to the repayment in full of the DIP Obligations, the Prepetition Priority Agent shall have the right to credit bid up to the full amount of the relevant Prepetition Debt in any sale of the DIP Collateral, in each case, as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

29.    *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

30.    *Necessary Action*.  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Order.

31.    *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding

the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

32.    *Final Hearing*.  The Final Hearing is scheduled for _____, 2019 at _____ __.m. before this Court.

33.    *Objections*.    Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon (a) proposed counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, IL 60606, Attention: James J. Mazza, Jr., james.mazza@skadden.com and Justin Winerman, justin.winerman@skadden.com, and 4 Times Square, New York, NY, Attention Jason N. Kestecher, jason.kestecher@skadden.com; (b) the Office of the United States Trustee for the Southern District of New York; (c) counsel to the DIP Agent and the Priority First Lien Group, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, Attention: Alan W. Kornberg, akornberg@paulweiss.com, Robert A. Britton, rbritton@paulweiss.com; (d) counsel to the First Lien Lenders, Kirkland & Ellis, LLP, 300 N. LaSalle, Chicago, IL 60654, Attention: Patrick J. Nash, patrick.nash@kirkland.com; (e) counsel to the Second Lien Lenders, Latham & Watkins, LLP, 885 3rd Avenue, New York, NY 10022, Attention: Richard Levy, richard.levy@lw.com, and James Ktsanes, james.ktsanes@lw.com; (f) counsel to the Committee, if one has been appointed; and (g) any other party that has filed a request for notices with this Court, in each case to allow actual receipt by the foregoing no later than _____, 2019 at 4:00 p.m., prevailing Eastern Time.

34.    The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under sections 506(c) and

552(b) of the Bankruptcy Code) to the parties having been given notice of the Interim Hearing,

to any party that has filed a request for notices with this Court and to the Committee after the

same has been appointed, or such Committee's counsel, if the same shall have been appointed.

Dated: _____ __, 2019
       New York, New York

_____
     UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

Initial Budget

TridentCare
DIP Budget
February 10, 2019

Confidential; Subject to FRE 408
Preliminary and Subject to Material Revision

**PRELIMINARY AND SUBJECT TO MATERIAL REVISION**

| ($ in Thousands) | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | Wk 1 - Wk 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Projection | Projection | Projection | Projection | Projection | Projection | Projection | Projection | Projection | Projection | Projection | Projection | Projection | Projection |
| | Postpetition | Postpetition | Postpetition | Postpetition | Postpetition | Postpetition | Postpetition | Postpetition | Postpetition | Postpetition | Postpetition | Postpetition | Postpetition | Postpetition |
| | 2/15 | 2/22 | 3/1 | 3/8 | 3/15 | 3/22 | 3/29 | 4/5 | 4/12 | 4/19 | 4/26 | 5/3 | 5/10 | Total |
| **Operating Activity** | | | | | | | | | | | | | | |
| Total Cash Receipts | 9,189 | 8,251 | 9,856 | 9,623 | 10,323 | 10,923 | 11,223 | 8,231 | 8,631 | 9,081 | 9,231 | 9,188 | 9,559 | 123,307 |
| Total Operating Disbursements | (8,489) | (8,729) | (11,740) | (9,609) | (9,811) | (7,826) | (11,636) | (7,807) | (10,566) | (7,422) | (10,047) | (9,478) | (10,562) | (123,722) |
| Net Operating Cash Flow | 700 | (478) | (1,884) | 14 | 512 | 3,097 | (413) | 423 | (1,935) | 1,659 | (817) | (291) | (1,003) | (415) |
| **Non-Operating Activity** | | | | | | | | | | | | | | |
| Total Non-Operating Disbursements | (900) | - | - | - | - | - | - | - | - | - | - | (900) | - | (1,800) |
| Total Interest Payments & Fees | (1,000) | - | (1,103) | - | - | - | (1,602) | - | - | - | (1,549) | - | - | (5,254) |
| Total Professional Fees | (1,094) | - | (30) | (1,166) | - | (2,677) | - | (598) | - | - | (2,806) | (585) | (17) | (8,973) |
| Total Other Restructuring Disbursements | - | - | (1,875) | (1,875) | (415) | (30) | - | - | - | (444) | (30) | - | (971) | (5,639) |
| Net Cash Flow | (2,294) | (478) | (4,893) | (3,027) | 97 | 389 | (413) | (1,777) | (1,935) | 1,215 | (3,652) | (3,324) | (1,990) | (22,082) |
| **Beginning Book Cash Balance** | 7,097 | 15,495 | 15,017 | 10,124 | 8,800 | 8,897 | 9,286 | 8,874 | 14,794 | 12,859 | 14,074 | 10,422 | 11,339 | 7,097 |
| Net Cash Flow | (2,294) | (478) | (4,893) | (3,027) | 97 | 389 | (413) | (1,777) | (1,935) | 1,215 | (3,652) | (3,324) | (1,990) | (22,082) |
| Net Cash From DIP Loan | 10,692 | - | - | 1,703 | - | - | - | 7,697 | - | - | - | 4,241 | - | 24,332 |
| **Ending Book Cash Balance** | 15,495 | 15,017 | 10,124 | 8,800 | 8,897 | 9,286 | 8,874 | 14,794 | 12,859 | 14,074 | 10,422 | 11,339 | 9,348 | 9,348 |
| DIP Segregated Account Balance | 1,808 | 1,808 | 1,808 | 37,606 | 37,606 | 37,606 | 37,606 | 29,909 | 29,909 | 29,909 | 29,909 | 25,668 | 25,668 | 25,668 |
| **Total Ending Book Cash Balance** | 17,303 | 16,825 | 11,932 | 46,406 | 46,503 | 46,892 | 46,480 | 44,703 | 42,768 | 43,983 | 40,331 | 37,006 | 35,016 | 35,016 |

## **Exhibit B**

Buschmann Declaration

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* | **Chapter 11** |
| **TRIDENT HOLDING COMPANY, LLC, *et al.*,** | **Case No. 19-10384 (___)** |
| **Debtors.**[1] | **(Joint Administration Pending)** |

## <u>DECLARATION OF MARK BUSCHMANN IN SUPPORT OF THE DIP MOTION</u>

I, Mark Buschmann, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of

perjury:

1.      I am a Partner in the Restructuring and Special Situations Group at PJT

Partners LP ("**PJT**"), an investment banking firm listed on the New York Stock Exchange with

its principal offices at 280 Park Avenue, New York, New York 10017. PJT is the proposed

investment banker and one of the lead restructuring advisors to Trident Holding Company, LLC

and certain of its debtor subsidiaries and affiliates (collectively, the "**Company**," "**Trident**," or

the "**Debtors**").

2.      PJT was spun off from The Blackstone Group L.P. ("**Blackstone**")

effective October 1, 2015. Upon the consummation of the spin-off, Blackstone's restructuring

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are as follows: Trident Holding Company, LLC (6396); American Diagnostics Services, Inc. (2771); Community Mobile Diagnostics, LLC (9341); Community Mobile Ultrasound, LLC (3818); Diagnostic Labs Holdings, LLC (8024); FC Pioneer Holding Company, LLC (6683); JLMD Manager, LLC (8470); Kan-Di-Ki LLC (6100); Main Street Clinical Laboratory, Inc. (0907); MDX-MDL Holdings, LLC (2605); MetroStat Clinical Laboratory – Austin, Inc. (4366); MX Holdings, LLC (8869); MX USA, LLC (4885); New Trident Holdcorp, Inc. (4913); Rely Radiology Holdings, LLC (3284); Schryver Medical Sales and Marketing, LLC (9620); Symphony Diagnostic Services No. 1, LLC (8980); Trident Clinical Services Holdings, Inc. (6262); Trident Clinical Services Holdings, LLC (1255); TridentUSA Foot Care Services LLC (3787); TridentUSA Mobile Clinical Services, LLC (0334); TridentUSA Mobile Infusion Services, LLC (5173); U.S. Lab & Radiology, Inc. (4988). The address of the Debtors' corporate headquarters is 930 Ridgebrook Road, 3rd Floor, Sparks, MD 21152.

and reorganization advisory group became a part of PJT, and Blackstone's restructuring professionals became employees of PJT. PJT and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings. PJT has over 500 employees located in New York, San Francisco, Boston, Chicago, London, Sydney, Hong Kong, and Madrid. PJT has extensive experience in providing financial advisory and investment banking services to financially distressed companies and representing both debtors and lenders in the procurement and provision of postpetition financing. PJT is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

3.      Since joining Blackstone in 2001, and continuing at PJT, I have worked on a broad range of restructuring and reorganization assignments for companies, creditor groups, special committees of corporate boards, corporate parents of troubled companies, governmental entities and acquirers of distressed assets. Over the course of my career, I have advised senior management and boards of directors of companies in a wide variety of industries in connection with restructurings, mergers and acquisitions, and financing transactions. In particular, I have been involved in numerous restructurings, including, among others, 21st Century Oncology Holdings, Inc., Alestra S. de R.L. de C.V.; Angiotech Pharmaceuticals, Inc.; API Heat Transfer; Arch Coal, Inc.; Cable & Wireless America; Central European Distribution Corporation; Delta Air Lines, Inc.; Excite@Home; Homer City Generation, L.P.; IAP Worldwide Services, Inc.; Los Angeles Dodgers LLC; Magnetation LLC; Mattress Discounters Corporation; Milagro Exploration, LLC; Noranda Aluminum, Inc.; Nortek, Inc.; Nybron Flooring International; Patriot Coal Corporation; Philadelphia Newspapers, LLC; Pinnacle Airlines Corp; Russell-Stanley

Holdings; Six Flags; Taro Pharmaceutical Industries Ltd; Tribune Media Company; Twin River
Casino; Ultra Petroleum Corp.; Westinghouse Electric Company, LLC; and WilTel
Communications Group Inc.

      4.     I hold a Bachelor of Arts degree from Dartmouth College and an MBA
with a concentration in Finance from Kellogg School of Management at Northwestern
University. Prior to joining Blackstone, I was a Financial Analyst in the Financial Institutions
Group at Salomon Smith Barney, where I executed various mergers and acquisitions and
financing assignments. Additionally, I have served as an expert witness on numerous occasions.

      5.     I submit this declaration in support of the *Debtors' Motion For Interim
and Final Orders (I) Authorizing Debtors  (A) To Obtain Postpetition Financing Pursuant To 11
U.S.C. §§ 105, 361, 362, 363, and 364 and (B) To Utilize Cash Collateral Pursuant To 11 U.S.C.
§ 363, (II) Granting Adequate Protection To Prepetition Secured Parties Pursuant To 11 U.S.C.
§§ 361, 362, 363, 364 and 507(b) And (III) Scheduling Final Hearing Pursuant To Bankruptcy
Rules 4001(b) and (c)* (the "**DIP Motion**").[2]

      6.     All facts set forth in this declaration are based on (i) my personal
knowledge , (ii) my discussions with the Debtors' senior management, other members of the PJT
team, or other interested parties, (iii) my review of relevant documents, or (iv) my opinion based
upon my experience, knowledge, and information concerning the Debtors' operations and
financial affairs. If I were called to testify, I would testify competently to the facts set forth
herein.

---

[2]    Capitalized terms used herein and not otherwise defined shall have the same meaning ascribed to them in the
DIP Motion.

**A.       Trident's Restructuring Negotiations and Capital Raising Efforts**

7.       The Debtors first engaged PJT to advise them with respect to their capital structure in August 2017. In early 2018, the Debtors turned to addressing the impending maturity of their first lien revolving credit facility. In connection with such efforts, the Debtors and PJT ran a process to address the Debtors' debt maturities and liquidity needs; carefully considered all reasonable alternatives available at the time; and engaged in discussions with multiple stakeholders and potential financing sources to present a transaction intended to position the Company to achieve its business objectives.

8.       As part of that financing process, the Company provided the lenders and financing sources who executed a confidentiality agreement with significant access to (i) due diligence information regarding the Company and (ii) management. Thereafter, Trident launched a consent solicitation process to raise liquidity and address upcoming debt maturities. Throughout the consent solicitation process, Trident and/or its advisors, including PJT, engaged in direct conversations with virtually all lenders, many of whom were represented by counsel. Ultimately, the Priority First Lien Lender extended a $216 million term loan, which the Company used to repay its first lien revolving credit facility that was nearing maturity; to refinance the Priority First Lien Lender's holdings under the first lien term loan; to provide an approximately 19% ($50 million) paydown to other then-existing first lien term lenders; and to provide an additional $40 million in cash to Trident's balance sheet for general corporate purposes and transaction expenses.

9.       The Debtors again retained PJT in November 2018, when, due to their business's declining performance, they projected to have insufficient capital to make an approximately $9 million interest payment on January 31, 2019 and would likely need to implement a comprehensive capital structure solution.

10.     PJT evaluated, among other things, the Company's recent performance, financial outlook, credit agreements, liquidity and leverage.  In consultation with management and the Restructuring Committee ("**Restructuring Committee**") of the Board of Managers (the "**Board**") of FC Pioneer Holding Company, LLC, the ultimate parent of the Debtors, PJT then developed a process to facilitate a comprehensive solution to the Company's liquidity and leverage issues. In doing so, PJT considered a number of scenarios, both in- and out-of-court.  As part of developing such scenarios, PJT, with the assistance of Trident's management, Ankura Consulting Group, LLC ("**Ankura**"), and other advisors, initiated the process of evaluating the Debtors' cash needs and potential financing sources both in- and out-of-court.

11.     Beginning in the first week of December 2018, PJT began engaging with the Company's major constituents to discuss strategic options. The Company invited such lenders to enter into confidentiality agreement to (i) conduct due diligence and (ii) negotiate transaction terms. Many lenders accepted this invitation, including (i) SPCP Group, LLC (the "**Priority First Lien Lender**"); (ii) lenders holding approximately 80% of the loans under the Prepetition First Lien Credit Agreement; (iii) lenders holding approximately 75% of the loans under the Prepetition Second Lien Credit Agreement; and (iv) a group of significant noteholders under certain mezzanine debt.[3]

12.     PJT also began discussions with one of the Company's equity sponsors, Revelstoke Capital Partners ("**Revelstoke**"), which also held a claim under the Prepetition First Lien Credit Agreement.

---

[3]     At the outset of this process, lenders holding approximately 59% of the loans under the Prepetition First Lien Credit Agreement and 54% of the loans under the Prepetition Second Lien Credit Agreement entered into confidentiality agreement, but these numbers grew as the process continued.

13.     The Priority First Lien Lender engaged Houlihan Lokey, L.P.

("**Houlihan**") and an ad hoc group of Prepetition First Lien Lenders (the "**Ad Hoc Group**")

engaged Greenhill & Co., Inc. ("**Greenhill**"), each to serve as their respective financial advisor.

Each party also engaged separate legal counsel, with the Priority First Lien Lender engaging

Paul, Weiss, Rifkind, Wharton & Garrison LLP and the Ad Hoc Group selecting Kirkland &

Ellis LLP ("**Kirkland**"). Houlihan and Greenhill submitted comprehensive due diligence request

lists and, along with their clients, were granted access to a data room that the Company

populated with information responsive to their requests. The Company, PJT, and/or Ankura held

at least nine due diligence meetings or telephone calls with the Priority First Lien Lender and/or

its advisors, and held at least eight due diligence meetings or telephone calls with the Ad Hoc

Group and/or its advisors. The Company's management made itself readily available to such

parties, including for in-person meetings.

14.     Over the weeks leading up to the Petition Date, the Debtors and their

advisors negotiated with their constituents regarding restructuring and financing terms. PJT

solicited offers for debtor-in-possession financing as well as out-of-court bridge funding to allow

further negotiations on a potentially consensual restructuring transaction.

15.     The Company and PJT evaluated the restructuring proposals submitted by

the parties and continued to engage in multi-track negotiations with the Priority First Lien

Lender and the Ad Hoc Group,[4] including providing comments to the restructuring term sheets

submitted by both parties and exchanging credit agreement drafts with the Priority First Lien

Lender.

---

[4]     In January 2019, Revelstoke had associated itself with the Ad Hoc Group, given Revelstoke's significant
debt holdings under the First Lien Credit Agreement.

16.     Ultimately, while each of the Priority First Lien Lender, the Ad Hoc Group, and Revelstoke submitted restructuring proposals, only the Priority First Lien Lender was willing to extend financing to effect a restructuring – and, even then, only on an in-court basis. Moreover, the Priority First Lien Lender, expressly communicated that it would not consent to the priming of its senior debt by a third party. The Priority First Lien Lender's financing proposals were premised on the Company's entry into a restructuring support agreement (the "**RSA**"), containing milestones for the prosecution of a chapter 11 case, including the development of a five year business plan, which would serve as the foundation for a chapter 11 reorganization plan. The RSA, which is a prepetition contract, preserves the Company's ability to exercise a fiduciary-out termination right or otherwise terminate if the Company determines that the Priority First Lien Lender's claim is oversecured.

17.     The Ad Hoc Group, which consists of at least eight[5] sophisticated lending institutions advised by Kirkland and Greenhill, dismissed the notion of providing the Company financing on any terms. Instead, each proposal put forth by the Ad Hoc Group would require the Priority First Lien Lender to extend DIP Financing or additional funding out of court while the Ad Hoc Group continued its diligence process. Even then, the Ad Hoc Group's proposals contemplated a potential investment that was pari passu with or senior to a portion of the Priority First Lien Lender's recovery under a chapter 11 plan, all subject to a due diligence condition.

18.     Apart from the extensive discussions with existing stakeholders regarding alternatives for addressing the Company's financing needs, PJT did not conduct outreach to third-party financing sources. Based upon my experience, I do not believe that any third-party

---

[5]     Including two institutions that are not official group members, but who had associated themselves with the Ad Hoc Group.

would be willing to extend debtor-in-possession financing to the Company. Over the course of

January through April 2018, PJT ran a comprehensive marketing process in order to raise capital

to address liquidity shortfalls and upcoming maturities of the Company's secured debt. During

that process, which occurred prior to significant degradation in the Company's business during

the second half of 2018, no financing party was willing to extend new capital except on a senior

secured basis. Given this, it is my professional opinion that attempting to raise financing on a

junior or unsecured basis would have been futile and could have negatively impacted the

Company's business, given the risk of public disclosure of the Company's financial distress.

19.     Throughout the process, PJT, the Company, and the Company's other

advisors presented each of the proposals it received to the Restructuring Committee. The

Restructuring Committee met frequently to discuss developments in the negotiations and to

evaluate the proposals.

20.     Ultimately, the Priority First Lien Lender submitted the only viable

proposal to provide DIP financing to the Company. While the Ad Hoc Group submitted several

restructuring proposals, each was dependent on the Priority First Lien Lender financing the

Company until the proposals were consummated, including completion of due diligence by the

Ad Hoc Group, and the equitization of the Priority First Lien Lender's senior secured claim, to

which it was not willing to consent. None of the Ad Hoc Group's proposals contemplated

providing any funding to the Company in advance of a restructuring.

21.     On February 8, 2019, PJT made a formal presentation to the Board that

analyzed the details of the Priority First Lien Lender's proposal, answered numerous questions

posed by managers, and made various observations and recommendations concerning the

strengths and weaknesses of the proposal. After reviewing the Priority First Lien Lender's offer,

on February 9, 2019, the Board authorized the Company to enter into the DIP Facility and the

RSA. In my view, the DIP Facility, including its structure, collateral required to be pledged,

principal amount, pricing and fee structure, is the best– indeed, the only viable option – to

finance the   chapter 11 cases and is an exercise of sound business judgment.

**B.      The DIP Facility Is Fair and Reasonable**

22.     Based on my experience in negotiating DIP facilities in other chapter 11

cases and my involvement in negotiating the DIP Facility here, I believe that the terms of the

DIP Financing are fair and reasonable and were negotiated in good faith and at arms'-length. The

Debtors require immediate access to capital to preserve the going-concern value of their business

and implement a chapter 11 reorganization.  The DIP Facility allows the Debtors to draw up to

$12.5 million upon entry of the Interim Order, and upon entry of the Final Order, make an

additional draw of up to $37.5 million. The new money commitment provides the Debtors with

the ability to meet their liquidity needs to fund the Chapter 11 Cases and make necessary capital

expenditures during the pendency of these cases.[6]

23.     I also believe the Debtors' provision of adequate protection to the

Prepetition Secured Parties, including the grant of replacement liens and superpriority claims, is

reasonable and appropriate under the circumstances.

24.     Based on my experience and comparable debtor-in-possession financing

transactions, I believe that the fees associated with the DIP Facility are reasonable. I have

reviewed the all-in yield in similar transactions, and based upon this review, have concluded that

the all-in yield associated with the DIP Facility is in line with DIP transactions of similar size

---

[6]      The DIP budget developed by the Company, Ankura, and PJT contemplates the funding of necessary
capital expenditures that had been deferred due to the Company's liquidity constraints.

and complexity. Moreover, the Debtors heavily negotiated various terms of the DIP Facility and were successful in obtaining certain concessions from the DIP lenders, including a reduction in upfront fees and an extension in the effective term of the facility. The concessions obtained through these negotiations have allowed the Debtors to achieve a significant reduction in the all-in yield relative to the DIP lenders' initial proposal. Additionally, the DIP Facility does not contemplate a roll-up of prepetition debt, which could provide greater flexibility to the Debtors than would be available in comparable cases.

Dated: February 10, 2019
      New York, New York

                                            */s/ Mark Buschmann*
                                            Mark Buschmann

## Exhibit C

RSA

EXECUTION VERSION

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, modified, or otherwise supplemented from time to time, this "***Agreement***"), dated as of February 10, 2019, is entered into by and among:

 (a) New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., and Schryver Medical Sales and Marketing, LLC, on behalf of themselves and certain of their affiliated entities listed on **Exhibit A** attached hereto (collectively, the "***Company***"); and

 (b) the undersigned beneficial holders, or investment advisors, investment managers, managers, nominees, advisors, or subadvisors to funds that beneficially own (together with any holders that accede to this Agreement in accordance with Section 20, the "***Consenting Priority Lenders***") outstanding term loans under that certain Credit Agreement, dated as of April 30, 2018 (as amended and restated, supplemented or otherwise modified, the "***Priority First Lien Credit Agreement***," the loans outstanding thereunder, the "***Priority First Lien Loans***" and the lenders party thereto from time to time, the "***Priority Lenders***"), among New Trident HoldCorp Inc., Trident Clinical Services Holdings, Inc., and Schryver Medical Sales and Marketing, LLC, as borrowers, the holding companies party thereto, the subsidiary guarantors party thereto, the lenders from time to time party thereto, and Silver Point Finance, LLC, as administrative agent (the "***Priority First Lien Agent***").

The Company, the Consenting Priority Lenders, and any subsequent Person that becomes a party hereto in accordance with the terms hereof, are collectively referred to herein as the "***Parties***" and each individually as a "***Party***."

## RECITALS

**WHEREAS**, the Parties have engaged in good faith and arm's-length negotiations regarding a restructuring of the Company;

**WHEREAS** the Parties have agreed to undertake and support a financial restructuring of the existing Claims against and Interests in the Company in accordance with the terms and subject to the conditions set forth in this Agreement and in the restructuring term sheet attached hereto as **Exhibit B** (including any schedules and exhibits attached thereto, the "***Restructuring Term Sheet***") (the "***Restructuring***") to be implemented through a plan of reorganization to be filed by the Company in connection with cases (the "***Chapter 11 Cases***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"). Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Restructuring Term Sheet;

**WHEREAS**, as of the date hereof, the Consenting Priority Lenders collectively hold 100% of the aggregate outstanding principal amount of the Priority First Lien Loans;

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters set forth in this Agreement and the Restructuring Term Sheet;

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.    **DEFINITIONS; RULES OF CONSTRUCTION**.

(a)    <u>Definitions</u>.  The following terms shall have the following definitions:

"*Agreement*" has the meaning set forth in the preamble hereof, and includes, for the avoidance of doubt, the Restructuring Term Sheet and any schedules and exhibits attached thereto.

"*Alternative Proposal*" means any plan of reorganization or liquidation, proposal, term sheet, offer, transaction, dissolution, winding up, liquidation, reorganization, refinancing, recapitalization, restructuring, merger, consolidation, business combination, joint venture, partnership, sale of material assets or equity involving the majority of the Company or one or more of its subsidiaries' equity, assets, or liabilities, in each case, (i) to the extent materially inconsistent with the Restructuring, and (ii) other than the Restructuring; <u>provided</u>, <u>that</u> any divestitures in connection with Project Fischer 2.0 shall not constitute an Alternative Proposal; <u>provided further</u> that any of the other Project Fischer transactions or the sale of the Company's oxygen business shall constitute an Alternative Proposal.

"*Bankruptcy Code*" has the meaning set forth in the recitals hereof.

"*Bankruptcy Court*" has the meaning set forth in the recitals hereof.

"*Business Day*" means any day other than Saturday, Sunday, and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"*Business Plan*" has the meaning set forth in <u>Section 8(a)(v)</u>.

"*Chapter 11 Cases*" has the meaning set forth in the recitals hereof.

"*Chapter 11 Plan*" means the chapter 11 plan of reorganization of the Company (including any annexes, supplements, exhibits, term sheets, or other attachments thereto) filed in the Chapter 11 Cases, which will be consistent in all respects with this Agreement.

"*Claim*" means any claim as that term is defined in section 101(5) of the Bankruptcy Code.

"*Company*" has the meaning set forth in the preamble hereof.

2

"*Company Termination Event*" has the meaning set forth in Section 8(b).

"*Confidential Claims Information*" has the meaning set forth in Section 5(a)(xvi).

"*Confirmation Order*" means an order entered by the Bankruptcy Court confirming the Chapter 11 Plan that is consistent with this Agreement and, if applicable, the Restructuring Term Sheet.

"*Consenting Priority Lenders*" has the meaning set forth in the preamble hereof.

"*Definitive Documents*" means the documents that are necessary or desirable to implement, or otherwise relate to, the Restructuring, which documents shall in each case be consistent with this Agreement and in form and substance acceptable to the Company and the Requisite Consenting Priority Lenders, including (i) all motions and proposed court orders that the Company files on or after the Petition Date and seeks to have heard on an expedited basis at the "first day hearing" (the "*First Day Pleadings*"), including any motion authorizing the Company to pay prepetition Claims of certain critical vendors and service providers, foreign service providers, lien claimants, and section 503(B)(9) claimants, (ii) the Chapter 11 Plan (including any ballots related thereto), (iii) the Plan Supplement, (iv) the Disclosure Statement, (v) the Disclosure Statement Order, (vi) the Confirmation Order, (vii) the New Exit Facilities, (viii) the Warrants, (ix) the Security Documents, (x) the Organizational Documents, (xi) any key employee incentive plan, (xii) any key employee retention plan, (xiii) any management incentive plan, (xiv) the DIP Orders, (xv) any motions seeking approval of the DIP Orders, (xvi) the DIP Credit Agreement and related financing and security documents, (xvii) any filings seeking to or that would have the effect of assuming, or assuming and assigning, any executory contract or unexpired lease (including related cure amounts), (xviii) any shareholders' agreement, (xix) any document filed by the Company in the Chapter 11 Cases to implement any of the foregoing, and (xx) any other documents (including any agreements, instruments, schedules, or exhibits) related to or contemplated in the foregoing clauses (i) through (xix); provided, that in the case of clauses (i), (xi), and (xii), and to the extent related to such clauses, clause (xx) shall be reasonably acceptable to the Requisite Consenting Priority Lenders.

"*DIP Credit Agreement*" means that certain debtor in possession credit agreement (as amended and restated, supplemented or otherwise modified), between New Trident HoldCorp, Inc., Trident Clinical Services Holdings, Inc., and Schryver Medical Sales and Marketing, LLC, as borrowers, the holding company party thereto, the subsidiary guarantors party thereto, and the lenders from time to time party thereto, consistent in all material respects with the terms set forth in the Restructuring Term Sheet.

"*DIP Orders*" means collectively, the Interim DIP Order and the Final DIP Order.

"*DIP Term Loan Facility*" means the debtor-in-possession facility to be provided to the Company in accordance with the terms, and subject in all respects to the conditions, set forth in the DIP Credit Agreement and the DIP Orders.

"*Disclosure Statement*" means the Company's disclosure statement, including any exhibits, appendices, related documents, ballots, and procedures related to the solicitation of

3

votes to accept or reject a plan of reorganization for the Company, in each case, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, that is consistent with this Agreement.

"*Disclosure Statement Order*" means an order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by sections 1125 and 1126(b) of the Bankruptcy, which may be the Confirmation Order.

"*Effective Date*" means the date upon which all conditions precedent to the effectiveness of the Chapter 11 Plan have been satisfied or are expressly waived in accordance with the terms thereof, as the case may be, and on which the Restructuring and the other transactions to occur on the effective date pursuant to the Chapter 11 Plan become effective or are consummated.

"*Executory Contracts and Leases Information*" has the meaning set forth in Section 5(a)(x).

"*Final DIP Order*" means the final order approving the Company's entry into the DIP Term Loan Facility, to be entered by the Bankruptcy Court.

"*Intercreditor Agreement*" means that certain Priority/First Lien/Second Lien Intercreditor Agreement dated as of April 30, 2018 (as amended and restated, supplemented or otherwise modified), between New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., and Schryver Medical Sales and Marketing, LLC, as borrowers, the holding companies party thereto, Silver Point Finance, LLC, as Priority First Lien Credit Agreement Administrative Agent, Cortland Capital Market Services LLC, as Existing First Lien Credit Agreement Administrative Agent, and Ares Capital Corporation, as Second Lien Credit Agreement Administrative Agent.

"*Interest*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interest, unit, or share in the Company (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in the Company), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

"*Interim DIP Order*" means the interim order approving the Company's entry into the DIP Term Loan Facility, to be entered by the Bankruptcy Court.

"*Joinder Agreement*" has the meaning set forth in Section 9(a).

"*Material Adverse Change*" means any event, change, effect, occurrence, development, circumstance or change of fact occurring after the date hereof that, individually or in the aggregate, has, had, or would reasonably be expected to have a material adverse effect on the business, results or operations, financial condition, assets, or liabilities of the Company, taken as a whole; provided, however, that any change arising related to customary occurrences as a result of events leading up to and following the commencement of a proceeding under chapter 11

of the Bankruptcy Code shall not constitute a Material Adverse Change or be taken into account in determining whether a Material Adverse Change has occurred or would reasonably be expected to occur.

"*Milestones*" means the Priority Lender Termination Events set forth in <u>Sections 8(a)(ii)-8(a)(x)</u>.

"*New Exit Facilities*" has the meaning set forth in the Restructuring Term Sheet.

"*Non-Consenting Lender*" has the meaning set forth in <u>Section 11</u>.

"*Other Termination Event*" has the meaning set forth in <u>Section 8(c)</u>.

"*Organizational Documents*" means the certificate or articles of incorporation and bylaws, certificate of formation, partnership agreement, operating agreement, limited liability company agreement, and any similar documents of the Reorganized Company.

"*Oversecured Priority Claim Determination*" means the Company has reasonably determined in good faith upon the advice of an outside investment bank after the Company has delivered the Business Plan that the Claims of the Priority Lenders (inclusive of any interest, prepayment fee, and other amounts payable under the Priority First Lien Credit Agreement) are oversecured.

"*Party*" has the meaning set forth in the preamble hereof.

"*Person*" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

"*Petition Date*" means the date on which the Chapter 11 Cases are filed with the Bankruptcy Court.

"*Plan Filing Date*" means the date on which the Chapter 11 Plan and Disclosure Statement are filed with the Bankruptcy Court, which may be the Petition Date.

"*Plan Supplement*" means the documents to be filed in a supplement to the Chapter 11 Plan prior to the entry of the Confirmation Order which include the necessary documentation to effect the Chapter 11 Plan, including (i) the Organizational Documents, (ii) any documents identifying the members of the board of directors of the Reorganized Company, (iii) the New Exit Facilities, (iv) the agreement governing the Warrants, (v) if applicable, a description of tax structuring transaction steps, and (vi) the management incentive plan, in each case in form and substance consistent with this Agreement.

"*Priority First Lien Agent*" has the meaning set forth in the preamble hereof.

"*Priority First Lien Credit Agreement*" has the meaning set forth in the preamble hereof.

5

"***Priority First Lien Loans***" has the meaning set forth in the preamble hereof.

"***Priority Lenders***" has the meaning set forth in the preamble hereof.

"***Priority Lender Termination Event***" has the meaning set forth in <u>Section 8(a)</u>.

"***Priority Lenders' Counsel***" means Paul, Weiss, Rifkind, Wharton & Garrison LLP.

"***Priority Lenders' Professionals***" means Priority Lenders' Counsel, Houlihan Lokey, Inc., and any other professional or consultant that may be engaged by the Priority Lenders (including any local counsel).

"***Proceeding***" has the meaning set forth in <u>Section 13</u>.

"***Qualified Marketmaker***" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Claims, or enter with customers into long or short positions in Claims, in its capacity as a dealer or market maker in such Claims, and (ii) is in fact regularly in the business of making a market in claims, interests or securities of issuers or borrowers.

"***Requisite Consenting Priority Lenders***" means Consenting Priority Lenders holding at least a majority in aggregate outstanding principal amount of the Priority First Lien Loans as of the date of determination.

"***Reorganized Company***" means the Company, as reorganized on the Effective Date.

"***Restructuring***" has the meaning set forth in the recitals hereof.

"***Restructuring Support Period***" means the period of time commencing on the Support Date and ending on the Termination Date.

"***Restructuring Term Sheet***" has the meaning set forth in the recitals hereof.

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Security Documents***" has the meaning set forth in the Restructuring Term Sheet.

"***Supermajority Consenting Lenders***" means Consenting Priority Lenders holding at least 66.67% in aggregate outstanding principal amount of the Priority First Lien Loans.

"***Support Date***" means the date on which counterpart signature pages to this Agreement have been executed and delivered by the Company and the Supermajority Consenting Lenders.

"***Solicitation***" means the solicitation of votes for the Chapter 11 Plan pursuant to, and in compliance with, the Bankruptcy Code and any order of the Bankruptcy Court governing such solicitation.

"***Solicitation Materials***" means any solicitation materials distributed in connection with the Solicitation, including without limitation, the Disclosure Statement and the Chapter 11 Plan, in form and substance acceptable to the Company and the Requisite Consenting Priority Lenders.

"***Termination Date***" means the date on which this Agreement terminates in accordance with Section 8.

"***Termination Event***" means any Company Termination Event, Priority Lenders' Termination Event, or Other Termination Event.

"***Transaction Expenses***" means all fees and expenses incurred by any administrative or collateral agents under the Priority First Lien Credit Agreement, including all fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Houlihan Lokey, Inc.

"***Subject Claims***" has the meaning set forth in Section 9(a).

"***Transfer***" has the meaning set forth in Section 9(a).

"***Warrants***" has the meaning set forth in the Restructuring Term Sheet.

"***Skadden***" means Skadden, Arps, Slate, Meagher & Flom LLP.

(b)    Rules of Construction.  When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," (iv) references to "$," "dollar," or any other currency are to United States dollars, (v) all references to time of day refer to Eastern time, as in effect in New York, New York on such day, and (vi) the word "or" shall not be exclusive and shall be read to mean "and/or."

**2.**    **THE RESTRUCTURING TERM SHEET**.  The Restructuring Term Sheet is expressly incorporated herein by reference and made a part of this Agreement as if fully set forth herein.  The terms and conditions of the Restructuring are set forth in the Restructuring Term Sheet; provided that the Restructuring Term Sheet is supplemented by the terms and conditions of this Agreement.  In the event of any inconsistencies between the terms of this Agreement and the Restructuring Term Sheet, the Restructuring Term Sheet shall govern.

3.      **BANKRUPTCY PROCESS; PLAN OF REORGANIZATION**.

(a)     <u>Filing of the Chapter 11 cases</u>.  The Company shall file the Chapter 11 cases within three (3) days of the execution of this Agreement.

(b)     <u>Filing of the Chapter 11 Plan and Disclosure Statement</u>.  The Parties shall work together in good faith to negotiate and document the Chapter 11 Plan and Disclosure Statement in accordance with this Agreement and, if applicable, the Restructuring Term Sheet. The Company shall file the Chapter 11 Plan and the Disclosure Statement with the Bankruptcy Court within ten (10) days after the delivery of the Business Plan.

(c)     <u>Confirmation of the Chapter 11 Plan</u>.  The Company shall use its commercially reasonable efforts to obtain the entry of the Confirmation Order as soon as reasonably practicable following the Plan Filing Date, in accordance with this Agreement and the Bankruptcy Code.

(d)     <u>DIP Financing and Cash Collateral</u>.  No later than one (1) business day after the Petition Date, the Company shall file a motion with the Bankruptcy Court seeking interim and final authority to use Cash Collateral and enter into the DIP Term Loan Facility in accordance with the DIP Orders.

4.      **COVENANTS OF THE CONSENTING PRIORITY LENDERS**

(a)     <u>Affirmative Covenants of the Consenting Priority Lenders</u>.  Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, each Consenting Priority Lender shall:

(i)      negotiate in good faith the Definitive Documentation;

(ii)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated herein, negotiate in good faith appropriate additional or alternative provisions to address any such impediment; <u>provided</u> <u>that</u> the economic outcome for the Consenting Priority Lenders and other material terms of this Agreement are preserved in any such provisions;

(iii)    timely vote (when solicited to do so in accordance with this Agreement) all of its Claims whether now or hereafter owned to accept the Chapter 11 Plan, and not change or withdraw such vote prior to the voting deadline to accept or reject the Chapter 11 Plan; <u>provided</u> that such vote shall be deemed revoked and void *ab initio* at any time following termination of this Agreement (other than as a result of the occurrence of the Effective Date);

(iv)    opt in to, or not opt out of, any applicable third party releases under the Chapter 11 Plan; <u>provided</u> that any such decision to opt in, or not opt out, shall be deemed revoked and void *ab initio* at any time following termination of this Agreement (other than as a result of the occurrence of the Effective Date);

8

(v)    promptly notify the Company, in writing, of any material governmental or third-party complaints, litigations, investigations, or hearings (or written communications indicating that the same may be contemplated or threatened) with respect to the Restructuring; and

(vi)    upon request by the Company and/or their advisors, promptly provide through Skadden, PJT Partners L.P., or the Company, as applicable, the aggregate principal amount of each Priority Lender's claim as of the date of such request, which the Company shall treat as Confidential Claims Information.

(b)    <u>Negative Covenants of the Consenting Priority Lenders</u>.  Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, each Consenting Priority Lender shall not:

(i)    vote any of its Claims to reject the Chapter 11 Plan;

(ii)    change or withdraw (or cause to be changed or withdrawn) any such vote or release described in <u>Sections (a)(iii)</u> and <u>(a)(iv)</u> above; <u>provided</u> <u>that</u> such vote or release shall be deemed revoked and void *ab initio* at any time following termination of this Agreement (other than as a result of the occurrence of the Effective Date);

(iii)    opt-out of, or fail to opt in to, any third party release contemplated by the Chapter 11 Plan; <u>provided that</u> such release shall be deemed revoked and void *ab initio* at any time following termination of this Agreement (other than as a result of the occurrence of the Effective Date);

(iv)    (A) object to, delay, impede, or take any other action to unreasonably interfere with, delay, or postpone acceptance, confirmation, or implementation of the Chapter 11 Plan, (B) directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout, or plan of reorganization for the Company other than the Chapter 11 Plan, or (C) otherwise take any action that could in any material respect interfere with, delay, or postpone the consummation of the Restructuring; or

(v)    initiate (or direct or encourage any agents, any official or unofficial committee, or any other Person to initiate) any action, including legal proceedings, that are inconsistent with, or that would materially delay, prevent, frustrate, or impede the approval, confirmation, or consummation, as applicable, of the Restructuring.

(c)    Notwithstanding the foregoing or anything contained in this Agreement, each Consenting Priority Lender shall not be:

(i)    obligated to deliver a consent or vote to accept the Chapter 11 Plan or any release set forth therein, or prohibited from withdrawing such consent or vote, in each case, upon the termination of this Agreement;

9

(ii)    subject to the Bankruptcy Code, and the Intercreditor Agreement, prohibited, limited, or restricted from (A) taking or directing any action to be taken relating to maintenance, protection, or preservation of any collateral or defending its Claims or Interests, or (B) enforcing any right, remedy, condition, consent, or approval requirement under this Agreement or any Definitive Documentation entered into in connection with the Restructuring;

(iii)    prohibited, limited, or restricted from contesting (in a proceeding or otherwise) whether any matter, fact, or thing is a breach of, or inconsistent with, this Agreement;

(iv)    prohibited, limited, or restricted from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, or asserting or raising any objection permitted under this Agreement in connection with any hearing on confirmation of the Chapter 11 Plan or any other matter so long as such appearance, objection, or the positions advocated in connection therewith are not inconsistent with this Agreement, the Intercreditor Agreement, and the Restructuring and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring; or

(v)    prohibited, limited, or restricted from engaging in discussions with or among the Company, officers, representatives, or advisors, any other Consenting Priority Lender or its affiliates, or any of their respective officers, representatives, or advisors, or any other party; provided that such discussions shall not be inconsistent with the Restructuring.

(d)    The covenants of the Consenting Priority Lenders in this <u>Section 4</u> are several and not joint.

**5.    <u>COVENANTS OF THE COMPANY</u>.**

(a)    <u>Affirmative Covenants of the Company</u>.    Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, the Company shall:

(i)    act in good faith and use commercially reasonable efforts to support and successfully complete the Restructuring and all transactions contemplated under this Agreement, in accordance with the Milestones;

(ii)    negotiate in good faith the Definitive Documentation;

(iii)    consult regularly (and in any event no less than weekly, or otherwise as often as reasonably requested by the Priority Lenders' Professionals) with the Priority Lenders' Professionals regarding all aspects of the Company's Restructuring;

(iv)    (A) provide Priority Lenders' Counsel drafts of all motions, applications, and other pleadings that the Company intends to file with the Bankruptcy Court relating to the DIP Term Loan Facility, the DIP Orders, the Chapter 11 Plan, any key employee incentive plan, any key employee retention plan, the first day hearing, the second day hearing, the Executory Contracts and Leases Information, this Agreement, or

10

any material written notices, filings, motions, pleading concerning the financial condition of the Company or the Priority Lenders' Claims at least three (3) days before the date when the Company intends to file such pleading to the extent reasonably practicable, and (B) provide the Priority Lenders' Counsel drafts of all other motions, applications, and other pleadings that the Company intends to file with the Bankruptcy Court at least one (1) day before the date when the Company intends to file such pleading to the extent reasonably practicable.

(v)    provide information reasonably requested by any Consenting Priority Lenders for purposes of effectuating the Restructuring, including, but not limited to, financial information concerning the Company;

(vi)    maintain its good standing under the laws of the state or other jurisdiction in which it is incorporated or organized;

(vii)    timely file a formal written objection to any motion filed with the Bankruptcy Court by a third party seeking entry of an order modifying or terminating the Company's exclusive right to file or solicit acceptances for a plan of reorganization;

(viii)    obtain any and all required governmental, regulatory, licensing, Bankruptcy Court, or other approvals (including, without limitation, any necessary third-party consents) necessary to implement or consummate the Restructuring;

(ix)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated herein, negotiate in good faith appropriate additional or alternative provisions to address any such impediment; provided that the economic outcome for the Consenting Priority Lenders and other material terms of this Agreement are preserved in any such provisions;

(x)    (A) consult in good faith with the Priority Lenders' Professionals on the Company's lease assumption and rejection strategy, including with respect to negotiations on the rejection, modification, or assumption of leases, (B) consult in good faith with the Priority Lenders' Professionals prior to the Company's entry into, termination, or modification of any material operational contracts or other arrangements; and (C) identify in writing to the Priority Lenders' Professionals the contracts and leases proposed to be assumed, assumed and assigned, or rejected by notice or motion to the Bankruptcy Court or pursuant to the Chapter 11 Plan at least three (3) calendar days prior to filing such motion or the Plan Supplement to the extent reasonably practicable, as the case may be (the "***Executory Contracts and Leases Information***").  The Company shall make relevant personnel or advisors reasonably available during business hours to provide reasonable assistance to the Consenting Priority Lenders' review of any such executory contracts and leases identified in the Executory Contracts and Leases Information;

(xi)    timely pay the fees and expenses of the Priority Lenders and their advisors in accordance with the terms of this Agreement, the Restructuring Term Sheet,

and the DIP Orders including payment of all such fees and expenses upon the closing of the DIP Term Loan Facility;

(xii) continue to operate its business in the ordinary course in accordance with its reasonable business judgment, and confer with the Consenting Priority Lenders and their respective representatives, as reasonably requested, to report on operational matters and the general status of ongoing operations;

(xiii) use commercially reasonable efforts to minimize the amount of Claims entitled to administrative priority allowed against the Company;

(xiv) provide to the Consenting Priority Lenders or the Priority Lenders' Professionals, upon reasonable advance notice to the Company, (A) reasonable access (without any material disruption to the conduct of the Company's businesses) during normal business hours to the Company's books, records, and facilities, and (B) reasonable access to the respective management and advisors of the Company during normal business hours for the purposes of evaluating the Company's finances and operations and participating in the Company's planning process with respect to the Restructuring;

(xv) promptly notify the Priority Lenders' Professionals upon becoming aware of any of the following occurrences: (A) the occurrence of a Termination Event; (B) any person challenging the validity or priority of, or seeking to avoid, the Priority First Lien Loans or any lien securing the Priority First Lien Loans pursuant to a pleading filed with the Bankruptcy Court or otherwise; (C) the Company, Skadden, or any of the Company's professionals receiving an Alternative Proposal, with such notice to include the identity of the non-Company Person or group of Persons involved as well as a written copy of such Alternative Proposal, unless prohibited by the terms of the Alternative Proposal or a separate agreement, in which case the Company shall use reasonable efforts to obtain the consent of the party proposing an Alternative Proposal to provide the Priority Lenders' Professionals (under a reasonably acceptable confidentiality agreement) the information contemplated by this sub-clause (C); provided, that to the extent the Company receives an Alternative Proposal and the Consenting Priority Lenders propose modifications to the terms of the Restructuring  contemplated hereby, the Company shall be permitted to fully inform counsel to any parties providing an Alternative Proposal of any material changes to the Restructuring; (D) the occurrence, or failure to occur, of any event of which the occurrence or failure to occur would be reasonably likely to cause (1) any representation or warranty of the Company contained in this Agreement to become untrue or inaccurate in any material respect, (2) any covenant of the Company contained in this Agreement not to be satisfied in any material respect, or (3) any condition precedent contained in the Chapter 11 Plan or this Agreement not to occur or become impossible to satisfy, (E) the receipt of any written notice from any third party alleging that the consent of such party is or may be required as a condition precedent to consummation of the transactions contemplated by the Restructuring, (F) the receipt of any written notice from any governmental body that is material to the consummation of the transactions contemplated by the Restructuring, (G) the receipt of any written notice of any proceeding commenced or threatened against the Company that, if determined in a

12

manner adverse to the Company would be material to the consummation of the transactions contemplated by the Restructuring, and (H) any failure of the Company to comply with or satisfy any covenant, condition, or agreement herein; and

(xvi)   use the information regarding any Claims owned at any time by any Consenting Priority Lender (the "***Confidential Claims Information***") solely in connection with this Agreement and keep the Confidential Claims Information strictly confidential and not disclose the Confidential Claims Information to any other Person except as specifically permitted by this Agreement or required by applicable law or court order.

(b)   <u>Negative Covenants of the Company</u>.  Subject to the terms and conditions hereof, including the Company's "fiduciary out" pursuant to <u>Section 8(b)(ii)</u>, for the duration of the Restructuring Support Period, the Company (except with the prior written consent of the Requisite Consenting Priority Lenders or the Priority Lenders' Professionals) shall not, directly or indirectly:

(i)   (A) announce an intention not to pursue the Restructuring; (B) suspend or revoke the Restructuring; or (C) execute any agreements, instruments, or other documents (including any document relating to an Alternative Proposal or any modifications or amendments to any Definitive Documentation) that, in whole or in part, are not materially consistent with this Agreement;

(ii)   take any actions that are inconsistent, or fail to take any actions that are consistent, with this Agreement, the Definitive Documentation, or the implementation of the Restructuring;

(iii)   enter into, terminate, or otherwise modify any material operational contracts, leases, or other arrangements other than (A) in the ordinary course of business, and (B) in connection with Project Fischer 2.0;

(iv)   enter into any transaction, or proposed settlement of any Claim, litigation, dispute, controversy, cause of action, proceeding, appeal, determination, investigation, matter, or otherwise that will materially impair the Company's ability to consummate the Restructuring or the value distributable to holders of Priority First Lien Loans Claims under the Chapter 11 Plan;

(v)   file, support, amend, or modify the Chapter 11 Plan except as provided by this Agreement;

(vi)   commence an avoidance action or other legal proceeding that challenges the validity, enforceability, or priority of the Priority First Lien Loans or obligations under the Priority First Lien Credit Agreement, or any liens securing the same;

(vii)   enter into any other restructuring support or similar agreement (including any settlement agreement) with respect to the Restructuring with any creditor, equity holder, ad hoc group, or statutory committee that would be inconsistent with the

13

Company's obligations under this Agreement or that would impair the Company's ability to consummate the Restructuring within the timeframe contemplated by this Agreement; or

(viii)   directly or indirectly, encourage any Person to undertake any action prohibited by this Section 5(b).

## 6.    **REPRESENTATIONS AND WARRANTIES**.

(a)    Each Party, severally and not jointly, represents and warrants to each other Party that the following statements are true, correct and complete as of the date hereof (as of the date that such Party first becomes a Party):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations hereunder. The execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership, or other similar action on its part;

(ii)    the execution, delivery, or performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule, or regulation applicable to it or its charter or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party;

(iii)    the execution, delivery, or performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state, or governmental authority or regulatory body; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(b)    Each Consenting Priority Lender severally (and not jointly) represents and warrants to the Company that as of the date hereof (or as of the date such Consenting Priority Lender becomes a party hereto), such Consenting Priority Lender (i) is the owner of the aggregate outstanding principal amount of Priority First Lien Loans set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Priority Lender that becomes a party hereto after the date hereof), or (ii) has, with respect to the beneficial owner(s) of such outstanding principal amount of Priority First Lien Loans, (A) sole investment or voting discretion with respect to such outstanding principal amount of Priority First Lien Loans, and (B) full power and authority to bind or act on the behalf of, such beneficial owner(s).

14

(c)      The Company represents and warrants to the Consenting Priority Lenders that there are no pending agreements (oral or written) with respect to an Alternative Proposal as of the date hereof.

## 7.      DEFINITIVE DOCUMENTS; GOOD FAITH COOPERATION; FURTHER ASSURANCES.

(a)      Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation and consummation of the Chapter 11 Plan and the Restructuring, as well as the negotiation, drafting, execution, and delivery of the Definitive Documents, which may, after the Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement (including the Exhibits and Schedules) and be in form and substance reasonably satisfactory to the Company and the Requisite Consenting Priority Lenders.

(b)      Subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and shall, subject to the Company's "fiduciary out" pursuant to Section 8(b)(ii) of this Agreement, refrain from taking any action that would frustrate the purposes and intent of this Agreement.

(c)      The Parties agree, consistent with clause (a) of this Section 7, to negotiate in good faith the Definitive Documents that are subject to negotiation and completion on the Effective Date and that, notwithstanding anything herein to the contrary, the Definitive Documents, including any motions or orders related thereto, shall not be inconsistent with this Agreement and otherwise subject to the applicable consent rights of the Parties set forth herein. The Company shall provide to the Consenting Priority Lenders, and shall direct its employees, officers, advisors, and other representatives to provide the Priority Lenders' Professionals (i) reasonable access (without any material disruption to the conduct of the Company's businesses) during normal business hours to the Company's books and records; (ii) reasonable access during normal business hours to the management and advisors of the Company; and (iii) reasonable responses to all reasonable diligence requests, in each case, for the purposes of evaluating the Company's assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs or entry into any of the Restructuring transactions.

## 8.      TERMINATION OF AGREEMENT.

This Agreement shall automatically terminate three (3) Business Days after delivery of written notice (i) to the Company (in accordance with Section 24) from the Requisite Consenting Priority Lenders at any time after and during the continuance of any Priority Lender Termination Event or (ii) from the Company to the Consenting Priority Lenders (in accordance with Section 24) at any time after the occurrence and during the continuance of any Company Termination Event.  This Agreement shall terminate automatically on the Effective Date without any further required action or notice.

15

Notwithstanding the foregoing, any of the dates set forth in this <u>Section 8</u> may be extended by written agreement among the Company and the Requisite Consenting Priority Lenders or the other lenders as applicable.

(a)    A "***Priority Lender Termination Event***" shall mean the occurrence of any of the following:

(i)    The material breach by the Company of any of the undertakings, representations, warranties, or covenants of the Company set forth herein that, if capable of being cured, remains uncured for a period of five (5) Business Days after the receipt of written notice of such breach from the Requisite Consenting Priority Lenders pursuant to this <u>Section 8</u> and in accordance with <u>Section 24</u> (as applicable).

(ii)    Entry of an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Company or that would materially and adversely affect the Company's ability to operate its businesses in the ordinary course.

(iii)    The Company shall not have filed the Chapter 11 Cases by February 10, 2019 (the "***Petition Date***").

(iv)    At 11:59 p.m. (Eastern Time) on the date that is two (2) days after the Petition Date, if the Bankruptcy Court shall not have entered the order approving debtor in possession financing on an interim basis (the "***Interim DIP Order***").

(v)    At 11:59 p.m. (Eastern Time) on the date that is thirty-six (36) days after the Petition Date, if the Company shall not have prepared in good faith and delivered a detailed five year business plan (the "***Business Plan***") to the Priority Lenders, that is reasonably acceptable to the Priority Lenders.

(vi)    At 11:59 p.m. (Eastern Time) on the date that is seven (7) days after the Company has delivered the Business Plan, if (A) the Company has not delivered an Oversecured Priority Claim Determination in writing to the Priority Lenders' Counsel on behalf of the Consenting Priority Lenders, unless the Company has filed the Chapter 11 Plan and accompanying disclosure statement (the "***Disclosure Statement***") in form and substance consistent with the Restructuring Term Sheet, it being understood that such Disclosure Statement may be supplemented in advance of the hearing for approval thereof, or (B) the Company has delivered an Oversecured Priority Claim Determination in writing to the Priority Lenders' Counsel on behalf of the Consenting Priority Lenders, unless the Company has filed an alternative Chapter 11 Plan that is acceptable to the Consenting Priority Lenders;

(vii)    At 11:59 p.m. (Eastern Time) on the date that is thirty (30) days after the entry of the Interim DIP Order, if the Bankruptcy Court shall not have entered an order approving the debtor in possession financing on a final basis (the "***Final DIP Order***");

(viii)    At 11:59 p.m. (Eastern Time) on the date that is thirty-eight (38) days after the Company has filed the Chapter 11 Plan and the Disclosure Statement, if the Bankruptcy Court shall not have entered the Disclosure Statement Order, provided that the Company shall use commercially reasonable efforts to obtain entry of the Disclosure Statement Order as soon as reasonably practicable.

(ix)    At 11:59 p.m. (Eastern Time) on the date that is forty-five (45) days after the entry of the Disclosure Statement Order, if the Bankruptcy Court shall not have entered the Confirmation Order.

(x)    At 11:59 p.m. (Eastern Time) on the date that is five (5) Business Days after the entry of the Confirmation Order, if the Effective Date of the Chapter 11 Plan shall have not occurred.

(xi)    The Company withdraws or modifies the Chapter 11 Plan or Disclosure Statement or files any motion or pleading with the Bankruptcy Court that is inconsistent with this Agreement or the Chapter 11 Plan and such withdrawal, modification, motion, or pleading has not been revoked before the earlier of (A) two (2) Business Days after the Company receives written notice from the Requisite Consenting Priority Lenders (in accordance with Section 24) that such withdrawal, modification, motion, or pleading is inconsistent with this Agreement or the Restructuring Term Sheet and (B) entry of an order of the Bankruptcy Court approving such withdrawal, modification, motion, or pleading.

(xii)    If (A) any of the DIP Orders are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Requisite Consenting Priority Lenders not to be unreasonably withheld, conditioned, or delayed, or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company has failed to object timely to such motion.

(xiii)    If (A) the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Requisite Consenting Priority Lenders not to be unreasonably withheld, conditioned, or delayed, or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company has failed to object timely to such motion.

(xiv)    The occurrence of the Maturity Date (as defined in the DIP Credit Agreement) without the Chapter 11 Plan having been substantially consummated; provided that this Priority Lender Termination Event shall only be assertable by the Required DIP Lenders.

(xv)    The Company (A) announces its intention not to support the Restructuring or the Chapter 11 Plan or (B) agrees to pursue (including, for the avoidance of doubt, as may be evidenced by a term sheet, letter of intent, court filing, or similar document) or announces its intention to pursue an Alternative Proposal.

(xvi)    The Bankruptcy Court grants relief that is materially inconsistent with this Agreement or the Chapter 11 Plan.

17

(xvii)   The Company files, propounds, or otherwise supports any chapter 11 plan other than the Chapter 11 Plan.

(xviii)   The occurrence of a Material Adverse Change.

(xix)   The dismissal of one or more of the Chapter 11 Cases.

(xx)   The appointment of a trustee, receiver, or examiner with expanded powers in one or more of the Chapter 11 Cases.

(xxi)   Any representation or warranty in this Agreement made by the Company shall have been untrue in any material respect when made.

(xxii)   The Company or its affiliates that are controlled by the Company shall assert after the Support Date any claim or cause of action against any administrative or collateral agents under the Priority First Lien Loans or any Consenting Priority Lender, except to enforce the terms of this Agreement.

(xxiii)   The DIP Term Loan Facility terminates in accordance with its terms.

(xxiv)   The Bankruptcy Court (or other court of competent jurisdiction) enters an order invalidating, disallowing, subordinating or limiting the enforceability, priority, or validity of any of the Consenting Priority Lenders' Claims or liens.

(xxv)   The failure by the Company to timely pay all fees and expenses of the Consenting Priority Lenders in accordance with the terms of this Agreement.

(xxvi)   The final forms of any of the Definitive Documents are not consistent in any material respect with this Agreement (or are not acceptable or reasonably acceptable, as applicable, to the Parties designated in the definition of Definitive Documents).

(xxvii)   The occurrence of an Other Termination Event.

(xxviii)   Any Consenting Priority Lender has transferred all (but not less than all) of its Claims in accordance with Section 9 (provided that this Agreement shall terminate only with respect to such Consenting Priority Lender on the date of such transfer and shall remain in effect as to other Consenting Priority Lenders).

(xxix)   At any time prior to the voting deadline for the Chapter 11 Plan, the Consenting Priority Lenders subject to this Agreement no longer beneficially own or control at any time a sufficient amount of outstanding debt under the Priority First Lien Loans to constitute Supermajority Consenting Lenders.

(b)    A "***Company Termination Event***" shall mean the occurrence of any of the following:

(i)    The breach, in any material respect, by one or more of the Consenting Priority Lenders of any of the undertakings, representations, warranties, or covenants of the Consenting Priority Lenders set forth herein which, if capable of being cured, remains uncured for a period of three (3) Business Days after the receipt of written notice of such breach pursuant to this Section 8 and in accordance with Section 24 (as applicable), but only if acceptance of the Chapter 11 Plan by the non-breaching Consenting Priority Lenders would not satisfy the conditions for acceptance set forth in Section 1126(c) of the Bankruptcy Code.

(ii)    The board of directors or other governing body of the Company reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement, the Chapter 11 Plan, or the Definitive Documents would be inconsistent with the exercise of its fiduciary duties under applicable law, it being understood that, subject to this Section 8(b)(ii), nothing in this Agreement shall require the Company or its subsidiaries or affiliates or any of their respective directors, managers, officers or members, as applicable (each in such person's capacity as a director, manager, officer or member), to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations under applicable law; provided that, the Company shall provide written notice of such determination in accordance with Section 24 (as applicable) to the Consenting Priority Lenders within one (1) day after the date of such determination and the Company shall engage in good faith discussions regarding the Transactions with the Consenting Priority Lenders following such notice.

(iii)    The Confirmation Order or the Disclosure Statement Order is reversed, stayed, dismissed, vacated, reconsidered or is materially modified or materially amended after entry in a manner that is not reasonably acceptable to the Company.

(iv)    The Company shall not have obtained votes accepting the Chapter 11 Plan from holders of the outstanding principal amounts of the Priority First Lien Loans sufficient to satisfy the conditions for acceptance set forth in Section 1126(c) of the Bankruptcy Code on or before the voting deadline set forth in the Solicitation Materials.

(v)    The occurrence of an Other Termination Event.

(c)    Other Termination Events.  An "***Other Termination Event***" shall mean the occurrence of any of the following:

(i)    Any governmental authority, including any regulatory authority or court of competent jurisdiction, issues any ruling, judgment, or order enjoining the consummation of, or rendering illegal, a material portion of the Restructuring, which

19

ruling, judgment, or order has not been not stayed, reversed, or vacated within twenty (20) Business Days after such issuance.

(ii)    At 11:59 p.m. (Eastern Time) on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Chapter 11 Plan (unless directly caused by a default by any Consenting Priority Lender of its obligations hereunder, in which event the Consenting Priority Lenders shall not have the right to terminate under this clause <u>(c)(ii)</u>) or refusing to approve the Disclosure Statement; <u>provided</u> <u>that</u> the Consenting Priority Lenders shall not have the right to terminate this Agreement pursuant to this clause <u>(c)(ii)</u> if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of the Chapter 11 Plan subject only to modifications to the Chapter 11 Plan or Disclosure Statement that would not affect the recovery or treatment that the Consenting Priority Lenders would receive pursuant to the Chapter 11 Plan.

(iii)    At 11:59 p.m. (Eastern Time) on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction either converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or dismissing the Chapter 11 Cases.

(d)    <u>Mutual Termination</u>.  This Agreement may be terminated by the mutual, written agreement of the Company and the Requisite Consenting Priority Lenders.

(e)    <u>Effect of Termination</u>.  Subject to the provisions contained in <u>Section 15</u>, upon the termination of this Agreement in accordance with this <u>Section 8</u>, this Agreement shall become void and of no further force or effect and each Party shall, except as otherwise provided in this Agreement, be immediately released from its respective liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement, shall have no further rights, benefits, or privileges hereunder, and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement and no such rights or remedies shall be deemed waived pursuant to a claim of laches or estoppel; <u>provided</u> <u>that</u> in no event shall any such termination relieve a Party from (i) liability for its breach or non-performance of its obligations hereunder before the date of such termination or (ii) its obligation to pay any fees of the Consenting Priority Lenders in accordance with <u>Section 27</u> through and including the date of such termination.  Upon any termination of this Agreement prior to the Effective Date, each of the Consenting Priority Lenders' votes on and releases provided in connection with the Chapter 11 Plan shall be automatically deemed to be withdrawn and void *ab initio* without further order of the Bankruptcy Court, and without the consent of the Company, irrespective of whether or not any voting deadline or similar deadline or bar has passed.

(f)    <u>Automatic Stay</u>.  The Company acknowledges that the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code; <u>provided</u> <u>that</u> nothing herein shall prejudice any Party's rights to argue that the giving of notice of termination was not proper under the terms of this Agreement.

## 9.    **TRANSFER OF CLAIMS**.

(a)    Each Consenting Priority Lender agrees that, during the Restructuring Support Period, it shall not sell, transfer, loan, issue, pledge, hypothecate, assign, or otherwise dispose of (each, a "*Transfer*"), any of its Claims or any option thereon or any right or interest therein or any other Claims against or interests in the Company (collectively, the "*Subject Claims*") (including grant any proxies, deposit any Subject Claims into a voting trust or enter into a voting agreement with respect to any such Subject Claims), unless the transferee thereof either (i) is a Consenting Priority Lender, in which case within two (2) Business Days of such Transfer the transferee shall provide written notice of such Transfer to Skadden, which notice shall disclose the principal amount of Subject Claims transferred and identity of the Consenting Priority Lender who has transferred the Subject Claims to the transferee, and which the Company shall treat as Confidential Claims Information, or (ii) before such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Priority Lender and to be bound by all of the terms of this Agreement applicable to the Consenting Priority Lenders (including with respect to any and all Subject Claims it already may hold against or in the Company before such Transfer) by executing a joinder agreement substantially in the form attached hereto as **Exhibit C** (a "*Joinder Agreement*"), and delivering an executed copy thereof within two (2) Business Days following such execution, to (A) Skadden and (B) the Consenting Priority Lenders' respective counsel (provided that if such transferee fails to timely deliver such notice of transfer, the transferor may provide such notice, and any notice so delivered shall be deemed effective for purposes of this Section 9(a)), in which event (1) the transferee shall be deemed to be a Consenting Priority Lender hereunder to the extent of such transferred rights and obligations and all other Claims it may own or control (2) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations. Each Consenting Priority Lender agrees that any Transfer of any Subject Claims that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each other Party shall have the right to enforce the voiding of such Transfer.

(b)    Notwithstanding Section 9(a): (i) a Consenting Priority Lender may Transfer its beneficial ownership of outstanding principal amount of the Priority First Lien Loans to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker become a Party, provided that (A) such Qualified Marketmaker must Transfer such right, title, or interest within five (5) Business Days following its receipt thereof, (B) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Priority First Lien Loans is to a transferee that is or becomes a Consenting Priority Lender at the time of such transfer and (C) such Consenting Priority Lender shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this Section 9; and (ii) if a Consenting Priority Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title, or interest in the Priority First Lien Loans that the Qualified Marketmaker acquires from a holder of the outstanding principal amount of Priority First Lien Loans who is not a Consenting Priority Lender without the requirement that the transferee be or become a Consenting Priority Lender.

(c)    Notwithstanding anything to the contrary herein, the foregoing provisions shall not preclude any Consenting Priority Lender from settling or delivering any beneficial ownership in the outstanding principal amount of the Priority First Lien Loans to settle any

confirmed transaction pending as of the date such Consenting Priority Lender entered into this Agreement.

(d)    <u>Additional Subject Claims</u>. Each Consenting Priority Lender agrees that if a Consenting Priority Lender acquires or owns additional Subject Claims (other than in its capacity as a Qualified Marketmaker), then without any further action such Subject Claims shall be subject to this Agreement (including the obligations of the Consenting Priority Lenders under this <u>Section 9</u>).

10.    **DISCLOSURE; PUBLICITY**. To the extent reasonably practicable, the Company shall submit drafts to the Priority Lenders' Professionals of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement, or that in any way relate to the Chapter 11 Plan or the Restructuring, at least one (1) day prior to making any such disclosure, shall afford them a reasonable opportunity to comment on such documents and disclosures and shall incorporate any such comments in good faith, and in no event shall the identity of the Consenting Priority Lenders be publicly released in such documents and disclosures without the prior written consent of such Consenting Priority Lenders. Except as required by applicable law or otherwise permitted under the terms of any agreement between the Company and any Consenting Priority Lender, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Consenting Priority Lender), other than the Company or advisors to the Company, the principal outstanding amount or percentage of Priority First Lien Loans held by any Consenting Priority Lender, in each case, without such Consenting Priority Lender's prior written consent; <u>provided</u> <u>that</u> (a) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Priority Lender a reasonable opportunity to review and comment before such disclosure and shall take commercially reasonable measures to limit such disclosure, (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate outstanding principal amount of Priority First Lien Loans held by all the Consenting Priority Lenders collectively and (c) any Party may disclose information requested by a regulatory authority with jurisdiction over its operations to such authority, which the Company shall treat as Confidential Claims Information, without limitation or notice to any other Party. Notwithstanding the provisions in this <u>Section 10</u>, any Party may disclose a Consenting Priority Lender's individual holdings if consented to in writing by such Consenting Priority Lender. To the extent not prohibited by law, any public filing of this Agreement, with the Bankruptcy Court or otherwise, that includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Priority Lender (<u>provided</u> <u>that</u> the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

11.    **AMENDMENTS AND WAIVERS**. Except as otherwise expressly set forth herein, this Agreement, the Restructuring Term Sheet, and the Chapter 11 Plan (including any exhibits or schedules thereto, including the Plan Supplement) may not be waived, modified, amended, or supplemented except in a writing signed by the Company and the Requisite Consenting Priority Lenders; <u>provided</u> <u>that</u> any modification, amendment, or change to the definition of Consenting Priority Lender or Requisite Consenting Priority Lenders shall require the written consent of each Lender directly affected thereby. If a Consenting Priority Lender does not consent to a waiver, change, modification, or amendment to this Agreement, the

Restructuring Term Sheet, or the Chapter 11 Plan, in each case that would have the effect described above, requiring the consent of such Consenting Priority Lender (a "**Non-Consenting Lender**"), but such waiver, change, modification, or amendment receives the consent of the Supermajority Consenting Lenders, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Lender, but this Agreement shall continue in full force and effect with respect to all other Consenting Priority Lenders.

12.    **EFFECTIVENESS**.  This Agreement shall become effective and binding upon each Party on the Support Date and for signatories thereafter upon the execution and delivery by such Party of an executed signature page hereto; provided, that signature pages executed by Consenting Priority Lenders shall be delivered to (a) other Consenting Priority Lenders in a redacted form that removes such Consenting Priority Lenders' beneficially owned outstanding principal amount of the Priority First Lien Loans, and (b) the Company, Skadden, and the Company's other advisors in an unredacted form, but which shall be held confidentially by such recipients to the maximum extent permitted by applicable law, including the Bankruptcy Code.  For the avoidance of doubt, no affiliate of or business unit within a Consenting Priority Lender shall be subject to this Agreement unless they separately become a party thereto.

13.    **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL**.

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.  The Parties irrevocably agree that any legal action, suit, or proceeding (each, a "**Proceeding**") arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined exclusively in the Bankruptcy Court, and the Parties hereby irrevocably and generally submit to the exclusive jurisdiction of the Bankruptcy Court with respect to any Proceeding arising out of or relating to this Agreement and the Restructuring.  The Parties agree not to commence any Proceeding relating hereto or thereto except in the Bankruptcy Court.  The Parties further agree that notice as provided in Section 24 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  The Parties hereby irrevocably and unconditionally waive and agree not to assert that a Proceeding in the Bankruptcy Court is brought in an inconvenient forum, the venue of such Proceeding is improper, or that the Bankruptcy Court lacks authority to enter a final order pursuant to Article III of the United States Constitution.

(b)    The Parties hereby waive, to the fullest extent permitted by applicable law, any right they may have to a trial by jury in any Proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or any other theory).

14.    **SPECIFIC PERFORMANCE/REMEDIES**.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy.

The Parties hereby waive any requirement for the security or posting of any bond in connection with such remedies.

15.   **SURVIVAL**.    Notwithstanding the termination of this Agreement pursuant to Section 8, Sections 1, 13 –27, and 29 – 33 shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

16.   **HEADINGS**.  The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.   **NO WAIVER OF PARTICIPATION AND PRESERVATION OF RIGHTS**.  Nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses or any waiver of any rights such Party may have under any subordination or intercreditor agreement, and the Parties expressly reserve any and all of their respective rights, remedies, claims, and defenses, except as expressly provided herein and subject to the transactions contemplated hereby.

18.   **SUCCESSORS AND ASSIGNS; SEVERABILITY**.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives; provided that nothing contained in this Section 18 shall be deemed to permit Transfers of the outstanding principal amounts of Priority First Lien Loans or any Claims other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effectuate the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible, provided that no such modification may affect the economic outcome of this Agreement on any Consenting Priority Lender without such Consenting Priority Lender's prior written consent.

19.   **SEVERAL, NOT JOINT, OBLIGATIONS**.    The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

20.   **ACCESSION**.  After the date hereof, additional holders of outstanding principal  amounts of the Priority First Lien Loans may become Consenting Priority Lenders by agreeing in writing to be bound by the terms of this Agreement by executing a Joinder Agreement and delivering such Joinder Agreement in accordance with Section 24.

21.   **RELATIONSHIP AMONG PARTIES**.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other Person shall be a third-party beneficiary hereof.  No Party shall have any responsibility for the transfer, sale, purchase,

or other disposition of securities by any other entity, including with respect to the Priority First Lien Loans, by virtue of this Agreement. No prior history, pattern, or practice of sharing confidences among the Parties shall in any way affect or negate this understanding and agreement. The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any securities of the Company and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.

22. **PRIOR NEGOTIATIONS; ENTIRE AGREEMENT**. This Agreement, including the exhibits and schedules hereto (including the Restructuring Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations regarding the subject matters hereof and thereof, except that the Parties acknowledge that any confidentiality agreements executed between the Company and each Consenting Priority Lender before the execution of this Agreement and all intercreditor agreements shall continue in full force and effect.

23. **COUNTERPARTS**. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement delivered by facsimile or PDF shall be deemed to be an original for the purposes of this paragraph.

24. **NOTICES**. All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers or such other addresses of which notice is given pursuant hereto:

(a)    if to the Company, to:

FC Pioneer Holding Company, LLC
930 Ridgebrook Road
Sparks Glencoe, MD 21152
Attention:    David Smith
E-mail:    david.smith@tridentusahealth.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, IL 60606
Attention:    James J. Mazza, Jr. and Justin Winerman
Facsimile:    (312) 827-9322
E-mail:    james.mazza@skadden.com, justin.winerman@skadden.com

and

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY 10036
Attention:    Jason N. Kestecher
Facsimile:    (917) 777-2629
E-mail:        jason.kestecher@skadden.com

(b)        if to a Priority Lender or a transferee thereof, to the addresses, facsimile
numbers, or e-mail addresses set forth below such Priority Lender's signature
hereto (or as directed by any transferee thereof), as the case may be, with a copy
(which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas,
New York, NY 10019-6064
Attention:    Alan W. Kornberg, Esq., Robert A. Britton, Esq., and Michael
Turkel, Esq.
Facsimile:    (212) 757-3990
E-mail:        akornberg@paulweiss.com, rbritton@paulweiss.com, and
mturkel@paulweiss.com

Any notice given by mail, or courier shall be effective when received.  Any notice given by
facsimile or electronic mail shall be effective upon transmission.

     **25.**        **SETTLEMENT DISCUSSIONS**.  This Agreement and the Restructuring
Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of
litigation among the Parties.  Pursuant to Rule 408 of the Federal Rules of Evidence, any
applicable state rules of evidence, and any other applicable law, this Agreement and all
negotiations relating thereto shall not be admissible into evidence in any Proceeding other than a
Proceeding to enforce its terms.

     **26.**        **NO  SOLICITATION;  ADEQUATE  INFORMATION**.        This
Agreement is not and shall not be deemed to be a solicitation for consents to the Chapter 11 Plan.
The votes of the holders of claims against the Company will not be solicited until such holders
that are entitled to vote on the Chapter 11 Plan have received the Chapter 11 Plan, the Disclosure
Statement approved by the Bankruptcy Court, related ballots, and other required solicitation
materials.  In addition, this Agreement does not constitute an offer to issue or sell securities to
any Person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where
such offer or solicitation would be unlawful.  Although the Parties do not intend or believe that
this Agreement should constitute a solicitation or acceptance of a chapter 11 plan of
reorganization or an offering of securities, each Consenting Priority Lender acknowledges,
agrees, and represents to the other Parties that (a) it is either (i) a qualified institutional buyer as
defined in Rule 144A of the Securities Act, (ii) an institutional accredited investor (as defined in
Rule 501(a)(1), (2), (3), or (7) under the Securities Act, or (iii) a non-U.S. Person under
Regulation S under the Securities Act, and (b) any securities of the Company acquired by the
Consenting Priority Lender in connection with the Restructuring will have been acquired for
investment and not with a view to distribution or resale in violation of the Securities Act.

**27.**     **PAYMENT OF FEES**.  Subject to the DIP Orders, the Company shall pay, within five (5) days following receipt of any invoice, all fees and expenses of the Priority First Lien Agent's Professionals, without the need for any Person to file a fee application or otherwise seek Bankruptcy Court approval of such fees and expenses.  It shall be a condition precedent to the Effective Date that all outstanding Transaction Expenses shall have been paid in full.

**28.**     **RELEASES**.  The Parties agree that the Restructuring will, to the fullest extent permitted by applicable law, include a full release of the Company, any agents, the Consenting Priority Lenders, and each of their respective subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners, managers, affiliates, and representatives.

**29.**     **NO ADMISSIONS**.  This Agreement shall in no event be construed as, or deemed to be evidence of, an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims and defenses which it has asserted or could assert. No Party shall have, by reason of this Agreement, a fiduciary relationship in respect of any other Party or any Person, or the Company, and nothing in this Agreement, expressed or implied, is intended to, or shall be construed as to, impose upon any Party any obligation in respect of this Agreement except as expressly set forth herein.

**30.**     **NO INDEPENDENT OBLIGATIONS OR LIABILITIES OF AGENTS, ETC**.  Any custodian, depositary, agent, or management company that executes this Agreement or any Joinder Agreement for and on behalf of any Consenting Priority Lender, in circumstances where the relevant Consenting Priority Lender is or becomes a party to this Agreement and such custodian, depositary, agent, or management company merely executes this Agreement or the relevant Joinder Agreement on its behalf, shall have no obligations or liability under this Agreement or the relevant Joinder Agreement. For the avoidance of doubt, reference to a custodian, depository, agent, or management company shall not exculpate any Consenting Priority Lender from obligations or liabilities under this Agreement.

**31.**     **QUALIFICATION ON CONSENTING LENDER REPRESENTATIONS**.  The Parties acknowledge that all representations, warranties, covenants, and other agreements made by any Consenting Priority Lender that is a separately managed account of an investment manager are being made only with respect to the Claims managed by such investment manager (in the amount identified on the signature pages hereto), and shall not apply to (or be deemed to be made in relation to) any Claims that may be beneficially owned by such Consenting Priority Lender that are not held through accounts managed by such investment manager.

**32.**     **BUSINESS DAY CONVENTION**.  When a period of days under this agreement ends on a Saturday, Sunday, or any day in New York which is a legal holiday or a day on which banking institutions are authorized or required to be closed, then such period shall be extended to the specified hour of the next Business Day.

33. **REPRESENTATION BY COUNSEL**. The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

*[Signature pages follow.]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**American Diagnostics Services, Inc.**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory

**Community Mobile Diagnostics, LLC**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory

**Community Mobile Ultrasound, LLC**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory

**Diagnostic Labs Holdings, LLC**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory

**FC Pioneer Holding Company, LLC**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory

**JLMD Manager, LLC**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory

**Kan-Di-Ki, LLC**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory


**Main Street Clinical Laboratory, Inc.**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory


**MDX-MDL Holdings, LLC**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory


**Metrostat Clinical Laboratory – Austin, Inc.**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory


**MX Holdings, Inc.**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory


**MX USA, LLC**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory

**New Trident Holdcorp, Inc.**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory

**Rely Radiology Holdings, LLC**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory

**Schryver Medical Sales and Marketing, LLC**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory

**Symphony Diagnostic Services No. 1, LLC**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory

**Trident Clinical Services Holdings, Inc.**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory

**Trident Clinical Services Holdings, LLC**

By: _____
    Name: Thomas McCaffery
    Title: Authorized Signatory

**TridentUSA Foot Care Services, LLC**

By: _____
     Name: Thomas McCaffery
     Title: Authorized Signatory


**TridentUSA Mobile Clinical Services, LLC**

By: _____
     Name: Thomas McCaffery
     Title: Authorized Signatory


**TridentUSA Mobile Infusion Services, LLC**

By: _____
     Name: Thomas McCaffery
     Title: Authorized Signatory


**U.S. Lab & Radiology, Inc.**

By: _____
     Name: Thomas McCaffery
     Title: Authorized Signatory

**SILVER POINT FINANCE, LLC,**
as Priority First Lien Agent

By: _____
Name: Michael A. Gatto
Title: Authorized Signatory

*[Signature Page to Restructuring Support Agreement]*

**SPCP GROUP, LLC,**
as Consenting Priority Lender

By: _____

Name:
Title: Michael A. Gatto
Authorized Signatory

## <u>Exhibit A</u>

## COMPANY SIGNATORIES

American Diagnostic Services, Inc.

Community Mobile Diagnostics, LLC

Community Mobile Ultrasound, LLC

Diagnostic Labs Holdings, LLC

FC Pioneer Holding Company, LLC

JLMD Manager, LLC

Kan-Di-Ki, LLC

Main Street Clinical Laboratory, Inc.

MDX-MDL Holdings, Inc.

Metrostat Clinical Laboratory – Austin, Inc.

MX Holdings, LLC

MX USA, LLC

New Trident Holdcorp, Inc.

Rely Radiology Holdings, LLC

Schryver Medical Sales and Marketing, LLC

Symphony Diagnostic Services No. 1, LLC

Trident Clinical Services Holdings, Inc.

Trident Clinical Services Holdings, LLC

Trident Holding Company, LLC

TridentUSA Foot Care Services LLC

TridentUSA Mobile Clinical Services, LLC

TridentUSA Mobile Infusion Services, LLC

U.S. Lab & Radiology, Inc.

**<u>Exhibit B</u>**

**Restructuring Term Sheet**

_____

**TRIDENT**


**RESTRUCTURING TERM SHEET**


**February 10, 2019**

_____


**THIS TERM SHEET AND THE EXHIBITS ATTACHED HERETO (THE "TERM SHEET") DO NOT CONSTITUTE (NOR SHALL THEY BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY EXCHANGE OR PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH SECTION 4(A)(2) OF THE SECURITIES ACT OF 1933 AND APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS.**


**THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING AND ANY AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET.[1]**


This Term Sheet sets forth the principal terms of a proposed restructuring (the "Restructuring") of the existing debt of the Company (as defined below) under the Priority First Lien Credit Agreement (as defined below) and certain other obligations of, and existing equity interests in, the Company through a "pre-negotiated" plan of reorganization (the "Chapter 11 Plan") and related disclosure statement (the "Disclosure Statement") to be filed by the Company in connection with commencing cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Following consummation of the Restructuring, the Company shall be referred to herein as the "Reorganized Company."

---

[1]    The "Priority Lender Group" means the group of Consenting Priority Lenders (as defined herein) represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP on the date hereof, and, in each case, to the extent each such Priority Lender continues to hold Priority Claims. The "Priority Lender Group Professionals" consist of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Houlihan Lokey, Inc.

| Restructuring Support Parties | |
|---|---|
| Company | New Trident Holdcorp, Inc., Trident Clinical Services Holdings, Inc., and Schryver Medical Sales and Marketing, LLC, on behalf of themselves and certain of their affiliated entities listed on **Annex A** hereto (collectively, the "Company"). |
| Consenting Priority Lenders | Certain beneficial holders of, or investment advisors, investment managers, managers, nominees, advisors, or subadvisors to funds that beneficially own, Priority Claims (as defined below) representing at least two-thirds of the aggregate amount of all outstanding Priority Claims (which shall include, for the avoidance of doubt, the Priority Lender Group) (collectively, the "Consenting Priority Lenders"), each of whom will execute the restructuring support agreement to which this Term Sheet is attached (together with the exhibits and schedules attached to such agreement, each as it may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "RSA") binding them to take or refrain from taking certain actions in support of the Restructuring of the Company on terms and conditions materially consistent with this Term Sheet. |
| **Proposed Treatment of Claims and Interests Under the Chapter 11 Plan** | |
| Administrative, Priority Tax, Other Priority, and Other Secured Claims | Unless a holder of an allowed administrative, priority tax, other priority, or other secured claim agrees to a lesser treatment, on the Effective Date (as defined below) or as soon as reasonably practicable thereafter, each holder of such an administrative, priority tax, other priority, or other secured claim will, at the option of the Company (with the reasonable consent of the Priority Lender Group), (a) be reinstated, (b) receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such claim, cash equal to the full amount of its claim, (c) with respect to other secured claims, receive delivery of the collateral securing any such claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (d) receive such other treatment as is consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code and acceptable to the Priority Lenders. |
| Priority Claims | To the extent that the Company has not made the Oversecured Priority Claim Determination:[2] |
| | Unless a holder of a Priority Claim (as defined herein) agrees to a lesser treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an allowed Priority Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Priority Claim, its *pro rata* share and interest in: |
| | (a) $105 million in principal amount of first lien term loans (the "New First Lien Debt"),[3] to be extended to the Reorganized Company |

---

[2] The "Oversecured Priority Claim Determination" means the Company has reasonably determined in good faith upon the advice of an outside investment bank after the Company has delivered the Business Plan that the Claims of the Priority Lenders (inclusive of any interest, prepayment fee, and other amounts payable under the Priority First Lien Credit Agreement) are oversecured.

[3] The exit loan documents will allow the Company to incur a working capital facility on terms and conditions TBD.

| | |
|---|---|
| | pursuant to the Chapter 11 Plan on the Effective Date, the material terms of which shall be substantially identical to those in the Priority First Lien Credit Agreement (as defined below), except that such loans shall bear interest at a rate of LIBOR *plus* 4% per annum payable in cash *plus* 3.5% per annum payable-in-kind; <u>provided</u> <u>that</u> the Company shall have the ability at any time to elect to pay interest at a rate of LIBOR *plus* 7% per annum payable in cash for any period; and |
| | (b)  100% of the issued and outstanding amount of the sole class of equity to be issued by the Reorganized Company (the "<u>Reorganized Common Equity</u>"), subject to dilution on account of the Warrants and the MIP (in each case, as defined below). |
| | As used in this Term Sheet, "<u>Priority Claims</u>" means all claims (as defined in section 101(5) of the Bankruptcy Code) against the Company arising under, relating to, or in connection with that certain Credit Agreement, dated as of April 30, 2018, among New Trident Holdcorp Inc., Trident Clinical Services Holdings, Inc., and Schryver Medical Sales and Marketing, LLC, as borrowers, the holding companies party thereto, the subsidiary guarantors party thereto, the lenders from time to time party thereto (the "<u>Priority Lenders</u>"), and Silver Point Finance, LLC, as administrative agent (the "<u>Priority First Lien Agent</u>") (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>Priority First Lien Credit Agreement</u>"). |
| | The Priority Claims will continue to accrue interest at the default rate on the terms set forth in the Priority First Lien Credit Agreement, and the Priority Lenders shall receive adequate protection payments on a current basis during the Chapter 11 Cases in an amount equal to interest that was required to be paid in cash prior to the Petition Date at the non-default rate payable under the Priority First Lien Credit Agreement. |
| | The Priority Lenders and the Priority First Lien Agent will waive the turnover provisions in the Intercreditor Agreement on the Effective Date of the Chapter 11 Plan, solely with respect to the treatment of the First Lien Claims and Second Lien Claims provided herein. |
| First Lien Claims | To the extent that the Company has not made the Oversecured Priority Claim Determination: |
| | Upon the Effective Date of the Plan, if the class of allowed First Lien Claims (as defined herein) votes to accept the Plan, holders of allowed First Lien Claims shall receive their *pro rata* share and interest in warrants, exercisable for up to [●]%[4] of the Reorganized Common Equity, subject to dilution by the MIP, on terms and conditions acceptable to the Priority Lender Group, and an expiry date of eighteen (18) months after the Effective Date at a strike price equal to the price per share that would result in a full return on invested capital to the Priority Lenders (inclusive of any interest, prepayment fee and other amounts payable under the Priority First Lien Credit Agreement) calculated as of the Effective Date, with such strike price continuing to accrue at a rate of LIBOR *plus* 9.5% compounding quarterly (the "<u>Warrants</u>"). |
| | If the class of allowed First Lien Claims rejects the Plan, holders of allowed |

---

[4] Allocation of 5% warrants among the holders of First Lien Claims and Second Lien Claims to be determined.

|  |  |
|---|---|
|  | First Lien Claims shall not receive any distribution under the Plan.<br><br>As used in this Term Sheet, "First Lien Claims" means all claims (as defined in section 101(5) of the Bankruptcy Code) against the Company arising under, relating to, or in connection with that certain Credit Agreement, dated as of July 31, 2013, among New Trident Holdcorp Inc., Trident Clinical Services Holdings, Inc., and Schryver Medical Sales and Marketing, LLC, as borrowers, the holding companies party thereto, the subsidiary guarantors party thereto, the lenders from time to time party thereto, and Cortland Capital Market Services LLC, as administrative agent (as amended, restated, supplemented, or otherwise modified from time to time). |
| Second Lien Claims | To the extent that the Company has not made the Oversecured Priority Claim Determination:<br><br>Upon the Effective Date of the Plan, if the class of allowed Second Lien Claims (as defined herein) votes to accept the Plan, holders of allowed Second Lien Claims shall receive their *pro rata* share and interest in Warrants, exercisable for up to [●]% of the Reorganized Common Equity, subject to dilution by the MIP.<br><br>If the class of allowed Second Lien Claims rejects the Plan, holders of allowed Second Lien Claims shall not receive any distribution under the Plan.<br><br>As used in this Term Sheet, "Second Lien Claims" means all claims (as defined in section 101(5) of the Bankruptcy Code) against the Company arising under, relating to, or in connection with that certain Credit Agreement, dated as of July 31, 2013, among New Trident Holdcorp Inc., Trident Clinical Services Holdings, Inc., and Schryver Medical Sales and Marketing, LLC, as borrowers, the holding companies party thereto, the subsidiary guarantors party thereto, the lenders from time to time party thereto, and Ares Capital Corporation, as administrative agent (as amended, restated, supplemented, or otherwise modified from time to time). |
| General Unsecured Claims | To the extent that the Company has not made the Oversecured Priority Claim Determination:<br><br>Upon the Effective Date of the Plan, if the class of allowed General Unsecured Claims (as defined herein) votes to accept the Plan, holders of allowed General Unsecured Claims shall receive their *pro rata* share and interest in $100,000.<br><br>In the event the class of allowed General Unsecured Claims rejects the Plan, holders of allowed General Unsecured Claims shall not receive any distribution under the Plan.<br><br>As used in this Term Sheet, "General Unsecured Claims" means all non-priority unsecured claims of the Company, excluding the First Lien Claims, the Second Lien Claims, Claims under section 503(b)(9) of the Bankruptcy Code, Claims in connection with contract assumption and/or assignment, Claims paid in accordance with critical vendor relief, and other Claims paid prior to the Effective Date of the Plan pursuant to any order of the Bankruptcy Court. |
| Section 510(b) Claims | Any Section 510(b) Claims (as defined below) shall be subordinated to all |

| | other claims against the Company. |
|---|---|
| | On the Effective Date, each holder of a Section 510(b) Claim shall receive no distribution on account thereof and each Section 510(b) Claim shall be discharged. |
| | As used in this Term Sheet, "<u>Section 510(b) Claims</u>" means all claims (as defined in section 101(5) of the Bankruptcy Code), if any, against the Company of the type described in section 510(b) of the Bankruptcy Code. |
| Company Interests | On the Effective Date, each holder of an allowed Company Interest (as defined below) shall receive no distribution on account thereof and each Company Interest shall be cancelled. |
| | As used in this Term Sheet, "<u>Company Interest</u>" means any common stock, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interest, unit, or share in the Company (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in the Company), whether or not arising under or in connection with any employment agreement and whether or not certificated, vested, transferable, preferred, common, voting, or denominated "stock" or a similar security. |
| Intercompany Claims | On the Effective Date, all claims held by one Company entity against any other Company entity will be, at the option of the Company (with the reasonable consent of the Priority Lender Group), either (a) reinstated, or (b) discharged without any distribution on account of such claims. |
| Intercompany Interests | On the Effective Date, all interests held by one Company entity in any other Company entity will be, at the option of the Company (with the reasonable consent of the Priority Lender Group), either (a) reinstated or (b) cancelled without any distribution on account of such interests. |
| **DIP Financing Terms** | |
| DIP Financing and Cash Collateral | The Company shall seek, and the Consenting Priority Lenders shall support, entry of an order authorizing debtor-in-possession financing ("<u>DIP Financing</u>") and the use of cash collateral pursuant to sections 363 and 364 of the Bankruptcy Code, pursuant to the terms contained in the DIP Credit Agreement and the Financing Order and described herein. |
| | On the Effective Date, all outstanding obligations under the DIP Facility shall convert into a term loan credit facility of the Reorganized Company with priority over all other indebtedness of the Reorganized Company and shall bear interest at a rate of LIBOR *plus* 7% per annum payable in cash (the "<u>Exit Term Loan Facility</u>"). |
| Borrower | All existing borrowers under the Priority First Lien Credit Agreement. |
| Guarantors | All existing loan parties under the Priority First Lien Credit Agreement other than the Borrowers. |
| Administrative Agent | Silver Point Finance, LLC |

| | |
|---|---|
| Lenders | All holders of the Priority Claims as of February 10, 2019 shall be entitled to participate *pro rata* in the DIP Financing; provided that it shall be a condition to such participation that any such holder becomes a party to the RSA. |
| Type and Amount of the DIP Facility | The DIP Financing shall consist of a two-draw term loan facility (the "DIP Facility") in an aggregate principal amount not to exceed $50 million (the DIP Lenders' commitments under the DIP Facility, the "DIP Commitments"). |
| Collateral | The DIP Facility will be secured by substantially all of the assets of the Company, excluding any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law, provided that, upon the entry of the Final DIP Order, the DIP Facility shall be secured by the proceeds of such causes of action. |
| Use of Proceeds | To fund the costs of administration of the Chapter 11 Cases and other general corporate purposes, consistent with, and subject to, the DIP Budget. |
| Maturity | All obligations of the Borrower and the Guarantors to the DIP Lenders and to the DIP Agent under the definitive documentation evidencing the DIP Facility, including, without limitation, all principal, accrued interest, cost, fees, and premiums provided for therein will be due and payable in full in cash (or such other form of consideration as the DIP Lenders may agree in their sole discretion) on the date that is one-hundred sixty-three (163) days after the Petition Date or immediately upon the occurrence of an event of default under the DIP Credit Agreement. |
| Upfront Premium | An upfront premium of 2% of the total amount of the DIP Commitments shall be payable from the first draw, in the form of an original issue discount, under the DIP Facility. Such payment shall be structured in the most tax efficient manner for the DIP Lenders. The Upfront Premium will be fully earned and payable with respect to the total amount of the DIP Commitments upon entry of the Interim DIP Order. |
| Interest Rate | All amounts outstanding under the DIP Facility will bear interest at a rate equal to LIBOR *plus* 8% per annum. |
| Lender Protections | Upon entry of the Final DIP Order, the DIP Documents shall provide for customary protections for the DIP Lenders, including, but not limited to, a waiver regarding section 506(c) of the Bankruptcy Code, the "equities of the case" under section 552(b) of the Bankruptcy Code, and the equitable doctrine of marshaling. |
| Adequate Protection | Ordinary and customary adequate protection for the Priority Lenders including superpriority claims, adequate protection liens, payment of current interest at the non-default rate, payment of professional fees, and information reporting. |
| Covenants | Ordinary and customary affirmative, negative, and financial covenants for loans of this type. |

| | |
|---|---|
| Case Milestones | As set forth in Section 8(a) of RSA. |
| Conditions Precedent for Borrowing Under the DIP Facility | Borrowing under the DIP Facility shall be subject to compliance with a budget acceptable to the Priority Lenders (the "DIP Budget") and other ordinary and customary conditions precedent to borrowing for loans of this type. |
| DIP Party Fees | The definitive documents evidencing and approving the DIP Financing shall provide for the payment of all fees and expenses of the DIP Lenders including of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Houlihan Lokey, Inc. |
| Carve Out | As set forth in the Interim DIP Order |
| Investigation Budget | The DIP Documents shall provide for the payment of professional fees and expenses in an amount not to exceed $35,000 in the aggregate only for the purpose of paying allowed professional fees of the creditors' committee to investigate claims against and potential objections with respect to the pre-petition obligations and pre-petition liens and security interests of the agents and the lenders (including, without limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of the agents and the lenders) provided that any fees, expenses or costs incurred by the Creditors' Committee in excess of the investigation shall not constitute an allowable administrative expense claim, including for purposes of section 1129(a)(9)(A) of the Bankruptcy Code. |
| **Implementation** | |
| Claims Resolution Matters | Prior to the Effective Date of the Chapter 11 Plan, the Company shall not enter into any agreements with holders of claims or interests relating to the allowance, estimation, validity, extent or priority of such claims or interests, or the classification and treatment of such claims or interests under the Chapter 11 Plan, without the reasonable consent of the Priority Lender Group, except for (i) claims which the Company is authorized to pay pursuant to an applicable first-day order; (ii) undisputed administrative claims arising postpetition in the ordinary course of business; and (iii) claims for which the allowed amount is less than $500,000. |
| Definitive Documentation | As soon as reasonably practicable, the Restructuring Support Parties will execute definitive documentation implementing the Restructuring in form and substance materially consistent with this Term Sheet. |
| Conditions Precedent to Effectiveness of Plan | The court order confirming the Chapter 11 Plan (the "Confirmation Order") shall be deemed to authorize, among other things, all actions that may be necessary or appropriate to effectuate any transaction described in or contemplated by, or necessary to effectuate the Chapter 11 Plan, including the borrowings by the Reorganized Company under the credit facilities described above, and the issuance of all securities, instruments, certificates and other documents required to be issued or delivered pursuant to the Restructuring.

The "Effective Date" shall occur upon: |

7

|  | (1) the satisfaction or waiver by the Company and the Consenting Priority Lenders of the following conditions precedent:<br><br>    (a) the Bankruptcy Court shall have entered the Confirmation Order and such Order shall be in full force and effect;<br><br>    (b) the Company shall have obtained all authorizations, consents, regulatory approvals, rulings, waivers or other documents that are necessary to implement and effectuate the Chapter 11 Plan and evidence thereof shall have been delivered to the Consenting Priority Lenders;<br><br>    (c) the payment by the Company of all fees and expenses of the DIP Lenders and Priority Lenders, including Paul, Weiss, Rifkind, Wharton & Garrison LLP and Houlihan Lokey, Inc.; and<br><br>    (d) the Company shall emerge with a minimum of $10 million of liquidity, or shall reasonably expect to build to $10 million of liquidity within 60 days of the Effective Date, in either case in a manner consistent with the terms set forth the section titled "Exit Financing";<br><br>(2) the satisfaction or waiver by the Company and the Priority Lender Group of the following condition precedent:<br><br>    (a) the Company shall have satisfied all conditions precedent set forth in the credit agreement evidencing the New First Lien Debt. |
| Key Employee Incentive Plan | The Company and the Consenting Priority Lenders have reached an agreement in principle with respect to the material terms of the Key Employee Incentive Plan (the "KEIP"), as summarized in Annex C hereto.  Such KEIP terms and conditions remain subject to modification by the Company with the reasonable consent of the Consenting Priority Lenders, provided, however, that the Company shall not increase the amount of the overall KEIP awards without the consent of the Consenting Priority Lenders. |
| Key Employee Retention Plan | The Company and the Consenting Priority Lenders have reached an agreement in principle with respect to the material terms of the Key Employee Retention Plan (the "KERP"), as summarized in Annex C hereto.  Such KERP terms and conditions remain subject to modification by the Company with the reasonable consent of the Consenting Priority Lenders, provided, however, that the Company shall not increase the amount of the overall KERP awards without the consent of the Consenting Priority Lenders..  For the avoidance of doubt, any payments under the KERP to qualifying employees of the Company will reduce such employees' existing 2019 retention bonus grants, if any, pursuant to the Company's existing retention bonus program. |
| Exit Financing | To the extent necessary to provide the Company at least $10 million of liquidity on the Effective Date or reasonably expected within 60 days of the |

8

| | |
|---|---|
| | Effective Date:<br><br>(1) in their sole discretion, the Priority Lenders may arrange for a capital raising or liquidity generating transaction to allow for the implementation and effectiveness of the Chapter 11 Plan (whether in the form of exit financing or otherwise) on terms and conditions reasonably acceptable to the Company; or<br><br>(2) solely to the extent that the Priority Lenders elect not to arrange for a capital raising or liquidity generating transaction to allow for the implementation and effectiveness of the Chapter 11 Plan, the Company may arrange for a senior secured liquidity ABL, receivables, or similar facility with revolving commitments in an aggregate amount not to exceed the difference between $10 million and the Debtors' projected available cash and Cash Equivalents (as defined in the DIP Credit Agreement) on the Effective Date, on terms and conditions reasonably acceptable to the Priority Lenders, which shall be senior in lien priority to the Exit Term Facility and the New First Lien Debt with respect to the Company's receivables and inventory assets. |

### Corporate Governance and Management Incentive Plans

| | |
|---|---|
| Board of Directors | The size and membership of the board of directors of the Reorganized Company shall be determined by the Consenting Priority Lenders in their sole discretion, shall include the Reorganized Company's Chief Executive Officer, and shall be disclosed in the Plan Supplement. |
| Corporate Governance Documents | In connection with the consummation of the Chapter 11 Plan, and consistent with section 1123(a)(6) of the Bankruptcy Code, the Reorganized Company shall adopt customary corporate governance documents, including an amended and restated certificate of incorporation, bylaws, the terms of which shall be satisfactory in all respects to the Priority Lender Group and the Company (collectively, the "Corporate Governance Documents").<br><br>Existing corporate governance documents will be amended and restated or terminated, as necessary, to, among other things, set forth the rights and obligations of the parties (consistent with this Term Sheet), the terms of which shall be satisfactory in all respects to the Priority Lender Group and the Company. |
| Existing Management Employment Agreements | All employment and compensation-related agreements of the Company as of the Petition Date, including any indemnification and severance obligations and guaranteed bonus amounts, and incentive compensation plans related thereto, shall be assumed. To the extent any employment-related agreements contain a sale-related bonus, the Consenting Priority Lenders shall begin renegotiating such bonus in good faith prior to the Effective Date based upon the post-emergence capital structure. For the avoidance of doubt, the consummation of the Restructuring shall not be deemed to constitute a change of control under the terms of any such agreement. Each Restructuring Support Party shall support any motion the Company may file seeking authority to assume any management employment agreements, management consulting agreements, and other employee compensation-related agreements that are existing and effective as of the Petition Date (and |

| | which, for the avoidance of doubt, are not entered into by the Company on or after the Petition Date). |
|---|---|
| Issuance of Reorganized Common Equity Under the Chapter 11 Plan | It is the intent of the parties that any "securities" as defined in section 2(a)(1) of the Securities Act of 1933 issued under the Chapter 11 Plan, except with respect to any entity that is an underwriter, shall be exempt from registration under U.S. state and federal securities laws pursuant to section 1145 of the Bankruptcy Code and the Reorganized Company will utilize section 1145 of the Bankruptcy Code, or to the extent that such exemption is unavailable, shall utilize any other available exemptions from registration, as applicable. |
| Management Incentive Plans | An amount of Reorganized Common Equity which shall not exceed 10% of the Reorganized Common Equity will be reserved for awards of fully diluted equity, options, restricted stock units, or other equity instruments at plan value for a management incentive plan ("MIP") (excluding any such equity, options, restricted stock units, or other equity instruments granted to the new Board of Directors) on terms to be determined by the new Board of Directors.  If the Priority Lenders and the Debtors agree to a capital structure for the Reorganized Company that is materially inconsistent with the terms of this Restructuring Term Sheet, the Consenting Priority Lenders and the Debtors shall consider that post-emergence capital structure in determining the overall percentage of the MIP.  The Reorganized Company shall have the right to set additional equity awards for the benefit of members of the new Board of Directors following the Effective Date. |
| **Miscellaneous Provisions** | |
| Additional Plan Provisions and Documentation | The Chapter 11 Plan shall contain other customary provisions for chapter 11 plans of this type.  The Chapter 11 Plan, plan supplement, Disclosure Statement, form of Chapter 11 Plan ballots, Confirmation Order and Corporate Governance Documents shall be in form and substance satisfactory to the Consenting Priority Lenders and the Company in all respects. |
| Fiduciary Duties | As set forth in RSA. |
| Releases/Exculpation | The Chapter 11 Plan and the Confirmation Order will provide for the releases and related provisions set forth in **Annex B** hereto. |
| Tax Issues | To the extent possible, the Restructuring contemplated by this Term Sheet shall be structured so as to obtain the most beneficial tax structure for the Reorganized Company as reasonably determined by the Company and the Priority Lender Group. |

## Annex A

### Affiliated Entities

American Diagnostic Services, Inc.

Community Mobile Diagnostics, LLC

Community Mobile Ultrasound, LLC

Diagnostic Labs Holdings, LLC

FC Pioneer Holding Company, LLC

JLMD Manager, LLC

Kan-Di-Ki, LLC

Main Street Clinical Laboratory, Inc.

MDX-MDL Holdings, Inc.

Metrostat Clinical Laboratory – Austin, Inc.

MX Holdings, LLC

MX USA, LLC

New Trident Holdcorp, Inc.

Rely Radiology Holdings, LLC

Schryver Medical Sales and Marketing, LLC

Symphony Diagnostic Services No. 1, LLC

Trident Clinical Services Holdings, Inc.

Trident Clinical Services Holdings, LLC

Trident Holding Company, LLC

TridentUSA Foot Care Services LLC

TridentUSA Mobile Clinical Services, LLC

TridentUSA Mobile Infusion Services, LLC

U.S. Lab & Radiology, Inc.

**Annex B**

**RELEASES AND EXCULPATION**

| Definitions | "**Claim**" means a "claim," as defined in section 101(5) of the Bankruptcy Code, as against any Debtor. |
|---|---|
| | "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the transactions contemplated thereby. |
| | "**Estates**" means the estates of the Company created on the Petition Date under section 541 of the Bankruptcy Code. |
| | "**Final Order**" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing will then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment will have been affirmed by the highest court to which such order was appealed, or certiorari will have been denied, or a new trial, reargument, or rehearing will have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing will have expired; provided, however, that no order or judgment will fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment. |
| | "**Interest**" means any equity security (as defined in section 101(16) of the Bankruptcy Code) of the Company, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in the Company, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Company, whether fully vested or vesting in the future, including, without limitation, equity or equity-based incentives, grants, or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, or contractors of the Company, to acquire any such interests in the Company that existed immediately before the Effective Date. |
| | "**Impaired**" means,  with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code. |
| | "**Released Parties**" means, collectively:  (a) the Company; (b) each of the Consenting Priority Lenders; (c) the DIP Agent; (d) the DIP Lenders; (e) the administrative and collateral agents under the Priority First Lien Credit Agreement; (f) the Priority Lender Group and each of its members; (g) with respect to each of the foregoing entities in clauses (a) through (f), each of their current and former affiliates; and (h) with respect to each of the foregoing |

|  | entities in clauses (a) through (g), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

"**Releasing Parties**" means, collectively, (a) the Company; (b) each of the Consenting Priority Lenders; (c) the DIP Agent; (d) the DIP Lenders; (e) the administrative and collateral agents under the Priority First Lien Credit Agreement; (f) the Priority Lender Group and each of its members; (g) with respect to each of the foregoing parties under (a) through (f), each of their current and former affiliates; (h) with respect to each of the foregoing entities in clauses (a) through (g), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees; and (i) without limiting the foregoing, each holder of a Claim against or Interest in the Company that (1) voted to accept the Plan, (2) is deemed to accept the Plan, (3) is deemed to reject the Plan and did not indicate that they opt to not grant the releases provided in the Plan; (4) whose vote to accept or reject the Plan was solicited but who does not vote either to accept or to reject the Plan and, further, did not indicate that they opt to not grant the releases provided in the Plan, or (5) voted to reject the Plan and did not indicate that they opt to not grant the releases provided in the Plan.  For the avoidance of doubt, the Releasing Parties shall not include any holder of a Claim against or interest in the Company that was entitled to vote on the Plan, voted to reject the Plan, and elected to opt-out of the releases provided for in the Plan (an "<u>Excluded Releasing Party</u>");

"**Reorganized Company**"  means the Company as reorganized pursuant to the Plan. |
| **Releases** | <u>Releases by the Company</u>:  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Definitive Documents, including the preserved causes of action, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Company and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties will be deemed forever released and discharged, to the maximum extent permitted by law, by the Company, the Reorganized Company, the Estates, all affiliates or subsidiaries managed or controlled by the foregoing, and each of their predecessors, successors and assigns, subsidiaries, and affiliates, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, from any and all |

Claims, Interests or causes of action whatsoever, including any derivative Claims asserted or that could have been asserted on behalf of the Company, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, directly or indirectly, in any manner whatsoever, the Company, the assets, liabilities, operations or business of the Company, the Restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Company or the Reorganized Company, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Company and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the DIP Orders, the Plan, this Term Sheet, the RSA, the Definitive Documents, or any related agreements, instruments, or other documents, or  the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided that nothing in the Plan shall be construed to release the Released Parties from willful misconduct or intentional fraud as determined by a Final Order.

Third Party Releases:  The Plan and Confirmation Order shall provide that, effective as of the Effective Date, the Releasing Parties conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each entity so discharged and released shall be deemed discharged and released by the Releasing Parties) the Released Parties and their respective property from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Company, the Reorganized Company, or their Estates, any Claims or causes of action asserted on behalf of any Holder of any Claim or any Interest or that any Holder of a Claim or an Interest would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising prior to the Effective Date from, in whole or in part, directly or indirectly, in any manner whatsoever, the Company, the assets, liabilities, operations or business of the Debtors, the Restructuring, the Chapter 11 Cases, or the RSA, the purchase, sale, transfer or rescission of any debt, security, asset, right, or interest of the Company or the Reorganized Company, the subject matter of, or the transactions or events giving rise to, any Claim against or Interest in the Company that is treated in the Plan, the business or contractual arrangements between the Company and any Released Party, the negotiation, formulation, or preparation of the Restructuring documents or related agreements, instruments or other documents, including the DIP Orders, the Plan, this Term Sheet, the RSA, the Definitive Documents, or any related agreements or instruments, or the solicitation of votes with respect to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date,  provided that nothing in the Plan shall be construed to release the Released Parties   from any claims based upon willful misconduct or intentional fraud as determined by a Final Order (the "Third Party Release").

| Exculpation | The Plan will provide that "**Exculpated Parties**" will have the same meaning as |

4

| | |
|---|---|
| | Released Parties. |
| | The Plan will contain exculpation provisions with language substantially to the effect of the following: |
| | To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement, the RSA, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for fraud or willful misconduct, as determined by a Final Order. This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. |
| **Injunction** | The Plan will provide for an injunction solely with respect to any Claim or Interest extinguished, discharged, or released pursuant to the Plan, with language substantially to the effect of the following: |
| | (a) Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan. |
| | (b) Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Company and a holder of a Claim against or Interest in the Company, all Entities that have held, hold, or may hold Claims against or Interests in the Company whether or not such parties have voted to accept or reject the Plan and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and causes of action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the |

|  | property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan. |
|  | (c) The injunctions in the Plan shall extend to any successors of the Company and the Reorganized Company and their respective property and interests in property. |

6

**Annex C**

Key Employee Incentive Plan and Key Employee Retention Plan
Summary of Principal Terms and Conditions

This Summary of Principal Terms and Conditions is intended merely as an outline of certain of the material terms of the Key Employee Incentive Plan ("KEIP") and Key Employee Retention Plan ("KERP") described herein and does not purport to summarize all the terms with respect to such plans.  This summary reflects the intention of the Company[5] and the Consenting Priority Lenders with respect to the KEIP and KERP, which remain subject to further modification by the Company with the reasonable consent of the Consenting Priority Lenders.

| KEY EMPLOYEE INCENTIVE PLAN ("KEIP") | |
|---|---|
| Purpose: | Incentive plan with the goal of navigating the Company through the restructuring. The KEIP is not replacing any existing annual incentive plans, and such annual incentive plans will be assumed under the Chapter 11 Plan |
| Participants / Eligibility: | Seven (7) key senior executives have been identified as potential participants based on influence in the Company and ability to drive restructuring activity and financial and operational achievements |
| Total Cost: | Total cost is determined by performance against specified metrics (as set forth below)<br><br>| Maximum Cost | $2,118,000 |<br>| Target Cost | $1,412,000 |<br>| Threshold Cost | $706,000 | |
| Metrics and Weighting: | ▪  33% Revenue (per the Company Business Plan)<br>▪  33% Cash Receipts (per the DIP Budget)<br>▪  33% Operating Disbursements (per the DIP Budget) |
| Plan Leverage: | Between Threshold, Target, and Maximum performance levels, there will be straight line interpolation<br><br>**Revenue**<br>| | Payout | Performance |<br>| Maximum | 150% of Target | 110% of Projection |<br>| Target | 100% of Target | 100% of Projection |<br>| Threshold | 50% of Target | 90% of Projection |<br><br>**Cash Receipts and Operating Disbursements**<br>| | Payout | Performance |<br>| Maximum | 150% of Target | 115% of DIP Budget |<br>| Target | 100% of Target | 100% of DIP Budget |<br>| Threshold | 50% of Target | 85% of DIP Budget | |
| Payout Timing: | ▪  Payout is tied to the life of the Chapter 11 Cases<br>▪  1/3 of payments will be made after 3 months and 2/3 upon emergence |
| KEY EMPLOYEE RETENTION PLAN ("KERP") | |
| Purpose: | Retain key leadership and individual contributors critical to the Company's ongoing operations and value maximization.  Any payments under the KERP to qualifying employees of the Company will reduce such employees' existing 2019 retention bonus grants, if any, pursuant to the Company's existing retention bonus program |

---

[5]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Restructuring Term Sheet, dated February 10, 2019.

| | |
|---|---|
| <u>Participants / Eligibility</u>: | Company management has conducted a criticality assessment to determine approximately 75 employees critical to the restructuring process |
| <u>Total Cost</u>: | Total cost of the KERP will be $1.5 million, which includes a discretionary pool that can be allocated to qualifying employees as criticality changes; awards for KERP participants are based on their criticality to the Company's restructuring |
| <u>Metrics and Weighting</u>: | Paid based on continued employment |
| <u>Payout Timing</u>: | <ul><li>Payout is tied to the life of the Chapter 11 Cases</li><li>1/3 of payments will be made after 3 months and 2/3 upon emergence</li></ul> |

**Exhibit C**

**FORM OF JOINDER AGREEMENT FOR CONSENTING PRIORITY LENDERS**

This joinder agreement (this "Joinder Agreement") to the Restructuring Support Agreement dated as of February [●], 2019 (as amended, modified, or otherwise supplemented from time to time, the "Agreement"), among New Trident Holdcorp, Inc. ("Trident"), Trident Clinical Services Holdings, Inc., and Schryver Medical Sales and Marketing, LLC, the subsidiaries of Trident party thereto (collectively the "Company"), and certain holders of outstanding principal amounts of term loans under that certain credit agreement dated as of April 30, 2018 (together with their respective successors and permitted assigns, the "Consenting Priority Lenders" and each, a "Consenting Priority Lender") is executed and delivered by _____ (the "Joining Party") as of _____, 201__. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1.  Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Priority Lender" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2.  Representations and Warranties.  With respect to the aggregate outstanding principal amount of Priority First Lien Loans set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Priority Lenders set forth in Section 6 of the Agreement.

3.  Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

*[Signature pages follow.]*

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the date first written above.

**[CONSENTING PRIORITY LENDER]**

By:_____

     Name:

     Title:

Principal Amount of Beneficially Owned Priority First Lien Loans:  $_____

Notice Address:

_____

_____

_____

Fax:_____

Attention:_____

E-mail:_____

## **Exhibit D**

DIP Credit Agreement

$50,000,000
SENIOR SECURED, SUPER PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT

Dated as of February 11, 2019,

among

NEW TRIDENT HOLDCORP, INC.,
as a Borrower and the Borrower Representative,

TRIDENT CLINICAL SERVICES HOLDINGS, INC.,
as a Borrower,

SCHRYVER MEDICAL SALES AND MARKETING, LLC,
as a Borrower,

TRIDENT HOLDING COMPANY, LLC,
as New Holdings,

THE OTHER GUARANTORS PARTY HERETO

and

THE LENDERS PARTY HERETO

————————————

SILVER POINT FINANCE, LLC,
as DIP Agent

**Table of Contents**

Page

ARTICLE I

Definitions and Accounting Terms

SECTION 1.01.  Defined Terms ................................................................................................1
SECTION 1.02.  Other Interpretive Provisions ......................................................................25
SECTION 1.03.  Accounting Terms .........................................................................................25
SECTION 1.04.  Rounding .......................................................................................................25
SECTION 1.05.  References to Agreements, Laws, Etc ..........................................................25
SECTION 1.06.  Times of Day and Timing of Payment and Performance ..............................25
SECTION 1.07.  [Reserved] .....................................................................................................26
SECTION 1.08.  [Reserved] .....................................................................................................26
SECTION 1.09.  Currency Equivalents Generally ..................................................................26

ARTICLE II

The Commitments and Borrowings

SECTION 2.01.  The Loans .......................................................................................................26
SECTION 2.02.  Borrowings, Conversions and Continuations of Loans ................................26
SECTION 2.03.  [Reserved] .....................................................................................................28
SECTION 2.04.  [Reserved] .....................................................................................................28
SECTION 2.05.  Prepayments ..................................................................................................28
SECTION 2.06.  [Reserved] .....................................................................................................29
SECTION 2.07.  [Reserved] .....................................................................................................29
SECTION 2.08.  Interest ...........................................................................................................29
SECTION 2.09.  Fees ................................................................................................................29
SECTION 2.10.  Computation of Interest and Fees ................................................................29
SECTION 2.11.  Evidence of Indebtedness .............................................................................30
SECTION 2.12.  Payments Generally ......................................................................................30
SECTION 2.13.  Sharing of Payments, Etc. ............................................................................31
SECTION 2.14.  [Reserved] .....................................................................................................31
SECTION 2.15.  [Reserved] .....................................................................................................31
SECTION 2.16.  [Reserved] .....................................................................................................31
SECTION 2.17.  [Reserved] .....................................................................................................31
SECTION 2.18.  Borrower Representative ...............................................................................31

ARTICLE III

Taxes, Increased Costs Protection and Illegality

SECTION 3.01.  Taxes ..............................................................................................................32
SECTION 3.02.  Illegality .........................................................................................................36
SECTION 3.03.  Inability to Determine Rates .........................................................................36
SECTION 3.04.  Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate
                Loans .............................................................................................................36
SECTION 3.05.  Funding Losses ..............................................................................................38
SECTION 3.06.  Matters Applicable to All Requests for Compensation .................................38
SECTION 3.07.  [Reserved] .....................................................................................................39
SECTION 3.08.  Survival ..........................................................................................................39

i

ARTICLE IV

Conditions Precedent to Credit Extensions

SECTION 4.01.  Conditions to Initial Credit Extension ........................................................................ 39
SECTION 4.02.  Conditions to Credit Extensions Upon Final Order ..................................................... 40
SECTION 4.03.  Conditions Subsequent ................................................................................................ 41

ARTICLE V

Representations and Warranties

SECTION 5.01.  Existence, Qualification and Power; Compliance with Laws ........................................ 42
SECTION 5.02.  Authorization; No Contravention ................................................................................. 42
SECTION 5.03.  Governmental Authorization ....................................................................................... 42
SECTION 5.04.  Binding Effect ............................................................................................................. 42
SECTION 5.05.  Financial Statements; No Material Adverse Effect ...................................................... 43
SECTION 5.06.  Litigation ..................................................................................................................... 43
SECTION 5.07.  Labor Matters .............................................................................................................. 43
SECTION 5.08.  Ownership of Property; Liens; Closing Date Significant Contracts .............................. 43
SECTION 5.09.  Environmental Matters ................................................................................................. 43
SECTION 5.10.  Taxes ........................................................................................................................... 44
SECTION 5.11.  ERISA Compliance ..................................................................................................... 44
SECTION 5.12.  Subsidiaries ................................................................................................................. 44
SECTION 5.13.  Margin Regulations; Investment Company Act ............................................................ 44
SECTION 5.14.  Disclosure .................................................................................................................... 45
SECTION 5.15.  Intellectual Property; Licenses, Etc. ........................................................................... 45
SECTION 5.16.  [Reserved] ................................................................................................................... 45
SECTION 5.17.  [Reserved] ................................................................................................................... 45
SECTION 5.18.  USA PATRIOT Act and OFAC ................................................................................... 45
SECTION 5.19.  Collateral Documents .................................................................................................. 45
SECTION 5.20.  Initial Budget .............................................................................................................. 46
SECTION 5.21.  Chapter 11 Cases ........................................................................................................ 46

ARTICLE VI

Affirmative Covenants

SECTION 6.01.  Financial Statements .................................................................................................... 46
SECTION 6.02.  Certificates; Other Information .................................................................................... 47
SECTION 6.03.  Notices ........................................................................................................................ 48
SECTION 6.04.  Payment of Obligations ............................................................................................... 49
SECTION 6.05.  Preservation of Existence, Etc. .................................................................................... 49
SECTION 6.06.  Maintenance of Properties ........................................................................................... 49
SECTION 6.07.  Maintenance of Insurance ........................................................................................... 49
SECTION 6.08.  Compliance with Laws ................................................................................................ 50
SECTION 6.09.  Books and Records ...................................................................................................... 50
SECTION 6.10.  Inspection Rights ........................................................................................................ 50
SECTION 6.11.  Covenant to Guarantee Obligations and Give Security ............................................... 50
SECTION 6.12.  Loan Proceeds ............................................................................................................. 51
SECTION 6.13.  Further Assurances ...................................................................................................... 51
SECTION 6.14.  [Reserved] ................................................................................................................... 51
SECTION 6.15.  [Reserved] ................................................................................................................... 51
SECTION 6.16.  Use of Proceeds .......................................................................................................... 51
SECTION 6.17.  [Reserved]. .................................................................................................................. 52
SECTION 6.18.  Case Milestones .......................................................................................................... 52

ii

SECTION 6.19.  Restructuring Advisor; Cooperation with Restructuring Advisor. ...............................52
SECTION 6.20.  Budget. ...............................................................................................................52
SECTION 6.21.  Lender Calls ........................................................................................................53
SECTION 6.22.  DIP Orders ..........................................................................................................53

## ARTICLE VII

### Negative Covenants

SECTION 7.01.  Liens ....................................................................................................................53
SECTION 7.02.  [Reserved] ...........................................................................................................56
SECTION 7.03.  Indebtedness .......................................................................................................56
SECTION 7.04.  Fundamental Changes .......................................................................................57
SECTION 7.05.  Dispositions ........................................................................................................58
SECTION 7.06.  Restricted Payments ..........................................................................................59
SECTION 7.07.  Change in Nature of Business ...........................................................................59
SECTION 7.08.  Transactions with Affiliates ..............................................................................59
SECTION 7.09.  Burdensome Agreements ...................................................................................59
SECTION 7.10.  Change in Fiscal Year .......................................................................................60
SECTION 7.11.  Modification of Terms of Financing Documentation; Organization Documents; Swap
                 Contracts ............................................................................................................60
SECTION 7.12.  [Reserved] ...........................................................................................................60
SECTION 7.13.  New Holdings ......................................................................................................61
SECTION 7.14.  Settlement ...........................................................................................................61
SECTION 7.15.  [Reserved] ...........................................................................................................61
SECTION 7.16.  Insolvency Proceeding Claims ..........................................................................61
SECTION 7.17.  Bankruptcy Actions ...........................................................................................61
SECTION 7.18.  Subrogation .........................................................................................................61

## ARTICLE VIII

### Events of Default and Remedies

SECTION 8.01.  Events of Default .................................................................................................61
SECTION 8.02.  Remedies upon Event of Default .......................................................................65
SECTION 8.03.  Application of Funds ...........................................................................................66

## ARTICLE IX

### DIP Agent

SECTION 9.01.  Appointment and Authority of the DIP Agent .....................................................66
SECTION 9.02.  Rights as a Lender ..............................................................................................67
SECTION 9.03.  Exculpatory Provisions .......................................................................................67
SECTION 9.04.  Reliance by the DIP Agent .................................................................................68
SECTION 9.05.  Delegation of Duties ...........................................................................................69
SECTION 9.06.  Non-Reliance on DIP Agent and Other Lenders; Disclosure of Information by DIP Agent ..........69
SECTION 9.07.  Indemnification of Agents ..................................................................................70
SECTION 9.08.  [Reserved] ...........................................................................................................70
SECTION 9.09.  Resignation of DIP Agent ..................................................................................70
SECTION 9.10.  [Reserved] ...........................................................................................................71
SECTION 9.11.  Collateral and Guaranty Matters .......................................................................71
SECTION 9.12.  [Reserved] ...........................................................................................................72
SECTION 9.13.  [Reserved] ...........................................................................................................72
SECTION 9.14.  Withholding Taxes ..............................................................................................72
SECTION 9.15.  Notice of Default .................................................................................................72

iii

SECTION 9.16.  Agents Entitled to Act as Lender ................................................................. 72
SECTION 9.17.  [Reserved] ..................................................................................................... 73
SECTION 9.18.  CIP Regulations ............................................................................................. 73

## ARTICLE X

### Miscellaneous

SECTION 10.01. Amendments, Etc. .......................................................................................... 73
SECTION 10.02. Notices and Other Communications; Facsimile Copies ............................... 74
SECTION 10.03. No Waiver; Cumulative Remedies ............................................................... 76
SECTION 10.04. Secured Party Advisor Costs and Expenses ................................................. 76
SECTION 10.05. Indemnification by the Borrowers ............................................................... 76
SECTION 10.06. Marshaling; Payments Set Aside ................................................................. 77
SECTION 10.07. Successors and Assigns ................................................................................ 78
SECTION 10.08. Confidentiality .............................................................................................. 80
SECTION 10.09. Setoff ............................................................................................................. 81
SECTION 10.10. Interest Rate Limitation ............................................................................... 82
SECTION 10.11. Counterparts; Integration; Effectiveness .................................................... 82
SECTION 10.12. Electronic Execution of Assignments and Certain Other Documents ......... 82
SECTION 10.13. Survival of Representations and Warranties ................................................ 82
SECTION 10.14. Severability ................................................................................................... 82
SECTION 10.15. GOVERNING LAW ..................................................................................... 83
**SECTION 10.16.       WAIVER OF RIGHT TO TRIAL BY JURY** ................................. 83
SECTION 10.17. Binding Effect ............................................................................................... 84
SECTION 10.18. Lender Action ............................................................................................... 84
SECTION 10.19. Use of Name, Logo, Etc. .............................................................................. 84
SECTION 10.20. USA PATRIOT Act Notice .......................................................................... 84
SECTION 10.21. Service of Process ........................................................................................ 84
SECTION 10.22. No Advisory or Fiduciary Responsibility .................................................... 84
SECTION 10.23. Joint and Several Liability ........................................................................... 85
SECTION 10.24. Acknowledgment and Consents to Bail-In of EEA Financial Institutions ....................................... 85

## ARTICLE XI

### SUPERPRIORITY CLAIMS, COLLATERAL SECURITY, ETC.

SECTION 11.01. Grant of Security ........................................................................................... 86
SECTION 11.02. Administrative Priority ................................................................................. 87
SECTION 11.03. No Filings Required ...................................................................................... 87
SECTION 11.04. Grants, Rights and Remedies ....................................................................... 87
SECTION 11.05. No Discharge; Survival of Claims ............................................................... 87
SECTION 11.06. Prohibition on Surcharge; Etc. .................................................................... 88
SECTION 11.07. Marshalling Obligations ............................................................................... 88

## ARTICLE XII

### GUARANTY

SECTION 12.01. The Guarantee ............................................................................................... 88
SECTION 12.02. Obligations Unconditional ........................................................................... 88
SECTION 12.03. Reinstatement ................................................................................................ 89
SECTION 12.04. Subrogation ................................................................................................... 89
SECTION 12.05. Remedies ....................................................................................................... 89
SECTION 12.06. Continuing Guarantee ................................................................................... 89
SECTION 12.07. [Reserved] ..................................................................................................... 89

SECTION 12.08. General Limitation on Guarantee Obligations ................................................................89
SECTION 12.09. Waivers ..............................................................................................................................90

1709895.02-NYCSR03A - MSW

SCHEDULES

| | |
|---|---|
| I | Guarantors |
| 2.01 | Commitment |
| 5.08(a) | Real Property |
| 5.08(b) | Closing Date Significant Contracts |
| 5.12 | Subsidiaries and Other Equity Investments |
| 5.15 | Intellectual Property |
| 6.18 | Case Milestones |
| 6.20 | Budget Procedures and Permitted Variance |
| 7.01(b) | Existing Liens |
| 7.01(u) | Ground Leases |
| 7.03(b) | Existing Indebtedness |
| 7.05(m) | Asset Disposition |
| 7.06 | Existing Investments |
| 7.09 | Existing Restrictions |
| 10.02 | DIP Agent's Office, Certain Addresses for Notices |
| 11.01 | Commercial Tort Claims |

EXHIBITS

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | Note |
| C | Compliance Certificate |
| D | Assignment and Assumption |
| E-1 | Non-Bank Certificate for Foreign Lenders That Are Not Treated as Partnerships for U.S. Federal Income Tax Purposes |
| E-2 | Non-Bank Certificate for Foreign Lenders That Are Treated as Partnerships for U.S. Federal Income Tax Purposes |
| E-3 | Non-Bank Certificate for Foreign Participants That Are Not Treated as Partnerships for U.S. Federal Income Tax Purposes |
| E-4 | Non-Bank Certificate for Foreign Partnerships That Are Treated as Partnerships for U.S. Federal Income Tax Purposes |
| F | Withdrawal Notice |

1709895.02-NYCSR03A - MSW

### SENIOR SECURED, SUPER PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT

This SENIOR SECURED, SUPER PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT is entered into as of February 11, 2019 (as amended, restated, supplemented, waived or otherwise modified from time to time, this "**Agreement**"), among NEW TRIDENT HOLDCORP, INC., a Delaware corporation ("**Trident Borrower**"), TRIDENT CLINICAL SERVICES HOLDINGS, INC., a Delaware corporation ("**Clinical Services Borrower**"), SCHRYVER MEDICAL SALES AND MARKETING, LLC, a Colorado limited liability company, as a Borrower ("**Schryver Borrower**" and, together with the Trident Borrower and the Clinical Services Borrower, each a "**Borrower**", and collectively, the "**Borrowers**"), TRIDENT HOLDING COMPANY, LLC, a Delaware limited liability company, "**New Holdings**"), the other GUARANTORS from time to time party hereto, each of the foregoing a debtor and debtor-in-possession, SILVER POINT FINANCE, LLC, as administrative agent and collateral agent (in such capacities, including any successor(s) thereto, the "**DIP Agent**") under the Loan Documents and each lender from time to time party hereto (collectively, the "**Lenders**" and, each, individually, a "**Lender**").

### RECITALS

WHEREAS, on February 10, 2019 (the "**Petition Date**"), the Borrowers and the Guarantors (collectively, the "**Debtors**") each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, which cases are being jointly administered as Bankruptcy Case No. 19-10384 (the "**Chapter 11 Cases**") before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). The Debtors remain in possession of their assets and are operating their businesses as debtors-in-possession under Chapter 11 of the Bankruptcy Code;

WHEREAS, the Borrowers have a need for additional liquidity and have requested that the Lenders make advances and other financial accommodations available to the Borrowers of up to $50 million on a senior secured and superpriority basis (subject to the limitations described herein), pursuant to, inter alia, Section 364(c) and (d) of the Bankruptcy Code to be used for the purposes specified herein, and in accordance with the terms hereof; and

WHEREAS, the Lenders are willing to provide advances and other financial accommodations to the Borrowers on the terms and subject to the conditions of this Agreement, so long as such post-petition credit obligations are (i) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of the Debtors, whether now owned or hereafter acquired, which Liens are superior to all other Liens pursuant to Section 364(c) and (d) of the Bankruptcy Code (collectively, the "**DIP Liens**") and (ii) given priority pursuant to Section 364(c)(i) of the Bankruptcy Code over any or all administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, under Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c), 507, 546 or 726 of the Bankruptcy Code, subject, as to priority, only to the Senior Permitted Liens, as provided in the DIP Orders.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

### ARTICLE I

### Definitions and Accounting Terms

SECTION 1.01.    Defined Terms. As used in this Agreement, the following terms shall have the meanings set forth below:

"**Actual Cash Receipts**" means the sum of all cash receipts received by the Loan Parties (excluding any borrowings under this Agreement) during the relevant period of determination which corresponds to the budgeted cash receipts described in the line item contained in the Budget under the heading "Total Cash Receipts", as determined in a manner consistent with the Budget.

"**Actual Disbursement Amount**" means the sum of all cash expenditures made by the Loan Parties during the relevant period of determination which corresponds to each of the budgeted cash expenditures described in the line item contained in the Budget under the headings "Operating Disbursements", "Non-Operating Disbursements" and the sub-headings "Other Operating Disbursements", "Capital Expenditures" and "UCC Professionals", as determined in a manner consistent with the Budget.

"**Adequate Protection Liens**" has the meaning assigned to the term "Adequate Protection Liens" in the Interim Order (or the Final Order, when applicable).

"**Adequate Protection Superpriority Claims**" has the meaning assigned to the term "Adequate Protection Superpriority Claims" in the Interim Order (or the Final Order, when applicable)

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the DIP Agent.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto. For the avoidance of doubt, none of the DIP Agent or its lending affiliates shall be deemed to be an Affiliate of New Holdings, the Borrowers or any of their respective Subsidiaries.

"**Agent Parties**" has the meaning specified in Section 10.02(d).

"**Agent-Related Persons**" means the DIP Agent, together with its Affiliates, and the officers, directors, employees, agents, attorney-in-fact, partners, trustees and advisors, including the Secured Party Advisors, of such Persons and of such Persons' Affiliates.

"**Agreement**" has the meaning specified in the introductory paragraph.

"**Alamo Obligations**" means the Obligations (including obligations to reimburse the sellers for advance payments of any equipment leases) of the sellers assumed pursuant to that certain Asset Purchase Agreement, dated as of October 30, 2017, by and among Alamo Mobile X-ray & EKG Services, Inc., a Texas corporation, Professional Ultrasound Imaging, Inc., a Texas corporation and Fast Response Portable Imaging, LLC, a Florida limited liability company, as sellers, Symphony Diagnostic Services No. 1, LLC and American Diagnostics Services, Inc., as buyers, and the other parties from time to time party thereto.

"**Annual Financial Statements**" means, collectively, the audited consolidated balance sheets of New Holdings and its consolidated Subsidiaries as of December 29, 2017 and December 30, 2016, and the related consolidated statements of operations, members' equity and cash flows for New Holdings and its consolidated Subsidiaries for the fiscal years then ended.

"**Ankura**" has the meaning specified in Section 6.19(a).

"**Applicable Rate**" means a percentage per annum equal to (a) 8.00% for Eurodollar Rate Loans and (y) 7.00% for Base Rate Loans.

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

2

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of <u>Exhibit D</u> or any other form approved by the DIP Agent.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" means title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto.

"**Bankruptcy Court**" has the meaning specified in the recitals hereto.

"**Base Rate**" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate <u>plus</u> 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by the DIP Agent as its "prime rate" and (c) the Eurodollar Rate on such day for an Interest Period of one (1) month <u>plus</u> 1.00% (or, if such day is not a Business Day, the immediately preceding Business Day); *provided* that the Base Rate will be deemed not to be less than 2.25% per annum. The "**prime rate**" is a rate set by the DIP Agent based upon various factors including the DIP Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by the DIP Agent shall take effect at the opening of business on the day specified in the public announcement of such change.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Borrower**" and "**Borrowers**" have the respective meanings specified in the preliminary statements to this Agreement.

"**Borrower Materials**" means materials and/or information provided by or on behalf of the Borrowers hereunder.

"**Borrower Representative**" means Trident Borrower and any applicable successors or assigns as agreed by all then-existing Borrowers and notified in writing to the DIP Agent.

"**Borrowing**" means a borrowing consisting of Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Rate Loans, having the same Interest Period.

"**Budget**" means the Initial Budget, as supplemented, modified and/or extended from time to time in accordance with Section 6.20 and the Interim Order (or Final Order, as applicable).

"**Budget Variance Report**" means a weekly report provided by the Borrower Representative to the DIP Agent (i) showing on a rolling four-week and cumulative basis the Actual Cash Receipts, the Actual Disbursement Amount and the total ending book cash balance (as described under the heading the "Total Ending Book Cash Balance" in the Budget), as required under the DIP Order and Schedule 6.20 hereof, through or as of the Friday of the prior week then ended, as applicable, noting therein all variances from the corresponding budgeted amounts set forth for such period in the Budget in a manner consistent with Schedule 6.20 hereof, and shall include explanations for all material variances, and (ii) certified by a Responsible Officer of the Borrower Representative. The Budget Variance Report shall be in a form reasonably satisfactory to the DIP Agent, and shall contain supporting information reasonably requested by the DIP Agent or the Required Lenders (the DIP Agent hereby acknowledges

that the form of Budget Variance Report provided by the Borrower Representative on or prior to the Closing Date is reasonably satisfactory).

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, New York, New York or the jurisdiction where the DIP Agent's Office is located and if such day relates to any interest rate settings as to a Eurodollar Rate Loan, any funding, disbursement, settlement and payment in respect of any such Eurodollar Rate Loan, or any other dealings to be carried out pursuant to this Agreement in respect of any such Eurodollar Rate Loan, means any such day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market.

"**Capitalized Lease Obligation**" means, at the time any determination thereof is to be made, the amount of the liability in respect of a Capitalized Lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) prepared in accordance with GAAP; provided that all obligations of any Person that are or would be characterized as operating lease obligations in accordance with GAAP on the Closing Date (whether or not such operating lease obligations were in effect on such date) shall continue to be accounted for as operating lease obligations (and not as Capitalized Lease Obligations) for purposes of this Agreement regardless of any change in GAAP following the Closing Date that would otherwise require such obligations to be recharacterized (on a prospective or retroactive basis or otherwise) as Capitalized Lease Obligations.

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, recorded as financing leases; *provided* that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Carve-Out**" has the meaning assigned to the term "Carve Out" in the Interim Order (or the Final Order, when applicable).

"**Case Milestones**" has the meaning specified in Section 6.18.

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by any Borrower or any Subsidiary:

(a)    Dollars;

(b)    in the case of any Foreign Subsidiary that is a Subsidiary or any jurisdiction in which any Borrower or any Subsidiary conducts business, such local currencies held by it, or used by it in such jurisdiction, from time to time in the ordinary course of business and not for speculation;

(c)    readily marketable direct obligations issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 12 months or less from the date of acquisition;

(d)    certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any domestic or foreign commercial bank having capital and surplus of not less than $500,000,000 in the case of U.S. banks and $100,000,000 (or the Dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(e)    repurchase obligations for underlying securities of the types described in clauses (c) and (d) above or clause (g) below entered into with any financial institution meeting the qualifications specified in clause (d) above;

4

(f)        commercial paper rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) and in each case maturing within 12 months after the date of creation or acquisition thereof;

(g)        marketable short-term money market and similar liquid funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(h)        [reserved];

(i)        Investments with average maturities of 3 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency);

(j)        investment funds investing substantially all of their assets in securities of the types described in clauses (a) through (i) above.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (a) and (b) above, provided that such amounts are converted into any currency listed in clauses (a) and (b) as promptly as practicable and in any event within ten (10) Business Days following the receipt of such amounts.

"**Cash Management Order**" means the Interim Order or Final Order, as applicable, of the Bankruptcy Court entered in the Chapter 11 Cases after the "first day" or "second day" hearing, together with all supplements, extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Required Lenders, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements or such other arrangements as shall be reasonably acceptable to the Required Lenders in all material respects.

"**Casualty Event**" means any event that gives rise to the receipt by a Borrower or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**Cash Management Services**" means any agreement or arrangement to provide cash management services, including treasury, depository, overdraft, credit card processing, credit or debit card, purchase card, electronic funds transfer and other cash management arrangements.

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

"**CFC Holdco**" has the meaning specified in the definition of "Collateral and Guarantee Requirement."

"**Change in Law**" means the occurrence, after the Closing Date (or, if later, with respect to the DIP Agent, any Lender or Eligible Assignee, the date such DIP Agent, Lender or Eligible Assignee becomes a party to this Agreement), of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty (excluding the taking effect after the Closing Date of a law, rule, regulation or treaty adopted prior to the Closing Date), (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority. It is understood and agreed that (i) the Dodd–Frank Wall Street Reform and Consumer Protection Act (Public Law 111-203, H.R. 4173), all Laws relating thereto and all interpretations and applications thereof and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall, for the purpose of this Agreement, be deemed to be adopted subsequent to the Closing Date.

5

"**Chapter 11 Cases**" has the meaning specified in the recitals hereto.

"**CIP Regulations**" has the meaning specified in Section 9.18.

"**Clinical Services Borrower**" has the meaning specified in the introductory paragraph to this Agreement.

"**Closing Date**" means the first date on which all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"**Closing Date Significant Contract**" means any contract or other arrangement to which New Holdings or any of its Subsidiaries is a party (other than the Loan Documents) for which breach, nonperformance, cancellation, termination or failure to renew could reasonably be expected to have a Material Adverse Effect (as such determination is made on the Closing Date only).

"**Closing Premium**" has the meaning specified in Section 2.09(b).

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means all the "Collateral" as defined in Section 11.01 hereof and the Interim Order (or Final Order, as applicable).

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that (in each case subject to the DIP Orders, including any limitations and exclusions set forth therein):

(a)    the DIP Agent shall have received each Collateral Document required to be delivered on the Closing Date or at such later time required hereunder or by such Collateral Documents, in each case, duly executed by each Loan Party that is party thereto;

(b)    all Obligations shall have been unconditionally guaranteed by New Holdings and each Subsidiary of each Borrower, and each such Subsidiary is scheduled on <u>Schedule I</u> (each, a "**Guarantor**");

(c)    the Obligations shall have been secured by a first-priority security interest in (i) all the Equity Interests of the Borrowers, (ii) all Equity Interests (other than Equity Interests of (x) a Foreign Subsidiary or (y) a Domestic Subsidiary described, in each case, in the following clauses (iii)(A), (B) and (C)) that are directly owned by a Borrower or any Subsidiary Guarantor, (iii) 100% of the issued and outstanding voting stock and 100% of all other Equity Interests of (A) each Foreign Subsidiary that is directly owned by a Borrower or any Subsidiary Guarantor, (B) each Domestic Subsidiary that is directly owned by a Borrower or by any Subsidiary Guarantor and that is a disregarded entity for United States Federal income tax purposes and substantially all of whose assets consist of Equity Interests of one or more Foreign Subsidiaries that are CFCs (each such Subsidiary described in this clause (iii)(B), a "**CFC Holdco**") and (C) each CFC that is directly owned by a Borrower or by any Subsidiary Guarantor and (iv) any other Equity Interests that are directly owned by a Borrower or any Subsidiary Guarantor; and

(d)    the Obligations shall have been secured by a perfected first-priority security interest (subject to the Senior Permitted Liens) in substantially all tangible and intangible real and personal property of the Borrowers and each Guarantor (including any Promissory Notes and any Instruments (each as defined in the Uniform Commercial Code) evidencing Indebtedness for borrowed money owed to a Loan Party, accounts, inventory, equipment, investment property, contract rights, applications and registrations of intellectual property registered with or, in the case of patents, issued by, and pending before the United States Patent and Trademark Office or the United States Copyright Office) and filed in the United States, other general intangibles, and proceeds of the foregoing), in each case, with the priority set forth in the DIP Orders and subject to exceptions and limitations otherwise set forth in this Agreement and the DIP Orders, and the Obligations shall be secured by any property that secures the obligations under the Priority Credit Agreement, First Lien Credit Agreement or Second Lien Credit Agreement.

6

"**Collateral Documents**" means, collectively, this Agreement, the DIP Orders or any security documents or other collateral documents delivered to the DIP Agent pursuant to Section 6.11 or 6.13 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the DIP Agent for the benefit of the Secured Parties.

"**Commitment**" means, as to each Lender, its obligation to make or be deemed to make a Loan to the Borrowers hereunder, expressed as an amount representing the maximum principal amount of the Loan to be made or deemed to be made by such Lender under this Agreement, as such commitment may be (a) reduced from time to time pursuant to Section 2.01 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The initial amount of each Lender's Commitment is set forth on Schedule 2.01 under the caption "Commitment" or, otherwise, in the Assignment and Assumption pursuant to which such Lender shall have assumed, reduced or increased its Commitment, as the case may be. As of the Closing Date, the total aggregate amount of the Commitments is $50,000,000.

"**Committed Loan Notice**" means a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to another Type of Loan, or (c) a continuation of Eurodollar Rate Loans, pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit A.

"**Committee**" means an official committee of unsecured creditors appointed in any of the Chapter 11 Cases by the U.S. Trustee.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. §1 et. seq.), as amended from time to time and any successor statute.

"**Communications**" has the meaning specified in Section 10.02(b).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C and which certificate shall in any event be a certificate of a Financial Officer of the Borrower Representative (a) certifying as to whether a Default has occurred and is continuing and, if applicable, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (b) setting forth a reasonably detailed calculation of the Net Cash Proceeds received during the most recent applicable period by or on behalf of, any Borrower or any Subsidiary in respect of the incurrence or issuance of Indebtedness or issuance of Qualified Equity Interests subject to prepayment pursuant to Section 2.05(b)(iii) and (c) setting forth a reasonably detailed calculation of the Net Cash Proceeds received during the most recent applicable period by or on behalf of, any Borrower or any Subsidiary in respect of any Disposition subject to prepayment pursuant to Section 2.05(b)(ii).

"**Contingent Obligations**" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other monetary obligations that do not constitute Indebtedness ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(e)        to purchase any such primary obligation or any property constituting direct or indirect security therefor;

(f)        to advance or supply funds;

(i)        for the purchase or payment of any such primary obligation; or

(ii)        to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(g)        to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

7

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**," "**Controlled**" and "**Controlling**" have the respective meanings specified in the definition of "Affiliate."

"**Costs**" means all reasonable fees, expenses and disbursements of any law firm or other external legal counsel of the DIP Agent or any Lender or other Secured Party Advisor, to the extent reasonably documented and invoiced and payable by the Borrowers under Section 10.04 hereof.

"**Credit Extension**" means a Borrowing.

"**Cumulative Period**" means the period since the Petition Date through the Friday of the most recent week then ended.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning assigned to such term in the recitals hereto.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan (giving effect to Section 2.02(c)) plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**DIP Agent**" has the meaning specified in the introductory paragraph to this Agreement.

"**DIP Agent's Office**" means the DIP Agent's address(es) and, as appropriate, account(s) as set forth on Schedule 10.02, or such other address or account as the DIP Agent may from time to time notify the Borrower Representative and the Lenders.

"**DIP Liens**" has the meaning specified in the recitals hereto.

"**DIP Order**" means, as the context may require, the Interim Order and/or the Final Order, whichever is then applicable.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale or issuance of Equity Interests in a Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable (other than, for the avoidance of doubt, contingent indemnification obligations as to which no claim has been asserted)), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests and other than as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a

8

change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable (other than, for the avoidance of doubt, contingent indemnification obligations as to which no claim has been asserted), in whole or in part), (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in the case of each of the immediately preceding clauses (a), (b), (c) and (d), prior to the date that is one hundred and twenty (120) days after the Maturity Date.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any direct or indirect Subsidiary of a Borrower that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Sections 10.07(b)(iii) and (v) (subject to such consents, if any, as may be required under Section 10.07(b)(iii)).

"**Environment**" means ambient air, indoor air, surface water, groundwater, drinking water, land surface and subsurface strata and natural resources such as wetlands, flora and fauna.

"**Environmental Claim**" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations or proceedings with respect to any Environmental Liability (hereinafter "**Claims**"), including (i) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"**Environmental Laws**" means any and all Laws relating to the protection of the Environment or, to the extent relating to exposure to Hazardous Materials, human health.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) of any Loan Party or any of its Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the Environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of

9

any of the foregoing (including through convertible securities), excluding from the foregoing any debt securities convertible into Equity Interests, whether or not such debt securities include any right of participation with Equity Interests, until any such conversion.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that together with any Loan Party is treated as a single employer within the meaning of Section 414(b) or (c) of the Code.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) with respect to any Pension Plan, the failure to satisfy the minimum funding standard under Section 412 of the Code and Section 302 of ERISA, whether or not waived, which could result in liability to any Loan Party; (c) a withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as a withdrawal under Section 4062(e) of ERISA; (d) a complete or partial withdrawal by any Loan Party or any of their respective ERISA Affiliates from a Multiemployer Plan that results in the imposition of Withdrawal Liability or written notification that a Multiemployer Plan is insolvent or is in reorganization within the meaning of Title IV of ERISA or is in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (e) the filing under Section 4041(c) of ERISA of a notice of intent to terminate a Pension Plan, the treatment of a Pension Plan or Multiemployer Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or Multiemployer Plan, other than for the payment of plan contributions or PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any of their respective ERISA Affiliates; (g) the imposition of a Lien under Section 303(k) of ERISA with respect to any Pension Plan; (h) with respect to any Plan, the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in liability to any Loan Party; or (i) a determination that any Pension Plan is in "at risk" status (within the meaning of Section 303 of ERISA).

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Eurodollar Rate**" means the rate per annum determined as the ratio of

(a)

(i)     for any Interest Period with respect to a Eurodollar Rate Loan, the rate per annum equal to (i) the London interbank offered rate administered by the ICE Benchmark Administration (or any other person which takes over the administration of that rate) for deposits (for delivery on the first day of such period), as published by Reuters (or such other commercially available source providing quotations of LIBOR as may be designated by the DIP Agent from time to time) ("**LIBOR**") at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, or (ii) if such published rate is not available at such time for any reason, then the "Eurodollar Rate" for such Interest Period shall be the rate per annum determined by the DIP Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in Same Day Funds in the approximate amount of the Eurodollar Rate Loan being made, continued or converted and with a term equivalent to such Interest Period would be offered by the DIP Agent's London branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two (2) Business Days prior to the commencement of such Interest Period; or

(ii)     for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to (i) LIBOR, at approximately 11:00 a.m., London time determined two (2) Business Days prior to such date for Dollar deposits being delivered in the London interbank market for a term of one month commencing that day or (ii) if such published rate is not available at such time for any reason, the rate per annum determined by the DIP Agent to be the rate at which deposits in Dollars for delivery on the

10

date of determination in Same Day Funds in the approximate amount of the Base Rate Loan being made or maintained and with a term equal to one month would be offered by the DIP Agent's London branch to major banks in the London interbank eurodollar market at their request at the date and time of determination;

*provided* that the Eurodollar Rate with respect to Loans that bear interest at a rate based on clause (a)(i) of this definition will be deemed not to be less than 1.25% per annum to

(b) the difference between the number one and the Eurodollar Reserve Requirements with respect to such Interest Period for such Eurodollar Rate Loan.

"**Eurodollar Rate Loan**" means a Loan that bears interest at a rate based on clause (a)(i) of the definition of Eurodollar Rate.

"**Eurodollar Reserve Requirements**" means, with respect to any Interest Period and for any Eurodollar Rate Loan, a rate per annum equal to the aggregate, without duplication, of the maximum rates (expressed as a decimal number) of reserve requirements in effect two (2) Business Days prior to the first day of such Interest Period (including basic, supplemental, marginal and emergency reserves) under any regulations of the Federal Reserve Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "eurocurrency liabilities" in Regulation D of the Federal Reserve Board) maintained by a member bank of the United States Federal Reserve System.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Exclusion Event**" means any event or events resulting in the exclusion of any Borrower or any Subsidiary from participation in any Medical Reimbursement Program.

"**fair market value**" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Borrower Representative in good faith.

"**FATCA**" means Sections 1471 through 1474 of the Code as in effect as of the date hereof (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the DIP Agent on such day on such transactions as determined by the DIP Agent.

"**Fee Letter**" means that certain letter agreement, dated as of the Closing Date, by and between the DIP Agent and the Borrower Representative.

"**Final Order**" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court in connection therewith, which order shall be reasonably satisfactory in form and substance to the DIP Agent and the Required Lenders in all respects and in the DIP Agent's and Required Lenders' sole discretion together with all extensions, modifications, and amendments thereto, in form and substance reasonably satisfactory to the DIP Agent and Required Lenders in their sole discretion, which, among other matters but not by way of limitation, approves

11

this Agreement on a final basis and authorizes the Loan Parties to obtain credit facilities and incur, or guaranty, the Indebtedness provided for herein on a super priority basis, and to grant first-priority Liens contemplated under this Agreement and the other Loan Documents, as the case may be.

"**Financial Officer**" means the chief financial officer, the treasurer or other financial officer, as appropriate, of the Borrower Representative.

"**First Lien Administrative Agent**" means Cortland Capital Market Services LLC (as successor to Citibank, N.A.), in its capacity as administrative agent and collateral agent under the First Lien Credit Documents, or any successor administrative agent and/or collateral agent (or other representative), as the case may be, under the First Lien Credit Documents.

"**First Lien Credit Agreement**" means that certain First Lien Credit Agreement dated as of July 31, 2013 by and among New Holdings, the Borrowers, the lenders party thereto in their capacities as lenders thereunder, the First Lien Administrative Agent and the other agents party thereto, as the same may be amended, restated, amended and restated, modified, supplemented, extended, renewed, refunded, replaced or refinanced from time to time and as in effect on the Petition Date.

"**First Lien Credit Documents**" means the First Lien Credit Agreement, the First Lien/Second Lien Intercreditor Agreement and the other Loan Documents (as defined in the First Lien Credit Agreement), in each case, as amended and as in effect on the Petition Date.

"**First Lien/Second Lien Intercreditor Agreement**" means the First Lien/Second Lien Intercreditor Agreement dated as of July 31, 2013 and as amended through the date hereof, among the Loan Parties, Cortland Capital Market Services LLC (as successor to Citibank, N.A.), as First Lien Credit Agreement Administrative Agent for the First Lien Credit Agreement Secured Parties (each, as defined therein) and Ares Capital Corporation (as successor to Citibank, N.A.), as Second Lien Credit Agreement Administrative Agent for the Second Lien Credit Agreement Secured Parties (each, as defined therein) and each additional representative party thereto from time to time, as the same may be amended, restated, amended and restated, modified, supplemented, extended, or replaced from time to time and as in effect on the Petition Date.

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Biggers-Waters Flood Insurance Act of 2012 as now or hereafter in effect or any successor statute thereto, (v) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (vi) all other Laws relating to flood insurance.

"**Foreign Lender**" has the meaning specified in Section 3.01(b).

"**Foreign Plan**" means any employee benefit plan, program or agreement maintained or contributed to by, or entered into with, New Holdings or any Subsidiary of New Holdings with respect to employees employed outside the United States (other than benefit plans, programs or agreements that are mandated by applicable Laws).

"**Foreign Subsidiary**" means any direct or indirect Subsidiary of a Borrower that is not a Domestic Subsidiary.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fund**" means any Person (other than a natural person) that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time.

12

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Granting Lender**" has the meaning specified in Section 10.07(g).

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning specified in Section 12.01.

"**Guarantors**" has the meaning specified in the definition of "Collateral and Guarantee Requirement."

"**Guaranty**" means the guaranty made by New Holdings and the other Guarantors in favor of the DIP Agent on behalf of the Secured Parties pursuant to Article XII of this Agreement.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes, all hazardous or toxic substances, and all chemicals, wastes, pollutants or contaminants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas and infectious or medical wastes regulated pursuant to any Environmental Law.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following:

(h)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(i)     the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(j)     net obligations of such Person under any Swap Contract;

13

(k)        all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts and accrued expenses payable in the ordinary course of business, (ii) any earn-out obligation until such obligation is not paid after becoming due and payable and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business);

(l)        indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(m)        all Attributable Indebtedness;

(n)        [reserved];

(o)        all obligations of such Person in respect of Disqualified Equity Interests; and

(p)        to the extent not otherwise included above, all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) above shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby.

"**Indemnified Liabilities**" has the meaning specified in Section 10.05.

"**Indemnitees**" has the meaning specified in Section 10.05.

"**Information**" has the meaning specified in Section 10.08.

"**Initial Budget**" means the budget attached to the Interim Order.

"**Interest Payment Date**" means, (a) as to any Loan that is not a Base Rate Loan, the last day of each relevant Interest Period and the Maturity Date of the Loans; and (b) as to any Base Rate Loan, the last Business Day of each month and the Maturity Date of the Loans.

"**Interest Period**" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one month thereafter; *provided* that:

(q)        any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

(r)        any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(s)        no Interest Period shall extend beyond the Maturity Date.

"**Interim Order**" means the interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing, together with all supplements, extensions, modifications, and amendments thereto, in form and

14

substance reasonably satisfactory to the DIP Agent and the Required Lenders, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrowers and Guarantors to incur the Loans and provide the Guaranty hereunder and execute and perform under the terms of this Agreement and the other Loan Documents.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.

The amount of any Investment outstanding at any time shall be the original cost of such Investment, reduced by any dividend, distribution, interest payment, return of capital, repayment or other amount received in Cash Equivalents by any Borrower or any Subsidiary in respect of such Investment.

"**Investment Grade Rating**" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other nationally recognized statistical rating agency selected by the Borrower Representative.

"**Investment Grade Securities**" means:

(t)    securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(u)    debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or instruments constituting loans or advances among the Borrowers and their Subsidiaries;

(v)    investments in any fund that invests exclusively in investments of the type described in clauses (a) and (b) which fund may also hold immaterial amounts of cash pending investment or distribution; and

(w)    corresponding instruments in countries other than the United States customarily utilized for high quality investments.

"**IP Rights**" has the meaning specified in Section 5.15.

"**IRS**" means Internal Revenue Service of the United States.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement, and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender." As of the Closing Date, Schedule 2.01 sets forth the name of each Lender.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower Representative and the DIP Agent.

"**LIBOR**" has the meaning specified in the definition of "Eurodollar Rate."

15

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); *provided* that in no event shall an operating lease in and of itself be deemed a Lien.

"**Loan**" means an extension of credit by a Lender to the Borrowers under Article II.

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Notes, (c) the Collateral Documents, (d) the DIP Orders and (e) amendments and joinders to this Agreement.

"**Loan Parties**" means, collectively, each Borrower and each Guarantor.

"**Margin Stock**" has the meaning set forth in Regulation U of the FRB, or any successor thereto.

"**Master Agreement**" has the meaning specified in the definition of "Swap Contract."

"**Material Adverse Effect**" means (a) a material adverse effect on the business, assets, financial condition or results of operations of New Holdings, the Borrowers and the Subsidiaries, taken as a whole (excluding events leading up to the commencement of the Chapter 11 Cases, the filing of the Chapter 11 Cases, and the customary effects thereof), (b) a material adverse effect on the rights and remedies of the DIP Agent or any Lender under any Loan Document or (c) a material adverse effect on the ability of the Loan Parties (taken as a whole) to perform their payment obligations under any Loan Document.

"**Material Contract**" means each contract or other arrangement to which New Holdings or any of its Subsidiaries is a party (other than the Loan Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"**Maturity Date**" means July 23, 2019; *provided*, that if such day is not a Business Day, the applicable Maturity Date shall be the Business Day immediately succeeding such day.

"**Maximum Rate**" has the meaning specified in Section 10.10.

"**Medical Reimbursement Programs**" mean a collective reference to the Medicare, Medicaid and any other health care programs operated by or financed in whole or in part by any foreign or domestic federal, state or local government in which any Borrower or any Subsidiary participates.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Multiemployer Plan**" means any multiemployer plan as defined in Section 4001(a)(3) of ERISA and subject to Title IV of ERISA, to which any Loan Party or any of their respective ERISA Affiliates makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Cash Proceeds**" means:

(x)       with respect to a Disposition by any Borrower or any Subsidiary or any Casualty Event, the excess, if any, of (i) the sum of Cash Equivalents received in connection with such Disposition or Casualty Event (including any Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event actually received by or paid to or for the account of any Borrower or any of the Subsidiaries) <u>over</u> (ii) the sum of (A) the principal amount, premium or penalty, if any, interest, breakage costs and other amounts on any Indebtedness that is secured by a Senior Permitted Lien on the asset subject to such Disposition or Casualty Event and required to be repaid in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents), (B) the out-of-pocket fees and

16

expenses (including local counsel fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees directly related to such Disposition) actually incurred by such Borrower or such Subsidiary in connection with such Disposition or Casualty Event and (C) taxes paid or reasonably estimated to be payable in connection therewith; *provided* that no net cash proceeds calculated in accordance with the foregoing realized in a single transaction or series of related transactions shall constitute Net Cash Proceeds unless such net cash proceeds shall exceed (x) $25,000 for any individual transaction and (y) $500,000 in the aggregate; and

(y)     with respect to (x) the incurrence or issuance of any Indebtedness by any Borrower or any Subsidiary or (y) any sale or issuance of Qualified Equity Interests by any Borrower or any Subsidiary or any direct or indirect parent of any Borrower, the excess, if any, of (A) the sum of the Cash Equivalents received by any Borrower or its Subsidiaries in connection with such incurrence or issuance over (B) all taxes paid or reasonably estimated to be payable as a result thereof, and all fees (including investment banking fees, underwriting fees and discounts), commissions, costs and other out-of-pocket expenses and other customary expenses incurred, by New Holdings, such Borrower or such Subsidiary in connection with such incurrence or issuance.

"**New Holdings**" has the meaning specified in the introductory paragraph to this Agreement.

"**New Holdings Investment Indebtedness**" means (a) that certain Investment Agreement, dated as of November 29, 2017, by and among FC Pioneer Holding Company, LLC, Trident Holding Company, LLC, Revelstoke Capital Partners Fund I, L.P. and the other noteholders party thereto, and each "Tranche A Note", "Additional Tranche A Note", "Tranche B Note", "Additional Tranche B Note", "Tranche C Notes" and "Additional Tranche C Note" (each as defined therein) issued thereunder and (b) that certain Investment Agreement, dated as of December 9, 2016, by and among FC Pioneer Holding Company, LLC, GCM Saint Paul SPV, LLC and the other noteholders party thereto, and each "Note" issued thereunder, in each case of the foregoing clauses (a) and (b), as amended and restated, modified, supplemented, extended, renewed, refunded, replaced or refinanced from time to time and as in effect on the Petition Date.

"**Non-Bank Certificate**" means (a) for any Foreign Lender that is not treated as a partnership for U.S. federal income tax purposes, a certificate substantially in the form of Exhibit E-1, (b) for any Foreign Lender that is treated as a partnership for U.S. federal income tax purposes, a certificate substantially in the form of Exhibit E-2, (c) for any Participant that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code and that is not treated as a partnership for U.S. federal income tax purposes, a certificate substantially in the form of Exhibit E-3, and (d) for any Participant that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code and that is treated as a partnership for U.S. federal income tax purposes, a certificate substantially in the form of Exhibit E-4.

"**Non-Loan Party**" means any Subsidiary of any Borrower that is not a Loan Party.

"**Note**" means a promissory note of the Borrowers payable to any Lender or its registered assigns, in substantially the form of Exhibit B hereto, evidencing the aggregate Indebtedness of the Borrowers to such Lender resulting from the Loans made by such Lender hereunder.

"**Obligations**" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, expenses and premiums that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowable or allowed claims in such proceeding. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and any of their Subsidiaries to the extent they have obligations under the Loan Documents) include the obligation (including guarantee obligations) to pay principal, interest, premiums, charges, expenses, fees, Costs, indemnities and other amounts payable by any Loan Party under any Loan Document.

"**OFAC**" has the meaning specified in Section 5.18(b).

17

"**OID**" means original issue discount.

"**Organization Documents**" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" has the meaning specified in Section 3.01(g).

"**Overnight Rate**" means, for any day, the greater of (i) the Federal Funds Rate and (ii) an overnight rate determined by the DIP Agent, as applicable, in accordance with banking industry rules on interbank compensation.

"**Participant**" has the meaning specified in Section 10.07(d).

"**Participant Register**" has the meaning specified in Section 10.07(e).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any of their respective ERISA Affiliates or to which any Loan Party or any of their respective ERISA Affiliates contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time in the preceding five plan years.

"**Permitted Acquisition**" has the meaning specified in clause (c) of "Permitted Investment."

"**Permitted Investments**" means:

(z)       any Investment in any Loan Party;

(aa)      any Investment in, or that at the time of making such Investment constituted, Cash Equivalents;

(bb)      any Investment by any Borrower or any Loan Party in a Person that is engaged in a business permitted pursuant to Section 7.07 if as a result of such Investment: (A) such Person becomes a Loan Party; or (B) such Person, in one transaction or a series of related transactions, is amalgamated, merged or consolidated with or into, or transfers or conveys substantially all of its assets (or assets constituting a business unit, a line of business or a division of such Person) to, or such Person is liquidated into, any Borrower or another Loan Party with such Loan Party surviving (each such Investment, a "**Permitted Acquisition**"):

(i)       the Loan Parties shall comply with the Collateral and Guarantee Requirement to the extent applicable; and

(ii)      (A) no Default or Event of Default shall have occurred and be continuing or result therefrom and (B) the total consideration paid or payable for such Permitted Acquisitions shall not exceed (x) $250,000 for any Permitted Acquisition and (y) $1,000,000 in the aggregate for all Permitted Acquisitions;

(cc)      any Investment in securities or other assets not constituting Cash Equivalents or Investment Grade Securities and received in connection with a Disposition made pursuant to Section 7.05;

(dd)      any Investment existing on the Closing Date as set forth on Schedule 7.06;

18

(ee)    any Investment acquired by any Borrower or any Subsidiary:

(i)    consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business;

(ii)    in exchange for any other Investment, accounts receivable or indorsements for collection or deposit held by such Borrower or any such Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of, or settlement of delinquent accounts and disputes with or judgments against, the issuer of such other Investment, accounts receivable or indorsements for collection or deposit (including any trade creditor or customer);

(iii)    in satisfaction of judgments against other Persons;

(iv)    as a result of a foreclosure by any Borrower or any Subsidiary with respect to any secured Investment or other transfer of title with respect to any secured Investment in default; or

(v)    as a result of the settlement, compromise or resolution of litigation, arbitration or other disputes with Persons who are not Affiliates;

(ff)    [reserved];

(gg)    [reserved];

(hh)    Guarantees of Indebtedness of any Borrower or a Loan Party permitted under Section 7.03, performance guarantees and Contingent Obligations incurred in the ordinary course of business and the creation of Liens on the assets of any Borrower or any Loan Party in compliance with Section 7.01;

(ii)    any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of Section 7.08;

(jj)    Investments consisting of (i) purchases or other acquisitions of inventory, supplies, material or equipment or (ii) the non-exclusive licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons, in each case, in the ordinary course of business;

(kk)    [reserved];

(ll)    [reserved];

(mm)    [reserved];

(nn)    advances, loans or extensions of trade credit in the ordinary course of business by any Borrower or any Subsidiary and any leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Borrowers and the Subsidiaries, taken as a whole, or (ii) secure any Indebtedness;

(oo)    Investments consisting of purchases and acquisitions of services in the ordinary course of business;

(pp)    Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client contacts;

(qq)    Investments in prepaid expenses, negotiable instruments held for collection and lease, utility and workers compensation, performance and similar deposits entered into as a result of the operations of the business in the ordinary course of business;

19

(rr)    Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection of deposit and Article 4 customary trade arrangements with customers consistent with past or industry practices; and

(ss)    Guarantees by any Borrower or any Loan Party of leases (other than Capitalized Leases) or of other obligations of the Loan Parties that do not constitute Indebtedness, in each case entered into in the ordinary course of business.

"**Permitted Liens**" has the meaning specified in Section 7.01.

"**Permitted Prior Liens**" means (i) valid, perfected and unavoidable liens (other than Primed Liens) in favor of third parties that were in existence immediately prior to the Petition Date to the extent such liens are senior or pari passu to the "Prepetition Liens" (as defined in the Interim Order (or Final DIP Order, when applicable)) and (ii) any such valid and unavoidable liens in existence immediately prior to the Petition Date to the extent such liens are senior or pari passu to the "Prepetition Liens" that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

"**Permitted Variance**" means any variances to the Budget described in <u>Schedule 6.20</u> hereof.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning specified in the recitals hereto.

"**PJT**" has the meaning specified in Section 6.19(a).

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), other than a Foreign Plan, established or maintained by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

"**Plan of Reorganization**" means a plan of reorganization confirmed by an order of the Bankruptcy Court under the Chapter 11 Cases.

"**Platform**" means IntraLinks or another similar electronic system.

"**Pledged Debt**" means all Promissory Notes and Instruments (each as defined in the Uniform Commercial Code) evidencing Indebtedness for borrowed money owed to a Loan Party.

"**Pledged Equity**" means all Equity Interests owned or obtained by a Loan Party and the certificates representing all such Equity Interests.

"**Pre-Petition Credit Agreements**" has the meaning specified in Section 7.03(p).

"**Primed Liens**" has the meaning specified in Section 7.01(aa).

"**Priority Administrative Agent**" means Silver Point Finance, LLC, in its capacity as administrative agent and collateral agent under the Priority Credit Agreement and the Loan Documents (as defined therein), or any successor administrative agent and/or collateral agent (or other representative), as the case may be, under such Loan Documents.

"**Priority Credit Agreement**" means that certain Priority First Lien Credit Agreement dated as of April 30, 2018 by and among New Holdings, the Borrowers, the lenders party thereto in their capacities as lenders thereunder, the Priority Administrative Agent and the other agents party thereto, as the same may be amended, restated, amended and restated, modified, supplemented, extended, renewed, refunded, replaced or refinanced from time to time and as in effect on the Petition Date.

"**Priority Credit Agreement Obligations**" means the "Obligations" (as defined in the Priority Credit Agreement).

"**Priority Credit Documents**" means the "Loan Documents" (as defined in the Priority Credit Agreement).

"**Priority Lenders**" means the "Lenders" (as defined in the Priority Credit Agreement).

"**Priority/First Lien/Second Lien Intercreditor Agreement**" means the Priority/First Lien/Second Lien Intercreditor Agreement, dated as of April 30, 2018, among the Priority Administrative Agent, as Priority First Lien Credit Agreement Administrative Agent, the Loan Parties, Cortland Capital Market Services LLC, as Existing First Lien Credit Agreement Administrative Agent for the Existing First Lien Secured Parties (each, as defined therein) and Ares Capital Corporation, as Second Lien Credit Agreement Administrative Agent for the Second Lien Credit Agreement Secured Parties (each, as defined therein) and each additional representative party thereto from time to time, as the same may be amended, restated, amended and restated, modified, supplemented, extended, or replaced from time to time and as in effect on the Petition Date.

"**Pro Rata Share**" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the aggregate Loans of such Lender at such time and the denominator of which is the amount of all Loans at such time.

"**Proceeding**" has the meaning specified in Section 10.05.

"**Proceeds Account**" has the meaning specified in Section 6.12.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Qualified Holding Company Debt**" means unsecured Indebtedness of New Holdings incurred prior to the Closing Date and as in effect on the Petition Date.

"**Quarterly and Monthly Financial Statements**" means the unaudited consolidated balance sheets of New Holdings and its consolidated Subsidiaries as of September 30, 2018, October 31, 2018 and November 30, 2018 and the related unaudited consolidated statements of operations and cash flows for New Holdings and its consolidated Subsidiaries for the fiscal quarter or month then ended.

"**Real Property**" means any fee-owned real property owned by any Loan Party.

"**Register**" has the meaning specified in Section 10.07(c).

"**Related Indemnified Person**" of an Indemnitee means (1) any controlling Person or controlled Affiliate of such Indemnitee, (2) the respective directors, officers, or employees of such Indemnitee or any of its controlling Persons or controlled Affiliates and (3) the respective agents of such Indemnitee or any of its controlling Persons or controlled Affiliates, in the case of this clause (3), acting at the instructions of such Indemnitee, controlling Person or such controlled Affiliate; *provided* that each reference to a controlled Affiliate or controlling Person in this definition pertains to a controlled Affiliate or controlling Person involved in the negotiation of this Agreement. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharge, injecting, escaping, leaching, dumping, disposing, depositing or migration into the Environment.

"**Remedies Notice Period**" has the meaning assigned to the term "Remedies Notice Period" in the Interim Order (or Final Order, when applicable).

21

"**Reportable Event**" means, with respect to any Pension Plan, any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"**Required Lenders**" means, as of any date of determination, one or more Lenders having more than 50% of the sum of the aggregate outstanding Loans.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer or Person performing similar functions of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower Representative.

"**Restricted Investment**" means an Investment other than a Permitted Investment.

"**Restricted Payment**" means (i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Borrower or any Subsidiary (in each case, solely in such Person's capacity as holder of such Equity Interests), (ii) any prepayment, redemption, purchase, defeasance or other satisfaction or payment of principal or interest prior to the scheduled maturity thereof in any manner under any Indebtedness except to the extent permitted by this Agreement, the Budget and the DIP Orders, (iii) any Restricted Investment and (iv) the payment of any earn-out or other delayed or deferred purchase price or other delayed consideration payable pursuant to any asset purchase agreement, share purchase agreement, merger agreement or similar agreement pursuant to which the target of, or entity resulting from, such agreement becomes a Subsidiary or the assets acquired become assets of a Subsidiary.

"**Restructuring Advisor**" has the meaning provided in Section 6.19(a).

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement (as amended, restated, modified or supplemented or replaced and in effect from time to time) entered into by and among, the Debtors, certain of the Priority Lenders (or investment advisors or managers for such Lenders), the Priority Administrative Agent, among others, immediately prior to the Petition Date.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means immediately available funds.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Lien Administrative Agent**" means Ares Capital Corporation (as successor to Citibank, N.A.), in its capacity as administrative agent and collateral agent under the Second Lien Credit Documents, or any successor administrative agent and/or collateral agent (or other representative), as the case may be, under the Second Lien Credit Documents.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement dated as of July 31, 2013 by and among New Holdings, the Borrowers, the lenders party thereto in their capacities as lenders thereunder, the Second Lien Administrative Agent and the other agents party thereto, as the same may be amended, restated, amended and restated, modified, supplemented, extended, renewed, refunded, replaced or refinanced from time to time and as in effect on the Petition Date.

"**Second Lien Credit Documents**" means Loan Documents (as defined in the Second Lien Credit Agreement), in each case, as amended and as in effect on the Petition Date.

"**Secured Parties**" means, collectively, the DIP Agent, the Lenders and each co-agent or sub-agent appointed by the DIP Agent from time to time pursuant to Section 9.05.

"**Secured Party Advisors**" means any financial advisor, attorney, accountant, appraiser, auditor, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by or on behalf of the DIP Agent or the Lenders, including, without limitation, Paul, Weiss, Rifkind Wharton & Garrison LLP and Houlihan Lokey, Inc.

"**Senior Permitted Liens**" means (i) all Permitted Prior Liens, (ii) Permitted Liens to the extent such liens are senior pursuant to applicable Laws, and (iii) Permitted Liens described in Sections 7.01(i), (t), (x) and (z).

"**Schryver Borrower**" has the meaning specified in the introductory paragraph hereto.

"**SPC**" has the meaning specified in Section 10.07(g).

"**Sponsor**" means, collectively, (a) Audax Management Company, LLC, Frazier Healthcare V, L.P. and Frazier Healthcare VI, L.P., Welltower, Inc., Safanad, Inc., Formation Capital, LLC and Revelstoke Capital Management, LLC and (b) any of their respective Affiliates and funds or partnerships managed or advised by any of them or any of their respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, charitable foundations) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of New Holdings.

"**Subsidiary Guarantor**" means any Guarantor other than New Holdings.

"**Superpriority Claim**" means an allowed claim against any Debtor or its estate in the Chapter 11 Cases which is an administrative expense claim having priority over (a) any and all other allowed administrative expenses and (b) all unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, Section 105, 326, 328, 330, 331, 364(c)(l), 365, 503, 506(c), 507, 546 or 726 of the Bankruptcy Code, other than the Carve-Out.

"**Swap**" means any agreement, contract, or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Taxes**" has the meaning specified in Section 3.01(a).

"**Termination Date**" means the earliest to occur of (i) the Maturity Date, (ii) the effective date of a Plan of Reorganization, (iii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Commitments are terminated (or deemed terminated) in accordance with Article VIII, (iv) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code or otherwise, (v) the date of conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (vi) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the DIP Agent (acting at the written direction of the Required Lenders), and (vii) the earlier of (a) thirty-five (35) days after the date of entry of the Interim Order if entry of the Final Order has not occurred by such date and (b) the first Business Day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto.

"**Threshold Amount**" means $500,000.

"**Transactions**" means, collectively, (a) the execution and delivery of this Agreement and the other Loan Documents and the funding of the Loans, (b) the consummation of any other transactions in connection with the foregoing and (c) the payment of the fees and expenses, including Costs, incurred in connection with any of the foregoing.

"**Trident Borrower**" has the meaning specified in the introductory paragraph to this Agreement.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"**Uniform Commercial Code**" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**U.S. Lender**" has the meaning specified in Section 3.01(d).

"**U.S. Trustee**" means the United States Trustee applicable in the Chapter 11 Cases.

"**USA PATRIOT Act**" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"**Withdrawal Liability**" means the liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such term is defined in Part I of Subtitle E of Title IV of ERISA.

"**Withdrawal Notice**" means a written notice by the Borrower Representative for a withdrawal from the Proceeds Account substantially in the form of Exhibit F.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for

24

the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02.    <u>Other Interpretive Provisions</u>. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(c)    References in this Agreement to an Exhibit, Schedule, Article, Section, clause or subclause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or subclause in, this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears.

(d)    The term "including" is by way of example and not limitation. The word "or" is not exclusive.

(e)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(g)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(h)    The words "principal amount" shall include the liquidation preference of any Disqualified Equity Interests, as applicable.

SECTION 1.03.    <u>Accounting Terms</u>. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.

SECTION 1.04.    <u>Rounding</u>. Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement, or required to be satisfied in order for a specific action to be permitted under this Agreement, shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

SECTION 1.05.    <u>References to Agreements, Laws, Etc</u>. Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

SECTION 1.06.    <u>Times of Day and Timing of Payment and Performance</u>. Unless otherwise specified, all references herein to times of day shall be references to New York, New York time. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day.

25

SECTION 1.07.    [Reserved].

SECTION 1.08.    [Reserved].

SECTION 1.09.    Currency Equivalents Generally.  For purposes of determining compliance with Sections 7.01, 7.03 and 7.06 and the definition of "Permitted Investments" with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness is incurred or such Investment is made (so long as such Indebtedness or Investment, at the time incurred or made, respectively, was permitted hereunder).

## ARTICLE II

### The Commitments and Borrowings

SECTION 2.01.    The Loans.

(a)    Subject to the terms and conditions set forth herein, including Section 4.01 and 4.02 (as applicable), and in the DIP Orders, each Lender severally agrees to make its Pro Rata Share of Loans to the Borrowers (i) on the Closing Date, in an aggregate principal amount not to exceed $12,500,000 and (ii) within two (2) Business Days following the date the Final Order is entered into by the Bankruptcy Court, on the Business Day specified by the Borrower Representative in a Committed Loan Notice submitted to the DIP Agent in accordance with the terms set forth herein, in an aggregate principal amount not to exceed $37,500,000, in each case, in accordance with such Lender's respective Commitments.  Loans may be Base Rate Loans or Eurodollar Rate Loans, as further provided herein.

(b)    The amount of each Lender's Commitment shall be automatically and permanently reduced by the amount of each Loan funded by such Lender pursuant to Section 2.01(a), immediately upon the funding thereof.

SECTION 2.02.    Borrowings, Conversions and Continuations of Loans.

(a)    The Borrowing, each conversion of Loans from one Type to the other and each continuation of Eurodollar Rate Loans shall be made upon the Borrower Representative's irrevocable notice to the DIP Agent (*provided* that the notice in respect of the Closing Date Borrowing may be given by telephone). Each such notice must be received by the DIP Agent not later than 12:00 noon (i) three (3) Business Days prior to the requested date of any Borrowing or continuation of Eurodollar Rate Loans or any conversion of Base Rate Loans to Eurodollar Rate Loans or (ii) on the requested date of any Borrowing of Base Rate Loans; *provided*, that the notice referred to in subclause (i) may be delivered no later than one (1) Business Day prior to the Closing Date (or such shorter period that the DIP Agent may agree in its reasonable discretion) in the case of the Closing Date Borrowing; *provided* further that a Committed Loan Notice for the Closing Date Borrowing may state that such Committed Loan Notice is conditioned upon the effectiveness of the Interim Order on the proposed borrowing date, in which case such notice may be revoked by the Borrower Representative (by notice to the DIP Agent on or prior to the proposed borrowing date) if such condition is not satisfied or not anticipated to be satisfied on such date.  Each telephonic notice by the Borrower Representative pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the DIP Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower Representative. Each Borrowing of, conversion to or continuation of, Eurodollar Rate Loans shall be in a principal amount of $2,500,000 or a whole multiple of $500,000 in excess thereof. Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof. Each Committed Loan Notice (whether telephonic or written) shall specify (i) whether the Borrowers are requesting a Borrowing, a conversion of Loans from one Type to the other or a continuation of Eurodollar Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to which existing Loans are to be converted and (v) that the proceeds of the Loan shall be deposited into the Proceeds Account in accordance with Section 6.12; *provided* that in the case of the Closing Date Borrowing, the amount of withdrawal as specified in the Withdrawal Notice (delivered substantially concurrently with the Committed Loan Notice) shall be directly deposited into the account(s) specified therein. If the

26

Borrower Representative fails to specify a Type of Loan to be made in a Committed Loan Notice, then the applicable Loans shall be made as Eurodollar Rate Loans. If the Borrower Representative fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made or continued as the same Type of Loan. Any such automatic continuation of Eurodollar Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans.

(b)      Following receipt of a Committed Loan Notice, the DIP Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the Loans, and if no timely notice of a conversion or continuation is provided by the Borrower Representative, the DIP Agent shall notify each Lender of the details of any automatic continuation of Eurodollar Rate Loans described in Section 2.02(a). Each Lender shall make the amount of its Loan available to the DIP Agent in Same Day Funds at the DIP Agent's Office not later than, in the case of any Borrowing on the Closing Date, 11:00 a.m., and otherwise, 1:00 p.m., in each case on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction (or waiver) of the applicable conditions set forth in Section 4.02 (or if such Borrowing is on the Closing Date, Section 4.01), the DIP Agent shall make all funds so received available to the Borrowers in like funds as received by the DIP Agent by wire transfer of such funds in accordance with instructions provided to (and reasonably acceptable to) the DIP Agent by the Borrower Representative.

(c)      Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan, unless the Borrowers pay the amount due, if any, under Section 3.05 in connection therewith. Upon the occurrence and during the continuation of an Event of Default, the DIP Agent or the Required Lenders may require by notice to the Borrower Representative that no Loans may be converted to or continued as Eurodollar Rate Loans.

(d)      The DIP Agent shall promptly notify the Borrower Representative and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate. At any time when Base Rate Loans are outstanding, the DIP Agent shall notify the Borrower Representative and the Lenders of any change in the DIP Agent's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(e)      After giving effect to all Borrowings, all conversions of Loans from one Type to the other and all continuations of Loans as the same Type, there shall not be more than three (3) Interest Periods in effect unless otherwise agreed between the Borrower Representative and the DIP Agent.

(f)      The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(g)      Unless the DIP Agent shall have received notice from a Lender prior to the date of any Borrowing or, in the case of any Borrowing of Base Rate Loans, prior to 11:00 a.m. on the date of such Borrowing, that such Lender will not make available to the DIP Agent such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such Borrowing, the DIP Agent may assume that such Lender has made such Pro Rata Share or other applicable share provided for under this Agreement available to the DIP Agent on the date of such Borrowing in accordance with Section 2.02(b), and the DIP Agent may, in reliance upon such assumption, make available to the Borrowers on such date a corresponding amount. If the DIP Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the DIP Agent, each of such Lender and each Borrower severally agrees to repay to the DIP Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrowers until the date such amount is repaid to the DIP Agent at (i) in the case of the Borrowers, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the Overnight Rate plus any administrative, processing, or similar fees customarily charged by the DIP Agent in accordance with the foregoing. A certificate of the DIP Agent submitted to any Lender with respect to any amounts owing under this Section 2.02(g) shall be conclusive in the absence of manifest error. If the Borrowers and such Lender shall pay such interest to the DIP Agent for the same or an overlapping period, the DIP Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Lender pays its share of the

27

applicable Borrowing to the DIP Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrowers shall be without prejudice to any claim any Borrower may have against a Lender that shall have failed to make such payment to the DIP Agent.

SECTION 2.03.    [Reserved].

SECTION 2.04.    [Reserved].

SECTION 2.05.    Prepayments.

(a)    *Optional*.

(i)    Any Borrower may, at any time, upon notice to the DIP Agent, from time to time and subject to Section 2.05(a)(ii), voluntarily prepay the Loans in whole or in part, without premium or penalty; *provided* that (1) such notice must be received by the DIP Agent not later than 12:00 noon (A) three (3) Business Days prior to any date of prepayment of Eurodollar Rate Loans and (B) on the date of prepayment of Base Rate Loans; (2) any partial prepayment of Eurodollar Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding; and (3) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and Type(s) to be prepaid and the payment amount specified in such notice shall be due and payable on the date specified therein (and, for the avoidance of doubt, may indicate prepayments by more than one Borrower on such date in such amounts so specified, which, individually may be below any minimum or multiple but which in aggregate amount on any given date shall satisfy such minimum and multiple requirements). The DIP Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share or other applicable share provided for under this Agreement of such prepayment. Any prepayment of a Eurodollar Rate Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05.

(ii)    Notwithstanding anything to the contrary contained in this Agreement, the Borrower Representative may rescind any notice of prepayment under Section 2.05(a)(i) if such prepayment would have resulted from a refinancing of the Loans, which refinancing shall not be consummated or shall otherwise be delayed.

(b)    *Mandatory*.

(i)    [Reserved].

(ii)    If (x) any Borrower or any Subsidiary Disposes of any property or assets (other than any Disposition of any property or assets permitted by Sections 7.05(a)(iii), (c), (d), (e), (g)(i), (h), (i) (l), (m), (n) and (o)) or (y) any Casualty Event occurs, which results in the realization or receipt by such Borrower or such Subsidiary of Net Cash Proceeds, the Borrowers shall prepay, or cause to be prepaid, on or prior to the date which is three (3) days after the date of the realization or receipt by such Borrower or such Subsidiary of such Net Cash Proceeds, an aggregate principal amount of Loans equal to 100% of the amount of such Net Cash Proceeds realized or received.

(iii)    If (x) any Borrower or any Subsidiary incurs or issues any Indebtedness not expressly permitted to be incurred or issued pursuant to Section 7.03 or (y) any direct or indirect parent of any Borrower (to the extent the Net Cash Proceeds therefrom are contributed to the Borrower or its Subsidiaries) sells or issues any Qualified Equity Interests, the Borrowers shall prepay, or cause to be prepaid, an aggregate principal amount of the Loans equal to 100% of all Net Cash Proceeds received therefrom on or prior to the date which is three (3) days after the receipt by such Borrower or such Subsidiary of such Net Cash Proceeds. The foregoing repayment shall not cure any breach resulting from such incurrence not otherwise permitted hereunder.

28

(iv)    Each prepayment of Loans required by Sections 2.05(b)(ii) and (iii) shall be applied pro rata to Loans of Lenders based upon the outstanding principal amounts owing to each such Lender under the Loans.

(v)    The Borrower Representative shall notify the DIP Agent in writing of any mandatory prepayment of Loans required to be made pursuant to clauses (ii) and (iii) of this Section 2.05(b) at least five (5) Business Days prior to the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the aggregate amount of such prepayment to be made by the Borrowers. The DIP Agent will promptly notify each Lender of the contents of the Borrower Representative's prepayment notice and of such Lender's Pro Rata Share, or other applicable share provided for under this Agreement, of the prepayment.

(c)    *Interest, Funding Losses, Etc*. All prepayments of Loans shall be accompanied by all accrued and unpaid interest thereon through but not including the date of such prepayment, together with, in the case of any such prepayment of a Eurodollar Rate Loan on a date prior to the last day of an Interest Period therefor, any amounts owing in respect of such Eurodollar Rate Loan pursuant to Section 3.05.

SECTION 2.06.    [Reserved].

SECTION 2.07.    [Reserved].

SECTION 2.08.    Interest.

(a)    Subject to the provisions of Section 2.08(b), (i) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable Borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)    If an Event of Default has occurred and is continuing, the Borrowers shall pay interest on all amounts hereunder (whether principal, interest, fees or other amounts) at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.

SECTION 2.09.    Fees.

(a)    *Other Fees*. The Borrowers shall pay, or cause to be paid, to the DIP Agent such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrowers or the Borrower Representative and the DIP Agent).

(b)    *Closing Premium*. The Borrowers agree to pay to each Lender party to this Agreement on the Closing Date, as a fee paid as consideration for its commitment to fund such Lender's Loans, a closing premium (the "**Closing Premium**") in an amount equal to such Lender's Pro Rata Share of the product of (i) 2.00% and (ii) the Commitment. Such Closing Premium will be (i) in all respects fully earned and due on the Closing Date, (ii) paid or netted against the Loans made by the Lender on the Closing Date and (iii) nonrefundable and non-creditable thereafter.

SECTION 2.10.    Computation of Interest and Fees. All computations of interest for Base Rate Loans (including Base Rate Loans determined by reference to the Eurodollar Rate) shall be made on the basis of a year of 365 days or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360 day year and actual days elapsed. Interest shall accrue on each Loan for the day on

29

which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the DIP Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

SECTION 2.11.    Evidence of Indebtedness.

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the DIP Agent, acting solely for purposes of United States Treasury regulation Section 5f.103-1(c), as agent for the Borrowers, in each case in the ordinary course of business. The accounts or records maintained by the DIP Agent and each Lender shall be prima facie evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the DIP Agent in respect of such matters, the accounts and records of the DIP Agent, as set forth in the Register, shall control in the absence of manifest error. Upon the request of any Lender made through the DIP Agent, the Borrower Representative shall execute and deliver to such Lender (through the DIP Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)    Entries made in good faith by the DIP Agent in the Register pursuant to Sections 2.11(a), and by each Lender in its account or accounts pursuant to Sections 2.11(a), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrowers to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the DIP Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrowers under this Agreement and the other Loan Documents.

SECTION 2.12.    Payments Generally.

(a)    All payments to be made by the Borrowers (whether of principal, premium, interest or fees, or of amounts payable under Section 2.09, 3.01, 3.04 or 3.05, or otherwise) shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the DIP Agent, for the account of the respective Lenders to which such payment is owed, at the applicable DIP Agent's Office for payment and in Same Day Funds not later than 2:00 p.m. on the date specified herein. The DIP Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share provided for under this Agreement as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the DIP Agent after 2:00 p.m. shall in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)    If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)    The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan or to fund any such participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

(d)    Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

30

(e)    Whenever any payment received by the DIP Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts of principal, interest, premiums and fees then due and payable hereunder to the DIP Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the DIP Agent and applied by the DIP Agent and the Lenders in the order of priority set forth in Section 8.03. If the DIP Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the DIP Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the sum of all Loans outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

SECTION 2.13.    Sharing of Payments, Etc. If, other than as expressly provided elsewhere herein, any Lender shall obtain payment in respect of any principal of or interest on account of the Loans made by it (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise), in excess of its ratable share (or other share contemplated hereunder) of the Loans, principal, interest, premium and accrued interest and fees, such Lender shall immediately (a) notify the DIP Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of any principal of, or accrued interest, premium or fees on, such Loans, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any principal, accrued interest, premium or fees paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. For avoidance of doubt, the provisions of this Section 2.13 shall not be construed to apply to (A) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement as in effect from time to time or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant permitted hereunder. Each Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation. The DIP Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

SECTION 2.14.    [Reserved].

SECTION 2.15.    [Reserved].

SECTION 2.16.    [Reserved].

SECTION 2.17.    [Reserved].

SECTION 2.18.    Borrower Representative.  Each Borrower hereby designates and appoints Trident Borrower as its agent, attorney-in-fact and legal representative on its behalf for all purposes, including issuing Committed Loan Notices; delivering the Budget, Budget Variance Report, Withdrawal Notice and Compliance Certificates; giving instructions with respect to the disbursement of the proceeds of the Loans; paying, prepaying and reducing Loans, Commitments, or any other amounts owing under the Loan Documents; selecting interest rate options; giving, receiving, accepting and rejecting all other notices, consents or other communications hereunder or under any of the other Loan Documents; and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or the Borrowers under the Loan Documents; *provided*, *however*, that any amounts paid by the Borrower Representative on behalf of another Borrower shall be deemed a payment by such

31

other Borrower. Trident Borrower hereby accepts such appointment. The DIP Agent and each Lender may regard any notice or other communication pursuant to any Loan Document from the Borrower Representative on behalf of one or more Borrowers as a notice or communication from all Borrowers. Each warranty, covenant, agreement and undertaking made on behalf of a Borrower by the Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower. Any action, notice, delivery, receipt, acceptance, approval, rejection or any other undertaking under any of the Loan Documents to be made by the Borrower Representative in respect of the Obligations of any Borrower shall be deemed, where applicable, to be made in the Borrower Representative's capacity as representative and agent on behalf of the applicable Borrower or Borrowers, and any such action, notice, delivery, receipt, acceptance, approval, rejection or other undertaking shall be deemed for all purposes to have been made by such Borrowers and shall be binding upon and enforceable against such Borrowers to the same extent as if the same had been made directly by such Borrowers.

## ARTICLE III

### Taxes, Increased Costs Protection and Illegality

SECTION 3.01.    Taxes.

(a)    Except as required by law, any and all payments by any Borrower or any Guarantor to or for the account of the DIP Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and all liabilities (including additions to tax, penalties and interest) with respect thereto, excluding, in the case of the DIP Agent and each Lender, (i) taxes imposed on or measured by net income (however denominated, and including branch profits and similar taxes), and franchise or similar taxes, imposed by the jurisdiction under the Laws of which such DIP Agent or Lender is organized or in which its principal office is located or in which its applicable Lending Office is located, (ii) taxes imposed as a result of a present or former connection between such DIP Agent or Lender (as applicable) and the jurisdiction imposing such Tax (other than connections arising from the DIP Agent or Lender (as applicable) having executed, delivered, entered into, became a party to, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, performed its obligations under, or enforced, any Loan Document, or sold or assigned any interest in any Loan Document), (iii) subject to Section 3.01(e), any U.S. federal tax that is (or would be) required to be withheld with respect to amounts payable hereunder in respect of a Lender or an Eligible Assignee (pursuant to an assignment under Section 10.07) on the date it becomes a Lender or an Eligible Assignee to the extent such tax is in excess of the tax that would have been applicable had such assigning Lender not assigned its interest arising under any Loan Document (unless such assignment is at the express written request of a Borrower), (iv) any U.S. federal withholding taxes imposed as a result of the failure of the DIP Agent or any Lender to comply with the provisions of Section 3.01(b) or 3.01(c) (in the case of any Foreign Lender, as defined below) or the provisions of Section 3.01(d) (in the case of any U.S. Lender, as defined below), (v) any taxes imposed on any amount payable to or for the account of the DIP Agent or any Lender as a result of the failure of such recipient to satisfy the applicable requirements under FATCA to establish that such payment is exempt from withholding under FATCA, (vi) amounts excluded pursuant to Section 3.01(e) hereto and (vii) penalties and interest on the foregoing amounts (all such non-excluded taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges and liabilities being hereinafter referred to as "**Taxes**"). If, under applicable Law, a Borrower or a Guarantor or other applicable withholding agent is required to deduct any Taxes or Other Taxes (as defined below) from or in respect of any sum payable under any Loan Document to the DIP Agent or any Lender, (i) the sum payable by the applicable Loan Party shall be increased as necessary so that after all required deductions have been made (including deductions applicable to additional sums payable under this Section 3.01(a)), each of the DIP Agent and such Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Borrower or Guarantor or other applicable withholding agent shall make such deductions, (iii) such Borrower or Guarantor or other applicable withholding agent shall pay the full amount deducted to the relevant taxing authority, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as practicable thereafter), such Borrower or Guarantor or other applicable withholding agent shall furnish to the DIP Agent or such Lender (as the case may be) the original or a facsimile copy of a receipt evidencing payment thereof to the extent such a receipt has been made available to the relevant Borrower or Guarantor or other applicable withholding agent (or other evidence of payment reasonably satisfactory to the DIP Agent). If any

Borrower or Guarantor fails to pay any Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the DIP Agent or any Lender the required receipts or other required documentary evidence that has been made available to such Borrower or Guarantor, such Borrower or Guarantor shall indemnify the DIP Agent and such Lender for any incremental Taxes that may become payable by the DIP Agent or such Lender arising out of such failure.

(b)    To the extent it is legally eligible to do so, the DIP Agent and each Lender (which shall, for the avoidance of doubt, for purposes of this Section 3.01, include any Eligible Assignee to which a Lender assigns its interest in accordance with Section 10.07) that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code (each a "**Foreign Lender**") agrees to complete and deliver to the Borrower Representative and the DIP Agent (in the case of any Lender) on or prior to the date on which the DIP Agent or Lender (or Eligible Assignee) becomes a party hereto, two (2) accurate, complete and original signed copies of whichever of the following is applicable: (i) IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, certifying that it is entitled to benefits under an income tax treaty to which the United States is a party; (ii) IRS Form W-8ECI certifying that the income receivable pursuant to any Loan Document is effectively connected with the conduct of a trade or business in the United States; (iii) if the Foreign Lender is claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code and is not (A) a bank described in Section 881(c)(3)(A) of the Code, (B) a 10-percent shareholder described in Section 871(h)(3)(B) of the Code, or (C) a controlled foreign corporation related to the Borrower Representative within the meaning of Section 864(d) of the Code (in each case treating any of the Foreign Lender's direct or indirect owners that is disregarded as an entity separate from its owner for U.S. federal income tax purposes as disregarded for purposes of the previous sentence), the appropriate Non-Bank Certificate and an IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, certifying that the Foreign Lender is not a United States person; (iv) to the extent a Lender is not the beneficial owner for U.S. federal income tax purposes, IRS Form W-8IMY (or any successor forms) of such Lender, accompanied by, as and to the extent applicable, an IRS Form W-8BEN, IRS Form W-8BEN-E, IRS Form W-8ECI, the appropriate Non-Bank Certificate, IRS Form W-9, IRS Form W-8IMY (or other successor forms) and any other reasonably required supporting information from each beneficial owner, provided that if the Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender is claiming the portfolio interest exemption, such Foreign Lender may provide the appropriate Non-Bank Certificate on behalf of each such direct and indirect partner (it being understood that a Lender need not provide certificates or supporting documentation from beneficial owners if (x) such Lender is a "qualified intermediary" or "withholding foreign partnership" for U.S. federal income tax purposes and (y) such Lender is as a result able to establish, and does establish, that payments to such Lender are, to the extent applicable, entitled to an exemption from or, if an exemption is not available, a reduction in the rate of, U.S. federal withholding taxes without providing such certificates or supporting documentation); and/or (v) any other form prescribed by applicable requirements of U.S. federal income tax law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed and any successor form to any form described in this Section 3.01(b) together with such supplementary documentation as may be prescribed by applicable requirements of law to permit the Borrower Representative and the DIP Agent to determine the withholding or deduction required to be made.

(c)    The DIP Agent or each Lender shall, to the extent it is legally eligible to do so, (i) promptly submit to the Borrower Representative and the DIP Agent (in the case of any Lender) two (2) accurate, complete and original signed copies of such forms described in Section 3.01(b) and any other or additional forms or certificates (or such successor forms or certificates as shall be adopted from time to time by the relevant taxing authorities) as may then be applicable or available to secure an exemption from or reduction in the rate of U.S. federal withholding tax on or prior to the Closing Date and from time to time thereafter if reasonably requested by the Borrower Representative or the DIP Agent, and (ii) promptly notify the Borrower Representative and the DIP Agent of any change in such Lender's circumstances which would modify or render invalid any claimed exemption or reduction.

(d)    The DIP Agent or any Lender that is a "United States person" (as such term is defined in Section 7701(a)(30) of the Code) (each a "**U.S. Lender**") shall deliver to the Borrower Representative and the DIP Agent (in the case of any Lender) two (2) original copies of accurate, complete and signed IRS Form W-9 or successor form certifying that the DIP Agent or Lender is not subject to United States federal backup withholding tax on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement) and from time to time thereafter if reasonably requested by the Borrower Representative or the DIP Agent.

33

(e)        Notwithstanding anything else herein to the contrary, if a Lender, Eligible Assignee or the DIP Agent is subject to any U.S. federal tax that is (or would be) required to be withheld with respect to amounts payable hereunder at a rate in excess of zero percent at the time such Lender, Eligible Assignee or the DIP Agent becomes a party to this Agreement or otherwise acquires an interest in any Loan, or pursuant to a law or other legal requirement in effect at such time, such tax (including additions to tax, penalties and interest imposed with respect to such tax) shall be considered excluded from Taxes except, (i) in the case of an Eligible Assignee, to the extent such Lender's assignor was entitled to additional amounts or indemnity payments immediately prior to the assignment or (ii) if such Lender is an assignee and such assignment is made at the express written request of a Borrower. Further, no Borrower shall be required pursuant to this Section 3.01 to pay any additional amount to, or to indemnify, any Lender, Eligible Assignee or the DIP Agent, as the case may be, to the extent that such Lender, Eligible Assignee or the DIP Agent becomes subject to Taxes subsequent to the Closing Date (or, if later, the date such Lender, Eligible Assignee or the DIP Agent becomes a party to this Agreement or otherwise acquires an interest in any Loan) solely as a result of a change in the place of organization or place of doing business of such Lender, Eligible Assignee or the DIP Agent (or any applicable beneficial owner), a change in the Lending Office of such Lender or Eligible Assignee (or any applicable beneficial owner) (other than at the written request of a Borrower to change such Lending Office), a change that results in such Lender or Eligible Assignee (or any applicable beneficial owner) being described in clause (A), (B) or (C) of Section 3.01(b)(iii) or otherwise as a result of any change in the circumstances of such Lender, Eligible Assignee or the DIP Agent, other than a Change in Law, occurring after the date that such Lender, Eligible Assignee or the DIP Agent becomes a party to this Agreement or otherwise acquires an interest in any Loan.

(f)        If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower Representative and the DIP Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower Representative or the DIP Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower Representative or the DIP Agent as may be necessary for the Borrower Representative and the DIP Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.

(g)        The Borrowers agree to timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the DIP Agent timely reimburse it for the payment of, any and all present or future stamp, court, documentary, excise, filing, intangible, recording or other similar taxes, charges or similar levies which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document (including additions to tax, penalties and interest related thereto) excluding, in each case, such amounts that result from an Assignment and Assumption, grant of a participation, transfer or assignment to or designation of a new applicable Lending Office or other office for receiving payments under any Loan Document and that are imposed as a result of a present or former connection between the assignor, participating lender, assignee or participant (as applicable) and the jurisdiction imposing such Tax (other than connections arising from the assignor, participating lender, assignee or participant (as applicable) having executed, delivered, entered into, become a party to, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, performed its obligations under, or enforced, any Loan Document, or sold or assigned an interest in any Loan Document); *provided* that such taxes shall not be excluded from this definition to the extent such taxes arise in connection with an assignment, participation, change in Lending Office or transfer that is requested in writing by a Borrower (all such non-excluded taxes described in this Section 3.01(g) being hereinafter referred to as "**Other Taxes**").

(h)        If any (i) Taxes with respect to any amount payable to the DIP Agent or any Lender in respect of any Loan Document, or (ii) Other Taxes are, in each case, directly asserted against the DIP Agent or such Lender, the DIP Agent or such Lender may pay such Taxes or Other Taxes and the Borrowers will promptly indemnify and hold harmless the DIP Agent or Lender for the full amount of such Taxes and Other Taxes (and any Taxes and Other Taxes imposed on amounts payable under this Section 3.01), and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted. Payments under this Section 3.01(h) shall be made within ten (10) days after the date the Borrower Representative receives

34

written demand for payment from the DIP Agent or Lender. For the avoidance of doubt, in the event any Borrower makes a payment to indemnify the DIP Agent or any Lender for Taxes or Other Taxes, the DIP Agent or such Lender, as the case may be, shall be responsible for paying such Taxes or Other Taxes to the appropriate Governmental Authority, and such Borrower shall not have any further responsibility with respect to such Taxes or Other Taxes.

(i)    A Participant shall not be entitled to receive any greater payment under Section 3.01 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation or unless the sale of the participation to such Participant is made with a Borrower's prior written consent.

(j)    [Reserved].

(k)    If the DIP Agent or any Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by any Borrower or any Guarantor, as the case may be, or with respect to which such Borrower or such Guarantor, as the case may be, has paid additional amounts pursuant to this Section 3.01, it shall pay over such refund (but only to the extent of payments made, or additional amounts paid, by any Borrower or any Guarantor, as the case may be, under this Section 3.01 with respect to the Taxes or Other Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including any taxes and any penalties thereon and additions thereto) incurred by the DIP Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that such Borrower or such Guarantor, as the case may be, upon the request of the DIP Agent or such Lender, agrees to repay the amount paid over to such Borrower or such Guarantor, as the case may be (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the DIP Agent or such Lender in the event the DIP Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection (k), in no event will the DIP Agent or any Lender, as the case may be, be required to pay any amount to any Borrower or any Guarantor pursuant to this subsection (k) the payment of which would place the indemnified party in a less favorable net after-Tax position than the DIP Agent or any such Lender, as the case may be, would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. The DIP Agent or such Lender, as the case may be, shall provide the Borrower Representative with a copy of any notice of assessment or other evidence reasonably available of the requirement to repay such refund received from the relevant Governmental Authority (*provided* that such Lender or the DIP Agent may delete any information therein that such Lender or the DIP Agent deems confidential in its reasonable discretion). This subsection shall not be construed to require the DIP Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it reasonably deems confidential) to any Borrower, any Guarantor or any other Person.

(l)    Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a) or (h) with respect to such Lender, it will, if requested by a Borrower, use commercially reasonable efforts (subject to legal and regulatory restrictions) to mitigate the effect of any such event, including by designating another Lending Office for any Loan affected by such event and by completing and delivering or filing any tax-related forms which such Lender is legally eligible to deliver and which would reduce or eliminate any amount of Taxes or Other Taxes required to be deducted or withheld or paid by any Borrower; *provided* that such efforts are made at such Borrower's expense and on terms that, in the reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage, and *provided*, *further*, that nothing in this Section 3.01(l) shall affect or postpone any of the Obligations of any Borrower or any Guarantor or the rights of such Lender pursuant to Section 3.01(a) or (h).

(m)    For the avoidance of doubt, nothing in this Agreement shall preclude the Borrowers and the DIP Agent from deducting and withholding any taxes required by any Laws to be deducted and withheld from any payment under any of the Loan Documents, subject to the provisions of this Section 3.01.

(n)    [Reserved].

(o)      [Reserved].

(p)      The agreements in this Section 3.01 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

SECTION 3.02.      <u>Illegality</u>. If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to the Eurodollar Rate, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on written notice thereof by such Lender to the Borrower Representative through the DIP Agent, (i) any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended, and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurodollar Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the DIP Agent without reference to the Eurodollar Rate component of the Base Rate, in each case until such Lender notifies the DIP Agent and the Borrower Representative that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (x) the Borrower Representative may revoke any pending Committed Loan Notice of, conversion to or continuation of Eurodollar Rate Loans and shall, upon demand from such Lender (with a copy to the DIP Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the DIP Agent without reference to the Eurodollar Rate component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurodollar Rate component of the Base Rate with respect to any Base Rate Loans, the DIP Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Eurodollar Rate component thereof until the DIP Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurodollar Rate. Each Lender agrees to designate a different Lending Office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender. Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted.

SECTION 3.03.      <u>Inability to Determine Rates</u>. If the Required Lenders reasonably determine that for any reason in connection with any request for a Eurodollar Rate Loan or a conversion to or continuation thereof that (a) deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan due to circumstances arising on or after the Closing Date, (b) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan or in connection with an existing or proposed Base Rate Loan, or (c) the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the DIP Agent will promptly so notify the Borrower Representative and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended, and (y) in the event of a determination described in the preceding sentence with respect to the Eurodollar Rate component of the Base Rate, the utilization of the Eurodollar Rate component in determining the Base Rate shall be suspended, in each case until the DIP Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Borrower Representative may revoke any pending Committed Loan Notice of, conversion to or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a Committed Loan Notice of Base Rate Loans in the amount specified therein.

SECTION 3.04.      <u>Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loans</u>.

36

(a)        *Increased Costs Generally*. If any Change in Law or compliance by any Lender therewith (the occurrence of which, in each case, shall be determined by each Lender which, absent manifest error, shall be final and conclusive and binding on all parties hereto), shall:

(i)        impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender or any holding company of such Lender;

(ii)        subject any DIP Agent or any Lender or any holding company of such Lender to any tax of any kind whatsoever with respect to this Agreement or any Eurodollar Rate Loan made by it or change the basis of taxation of payments to such Lender or any holding company of such DIP Agent, Lender in respect thereof (except for (A) Taxes (which, for the avoidance of doubt, the Loan Parties would be required to pay additional amounts or indemnify for under Section 3.01), (B) taxes and other amounts described in clauses (i) through (vii) of the first sentence of Section 3.01(a) that are imposed with respect to payments for or on account of the DIP Agent, any Lender or any holding company of such Lender or any Eligible Assignee under any Loan Document, and (C) Other Taxes); or

(iii)        impose on any Lender or any holding company of such Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender or any holding company of such Lender that is not otherwise accounted for in the definition of Eurodollar Rate or this clause (a);

and the result of any of the foregoing shall be to increase the cost to such Lender or any holding company of such Lender of making or maintaining any Loan the interest on which is determined by reference to the Eurodollar Rate (or of maintaining its obligation to make any such Loan), or to increase the cost to such Lender or any holding company of such Lender, or to reduce the amount of any sum received or receivable by such Lender or any holding company of such Lender (whether of principal, interest or any other amount) then, from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the DIP Agent), the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or any holding company of such Lender for such additional costs incurred or reduction suffered.

(b)        *Capital Requirements*. If any Lender reasonably determines that any Change in Law or compliance by any Lender therewith (the occurrence of which, in each case, shall be determined by each Lender which, absent manifest error, shall be final and conclusive and binding on all parties hereto) affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the DIP Agent), the Borrowers will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered; *provided* that such amounts shall only be payable by the Borrowers to the applicable Lender under this Section 3.04(b) so long as it is such Lender's general policy or practice to demand compensation in similar circumstances under comparable provisions of other financing agreements.

(c)        *Certificates for Reimbursement*. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section 3.04 and delivered to the Borrower Representative shall be conclusive absent manifest error. The Borrowers shall pay such Lender, as the case may be, the amount shown as due on any such certificate within ten days (10) days after receipt thereof.

(d)        *Delay in Requests*. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's right to demand such

1709895.02-NYCSR03A - MSW

compensation, *provided* that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or reductions suffered more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower Representative of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

SECTION 3.05.    Funding Losses. Upon written demand of any Lender (with a copy to the DIP Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense actually incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day prior to the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); or

(b)    any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower Representative;

including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or reemployment of funds obtained by it to maintain such Eurodollar Rate Loan or from fees payable to terminate the deposits from which such funds were obtained.

SECTION 3.06.    Matters Applicable to All Requests for Compensation.

(a)    *Designation of a Different Lending Office*. If any Lender requests compensation under Section 3.04, or any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the good faith judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material economic, legal or regulatory respect. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    *Suspension of Lender Obligations*. If any Lender requests compensation by any Borrower under Section 3.04, the Borrower Representative may, by notice to such Lender (with a copy to the DIP Agent), suspend the obligation of such Lender to make or continue Eurodollar Rate Loans from one Interest Period to another Interest Period, or to convert Base Rate Loans into Eurodollar Rate Loans until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)    *Conversion of Eurodollar Rate Loans*. If any Lender gives notice to the Borrower Representative (with a copy to the DIP Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of such Lender's Eurodollar Rate Loans no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurodollar Rate Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurodollar Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurodollar Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Pro Rata Shares.

SECTION 3.07.    [Reserved].

SECTION 3.08.    Survival. All of the Loan Parties' obligations under this Article III shall survive repayment of the Obligations hereunder and resignation of the DIP Agent.

## ARTICLE IV

## Conditions Precedent to Credit Extensions

SECTION 4.01.    Conditions to Initial Credit Extension. The obligation of each Lender to make a Credit Extension hereunder on the Closing Date is subject to satisfaction (or waiver) of the following conditions precedent, except as otherwise agreed between the Borrower Representative and the DIP Agent:

(a)    The DIP Agent's receipt of the following, each of which shall be originals, facsimiles or copies in.pdf or similar format (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party and each in form and substance reasonably satisfactory to the DIP Agent and its legal counsel:

(i)    a Committed Loan Notice in accordance with the requirements hereof;

(ii)    executed counterparts of this Agreement and the Fee Letter;

(iii)    a Note executed by the Borrowers in favor of each Lender that has requested a Note at least two (2) Business Days in advance of the Closing Date;

(iv)    delivery of certificates, if any, representing the Pledged Equity, accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Debt, accompanied by indorsements in blank;

(v)    evidence that all Uniform Commercial Code financing statements in the jurisdiction of organization of each Loan Party that the DIP Agent may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement shall have been provided for, and arrangements for the filing thereof in a manner reasonably satisfactory to the DIP Agent shall have been made;

(vi)    such certificates of good standing (to the extent such concept exists) from the applicable secretary of state of the state of organization of each Loan Party, customary certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(vii)    [reserved];

(viii)    evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect; and

(ix)    copies of a recent Lien and judgment search in each jurisdiction reasonably requested by the DIP Agent with respect to the Loan Parties.

(b)    The DIP Agent shall have received a certificate of a Responsible Officer of the Borrower Representative certifying that:

(i)    The representations and warranties of the Borrowers and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the Closing Date; *provided* that, to the extent that such representations and warranties specifically refer to an

39

earlier date, they shall be true and correct in all material respects as of such earlier date; *provided*, *further*, that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

    (ii)  No Default or Event of Default would result from such Borrowing or from the application of the proceeds therefrom; and

    (iii)  The conditions set forth in Section 4.01(e), (f)(ii) and (v) of this Agreement have been complied with.

    (c)  All fees, expenses or other Costs required to be paid to the DIP Agent, any Lender or any Secured Party Advisor on or before the Closing Date shall have been paid in full, and all fees required to be paid to the Lenders on or before the Closing Date shall have been paid in full.

    (d)  The DIP Agent and the Lenders shall have received the Initial Budget.

    (e)  No unstayed orders, injunctions or pending litigation exists which could reasonably be expected to have a Material Adverse Effect.

    (f)  <u>Bankruptcy Matters</u>.

    (i)  <u>Entry of Interim Order</u>. The Interim Order shall have been entered by no later than two (2) Business Days after the Petition Date and no more than one (1) Business Day prior to the Closing Date, in form and substance reasonably satisfactory to the DIP Agent and the Required Lenders, and such Interim Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the DIP Agent and the Required Lenders;

    (ii)  <u>Cash Management</u>. The Loan Parties shall have established or shall maintain the cash management systems described in Section 6.12, and the Loan Parties shall have taken all steps necessary to comply with the Cash Management Order.  The Secured Parties acknowledge that the cash management systems in effect on the Petition Date are acceptable;

    (iii)  <u>First Day Pleadings</u>.  The DIP Agent and the Lenders shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance reasonably satisfactory to the DIP Agent and the Required Lenders;

    (iv)  <u>First Day Orders</u>.  All motions, pleadings and proposed orders (including the "first day orders") that the Borrowers intend to file with and submit to the Bankruptcy Court on the Petition Date in connection with the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the DIP Agent and the Required Lenders, and the Bankruptcy Court shall have approved and entered all "first day" orders, including, without limitation, the Cash Management Order;

    (v)  <u>Control Over Collateral</u>.  No trustee, examiner with expanded powers to operate or manage the financial affairs, the business or reorganization of the  Loan Parties, or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and the Bankruptcy Court shall not have entered any order granting any party, other than the Loan Parties, control over any Collateral; and

    (vi)  <u>Restructuring Support Agreement</u>.  The DIP Agent shall have received a fully executed copy of the Restructuring Support Agreement.

    SECTION 4.02.  <u>Conditions to Credit Extensions Upon Final Order</u>. The obligation of each Lender to honor any Committed Loan Notice (other than a Committed Loan Notice requesting only a conversion of Loans to

40

the other Type or a continuation of Eurodollar Rate Loans) after the Closing Date is subject to satisfaction (or waiver) of the following conditions precedent:

(a)        The DIP Agent shall have received a certificate of a Responsible Officer of the Borrower Representative certifying that:

(i)        The representations and warranties of the Borrowers and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided*, *further*, that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

(ii)        No Default or Event of Default shall exist or would result from such proposed Credit Extension or from the application of the proceeds therefrom; and

(iii)        The conditions set forth in Section 4.02(c), (e) through (g) of this Agreement have been complied with.

(b)        The DIP Agent shall have received a Committed Loan Notice in accordance with the requirements hereof.

(c)        Since the Petition Date, other than those events or circumstances customarily arising from the commencement of the Chapter 11 Cases, there shall not have occurred any event or condition that has had or would be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect.

(d)        All fees and expenses or other Costs required to be paid to the DIP Agent, any Lender or any Secured Party Advisor on or before the Closing Date shall have been paid in full.

(e)        The Borrowers shall be in compliance with the Budget, subject to any Permitted Variance.

(f)        No orders, injunctions or pending litigation exists which could reasonably be expected to have a Material Adverse Effect.

(g)        (i) The Final Order shall have been entered and shall be reasonably satisfactory to the DIP Agent and the Required Lenders in all material respects; (ii) no appeal or motion to oppose, vacate or for reconsideration of the Interim Order or the Final Order shall have been timely filed by or with the support of any Debtor; and (iii) the Final Order shall not have been vacated, stayed, reversed, modified or amended without the DIP Agent's and Required Lenders' consent and shall otherwise be in full force and effect.

SECTION 4.03.        Conditions Subsequent.  The DIP Agent shall receive the following, each of which shall be originals, facsimiles or copies in.pdf or similar format (followed promptly by originals) unless otherwise specified, and each in form and substance reasonably satisfactory to the DIP Agent and its legal counsel:

(a)        within ten (10) Business Days of the Closing Date (or such longer period as the DIP Agent may agree in its reasonable discretion), a customary legal opinion from Skadden, Arps, Slate, Meagher& Flom LLP; and

(b)        within thirty (30) days of the Closing Date (or such longer period as the DIP Agent may agree in its reasonable discretion), evidence that the DIP Agent has been named as loss payee and/or additional insured, as applicable, under each insurance policy with respect to such insurance as to which the DIP Agent shall have reasonably requested to be so named.

1709895.02-NYCSR03A - MSW

## ARTICLE V

### Representations and Warranties

The Loan Parties represent and warrant to the DIP Agent and the Lenders at the time of the Credit Extension:

SECTION 5.01.    Existence, Qualification and Power; Compliance with Laws. Each Loan Party and each of its Subsidiaries (a) is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization (to the extent such concept exists in such jurisdiction), (b) has all corporate or other organizational power and authority to (i) own or lease its assets and carry on its business as currently conducted and (ii) in the case of the Loan Parties, subject to entry of the Interim Order (and Final Order, when applicable), execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept exists) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business as currently conducted requires such qualification, (d) is in compliance with all applicable Laws, orders, writs, injunctions and orders and (e) subject to entry of the Interim Order (and Final Order, when applicable), has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted ; except in each case referred to in clause (c), (d) or (e), to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.02.    Authorization; No Contravention.

(a)    Upon entry of the Interim Order (and Final Order, when applicable), the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action.

(b)    Upon entry of the Interim Order (and Final Order, when applicable), neither the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party nor the consummation of the Transactions will (i) contravene the terms of any of such Person's Organization Documents, (ii) result in any breach or contravention, that is not subject to the automatic stay of Section 362 of the Bankruptcy Code, of, or the creation of any Lien upon any of the property or assets of such Person or any of the Subsidiaries (other than as permitted by Section 7.01) under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any applicable Law; except with respect to any breach, contravention or violation (but not creation of Liens) referred to in clauses (ii) and (iii), to the extent that such breach, contravention or violation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.03.    Governmental Authorization. No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (i) the entry of the Interim Order (and Final Order, when applicable), (ii) filings and registrations necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (iii) the approvals, consents, exemptions, authorizations, actions, notices, filings and registrations that have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or in full and effect pursuant to the Collateral and Guarantee Requirement) and (iv) those approvals, consents, exemptions, authorizations or other actions, notices, filings or registrations, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.04.    Binding Effect. Subject to entry of the Interim Order (or the Final Order, when applicable) and the terms thereof, this Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto. Upon the entry of the Interim Order (and Final Order, when applicable), this Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such

42

Loan Party, enforceable against such Loan Party that is party thereto in accordance with its terms and the Interim Order (and the Final Order, when applicable).

SECTION 5.05.    Financial Statements; No Material Adverse Effect.

(a)    (i) The Annual Financial Statements fairly present in all material respects the financial position of New Holdings and its consolidated Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein.

(ii)    The Quarterly and Monthly Financial Statements fairly present in all material respects the financial position of New Holdings and its consolidated Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein and subject to changes resulting from normal year-end adjustments and the absence of footnotes.

(b)    Except for the information or data furnished by any Loan Party to the DIP Agent and Lenders and identified in Section 5.14, there is no event or circumstance, either individually or in the aggregate, that has occurred since the Petition Date, that could reasonably be expected to have a Material Adverse Effect.

SECTION 5.06.    Litigation. Except for the Chapter 11 Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrowers, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against New Holdings, the Borrowers or any Subsidiary that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.07.    Labor Matters. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) there are no strikes or other labor disputes against any of the Borrowers or the Subsidiaries pending or, to the knowledge of the Borrowers, overtly threatened in writing and (b) none of the Borrowers or the Subsidiaries have been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters.

SECTION 5.08.    Ownership of Property; Liens; Closing Date Significant Contracts.

(a)    Each Loan Party and each of its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all real property necessary in the ordinary conduct of its business, free and clear of all Liens except for Liens permitted by Section 7.01 and except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. No Real Property that has improvements is located in a special flood hazard area unless flood insurance has been obtained in accordance with Section 6.07(b). Set forth on Schedule 5.08(a) is a list of all Real Properties of any Loan Party as of the Closing Date.

(b)    All Closing Date Significant Contracts are identified on Schedule 5.08(b) hereto. As of the Closing Date, each Closing Date Significant Contract is in full force and effect and no defaults exist that would enable any counterparty to terminate, cancel or not renew such contract.

SECTION 5.09.    Environmental Matters.

(a)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each Loan Party and each of its Subsidiaries is in compliance with all Environmental Laws in all jurisdictions in which each Loan Party and each of its Subsidiaries, as the case may be, is currently doing business (including having obtained all Environmental Permits) and (ii) none of the Loan Parties or any of their respective Subsidiaries has become subject to any pending, or to the knowledge of the Borrowers, threatened Environmental Claim or any other Environmental Liability in writing.

43

(b)        None of the Loan Parties or any of their respective Subsidiaries has treated, stored, transported or disposed of Hazardous Materials at or from any currently or formerly operated real estate or facility relating to its business in a manner that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.10.        Taxes. Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, New Holdings, the Borrowers and each of the Subsidiaries have timely filed all Federal and state and other tax returns and reports required to be filed and all such tax returns are true, correct and complete, and have timely paid all Federal and state and other taxes, assessments, fees and other governmental charges (including satisfying its withholding tax obligations) levied or imposed on their properties, income or assets or otherwise due and payable (whether or not shown on any such tax returns or reports), except those which are being contested in good faith by appropriate actions diligently taken and for which adequate reserves have been provided in accordance with GAAP.  There is no proposed material Tax assessment against New Holdings, any of the Borrowers or any of the Subsidiaries, and, to the knowledge of New Holdings and the Borrowers, there is no basis for any such assessment.  None of New Holdings, the Borrowers, and the Subsidiaries has given or been requested to give a waiver of the statute of limitations relating to the payment of any material Tax, assessment, fee or other governmental charge.

SECTION 5.11.        ERISA Compliance.

(a)        Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state Laws.

(b)        (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) none of the Loan Parties or any of their respective ERISA Affiliates has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 et seq. or 4243 of ERISA with respect to a Multiemployer Plan; and (iii) none of the Loan Parties or any of their respective ERISA Affiliates has engaged in a transaction that is subject to Sections 4069 or 4212(c) of ERISA, except, with respect to each of the foregoing clauses of this Section 5.11(b), as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(c)        Except where noncompliance or the incurrence of an obligation would not reasonably be expected to result in a Material Adverse Effect, (i) each Foreign Plan has been maintained in compliance with its terms and with the requirements of any and all applicable Laws, statutes, rules, regulations and orders, and (ii) neither New Holdings nor any Subsidiary has incurred any obligation in connection with the termination of or withdrawal from any Foreign Plan.

SECTION 5.12.        Subsidiaries. As of the Closing Date, neither New Holdings nor any other Loan Party has any Subsidiaries other than those specifically disclosed in Schedule 5.12, and all of the outstanding Equity Interests in the Borrowers and the Subsidiaries have been validly issued and are fully paid and (if applicable) nonassessable, and all Equity Interests owned by New Holdings or any other Loan Party are owned free and clear of all security interests of any person except (i) those created under the Collateral Documents, the Priority Credit Agreement, the First Lien Credit Documents or the Second Lien Credit Documents (which Liens shall be subject to the DIP Orders, Priority/First Lien/Second Lien Intercreditor Agreement and the First Lien/Second Lien Intercreditor Agreement) and (ii) any other Lien that is permitted under Section 7.01. As of the Closing Date, Schedule 5.12 (a) sets forth the name and jurisdiction of each Subsidiary, (b) sets forth the ownership interest of New Holdings, each Borrower and any other Subsidiary in each Subsidiary, including the percentage of such ownership and (c) identifies each Subsidiary, the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

SECTION 5.13.        Margin Regulations; Investment Company Act.

(a)        As of the Closing Date, none of the Collateral is Margin Stock. No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used for any purpose that violates Regulation U.

44

(b)        None of the Borrowers or any Guarantor is an "investment company" under the Investment Company Act of 1940.

SECTION 5.14.        Disclosure.  As of the Closing Date, each Loan Party has disclosed to the DIP Agent and the Lenders all agreements, instruments, corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, with respect to each of the foregoing, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect. None of the factual information and data heretofore or contemporaneously furnished in writing by or on behalf of any Loan Party to the DIP Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make such factual information and data (taken as a whole), in the light of the circumstances under which it was delivered, not materially misleading; it being understood that for purposes of this Section 5.14, such factual information and data shall not include any forecasts, projections or pro forma financial information or information of a general economic or general industry nature.

SECTION 5.15.        Intellectual Property; Licenses, Etc. The Borrowers and the Subsidiaries have good and marketable title to, or a valid license or right to use, all patents, patent rights, trademarks, servicemarks, trade names, domain names, copyrights, technology, software, know-how database rights, trade secrets, rights of privacy and publicity, licenses and other intellectual property rights (collectively, "**IP Rights**") that are material to the operation of their respective businesses as currently conducted except where the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. The operation of the respective businesses of the Borrowers or any Subsidiary as currently conducted does not infringe upon, misuse, misappropriate or violate any rights held by any Person except for such infringements, misuses, misappropriations or violations individually or in the aggregate, that would not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrowers, overtly threatened in writing against any Loan Party or Subsidiary, that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.  Schedule 5.15 set forth a complete list of all of each Loan Party's patents, trademarks and copyrights filed or registered with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, and all material licenses of intellectual property in favor of any Loan Party.

SECTION 5.16.        [Reserved].

SECTION 5.17.        [Reserved].

SECTION 5.18.        USA PATRIOT Act and OFAC.

(a)        To the extent applicable, New Holdings, each Borrower and each Subsidiary is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the USA PATRIOT Act.

(b)        None of New Holdings, any Borrower or any Subsidiary nor, to the knowledge of the Borrowers, any director, officer or employee of New Holdings, any Borrower or any Subsidiary, is subject as of the Closing Date to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**") or a person on the list of "Specially Designated Nationals and Blocked Persons." The proceeds of the Loans will not, to the knowledge of the Borrowers, be made available to any Person for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

SECTION 5.19.        Collateral Documents. Subject to, and upon the entry of, the Interim Order (and the Final Order, when applicable), this Agreement and any other Collateral Documents are effective to create in favor of the DIP Agent for the benefit of the Secured Parties, a legal, valid, enforceable and perfected Lien on all right, title and interest of the respective Loan Parties in the Collateral described herein, in each case with the priority set forth herein and in the applicable DIP Order and subject to the Senior Permitted Liens.

45

SECTION 5.20.    Initial Budget.  The Initial Budget was delivered by the Borrowers to the DIP Agent on or prior to the Closing Date.  Such Initial Budget and any subsequent supplement, amendment or extension of to the Budget has been or will be prepared in good faith based upon assumptions the Loan Parties believed to be reasonable at the time such Budget was prepared.

SECTION 5.21.    Chapter 11 Cases.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable Law and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and entry of the Interim Order and Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order.  The Debtors shall have given, on a timely basis as specified in the Interim Order or the Final Order, when applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, when applicable.

(b)    After the entry of the Interim Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to the Carve-Out and except to the extent otherwise set forth in the Interim Order or Final Order, as applicable.

(c)    After the entry of the Interim Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, subject, as to priority, only to the Senior Permitted Liens and except to the extent otherwise set forth in the Interim Order or the Final Order.

(d)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the Remedies Notice Period and other applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Termination Date (whether by acceleration or otherwise) of any of the Obligations, the DIP Agent and Lenders shall be entitled to immediate payment of the Obligations and to enforce the remedies provided for hereunder and thereunder or under applicable Law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

## ARTICLE VI

## Affirmative Covenants

So long as any Loan or other Obligation hereunder (other than contingent indemnification obligations as to which no claim has been asserted) shall remain unpaid or unsatisfied, the Loan Parties shall and shall cause each of the Subsidiaries to:

SECTION 6.01.    Financial Statements. Deliver to the DIP Agent for prompt further distribution to each Lender each of the following and shall take the following actions:

(a)    as soon as available, and in any event within one hundred and twenty (120) days after the end of each fiscal year of New Holdings, a consolidated balance sheet of New Holdings and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of operations, changes in members' equity and cash flows for such fiscal year, together with related notes thereto and a customary "management's discussion and analysis" describing results of operations, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of McGladrey & Pullen, LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and certified by a Responsible Officer of the Borrower Representative as fairly presenting in all material respects the financial position, results of operations and cash flows of New Holdings and its Subsidiaries in accordance with GAAP;

46

(b)        as soon as available, and in any event within forty-five (45) days after the end of each fiscal quarter, including the fourth quarter, of each fiscal year of New Holdings, a consolidated balance sheet of New Holdings and its Subsidiaries as at the end of such fiscal quarter, and the related (x) consolidated statements of operations for such fiscal quarter and for the portion of the fiscal year then ended and (y) statements of cash flows for the portion of the fiscal year then ended, setting forth, in each case under this Section 6.01(b), in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower Representative as fairly presenting in all material respects the financial position, results of operations and cash flows of New Holdings and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes, together with, under this Section 6.01(b), a customary "management's discussion and analysis" describing results of operations; and

(c)        as soon as available, and in any event within twenty-five (25) days after the end of each fiscal month within each fiscal year of New Holdings, a consolidated balance sheet of New Holdings and its Subsidiaries as at the end of such fiscal month, and the related (x) consolidated statements of operations for such fiscal month and for the portion of the fiscal year then ended and (y) statements of cash flows for the portion of the fiscal month then ended, setting forth, in each case under this Section 6.01(c), in comparative form the figures for the corresponding fiscal month of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower Representative as fairly presenting in all material respects the financial position, results of operations and cash flows of New Holdings and its Subsidiaries in accordance with GAAP, subject to normal year-end adjustments and the absence of footnotes, together with, under this Section 6.01(c), a customary "management's discussion and analysis" describing results of operations.

All consolidated financial information of New Holdings and its Subsidiaries that is delivered pursuant to Sections 6.01(a), 6.01(b) and 6.01(c) shall be accompanied by consolidating information that explains in reasonable detail the differences between the information relating to New Holdings, on the one hand, and the Borrowers and the Subsidiaries on a standalone basis, on the other hand.

SECTION 6.02.        Certificates; Other Information. Deliver to the DIP Agent for prompt further distribution to each Lender:

(a)        no later than five (5) days after the delivery of the financial statements referred to in Sections 6.01(a), (b) and (c), a duly completed Compliance Certificate signed by a Financial Officer of the Borrower Representative;

(b)        promptly after the same are publicly available, copies of all annual, regular, periodic and special reports, proxy statements and registration statements which New Holdings, any Borrower or any Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor or with any national securities exchange, as the case may be (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the DIP Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8), and in any case not otherwise required to be delivered to the DIP Agent pursuant to any other clause of this Section 6.02;

(c)        promptly after the furnishing thereof, copies of any material statements or material reports furnished to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount, in each case, so long as the aggregate outstanding principal amount thereunder is greater than the Threshold Amount and not otherwise required to be furnished to the DIP Agent pursuant to any other clause of this Section 6.02.

(d)        [reserved];

(e)        promptly after request therefor by the DIP Agent, but subject to the limitations set forth in Section 6.10 and Section 10.08, such additional information regarding the business, legal, financial or corporate affairs of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the DIP Agent may from time to time on its own behalf or on behalf of any Lender reasonably request; and

(f)    promptly after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any investigation of any Loan Party (other than any routine inquiry) to the extent that such investigation could reasonably be expected to result in a Material Adverse Effect.

Documents required to be delivered pursuant to Section 6.01 or Section 6.02 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower Representative posts such documents, or provides a link thereto, on the website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrowers' behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the DIP Agent have access (whether a commercial, third-party website or whether sponsored by the DIP Agent); *provided* that (i) upon written request by the DIP Agent, the Borrower Representative shall deliver paper copies of such documents to the DIP Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the DIP Agent and (ii) the Borrower Representative shall notify (which may be by facsimile or electronic mail) the DIP Agent of the posting of any such documents and provide to the DIP Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the DIP Agent and maintaining its copies of such documents.

SECTION 6.03.    Notices. Promptly after a Responsible Officer obtains actual knowledge thereof, notify the DIP Agent:

(a)    of the occurrence of (i) any Default or Event of Default or (ii) any event or change that has caused or evidences, either individually or in the aggregate, a Material Adverse Effect;

(b)    of (i) any dispute, litigation, investigation or proceeding, or written threat thereof, between any Loan Party and any arbitrator or Governmental Authority, (ii) the filing or commencement of, or written threat thereof, or any development in, any litigation or proceeding affecting any Loan Party or any Subsidiary or which arises in respect of any Indebtedness of any Loan Party in excess of the Threshold Amount or alleges criminal misconduct by any Loan Party, including pursuant to any applicable Environmental Laws or in respect of IP Rights or the occurrence of any noncompliance by any Loan Party or any of its Subsidiaries with, or liability under, any Environmental Law or Environmental Permit, or (iii) the occurrence of any ERISA Event that, in any such case referred to in clause (i), (ii) or (iii) of this Section 6.03(b), has resulted or could reasonably be expected to result in a Material Adverse Effect together, in each case together with such other information as may be available to the Loan Parties to enable the Lenders and their counsel to evaluate such matters;

(c)    if, as a result of any change in accounting principles and policies (or the application thereof) from those used in the preparation of any consolidated financial statements previously delivered pursuant to Section 6.01(a), 6.01(b) or Section 6.01(c), any consolidated financial statements delivered pursuant to Section 6.01(a), Section 6.01(b) or Section 6.01(c) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the delivery of such financial statements after such change, one or more statements of reconciliation for such financial statements (of the prior year) in form and substance reasonably satisfactory to DIP Agent;

(d)    any Lien (other than Liens permitted under Section 7.01) or claims made or asserted against any material Collateral or interest therein, and the Borrowers also agree promptly to notify DIP Agent in writing if any material portion of the Collateral is lost, damaged or destroyed;

(e)    within ten (10) Business Days of any Material Contract of New Holdings or any of its Subsidiaries being breached, terminated, not renewed or amended in a manner that is materially adverse to New Holdings or such Subsidiary, as the case may be, or that any Loan Party determines in good faith to be material to DIP Agent or the Lenders; provided that an inadvertent failure to provide any such notice pursuant to this clause shall not result in a Default or Event of Default hereunder unless such breach, termination, non-renewal or amendment of the subject Material Contract could reasonably have been expected to result in a Material Adverse Effect;

48

(f)        within ten (10) Business Days of the occurrence of any Exclusion Event, provide an explanation of any actions being taken with respect thereto; and

(g)        (1) provide drafts of all motions, applications, and other pleadings that the Loan Parties intend to file with the Bankruptcy Court relating to the Loan Documents, the DIP Orders, any Plan of Reorganization, any key employee incentive plan, any key employee retention plan, the first day hearing, the second day hearing, executory contracts and unexpired leases, the Restructuring Support Agreement, or any material written notices, filings, motions and pleading concerning the financial condition of the Loan Parties at least three (3) days before the date when the Borrowers intend to file such pleading to the extent reasonably practicable, and (2) provide the DIP Agent's counsel drafts of all other motions, applications, and other pleadings that the Borrowers intend to file with the Bankruptcy Court at least one (1) day before the date when Borrowers intend to file such pleading to the extent reasonably practicable.

Each notice pursuant to this Section 6.03 (other than 6.03(g)) shall be accompanied by a written statement of a Responsible Officer of the Borrower Representative (x) that such notice is being delivered pursuant to Section 6.03 and (y) setting forth details of the occurrence referred to therein and stating what action the Borrowers have taken and/or propose to take with respect thereto (if applicable).

SECTION 6.04.        Payment of Obligations. Subject to the DIP Orders, timely pay, discharge or otherwise satisfy, as the same shall become due and payable, all of its obligations and liabilities incurred after the Petition Date and in accordance with the Budget in respect of taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent (i) any such tax, assessment, charge or levy is being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP or (ii) the failure to pay or discharge the same would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

SECTION 6.05.        Preservation of Existence, Etc. (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all reasonable action to obtain, preserve, renew and keep in full force and effect its rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except in the case of clause (a) or (b) (i) to the extent (other than with respect to the preservation of the existence of New Holdings and the Borrowers) that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (ii) pursuant to any merger, consolidation, liquidation, dissolution or Disposition permitted by Article VII.

SECTION 6.06.        Maintenance of Properties. Maintain preserve and protect all of its material properties and equipment used in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted.

SECTION 6.07.        Maintenance of Insurance.

(a)        Maintain with insurance companies that the Borrower Representative believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to the Borrowers' and the Subsidiaries' properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrowers and the Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon written request from the DIP Agent, information presented in reasonable detail as to the insurance so carried; provided that, notwithstanding the foregoing, in no event shall the Borrowers or any Subsidiary be required to obtain or maintain insurance that is more restrictive than its normal course of practice. Each such policy of insurance shall as appropriate, (i) name the DIP Agent, on behalf of the Lenders, as an additional insured thereunder as its interests may appear and/or (ii) in the case of each casualty insurance policy, contain an additional loss payable clause or endorsement that names the DIP Agent, on behalf of the Secured Parties, as an additional loss payee thereunder.

(b)        If any "building" or "improvement" (as defined in the Flood Insurance Laws) located on any Real Property is located in an area identified by the Federal Emergency Management Agency (or any successor agency)

49

as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then the Borrower Representative shall, or shall cause the applicable Loan Party to (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the DIP Agent evidence of such compliance in form and substance reasonably acceptable to the DIP Agent.

SECTION 6.08.    Compliance with Laws. Comply in all material respects with its Organization Documents and the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

SECTION 6.09.    Books and Records. Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP shall be made of all material financial transactions and matters involving the assets and business of a Borrower or such Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries may maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of any representations, warranties or covenants hereunder).

SECTION 6.10.    Inspection Rights. Permit representatives and independent contractors of the DIP Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrowers and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower Representative; *provided* that, only the DIP Agent on behalf of the Lenders may (or at the request of the Required Lenders, will) exercise rights of the DIP Agent and the Lenders under this Section 6.10. The DIP Agent shall give the Borrower Representative the opportunity to participate in any discussions with the Borrowers' independent public accountants. Notwithstanding anything to the contrary in this Section 6.10, none of the Borrowers or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (a) constitutes non-financial trade secrets or non-financial proprietary information, (b) in respect of which disclosure to the DIP Agent or any Lender (or their respective representatives or contractors, including the Secured Party Advisors) is prohibited by Law or any binding agreement or (c) is subject to attorney-client or similar privilege or constitutes attorney work product.

SECTION 6.11.    Covenant to Guarantee Obligations and Give Security. At the Borrowers' expense, subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the DIP Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(b)        upon the formation or acquisition of any new direct or indirect Subsidiary by any Loan Party, which formation or acquisition shall require the prior written consent of the Required Lenders:

(i)        within ten (10) Business Days (or such greater number of days specified below) after such formation, acquisition or designation or, in each case, such longer period as the DIP Agent may agree in its reasonable discretion:

(A)        [reserved];

(B)        within thirty (30) days after such formation, acquisition or designation, cause each such Subsidiary to duly execute and deliver to the DIP Agent, such security agreements and documents reasonably requested by and in form and substance reasonably satisfactory to the DIP Agent, in each case granting Liens required by the Collateral and Guarantee Requirement;

50

(C)        subject to the following paragraph, cause each such Subsidiary to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and instruments evidencing the Indebtedness held by such Subsidiary and required to be pledged pursuant to the Collateral Documents, indorsed in blank to the DIP Agent; and

(D)        within ten (10) Business Days after such formation, acquisition or designation, take and cause the applicable Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement, and each direct and indirect parent of such applicable Subsidiary, to take whatever action (including the filing of Uniform Commercial Code financing statements and delivery of stock and membership interest certificates to the extent certificated) may be required pursuant to the terms of the Collateral Documents or as necessary in the reasonable opinion of the DIP Agent to vest in the DIP Agent (or in any representative of the DIP Agent designated by it) valid and perfected (to the extent required by the Collateral Documents) Liens required by the Collateral and Guarantee Requirement, enforceable against all third parties in accordance with their terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity (regardless of whether enforcement is sought in equity or at law) and subject to Liens permitted under Section 7.01;

(ii)        within ten (10) Business Days (or within the periods specified in clause (c) hereof) after the reasonable request therefor by the DIP Agent (or such longer period as the DIP Agent may agree in its reasonable discretion), deliver to the DIP Agent a signed copy of an opinion, addressed to the DIP Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the DIP Agent as to such matters set forth in this Section 6.11(a) as the DIP Agent may reasonably request.

(c)        after the Closing Date, promptly after the acquisition of any Real Property by any Loan Party, if such Real Property shall not already be subject to a perfected Lien pursuant to the Collateral and Guarantee Requirement, the Borrower Representative shall give notice thereof to the DIP Agent.

SECTION 6.12.        Loan Proceeds. The net proceeds of the Loans shall be deposited into a segregated deposit account of the Borrower Representative or any other Loan Party (the "**Proceeds Account**"); *provided* that in the case of the Closing Date Borrowing, the amount of withdrawal as specified in the Withdrawal Notice (delivered substantially concurrently with the Committed Loan Notice) shall be directly deposited into the account(s) specified therein; *provided further*, that the Borrower Representative shall open a new account, which shall operate as the Proceeds Account hereunder, into which the remaining Loan proceeds shall be transferred within ten (10) days of the Closing Date (or such longer period as the DIP Agent may agree in its reasonable discretion). The Proceeds Account shall be subject to a first priority Lien in favor of the DIP Agent. The Borrower Representative may make withdrawals from the Proceeds Account by delivering to the DIP Agent a Withdrawal Notice in advance of the proposed withdrawal, appropriately completed and signed by a Responsible Officer of the Borrower Representative.

SECTION 6.13.        Further Assurances. Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document, promptly upon reasonable request by the DIP Agent or as may be required by applicable law (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments (including with respect to any Borrower, a joinder to this Agreement) as the DIP Agent may reasonably request from time to time in order to carry out more effectively the purposes of the DIP Orders and the Collateral Documents.

SECTION 6.14.        [Reserved].

SECTION 6.15.        [Reserved].

SECTION 6.16.        Use of Proceeds. Use the proceeds of the Loans (i) to pay Costs and to pay other fees, costs and expenses payable hereunder, and (ii) for general corporate purposes, including to fund the Chapter 11

Cases, and to pay other administrative costs incurred in connection herewith or in connection with the Chapter 11 Cases, in each case, in accordance with the Budget (subject to any Permitted Variance). The proceeds of the Loans shall be maintained in the Proceeds Account until withdrawn in accordance with Section 6.12.

SECTION 6.17.    [Reserved].

SECTION 6.18.    Case Milestones. Within the time periods specified in Schedule 6.18, deliver the documents or take the actions or cause the events to have occurred as specified therein (the "**Case Milestones**").

SECTION 6.19.    Restructuring Advisor; Cooperation with Restructuring Advisor.

(a)    Continue to engage and retain each of PJT Partners, Inc. ("**PJT**"), Ankura Consulting Group, LLC ("**Ankura**") or such other restructuring advisor reasonably acceptable to the Required Lenders (each, a "**Restructuring Advisor**"). The retention of any Restructuring Advisor shall be on terms and conditions (including as to scope of engagement) reasonably satisfactory to the Required Lenders. The Lenders hereby confirm that, as of the Closing Date, the existing engagement of each of Ankura and PJT as the Restructuring Advisor shall satisfy the applicable requirements set forth in this clause (a). Each of the Restructuring Advisors shall be retained by and at the sole cost and expense of the Loan Parties and solely on behalf of the Loan Parties at all times; and

(b)    The Loan Parties hereby (i) authorize the DIP Agent and the Required Lenders (or their respective agents or advisors, including the Secured Party Advisors) to communicate directly with each of the Restructuring Advisors regarding any and all matters related to the Loan Parties, including, without limitation, all financial reports and projections developed, reviewed or verified by any Restructuring Advisor and all additional information, reports and statements reasonably requested by the DIP Agent or the Lenders (it being understood that the Chief Financial Officer of the Borrowers may participate in such communications), and (ii) authorize and direct each Restructuring Advisor to provide the DIP Agent and the Lenders (or their respective agents or advisors) with copies of reports and other information or materials prepared or reviewed by such Restructuring Advisor as the DIP Agent or the Required Lenders may reasonably request (in each case, subject to protection as necessary in respect of bona fide attorney-client privilege).

SECTION 6.20.    Budget.

(a)    The use of Loans and other extensions of credit by the Loan Parties under this Agreement and the other Loan Documents shall be subject to Section 6.12 and Section 6.16 and limited in accordance with the Budget (subject to any Permitted Variance). The Initial Budget shall depict, on a weekly and line item basis, (1) (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Loan Parties' professionals and advisors), and any other fees and expenses relating to the Loan Documents), (iii) projected net cash flow, and (iv) total ending book cash balance, in each case, for the first thirteen (13) week period from the Closing Date, and (2) the other items set forth therein or required by the terms of the DIP Order and Schedule 6.20 hereof and other information reasonably requested by the DIP Agent or the Required Lenders for the first thirteen (13) week period from the Closing Date, and such Initial Budget shall be approved by, and in form and substance reasonably satisfactory to, the Required Lenders in their reasonable discretion (it being acknowledged and agreed that the Initial Budget is approved by and satisfactory to the Required Lenders). The Initial Budget shall be updated, modified or supplemented by the Borrowers from time to time as provided for in the DIP Order or with the written consent of the DIP Agent (acting at the written direction of the Required Lenders), and each such updated, modified or supplemented budget shall be in form and substance reasonably satisfactory to the DIP Agent and the Required Lenders in their reasonable discretion and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed a Budget for the applicable period; provided, however, that in the event the DIP Agent and the Required Lenders, on the one hand, and the Loan Parties, on the other hand, cannot agree as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default once the period covered by the prior Budget has terminated. Each Budget delivered to the DIP Agent and the Required Lenders shall be accompanied by such supporting documentation as reasonably requested by the DIP Agent and/or the Required Lenders. Each Budget shall be prepared in good faith based upon assumptions which the Loan Parties believe to be reasonable at the time such Budget is prepared.

52

(b)      The Borrower Representative shall deliver to the DIP Agent on or before 5:00 p.m. on Thursday of each week a Budget Variance Report.

(c)      DIP Agent and the Lenders (i) may assume that the Loan Parties will comply with the Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Budget.  The line items in the Budget for payment of interest, expenses and other amounts to the DIP Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable DIP Order regardless of whether such amounts exceed such estimates.  Nothing in any Budget shall constitute an amendment or other modification of any Loan Document or any lending limits set forth therein.

SECTION 6.21.    <u>Lender Calls</u>.  Unless otherwise agreed or waived by the DIP Agent and not in duplication of any other calls held with the DIP Agent, the Lenders and/or the DIP Agent's financial and legal advisors, the Loan Parties shall host the following telephonic conference calls with the DIP Agent, the Lenders and the DIP Agent's financial advisors, including, for the avoidance of doubt, relevant Secured Party Advisors: no less frequently than once every week, a call with Ankura and/or PJT to discuss (a) the contents of Budget Variance Reports and (b)(i) the financial operations and performance of the Loan Parties' business, or (ii) such other matters relating to the Loan Parties as the DIP Agent or the Required Lenders (or their respective agents or advisors) shall reasonably request (in each case, subject to protection as necessary in respect of bona fide attorney-client privilege); *provided* that, the DIP Agent and/or Ankura shall endeavor to circulate an agenda of any such additional items to be discussed reasonably in advance of such call.

SECTION 6.22.    <u>DIP Orders</u>.  The Loan Parties shall comply with the DIP Orders in all material respects including by making the adequate protection payments required thereby.

## ARTICLE VII

## <u>Negative Covenants</u>

So long as any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations as to which no claim has been asserted), the Loan Parties shall not permit or permit any Subsidiary to:

SECTION 7.01.    <u>Liens</u>. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following (the "**Permitted Liens**"):

(a)      Liens created pursuant to any Loan Document;

(b)      Liens existing on the date hereof and set forth on <u>Schedule 7.01(b)</u>;

(c)      Liens for taxes, assessments or governmental charges that are not overdue for a period of more than thirty (30) days or that are being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP;

(d)      statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, or other customary Liens (other than in respect of Indebtedness) in favor of landlords, so long as, in each case, such Liens arise in the ordinary course of business and (i) secure amounts not overdue for a period of more than thirty (30) days or (ii) are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)      (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, health, disability or employee benefits, unemployment insurance and other social security Laws or similar legislation or regulation or other insurance-related obligations (including, but not limited to, in respect of

deductibles, self-insured retention amounts and premiums and adjustments thereto) and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to New Holdings, any Borrower or any Subsidiary;

(f)        deposits to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business or consistent with industry practice;

(g)        easements, rights-of-way, restrictions (including zoning restrictions), encroachments, protrusions and other similar encumbrances and title defects affecting real property that, individually or in the aggregate, do not materially interfere with the ordinary conduct of the business of the Borrowers and the Subsidiaries, taken as a whole, or the use of the property for its intended purpose;

(h)        Liens arising from judgments or orders for the payment of money not constituting an Event of Default under Section 8.01(g);

(i)        Liens securing obligations in respect of Indebtedness permitted under Section 7.03(e); *provided* that (A) such Liens attach concurrently with or within one hundred and twenty (120) days after completion of the acquisition, construction, repair, replacement or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits and (C) such Liens do not at any time extend to or cover any assets (except for additions and accessions to such assets, replacements and products thereof and customary security deposits) other than the assets subject to, or acquired, constructed, repaired, replaced or improved with the proceeds of such Indebtedness; *provided* that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(j)        leases, licenses, subleases, sublicenses, grants or permits granted to others in the ordinary course of business (or other agreement under which any Borrower or any Subsidiary has granted rights to end users to access and use such Borrower's or Subsidiary's products, technologies or services) which (x) do not (i) interfere in any material respect with the business of the Borrowers and the Subsidiaries, taken as a whole, or (ii) secure any Indebtedness or (y) are permitted by Section 7.05;

(k)        Liens (i) in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business and (ii) on specific items of inventory or other goods and proceeds thereof of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or such other goods in the ordinary course of business;

(l)        Liens (i) of a collection bank arising under Section 4-208 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iii) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry or arising pursuant to such financial institution's general terms and conditions;

(m)        Liens (i) on cash advances in favor of the seller of any property to be acquired in any Investment or other acquisition permitted pursuant to this Agreement, in each case, to be applied against the purchase price for such Investment or other acquisition or (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment, other acquisition or Disposition, as the case may be, would have been permitted under this Agreement on the date of the creation of such Lien;

54

(n)        Liens in favor of any Borrower or any Subsidiary securing Indebtedness permitted under Section 7.03(d);

(o)        [reserved];

(p)        any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases (other than Capitalized Leases), subleases, licenses or sublicenses entered into by any Borrower or any of the Subsidiaries in the ordinary course of business or to the extent permitted by Section 7.05;

(q)        Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by any Borrower or any Subsidiary in the ordinary course of business;

(r)        Liens deemed to exist in connection with Investments in repurchase agreements permitted under the definition of "Permitted Investments" and Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts maintained in the ordinary course of business and not for speculative purposes;

(s)        Liens that are contractual rights of setoff or rights of pledge (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of any Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of any Borrower or any Subsidiary or (iii) relating to purchase orders and other agreements entered into with customers of any Borrower or any Subsidiary in the ordinary course of business;

(t)        the Carve-Out;

(u)        ground leases in respect of real property on which facilities owned or leased by any Borrower or any Subsidiary are located, to the extent disclosed in Schedule 7.01(u);

(v)        purported Liens evidenced by the filing of precautionary Uniform Commercial Code (or equivalent statute) financing statements or similar public filings;

(w)        Liens on insurance policies (other than title insurance policies) and the proceeds thereof securing the financing of the premiums with respect thereto;

(x)        Liens securing Indebtedness permitted pursuant to Section 7.03(g), (m) and (r);

(y)        any zoning, building, entitlement and other land use regulations or similar law or right reserved to or vested in any Governmental Authority which are not violated in any material respect, taken as a whole, by the Borrowers' and the Subsidiaries' use of such real property or the ordinary conduct of the business of the Borrowers and the Subsidiaries;

(z)        Liens securing any segregated adequate assurance utility account;

(aa)        Liens securing obligations in respect of the Pre-Petition Credit Agreements (the "**Primed Liens**"); provided that such Liens are at all times junior to the DIP Liens and subject to the Priority/First Lien/Second Lien Intercreditor Agreement and the First Lien/Second Lien Intercreditor Agreement;

(bb)        Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

55

(cc)    deposits of cash with the owner or lessor of premises leased and operated by any Borrower or any Subsidiary in the ordinary course of business of such Borrower or such Subsidiary to secure the performance of such Borrower's or such Subsidiary's obligations under the terms of the lease for such premises;

(dd)    [reserved];

(ee)    Liens securing Indebtedness or other obligations in an aggregate principal amount at any time outstanding not to exceed $250,000, in each case determined as of the date of incurrence, which Liens shall rank junior to the Liens securing the Obligations; and

(ff)    the Adequate Protection Liens and Adequate Protection Superpriority Claims.

The expansion of Liens by virtue of accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, amortization of original issue discount and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an incurrence of Liens for purposes of this Section 7.01.

SECTION 7.02.    [Reserved].

SECTION 7.03.    Indebtedness. Create, incur, assume or suffer to exist any Indebtedness, other than:

(a)    Indebtedness under the Loan Documents;

(b)    (i) Indebtedness existing on the date hereof set forth on Schedule 7.03(b) (without duplication of any Indebtedness of the type discussed in clauses (e), (m), (g) and (r) of this Section 7.03, which, to the extent set forth on Schedule 7.03(b), shall be treated as incurred under the foregoing clauses) and (ii) intercompany Indebtedness owed by one Loan Party to another Loan Party outstanding on the date hereof;

(c)    Guarantees by a Loan Party in respect of Indebtedness of any Borrower or any other Loan Party otherwise permitted hereunder;

(d)    Indebtedness of any Loan Party owing to any other Loan Party;

(e)    Attributable Indebtedness and other Indebtedness (including Capitalized Leases and Alamo Obligations) of any Borrower or any Subsidiary financing the acquisition, construction, repair, replacement or improvement of fixed or capital assets in an aggregate principal amount at any time outstanding not to exceed $17,500,000; provided that such Indebtedness is incurred concurrently with or within one hundred and twenty (120) days after the applicable acquisition, construction, repair, replacement or improvement of such assets and in accordance with the Budget (subject to any Permitted Variance);

(f)    [reserved];

(g)    obligations in respect of Cash Management Services and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, purchasing credit card programs, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantees thereof in an aggregate principal amount at any time outstanding not to exceed $2,000,000;

(h)    [reserved];

(i)    [reserved];

(j)    [reserved];

(k)    obligations constituting Indebtedness that are permitted by the Cash Management Order;

56

(l)        other Indebtedness of the Borrowers and the Subsidiaries in an aggregate principal amount at any time outstanding not to exceed $500,000;

(m)       Indebtedness consisting of the financing of (x) insurance premiums or (y) software, in each case, incurred in the ordinary course of business in an aggregate amount with respect to the foregoing clauses (x) and (y) not to exceed $4,500,000 outstanding at any time incurred in the ordinary course of business;

(n)        [reserved];

(o)        [reserved];

(p)        (x) Indebtedness outstanding on the Closing Date pursuant to the Priority Credit Documents, (y) Indebtedness outstanding on the Closing Date pursuant to the First Lien Credit Documents and (z) Indebtedness outstanding on the Closing Date pursuant to the Second Lien Credit Documents, in each case, which are subject to the DIP Orders, junior to the DIP Liens, and subject to the Priority/First Lien/Second Lien Intercreditor Agreement and First Lien/Second Lien Intercreditor Agreement (such Indebtedness, collectively, the "**Pre-Petition Credit Agreements**");

(q)        [reserved]; and

(r)        letters of credit incurred in the ordinary course of business outstanding at any time in an aggregate face amount not to exceed $17,500,000 (of which no more than $2,500,000 thereof may be used for purposes other than supporting insurance obligations (including worker's compensation)).

Notwithstanding the foregoing, no Subsidiary that is a Non-Loan Party will guarantee any Indebtedness for borrowed money of a Loan Party unless such Subsidiary becomes a Guarantor and no Loan Party shall Guarantee any obligation of any Non-Loan Party.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed or first incurred (whichever yields the lower Dollar equivalent), in the case of revolving credit debt.

The accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of OID, and the payment of interest or dividends in the form of additional Indebtedness of the same class, accretion or amortization of OID or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies, will, in each case, not be deemed to be a creation, incurrence, assumption or existence of Indebtedness for purposes of this Section 7.03. The principal amount of any Indebtedness incurred or issued to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on the consolidated balance sheet of New Holdings dated such date prepared in accordance with GAAP.

Notwithstanding any of the foregoing, and except for the Carve-Out, no Indebtedness permitted under this Section 7.03 shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the superpriority claims of the DIP Agent and the Lenders.

SECTION 7.04.      Fundamental Changes. Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except:

(a)        any Subsidiary may merge, amalgamate or consolidate with any Borrower and any Borrower may merge, amalgamate or consolidate with any other Borrower; *provided* that a Borrower shall be the continuing or surviving Person;

(b)        any Subsidiary may merge, amalgamate or consolidate with or into any other Subsidiary of any Borrower; *provided*, that the surviving Person shall be a Loan Party; and

(c)        any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to any Borrower or another Subsidiary that is a Loan Party.

SECTION 7.05.        Dispositions. Make any Disposition, except:

(a)        (i) Dispositions of obsolete, damaged, worn out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business, (ii) Dispositions of property no longer used or useful in the conduct of the business of the Borrowers and the Subsidiaries and (iii) Dispositions to landlords of improvements made to leased real property pursuant to customary terms of leases entered into in the ordinary course of business; *provided* that Dispositions of any property pursuant to clause (i) or (ii) above shall not exceed $1,000,000 in the aggregate following the Closing Date;

(b)        Dispositions of inventory and goods held for sale in the ordinary course of business and immaterial assets (considered in the aggregate) in the ordinary course of business;

(c)        Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)        Dispositions of property to any Borrower or any Loan Party; *provided* that if such transaction constitutes an Investment, such Investment must be permitted by Section 7.06 or the definition of "Permitted Investments";

(e)        Dispositions that otherwise constitute a Permitted Investment, are permitted by Section 7.04 or otherwise constitute a Restricted Payment permitted by Section 7.06 and Liens permitted by Section 7.01 (other than Section 7.01(m)(ii));

(f)        Other Dispositions in an amount not to exceed $500,000 following the Closing Date;

(g)        Dispositions of (i) Cash Equivalents and (ii) Investment Grade Securities;

(h)        leases, subleases, licenses, sublicenses, grants and permits (including agreements under which any Borrower or any Subsidiary has granted rights to end users to access and use any Borrower's or any Subsidiary's products, technologies or services), in each case in the ordinary course of business and which do not materially interfere with the business of the Borrowers and the Subsidiaries, taken as a whole;

(i)        transfers of property subject to Casualty Events;

(j)        [reserved];

(k)        [reserved];

(l)        Dispositions or discounts of accounts receivable in connection with the collection or compromise thereof;

(m)        Dispositions of property as set forth on Schedule 7.05(m);

58

(n)        the lapse or abandonment of immaterial IP Rights in the ordinary course of business and the abandonment of any registrations or applications for registration of any immaterial IP Rights to the extent such lapse or abandonment could not reasonably be expected to have a Material Adverse Effect; and

(o)        any surrender or waiver of contract rights or the settlement, release or surrender of contract rights or other litigation claims in the ordinary course of business;

*provided* that any Disposition of any property pursuant to Section 7.05 (except pursuant to Sections 7.05(e), (i), (n) and (o)) shall be for no less than the fair market value of such property at the time of such Disposition. To the extent any Collateral is Disposed of as expressly permitted by this Section 7.05 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and, if requested by the DIP Agent, upon the certification by the Borrower Representative that such Disposition is permitted by this Agreement, the DIP Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

SECTION 7.06.        Restricted Payments.

(a)        Declare or make, directly or indirectly, any Restricted Payment.

(b)        The provisions of Section 7.06(a) will not prohibit the declaration and payment of dividends or distributions by (A) a Loan Party to any other Loan Party or (B) a Subsidiary that is not a Loan Party to a Loan Party.

SECTION 7.07.        Change in Nature of Business. Engage in any material line of business substantially different from those lines of business conducted by the Borrowers and the Subsidiaries on the Closing Date or any business or any other activities that are reasonably similar, ancillary, incidental, complimentary or related to, or a reasonable extension, development or expansion of, the business conducted or proposed to be conducted by the Borrowers and the Subsidiaries on the Closing Date.

SECTION 7.08.        Transactions with Affiliates. Enter into any transaction of any kind with any Affiliate of any Borrower, whether or not in the ordinary course of business, other than:

(a)        transactions between New Holdings, any Borrower or any Subsidiary permitted under this Agreement;

(b)        [reserved];

(c)        [reserved];

(d)        employment and severance arrangements between New Holdings, any Borrower and any Subsidiary and newly hired employees in the ordinary course of business (which, for the avoidance of doubt, will not include stock option or other equity or equity-based incentive compensation); and

(e)        transactions related to the repayment of the Indebtedness of the Loan Parties' existing as of the Closing Date to be repaid in accordance with the terms and conditions of this Agreement, any "first day" orders and the Budget.

SECTION 7.09.        Burdensome Agreements. Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that prohibits, restricts, imposes any condition on or limits the ability of (a) any Subsidiary that is not a Loan Party to make Restricted Payments to (directly or indirectly) or to make or repay loans or advances to any Loan Party or to Guarantee the Obligations of any Loan Party under the Loan Documents or (b) any Loan Party to create, incur, assume or suffer to exist Indebtedness or Liens on property of such Person for the benefit of the Lenders with respect to the Obligations under the Loan Documents; *provided* that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations that:

(i)       exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09 hereto;

(ii)      are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such Contractual Obligations were not incurred in contemplation of such Person becoming a Subsidiary;

(iii)     are customary restrictions that arise in connection with (x) any Senior Permitted Lien and relate solely to the property subject to such Lien or (y) any Disposition permitted by Section 7.04 or 7.05 and relate solely to the assets or Person subject to such Disposition;

(iv)     [reserved];

(v)      are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the property interest, rights or the assets subject thereto;

(vi)     comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Section 7.03(e) or (m) to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

(vii)    are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Borrower or any Subsidiary;

(viii)   are customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(ix)     are restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(x)      are restrictions contained in the documentation and instruments relating to any Indebtedness incurred pursuant to Section 7.03(p); or

(xi)     arise in connection with cash or other deposits permitted under Section 7.01 or the definition of "Permitted Investments".

SECTION 7.10.     Change in Fiscal Year. Make any change in fiscal year.

SECTION 7.11.     Modification of Terms of Financing Documentation; Organization Documents; Swap Contracts.

(a)      Amend, modify or change in any manner materially adverse to the interests of the Lenders or the Loan Parties any term or condition of any Indebtedness having an aggregate outstanding principal amount in excess of the Threshold Amount.

(b)      Amend, modify or change in any manner materially adverse to the interests of the Lenders, as determined in good faith by the Borrower Representative, any term or condition of any New Holdings Investment Indebtedness, Qualified Holding Company Debt or any Organization Document, in each case, without the consent of the DIP Agent (which consent shall not be unreasonably withheld, delayed or conditioned).

(c)      Enter into, or amend, modify or change in any manner, any Swap Contract other than a Swap Contract designed to hedge against New Holdings', any Borrower's or any Subsidiary's exposure to interest rates or fuel pricing risks incurred in the ordinary course of business and not for speculative purposes.

SECTION 7.12.     [Reserved].

SECTION 7.13.    New Holdings.  In the case of New Holdings, conduct, transact or otherwise engage in any business or operations other than the following (and activities incidental thereto): (i) its ownership or acquisition of the Equity Interests of any Borrower and activities incidental thereto (other than payment of dividends and the distribution of other amounts in respect of its Equity Interests); (ii) the maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance); (iii) the performance of its obligations with respect to the Loan Documents, the Priority Credit Documents the First Lien Credit Documents, the Second Lien Credit Documents, the New Holdings Investment Indebtedness and any Qualified Holding Company Debt, in each case, solely to the extent in existence on the Closing Date; (iv) financing activities, including the issuance of securities, making contributions to the capital of its Subsidiaries and guaranteeing the obligations of its Subsidiaries in each case solely to the extent permitted hereunder; (v) participating in tax, accounting and other administrative matters as a member of the consolidated group of New Holdings and the Borrowers; (vi) the provision of guarantees in the ordinary course of business in respect of obligations of any Borrower or any of the other Loan Parties to suppliers, customers, franchisees, lessors, licensees, sublicensees or distribution partners; provided, for the avoidance of doubt, that such guarantees shall not be in respect of Indebtedness for borrowed money, and (vii) activities incidental to the businesses or activities described in clauses (i) to (vi) of this Section 7.13.

SECTION 7.14.    Settlement.  Enter into, or seek approval in any legal or other proceeding for, any settlement agreement or stipulation not contemplated by the Budget that would result in the Debtors individually or collectively expending funds in excess of $250,000, other than with the prior written consent of the Required Lenders.

SECTION 7.15.    [Reserved].

SECTION 7.16.    Insolvency Proceeding Claims.  Except for the Carve-Out, no Loan Party shall incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the superpriority claims of the DIP Agent or the Lenders.

SECTION 7.17.    Bankruptcy Actions.  No Loan Party shall seek, consent to, or permit to exist, without the prior written consent of the Required Lenders, any order granting authority to take any action that is prohibited by the terms of this Agreement, the DIP Orders or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the DIP Orders or any of the other Loan Documents.

SECTION 7.18.    Subrogation.  No Loan Party shall assert any right of subrogation or contribution against any other Loan Party.

**ARTICLE VIII**

**Events of Default and Remedies**

SECTION 8.01.    Events of Default. Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without notice, application, or motion, hearing before, or order of the Bankruptcy Court or any notice to any Loan Party, each of the events referred to in clauses (a) through (m) of this Section 8.01 shall constitute an "**Event of Default**":

(a)    *Non-Payment*. The Borrowers fail to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within three (3) Business Days after the same becomes due, any interest on any Loan, fee or any other amount payable hereunder or with respect to any other Loan Document; or

(b)    *Specific Covenants*. Any Borrower or any other Loan Party fails to perform or observe any term, covenant or agreement contained in Section 4.03, Section 6.01, Section 6.03(a), Section 6.03(g), Section 6.05(a), Section 6.12, Section 6.16, Section 6.18, Section 6.19, Section 6.20, Section 6.21, Section 6.22 or Article VII; or

(c)    *Other Defaults*. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in the DIP Order or any other Loan Document on its part to be

61

performed or observed and such failure continues for fifteen (15) days after the earlier of knowledge of (A) a Responsible Officer of any Borrower or (B) receipt by the Borrower Representative of written notice thereof from the DIP Agent; or

(d)    *Representations and Warranties.* Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made; or

(e)    *Cross-Default.* Except for defaults occasioned by the filing of the Chapter 11 Cases or entry into this Agreement or stayed as a result of the Chapter 11 Cases, (A) any Loan Party or any Subsidiary (i) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate outstanding principal amount (individually or in the aggregate with all other Indebtedness as to which such a failure shall exist) of not less than the Threshold Amount or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any default thereunder by any Loan Party), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to Section 8.02 or (B) any Loan Party defaults in the performance of its obligations under any Material Contract, which default would cause or permit the termination, cancellation or non-renewal of such Material Contract or permit the counterparty thereto to terminate, cancel or not renew such Material Contract; or

(f)    *Judgments.* Other than with respect to a general unsecured claim against any Loan Party, there is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money or a settlement for the payment of money, in each case in an aggregate amount exceeding the Threshold Amount (to the extent, in each case, not covered by independent third-party insurance or third-party indemnification as to which the insurer or indemnifying party, as applicable, has been notified of such judgment, settlement or order and has not denied coverage thereof), which judgment or order is not automatically stayed or otherwise stayed pursuant to an order of the Bankruptcy Court, and such judgment, settlement or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal, as applicable, for a period of sixty (60) consecutive days; or

(g)    *ERISA.* (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party or their respective ERISA Affiliates under Title IV of ERISA in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect, (ii) any Loan Party or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect or (iii) with respect to a Foreign Plan a termination, withdrawal or noncompliance with applicable Law or plan terms that could reasonably be expected to result in a Material Adverse Effect; or

(h)    *Invalidity.*

(i)    Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05 or as a result of acts or omissions by the DIP Agent or any Lender hereunder) or the satisfaction in full of all the Obligations (other than contingent indemnification obligations as to which no claim has been asserted), ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations (other than contingent indemnification

62

obligations as to which no claim has been asserted), or purports in writing to revoke or rescind any Loan Document; or

(ii)    The provisions of the Priority/First Lien/Second Lien Intercreditor Agreement shall for any reason be revoked or invalidated, in whole or in part, or otherwise cease to be in full force and effect or any Loan Party shall have commenced a suit or an action, contesting in any manner the validity or enforceability of the Loan Documents or the Priority Credit Documents or the liens granted in connection therewith or denying that it has any further liability or obligation hereunder or thereunder, or for any reason shall not have the priority contemplated by the DIP Orders, the Priority/First Lien/Second Lien Intercreditor Agreement and the other Priority Credit Documents;

(i)    *Collateral Documents.* (i) Any Collateral Document after delivery thereof pursuant to Section 6.11 or 6.13 shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction not prohibited under this Agreement) cease to create, or any Lien purported to be created by any Collateral Document shall be asserted in writing by any Loan Party not to be, a valid and perfected Lien, with the priority required by the Collateral Documents (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01, except to the extent that any such loss of perfection or priority results from the failure of the DIP Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents or to file Uniform Commercial Code amendments relating to a Loan Party's change of name or jurisdiction of formation (solely to the extent that the Borrower Representative provides the DIP Agent written notice thereof in accordance with the Loan Documents, and the DIP Agent and the Borrower Representative have agreed that the DIP Agent will be responsible for filing such amendments) and continuation statements and except as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage or (ii) any of the Equity Interests of the Borrowers shall cease to be pledged pursuant to the Collateral Documents free of Liens other than Liens permitted under Section 7.01 in respect of secured Indebtedness that is subject to the DIP Orders, junior to the DIP Liens and subject to the Priority/First Lien/Second Lien Intercreditor Agreement, First Lien/Second Lien Intercreditor Agreement or any nonconsensual Liens arising solely by operation of Law;

(j)    [Reserved];

(k)    *Exclusion Event*.  There occurs a permanent non-appealable Exclusion Event which (i) after taking such steps as such Loan Party determines to mitigate the impact thereof is not mitigated within 30 days and (ii) after the expiration of such mitigation period, such Exclusion Event has or could reasonably be expected to have a Material Adverse Effect; or

(l)    *Chapter 11 Cases*.  The occurrence of any of the following in the Chapter 11 Cases:

(i)    the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any of the Loan Parties or any Subsidiary, or any Person claiming by or through any Loan Party or any Subsidiary with standing to pursue such motion or action, in the Chapter 11 Cases: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Liens permitted pursuant to Section 7.01; or (C) except as provided in the Interim Order or Final Order, to use "cash collateral", as defined in the DIP Orders; or

(ii)    (A) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by a Loan Party that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement or such other treatment to which the DIP Agent and the Required Lenders do not consent, or any of the Loan Parties or their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order, (B) the entry of any order terminating any Loan Party's exclusive right to file a plan of reorganization, or (C) the expiration of any Loan Party's exclusive right to file a plan of reorganization; or

63

(iii)       without the consent of the Required Lenders, the entry of an order in any of the Chapter 11 Cases confirming a plan of reorganization that does not contain a provision for termination of the Commitments and indefeasible repayment in full in cash of all of the Obligations under this Agreement (or such other treatment that is acceptable to the Required Lenders) on or before the effective date of such plan or plans; or

(iv)       (A) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Interim Order, the Final Order or the Cash Management Order without the written consent of the DIP Agent or the Interim Order, the Final Order or the Cash Management Order shall otherwise not be in full force and effect or (B) any Loan Party or any Subsidiary shall fail to comply with the DIP Orders in any material respect; or

(v)       the Final Order is not entered immediately following the expiration of the Interim Order, and in any event within thirty-five (35) days after entry of the Interim Order; or

(vi)       the payment of, or application for authority to pay, any pre-petition claim without DIP Agent's prior written consent (acting at the written direction of the Required Lenders) unless in accordance with the Budget and provided under a "first day" order; or

(vii)       the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code; or

(viii)       (A) the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or (B) the sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code or otherwise that does not result in payment in full in cash of all of the Obligations under this Agreement at the closing of such sale or initial payment of the purchase price or effectiveness of such plan, as applicable; or

(ix)       the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise or the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code; or

(x)       except as provided in or contemplated by the DIP Orders, any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor (other than the DIP Agent) to execute upon or enforce a Lien on any Collateral, (B) approving any settlement or other stipulation not approved by the Required Lenders with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor other than as provided in the DIP Orders, or (C) with respect to any Lien on or the granting of any Lien on any Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of $500,000 or more; or

(xi)       the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents or Priority Credit Agreement Obligations owing under the Priority Credit Documents; or

(xii)       the failure of any Loan Party to perform in any material respect any of its obligations under the Interim Order, the Final Order, the Cash Management Order, or any order of the Bankruptcy Court approving any Plan of Reorganization or sale of all or substantially all assets under Section 363 of the Bankruptcy Code; or

(xiii)       the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of the Carve-Out, this Agreement and the other Loan Documents, or as otherwise permitted under the applicable Loan Documents and the DIP Orders, (A) entitled to superpriority administrative

64

expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the superpriority claims of the DIP Agent and the Secured Parties under this Agreement and the other Loan Documents or (B) granting any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein or in the DIP Orders then in effect; or

(xiv)    the DIP Orders shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect; or

(xv)    any Loan Party or any Person on behalf of any Loan Party shall seek or support any Person seeking an order in the Chapter 11 Cases shall be entered (A) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the DIP Agent and the Secured Parties or (B) limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Priority Administrative Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date; or

(xvi)    if the Final Order does not include a waiver, in form and substance reasonably satisfactory to the Required Lenders, of (A) the right to surcharge the Collateral under Section 506(c) of the Bankruptcy Code and (B) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Priority Administrative Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date; provided that in no event shall a violation of this clause (xvi) constitute an Event of Default prior to the entry of the Final Order; or

(xvii)    an order of the Bankruptcy Court shall be entered denying or terminating use of "Cash Collateral" (as defined in the DIP Orders) by the Loan Parties; or

(xviii)    any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or payables other than payments (A) in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases, (B) in respect of certain creditors as may be reasonably acceptable to the Required Lenders, (C) permitted under this Agreement or (D) authorized or required by one or more "first day" or "second day" orders or any of the DIP Orders.

(m)    *Restructuring Support Agreement*.  The Restructuring Support Agreement is terminated for any reason in accordance with its terms, except by mutual agreement of the parties thereto.

SECTION 8.02.    Remedies upon Event of Default. Subject to the DIP Order and the terms thereof, if any Event of Default occurs and is continuing, notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion, hearing before, or order of the Bankruptcy Court, the DIP Agent may with the consent of, and shall at the request of, the Required Lenders take any or all of the following actions:

(a)    (x) declare the Commitment of each Lender to make Loans to be terminated, whereupon such Commitments and obligation shall be terminated, but without affecting the DIP Liens or the Obligations (y) terminate, reduce or restrict the right or ability of the Loan Parties to use any cash collateral and (z) terminate the right of the Loan Parties to make withdrawals from the Proceeds Account;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, any premium or fees in effect on such date, and all other Obligations owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers;

(c)    declare that the application of the Carve-Out has occurred through the delivery of a "Trigger Notice" (as defined in the DIP Order) to the Borrower Representative and as otherwise required under the DIP Orders;

(d)       subject to the Remedies Notice Period, exercise on behalf of itself and the Secured Parties all rights and remedies available to it and the Secured Parties under the Loan Documents or applicable law, including applying amounts on deposit in the Proceeds Account to the Obligations.

Subject to the DIP Orders, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit the DIP Agent and the Lenders to exercise all rights and remedies under this Agreement, the other Loan Documents or applicable Law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

SECTION 8.03.      Application of Funds. Subject to the DIP Orders, after the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the DIP Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest and fees, but including Costs payable under Section 10.04 and amounts payable under Article III) payable to the DIP Agent in its capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the amounts described in this clause Fourth payable to the Lenders;

Fifth, to the payment of all other Obligations of the Loan Parties that are due and payable to the DIP Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the DIP Agent and the other Secured Parties on such date; and

Last, the balance, if any, after all of the Obligations have been paid in full, to the Borrowers or as otherwise required by Law.

## ARTICLE IX

## DIP Agent

SECTION 9.01.      Appointment and Authority of the DIP Agent.

(a)       Each Lender hereby irrevocably appoints Silver Point Finance, LLC to act on its behalf as the DIP Agent hereunder and under the other Loan Documents and authorizes the DIP Agent, in such capacity, to act as its agent and to take such actions on its behalf and to exercise such powers as are delegated to the DIP Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, each Lender hereby authorizes the DIP Agent to consent, on behalf of each Lender, to the Interim Order and the Final Order, each to be negotiated between the Loan Parties, the DIP Agent, certain other parties and the statutory committees appointed pursuant to Sections 327 and 1103 of the Bankruptcy Code. The provisions of this Article IX (other than this Section 9.01 and Sections 9.05, 9.09, 9.11 and 9.14) are solely for

66

the benefit of the DIP Agent and the Lenders, and the Borrowers shall not have any rights as a third party beneficiary of any such provision other than provisions which provided specific rights for the Borrowers. In performing its functions and duties hereunder, the DIP Agent shall act solely as an agent of each Lender and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any of the Borrowers. The DIP Agent, without consent of or notice to any party hereto, may assign any and all of its rights or obligations hereunder to any of its affiliates. As of the Closing Date, the DIP Agent shall have no obligations but shall be entitled to all benefits of this Article IX. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the DIP Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)        [Reserved].

(c)        The DIP Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the DIP Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or in trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the DIP Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the DIP Agent pursuant to Section 9.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the DIP Agent), shall be entitled to the benefits of all provisions of this Article IX (including Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto. Without limiting the generality of the foregoing, each Lender hereby authorizes the DIP Agent, as "collateral agent," to consent, on behalf of each Lender, to the Interim Order and the Final Order, each to be negotiated between the Loan Parties, the DIP Agent, certain other parties and the statutory committees appointed pursuant to Sections 327 and 1103 of the Bankruptcy Code.

SECTION 9.02.        Rights as a Lender. Any Person serving as the DIP Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the DIP Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Person serving as the DIP Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrowers or any Subsidiary of the Borrowers or other Affiliate thereof as if such Person were not the DIP Agent hereunder and without any duty to account therefor to the Lenders. The Lenders acknowledge that, pursuant to such activities, the DIP Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.

SECTION 9.03.        Exculpatory Provisions. Neither the DIP Agent nor its officers, partners, directors, employees or agents shall have any duties or obligations, or be liable to any Lenders for any action taken or omitted by the DIP Agent, except as expressly set forth herein and in the other Loan Documents. Additionally, nothing herein or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon the DIP Agent any obligations in respect hereof or any of the other Loan Documents except as expressly set forth herein or therein. Without limiting the generality of the foregoing, the DIP Agent:

(a)        shall not have, be deemed to have, or be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing and without limiting the generality of the foregoing, the use of the term "agent" herein and in the other Loan Documents with reference to the DIP Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law and instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties;

(b)        shall be entitled to refrain from any action (including the failure to take an action) and not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the DIP Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose the DIP Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)        shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of their Affiliates that is communicated to or obtained by any Person serving as the DIP Agent or any of its Affiliates in any capacity.

The DIP Agent and any Agent-Related Person shall not be responsible or liable to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Loan Document or for any action taken or not taken by it or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by the DIP Agent to any Lender or by or on behalf of any Borrower.  The DIP Agent and any Agent-Related Person shall also not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the DIP Agent and any Agent-Related Person shall believe in good faith shall be necessary, under the circumstances as provided in Sections 8.02 and 10.01) or (ii) in the absence of its own gross negligence or willful misconduct as determined by the final, nonappealable judgment or order of a court of competent jurisdiction, in connection with its duties expressly set forth herein. The DIP Agent and any Agent-Related Person shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the DIP Agent and/or any Agent-Related Person by the Borrower Representative or a Lender. Anything contained herein to the contrary notwithstanding, the DIP Agent shall not have any liability arising from confirmations of the amount of outstanding loans.

No Agent-Related Person shall be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty, communication or representation made in or in connection with this Agreement or any other Loan Document believed by it to be genuine and correct, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, (vi) the opinions and judgments of attorneys or legal counsel (who may be counsel for the Borrowers), accountants, experts and other professional advisors selected by it or (vii) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the DIP Agent, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.  No Lender shall have any right of action whatsoever against the DIP Agent as a result of the DIP Agent acting or (where so instructed) refraining from acting hereunder or under any Loan Document.

SECTION 9.04.        Reliance by the DIP Agent.

The DIP Agent shall be entitled to rely upon, and shall be fully protected and not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The DIP Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the DIP Agent may presume that such condition is satisfactory to such Lender unless the DIP Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The DIP Agent may consult with legal counsel (who may be counsel for

68

the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The DIP Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The DIP Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders; *provided* that the DIP Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose the DIP Agent to liability or that is contrary to any Loan Document or applicable Law.

SECTION 9.05.    <u>Delegation of Duties</u>. The DIP Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Documents by or through any one or more sub-agents appointed by the DIP Agent; *provided*, *however*, that any such sub-agent receiving payments from the Loan Parties shall be a "U.S. person" and a "financial institution" within the meaning of Treasury regulations Section 1.1441-1. The DIP Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons; *provided*, *however*, that any such sub-agent receiving payments from the Loan Parties shall be a "U.S. person" and a "financial institution" within the meaning of Treasury regulations Section 1.1441-1. The exculpatory provisions of this Article shall apply to any such sub agent and to the Agent-Related Persons of the DIP Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as DIP Agent.  Notwithstanding anything herein to the contrary, any sub-agent shall be a third-party beneficiary under this Agreement with respect to all of the rights, benefits and privileges of a third-party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification), without the consent or joinder of such sub-agent, against any or all Borrowers.

Solely for purposes of Section 9.07, the DIP Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment or order that the DIP Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

SECTION 9.06.    <u>Non-Reliance on DIP Agent and Other Lenders; Disclosure of Information by DIP Agent</u>. Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by the DIP Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to the DIP Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, affairs, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrowers and the other Loan Parties hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrowers and the other Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the DIP Agent herein, the DIP Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.  Each Lender, by delivering its signature page to this Agreement, shall be deemed to

have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by the DIP Agent, Lender or Lenders, as applicable.

SECTION 9.07.    Indemnification of Agents. Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify, in proportion to such Lender's Pro Rata Share, upon demand the DIP Agent and each other Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless the DIP Agent and each other Agent-Related Person from and against any and all Indemnified Liabilities incurred by it in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the DIP Agent or each other Agent-Related Person; *provided* that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final nonappealable judgment or order of a court of competent jurisdiction; *provided* that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.07. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the DIP Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Costs) incurred by the DIP Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal or other advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, the DIP Orders, any "exit financing" requested by the Loan Parties in connection with the Chapter 11 Cases, or any document contemplated by or referred to herein, to the extent that the DIP Agent is not reimbursed for such expenses by or on behalf of the Borrowers, provided that such reimbursement by the Lenders shall not affect the Borrowers' continuing reimbursement obligations with respect thereto, *provided*, *further*, that the failure of any Lender to indemnify or reimburse the DIP Agent shall not relieve any other Lender of its obligation in respect thereof. The undertaking in this Section 9.07 shall survive the payment of all other Obligations and the resignation of the DIP Agent.

SECTION 9.08.    [Reserved].

SECTION 9.09.    Resignation of DIP Agent. The DIP Agent may at any time give thirty (30) days' prior written notice of its resignation to the Lenders and the Borrower Representative. If the DIP Agent is in material breach of its obligations hereunder as DIP Agent, then the DIP Agent may be removed as the DIP Agent at the reasonable request in writing of the Required Lenders delivered to the Borrower Representative and the DIP Agent. Such resignation or removal shall take effect upon the appointment of a successor DIP Agent as provided below. Upon receipt of any such notice of resignation or removal, the Required Lenders shall have the right, with the consent of the Borrower Representative at all times other than upon the occurrence and during the continuation of a Default or an Event of Default (which consent of the Borrower Representative shall not be unreasonably withheld or delayed), to appoint a successor, which shall be a Lender or a bank with an office in the United States, or an Affiliate of any such Lender or bank with an office in the United States.

If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty days after the retiring DIP Agent gives notice of its resignation, or the Required Lenders or the Borrower Representative give notice of the DIP Agent's removal, then the retiring or removed DIP Agent may on behalf of the Lenders, with the consent of the Borrower Representative at all times other than upon the occurrence and during the continuation of a Default or an Event of Default (which consent of the Borrower Representative shall not be unreasonably withheld or delayed), appoint a successor DIP Agent meeting the qualifications set forth above that shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring DIP Agent; *provided* that if the DIP Agent shall notify the Borrower Representative and the Lenders that no qualifying Person has accepted such appointment or that no designated successor DIP Agent has been approved by the Borrower Representative, then such resignation shall nonetheless become effective after such thirty day period and (a) the retiring or removed DIP Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the DIP Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Agent shall continue to hold such collateral security until such time as a successor of the DIP Agent is appointed)

70

and (b) the Required Lenders shall thereafter perform all the duties of the DIP Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor DIP Agent as provided above in this Section 9.09. Upon the acceptance of a successor's appointment as DIP Agent hereunder and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to (i) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (ii) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) or removed DIP Agent and the retiring (or retired) or removed DIP Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.09) other than confidentiality obligations under Section 10.08. The fees payable by the Borrowers to a successor DIP Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor. After the DIP Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Sections 10.04 and 10.05 shall continue in effect for the benefit of the DIP Agent, its sub-agents and their respective Agent-Related Persons in respect of any actions taken or omitted to be taken by any of them while the DIP Agent was acting as DIP Agent, and the DIP Agent, its sub-agents and their respective Agent-Related Persons shall continue to be subject to Section 10.08.

SECTION 9.10.    [Reserved].

SECTION 9.11.    Collateral and Guaranty Matters. Each of the Lenders, on behalf of and for the benefit of the Secured Parties, irrevocably authorizes the DIP Agent to be the agent for and representative for the Secured Parties, and the DIP Agent agrees that it will:

(a)    release any Lien on any property granted to or held by the DIP Agent under any Loan Document (i) upon payment in full of all Obligations (other than contingent indemnification obligations not yet accrued and payable), (ii) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder to any Person other than New Holdings, any Borrower or any Subsidiary Guarantor, (iii) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders or (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to clause (c) below;

(b)    [reserved]; and

(c)    release any Guarantor from its obligations under the Guaranty if in the case of any Subsidiary, such Person ceases to be a Subsidiary as a result of a transaction or designation permitted hereunder; *provided* that no such release shall occur if such Guarantor continues to be a guarantor in respect of any unsecured Indebtedness or Indebtedness that is by its terms subordinated in right of payment or lien priority to the Obligations.

Upon request by the DIP Agent at any time, the Required Lenders will confirm in writing the DIP Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.11. In each case as specified in this Section 9.11, the DIP Agent will (and each Lender irrevocably authorizes the applicable Agent to), at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.11.

Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrowers, DIP Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Loan Documents may be exercised solely by DIP Agent or any Agent-Related Person, as applicable, for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by DIP Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by DIP Agent on any of the Collateral pursuant to a public or private sale or other Disposition,

71

DIP Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other Disposition and DIP Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Lenders shall otherwise agree in writing) shall be entitled, upon instructions from the Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or Disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by DIP Agent at such sale or other Disposition.

SECTION 9.12.    [Reserved].

SECTION 9.13.    [Reserved].

SECTION 9.14.    Withholding Taxes. To the extent required by any applicable Law, the DIP Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. Each Lender shall indemnify the DIP Agent fully for, and shall make payable within 10 days after demand therefor, (i) any taxes (including any fees, interest, penalties, and other charges thereon or with respect thereto) attributable to such Lender's failure to comply with the provisions of Section 10.07(e) relating to the maintenance of a Participant Register, (ii) any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the DIP Agent, allocated internal costs and out-of-pocket expenses) incurred by or asserted against the DIP Agent by the IRS or any other Governmental Authority as a result of the failure of the DIP Agent to properly withhold tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the DIP Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding tax ineffective), and (iii) any taxes (including any fees, interest, penalties, and other charges thereon or with respect thereto) whether or not included in the definition of Taxes attributable to such Lender, in each case, that are payable or paid by the DIP Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, in each case whether or not such tax (including any fees, interest, penalties, and other charges thereon or with respect thereto) or Tax was correctly or legally imposed or asserted. A certificate as to the amount of such payment or liability delivered to any Lender by the DIP Agent shall be conclusive absent manifest error. The agreements in this Section 9.14 shall survive the resignation and/or replacement of the DIP Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Agreement and the repayment, satisfaction or discharge of all other obligations. Each Lender hereby authorizes the DIP Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the DIP Agent under this Section 9.14. For the avoidance of doubt, (i) the Loan Parties shall not be responsible for any amount described in this Section 9.14 and (ii) nothing in Section 9.14 shall expand or limit the obligations of the Loan Parties under Section 3.01.

SECTION 9.15.    Notice of Default. The DIP Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to Events of Default in the payment of principal, interest and fees required to be paid to the DIP Agent for the account of the Lenders, unless the DIP Agent shall have received written notice from a Lender or the Borrower Representative referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." The DIP Agent will notify the Lenders of its receipt of any such notice. The DIP Agent shall take such action with respect to any such Default or Event of Default as may be directed by the Lenders in accordance with Article VIII; provided, however, that unless and until the DIP Agent has received any such direction, the DIP Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interest of the Lenders.

SECTION 9.16.    Agents Entitled to Act as Lender. The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, the DIP Agent or any Agent-Related Person in its individual capacity as a Lender hereunder.  With respect to its participation in the Loans, the DIP Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include the DIP Agent in its individual capacity.  The DIP Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with any Borrower or any of its Affiliates as if it were not performing the

72

duties specified herein, and may accept fees and other consideration from any Borrower for services in connection herewith and otherwise without having to account for the same to Lenders.

SECTION 9.17.    [Reserved].

SECTION 9.18.    CIP Regulations.  Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on any Agent-Related Person to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the Patriot Act or the regulations issued thereunder, including the regulations set forth in 31 C.F.R. §§ 1010.100(yy), (iii), 1020.100, and 1020.220 (formerly 31 C.F.R. § 103.121), as hereafter amended or replaced ("**CIP Regulations**"), or any other terrorism Laws, including any programs involving any of the following items relating to or in connection with any of the Borrowers, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby:  (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the Patriot Act.  Each Lender, Affiliate, participant or assignee subject to Section 326 of the Patriot Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations.

## ARTICLE X

### Miscellaneous

SECTION 10.01.    Amendments, Etc. Except as otherwise set forth in this Agreement, no amendment, modification, termination or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower Representative or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (other than with respect to any amendment or waiver contemplated in the first proviso below, which requires the consent of each directly and adversely affected Lender or each Lender) (or by the DIP Agent with the consent of the Required Lenders) and the Borrower Representative or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that no such amendment, waiver or consent shall:

(a)    [reserved];

(b)    postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.08 or postpone any date for the payment of fees hereunder, without the written consent of each Lender directly and adversely affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(c)    reduce the principal of, or the rate of interest specified herein on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document to any Lender without the written consent of each Lender directly and adversely affected thereby;

(d)    change any provision of this Section 10.01 or the definition of "Required Lenders" or any other provision specifying the number of Lenders or portion of the Loans required to take any action under the Loan Documents, without the written consent of each Lender directly and adversely affected thereby (it being understood that each Lender shall be directly and adversely affected by a change to the "Required Lenders" definition);

(e)    other than in a transaction permitted under Section 7.04 or Section 7.05, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(f)    other than in a transaction permitted under Section 7.04 or Section 7.05, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender; or

(g)    except as expressly permitted herein or in any other Loan Document, subordinate the Obligations or DIP Lien to any other Indebtedness or Lien, as the case may be, without the written consent of each Lender;

73

and *provided*, *further*, that (i) no amendment, waiver or consent shall, unless in writing and signed by the DIP Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the DIP Agent under this Agreement or any other Loan Document; and (ii) Section 10.07(g) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification.

Notwithstanding anything to the contrary contained in this Section 10.01, any other guarantees, collateral security documents and related documents executed by Subsidiaries in connection with this Agreement and any other Loan Document may be in a form reasonably determined by the DIP Agent and may be, together with this Agreement, amended and waived with the consent of the DIP Agent at the request of the Borrower Representative without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

If the DIP Agent and the Borrower Representative shall have each agreed that an obvious error (including, but not limited to, an incorrect cross-reference) or any error or omission of a technical or immaterial nature, in each case, in any provision of this Agreement or any other Loan Document (including, for the avoidance of doubt, any exhibit, schedule or other attachment to any Loan Document), then the DIP Agent (acting in its sole discretion), on the one hand, and the Borrower Representative or any other relevant Loan Party, on the other hand, shall be permitted to agree to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Document. Notification of such amendment shall be made by the DIP Agent to the Lenders promptly upon such amendment becoming effective.

The DIP Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on any Loan Party in any case shall entitle any Loan Party to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.01 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Loan Party, on such Loan Party.

SECTION 10.02.    Notices and Other Communications; Facsimile Copies.

(a)    *General*. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to New Holdings, the Borrower Representative or the DIP Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)    *Electronic Communication*. Each Borrower hereby agrees, unless directed otherwise by the DIP Agent or unless the electronic mail address referred to below has not been provided by the DIP Agent to such

74

Borrower that it will, or will cause its Subsidiaries to, provide to the DIP Agent all information, documents and other materials that it is obligated to furnish to the DIP Agent or to the Lenders pursuant to the Loan Documents, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a funding notice, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefore, (iii) provides notice of any Default or Event of Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Loan or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the DIP Agent to an electronic mail address as directed by the DIP Agent. In addition, each Borrower agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the DIP Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the DIP Agent.  Nothing herein shall prejudice the right of the DIP Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

(c)      Unless the DIP Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.  Each Lender agrees to notify the DIP Agent in writing (including by electronic communication) from time to time of such Lender's electronic mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such electronic mail address.

(d)      *The Platform*. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the DIP Agent or any of its Agent-Related Persons (collectively, the "**Agent Parties**") have any liability to New Holdings, the Borrowers, any Lender, or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrowers' or the DIP Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; *provided*, *however*, that in no event shall any Agent Party have any liability to New Holdings, the Borrowers, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(e)      *Change of Address*. Each of New Holdings, the Borrowers and the DIP Agent may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the Borrower Representative and the DIP Agent. In addition, each Lender agrees to notify the DIP Agent from time to time to ensure that the DIP Agent has on record (i) an effective address, contact name, telephone number, facsimile number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(f)      *Reliance by the DIP Agent*. The DIP Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower Representative even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the

75

recipient, varied from any confirmation thereof. The Borrowers shall indemnify the DIP Agent, each Lender and the Agent-Related Persons of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrowers in the absence of gross negligence or willful misconduct of such Person, as determined by the final non-appealable judgment of a court of competent jurisdiction. All telephonic notices to and other telephonic communications with the DIP Agent may be recorded by the DIP Agent, and each of the parties hereto hereby consents to such recording.

SECTION 10.03.    No Waiver; Cumulative Remedies. No failure by any Lender or the DIP Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

SECTION 10.04.    Secured Party Advisor Costs and Expenses. The Borrowers agree (a) to pay or reimburse the DIP Agent for all reasonable and documented out-of-pocket costs and expenses of the DIP Agent (promptly following a written demand therefor, together with backup documentation supporting such reimbursement request) incurred in connection with the Chapter 11 Cases or preparation, negotiation, syndication, execution and approval of this Agreement and the other Loan Documents (and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), the DIP Orders, the Restructuring Support Agreement, any "exit financing" requested by the Loan Parties in connection with the Chapter 11 Cases, and the consummation and administration of the transactions contemplated hereby and thereby, including all Costs of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey, Inc., one firm of regulatory counsel and one firm of local counsel, as reasonably necessary in each relevant jurisdiction material to the interests of the Lenders taken as a whole, and (b) to pay or reimburse the DIP Agent and the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including Costs of one principal counsel and one consulting firm to the DIP Agent and the Lenders taken as a whole (and, if reasonably necessary, one firm of regulatory counsel and one firm of local counsel in any relevant material jurisdiction and, in the event of any conflict of interest, one additional counsel to each group of similarly situated affected persons)). The agreements in this Section 10.04 shall survive the repayment of the Obligations. All amounts due under this Section 10.04 shall be paid within 30 days following receipt by the Borrower Representative of an invoice relating thereto setting forth such expenses in reasonable detail and, in the case of any amounts due under this Section 10.04 incurred prior to the Closing Date, such amounts shall be paid on the Closing Date to the extent invoiced two (2) Business Days before the Closing Date and, otherwise, will be paid thereafter. If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the DIP Agent in its sole discretion. This Section 10.04 shall not apply to Taxes, or amounts excluded from the definition of Taxes pursuant to clauses (i) through (vii) of the first sentence of Section 3.01(a), that are imposed with respect to payments to or for the account of the DIP Agent or any Lender under any Loan Document, which, in each case, shall be governed by Section 3.01. This Section 10.04 also shall not apply to Other Taxes or to taxes covered by Section 3.04.

SECTION 10.05.    Indemnification by the Borrowers. In addition to the payment of expenses pursuant to Section 10.04 (but without duplication thereof), the Borrowers shall indemnify and hold harmless the DIP Agent, each Lender and their respective Affiliates, directors, officers, employees, agents, sub-agents and affiliates of the DIP Agent, partners, members, trustees, advisors, Secured Party Advisors and other representatives of the DIP Agent and each Lender (collectively the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including Costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with but limited, in the case of legal fees and expenses, to the reasonable and documented out-of-pocket fees and expenses of one counsel to all Indemnitees taken as a whole and, if necessary, one firm of regulatory counsel and one firm of local counsel in each relevant jurisdiction, and solely in the case of a conflict of interest, one additional counsel (and, if reasonably

76

necessary, one additional firm of local counsel in each relevant jurisdiction) to each group of similarly situated affected Indemnitees) (a) the Chapter 11 Cases, the Restructuring Support Agreement, the execution, delivery, enforcement, performance or administration of any Loan Document and the DIP Orders, (b) any "exit financing" requested by the Loan Parties in connection with the Chapter 11 Cases or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (c) any Loan or the use or proposed use of the proceeds therefrom, (d) any actual or alleged presence or Release or threat of Release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrowers, any Subsidiary or any other Loan Party, or any Environmental Liability of the Borrowers, any Subsidiary or any other Loan Party, or (e) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (a "**Proceeding**") and regardless of whether any Indemnitee is a party thereto or whether or not such Proceeding is brought by any Borrower or any other person (all the foregoing, collectively, the "**Indemnified Liabilities**"), **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH INDEMNITEE**; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from (x) the gross negligence or willful misconduct of such Indemnitee or of any Related Indemnified Person of such Indemnitee, as determined by a final, non-appealable judgment of a court of competent jurisdiction or (y) any dispute solely among Indemnitees (or their respective Related Indemnified Persons) other than any claims against an Indemnitee in its capacity or in fulfilling its role as an administrative agent or arranger or any similar role under this Agreement and other than any claims arising out of any act or omission of New Holdings, the Borrowers or any of their respective Affiliates. To the extent that the undertakings to indemnify and hold harmless set forth in this Section 10.05 may be unenforceable in whole or in part because they are violative of any applicable law or public policy, each Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement (except to the extent such damages are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct or gross negligence of such Indemnitee or its Related Indemnified Persons), nor shall any Indemnitee or any Loan Party have any liability and each party hereby waives, any claim against any other party to this Agreement or any Indemnitee for any special, punitive, indirect or consequential damages relating to this Agreement or any Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Loan Party, in respect of any such damages incurred or paid by an Indemnitee and for any out-of-pocket expenses for which, in each case, such Indemnitee is otherwise entitled to indemnification pursuant to this Section 10.05). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated. All amounts due under this Section 10.05 shall be paid by, or at the direction of, the Borrower Representative to the DIP Agent for the benefit of the relevant Indemnitee within ten (10) Business Days after written demand therefor (together with backup documentation supporting such reimbursement request). The agreements in this Section 10.05 shall survive the resignation of the DIP Agent, the replacement of any Lender, the repayment, satisfaction or discharge of all Obligations. This Section 10.05 shall not apply to Taxes, or amounts excluded from the definition of Taxes pursuant to clauses (i) through (vii) of the first sentence of Section 3.01(a), that are imposed with respect to payments to or for the account of the DIP Agent or any Lender under any Loan Document, which, in each case, shall be governed by Section 3.01. This Section 10.05 also shall not apply to Other Taxes or to taxes covered by Section 3.04. Notwithstanding the foregoing, each Indemnitee shall be obligated to refund and return promptly any and all amounts paid by the Borrowers, any direct or indirect parent of a Borrower or any of their Affiliates under this Section 10.05 to such Indemnitee for any such fees, expenses or damages to the extent such Indemnitee is not entitled to payment of such amounts in accordance with the terms hereof.

SECTION 10.06.    Marshaling; Payments Set Aside. None of the DIP Agent or any Lender shall be under any obligation to marshal any assets in favor of the Loan Parties or any other party or against or in payment of any or all of the Obligations. To the extent that any payment by or on behalf of the Borrowers is made to the DIP

Agent or any Lender, or the DIP Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required (including pursuant to any settlement entered into by the DIP Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the DIP Agent upon demand its applicable share of any amount so recovered from or repaid by the DIP Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

SECTION 10.07.    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, and no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder, except as provided in Section 7.04, or any interest therein may be assigned or delegated by any Loan Party without the prior written consent of all Lenders (and any attempted assignment or transfer by any Loan Party without such consent shall be null and void). No Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of Section 10.07(b), (ii) by way of participation in accordance with the provisions of Section 10.07(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(f), or (iv) to an SPC in accordance with the provisions of Section 10.07(g). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(d), to the extent expressly contemplated hereby, the Agent-Related Persons of each of the DIP Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    *Assignments by Lenders*. Any Lender may at any time sell, assign or transfer to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it or other Obligations); *provided* that any such assignment shall be subject to the following conditions:

(i)    *Minimum Amounts*.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the DIP Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than an amount of $1,000,000 unless the DIP Agent otherwise consents (such consent not to be unreasonably withheld or delayed); *provided, however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)    *Proportionate Amounts*. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans assigned.

(iii)    *Required Consents*. No consent shall be required for any assignment except the consent of the DIP Agent (such consent not to be unreasonably conditioned, withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

78

(iv)     *Assignment and Assumption*. The parties to each assignment shall execute and deliver to the DIP Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; *provided* that the DIP Agent may, in its sole discretion, elect to waive or reduce such processing and recordation fee in the case of any assignment. The Eligible Assignee, if it shall not be a Lender, shall deliver to the DIP Agent an Administrative Questionnaire. All assignments shall be by novation.

(v)     *No Assignments to Certain Persons*. No such assignment shall be made to (A) New Holdings, any Borrower or any Subsidiary thereof, (B) any Affiliate of New Holdings, (C) a natural person or (D) Sponsor or an Affiliate of a Sponsor (other than New Holdings, any Borrower or any of their respective Subsidiaries).

Subject to acceptance and recording thereof by the DIP Agent pursuant to clause (c) of this Section and entry in the Register, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment), but shall in any event continue to be subject to Section 10.08. Upon request, and the surrender by the assigning Lender of its Note, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)     The DIP Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at the DIP Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the principal amounts (and related interest amounts) of the Loans owing to each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the DIP Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as the owner of its Loans hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrowers, the DIP Agent and any Lender (with respect to such Lender's own interests), at any reasonable time and from time to time upon reasonable prior notice. This Section 10.07(c) and Section 2.11 shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(d)     Any Lender may at any time, without the consent of, or notice to, the Borrowers or the DIP Agent, sell participations to any Eligible Assignee (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Loans); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the DIP Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 (other than clause (d) thereof) that directly and adversely affects such Participant. Subject to subsection (e) of this Section 10.07, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.01 (subject to the requirements of Section 3.01 (including subsections (b), (c) and/or (d), as applicable as though it were a Lender)), 3.04 and 3.05 (through the applicable Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section 10.07. To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 and Section 10.08 as though it were a Lender.

79

(e)     *Limitations upon Participant Rights*. A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower Representative's prior written consent. Each Lender that sells a participation shall (acting solely for this purpose as a non-fiduciary agent of the Borrowers) maintain a register on which is entered the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"). A Lender shall not be obligated to disclose the Participant Register to any Person except to the extent such disclosure is necessary (as reasonably determined in good faith by the Borrower Representative) to establish that any Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury regulations. The entries in the Participant Register shall be conclusive absent manifest error, and the Lenders, the Borrowers and the DIP Agent shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the DIP Agent (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (x) nothing herein shall constitute a commitment by any SPC to make any Loans and (y) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrowers under this Agreement (including their obligations under Section 3.01, 3.04 or 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the Lender hereunder.  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the Laws of the United States or any State thereof.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the DIP Agent and with the payment of a processing fee of $3,500 (which processing fee may be waived by the DIP Agent in its sole discretion), assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

SECTION 10.08.     Confidentiality. Each of the DIP Agent and the Lenders agrees to hold all Information regarding New Holdings and its Subsidiaries and their businesses in accordance with such Lender's customary procedures for handling its own confidential information, except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors, Secured Party Advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); *provided*, *however*, that the DIP Agent or Lender, as applicable, shall be principally liable to the extent this Section 10.08 is violated by one or more of its Affiliates or any of its or their respective partners, directors, officers, employees, agents, trustees, advisors and representatives, (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners); *provided*, *however*, that it will notify the Borrower Representative as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory

authority as part of a routine regulatory audit and review) unless such notification is prohibited by Law, rule or regulation, (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, provided that the DIP Agent or such Lender, as applicable, agrees that it will notify the Borrower Representative as soon as practicable in the event of any such disclosure by such Person unless such notification is prohibited by Law, rule or regulation, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions at least as restrictive as those of this Section 10.08, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement; *provided* that such disclosure shall be made subject to the acknowledgment and acceptance by such prospective Lender, Participant or Eligible Assignee that such Information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to the Borrower Representative and the DIP Agent, including, without limitation, as set forth in any confidential information memorandum or other marketing materials) in accordance with the standard syndication process of the DIP Agent or market standards for dissemination of such type of information which shall in any event require "click through" or other affirmative action on the part of the recipient to access such confidential information or (ii) any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to any Borrower and its obligations, (g) with the consent of the Borrowers, (h) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from such Lender), (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 10.08 or (ii) becomes available to the DIP Agent, any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than New Holdings, any Borrower or any Subsidiary thereof, and which source is not known by the DIP Agent or Lender to be subject to a confidentiality restriction in respect thereof in favor of any Borrower or any Affiliate thereof, or (j) to any Lender's financing sources, provided that prior to any disclosure, such financing source is informed of the confidential nature of the information and agrees to be bound by the terms of this Section 10.08 or terms not less restrictive than such terms.

For purposes of this Section, "**Information**" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the DIP Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof; it being understood that all information received from New Holdings, any Borrower or any Subsidiary thereof after the date hereof shall be deemed confidential unless such information is clearly identified at the time of delivery as not being confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so in accordance with its customary procedures if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

In addition, the DIP Agent and each Lender may disclose the existence of this Agreement and the information about this Agreement to market data collectors, similar services providers to the lending industry, and service providers to the DIP Agent and the Lenders solely in connection with the administration and management of this Agreement and the other Loan Documents. Notwithstanding anything to the contrary set forth herein, each party (and each of their respective employees, representatives or other agents) may disclose to any and all persons without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions and other tax analyses) that are provided to any such party relating to such tax treatment and tax structure. However, any information relating to the tax treatment or tax structure shall remain subject to the confidentiality provisions hereof (and the foregoing sentence shall not apply) to the extent reasonably necessary to enable the parties hereto, their respective Affiliates, and their respective Affiliates' directors and employees to comply with applicable securities Laws. For this purpose, "tax structure" means any facts relevant to the federal income tax treatment of the transactions contemplated by this Agreement but does not include information relating to the identity of any of the parties hereto or any of their respective Affiliates.

SECTION 10.09.    Setoff. Subject to the DIP Orders, if an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time (notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court), after obtaining the prior written consent of the DIP Agent, to the fullest extent permitted by applicable Law, to setoff and apply any and all deposits (general or special, time or

demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Borrower or any other Loan Party against any and all of the Obligations of such Borrower or such Loan Party then due and payable under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such Obligations of such Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and its Affiliates under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have. Each Lender agrees to notify the Borrower Representative and the DIP Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

SECTION 10.10.    Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  Notwithstanding the foregoing, it is the intention of Lenders and the Borrowers to conform strictly to any applicable usury Laws.  Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Maximum Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at be applied to the outstanding amount of the Loans made hereunder or, if it exceeds such unpaid principal, be refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by DIP Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest, throughout the contemplated term of the Obligations hereunder.

SECTION 10.11.    Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements, solely to the extent with respect to fees payable to the DIP Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the DIP Agent and when the DIP Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (including in .pdf format) shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 10.12.    Electronic Execution of Assignments and Certain Other Documents. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state Laws based on the Uniform Electronic Transactions Act.

SECTION 10.13.    Survival of Representations and Warranties. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the DIP Agent and each Lender, regardless of any investigation made by the DIP Agent or any Lender or on their behalf and notwithstanding that the DIP Agent or any Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

SECTION 10.14.    Severability. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall

82

endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 10.15.    GOVERNING LAW.

(a)    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE.

(b)    EACH BORROWER, EACH GUARANTOR, THE DIP AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY IN THE BOROUGH OF MANHATTAN AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. EACH PARTY HERETO AGREES THAT THE DIP AGENT AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.    NOTWITHSTANDING THE FOREGOING, DURING THE PENDENCY OF THE CHAPTER 11 CASES, ANY ACTION ARISING OUT OF OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT.

(c)    EACH BORROWER, EACH GUARANTOR, THE DIP AGENT AND EACH LENDER EACH IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION 10.15. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

**SECTION 10.16.    WAIVER OF RIGHT TO TRIAL BY JURY. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

83

SECTION 10.17.    Binding Effect. This Agreement shall become effective when it shall have been executed by each Borrower, each Guarantor and the DIP Agent and the DIP Agent shall have been notified by each Lender that each such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrowers, the Guarantors, the DIP Agent and each Lender and their respective successors and assigns.

SECTION 10.18.    Lender Action. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party all of which shall only be taken or instituted by the DIP Agent (by itself or at the direction of the Required Lenders, as the case may be). The provision of this Section 10.18 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 10.19.    Use of Name, Logo, Etc. Each Loan Party consents to the publication in the ordinary course by DIP Agent of customary advertising material relating to the financing transactions contemplated by this Agreement using such Loan Party's name, product photographs, logo or trademark, subject to compliance with such Loan Party's customary procedures in connection therewith. Such consent shall remain effective until revoked by such Loan Party in writing to the DIP Agent.

SECTION 10.20.    USA PATRIOT Act Notice. Each Lender that is subject to the USA PATRIOT Act and the DIP Agent (for itself and not on behalf of any Lender) hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name, address and tax identification of each Loan Party and other information that will allow such Lender or the DIP Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act. This notice is given in accordance with the requirements of the USA PATRIOT Act and is effective as to Lenders and the DIP Agent. The Borrower Representative shall, promptly following a request by the DIP Agent or any Lender, provide all documentation and other information that the DIP Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

SECTION 10.21.    Service of Process. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02 (OTHER THAN BY FACSIMILE OR ELECTRONIC COMMUNICATION). NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

SECTION 10.22.    No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrowers and New Holdings acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the DIP Agent are arm's-length commercial transactions between the Borrowers, New Holdings and their respective Affiliates, on the one hand, and the DIP Agent, on the other hand, (B) each of the Borrowers and New Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrowers and New Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated by the other Loan Documents; (ii) (A) the DIP Agent and each Lender are and have been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, have not been, are not, and will not be acting as an advisor, agent or fiduciary for the Borrowers, New Holdings or any of their respective Affiliates, or any other Person and (B) none of the DIP Agent nor any Lender has any obligation to the Borrowers, New Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents or as otherwise expressly agreed in writing; and (iii) the DIP Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrowers, New Holdings their respective Affiliates, and none of the DIP Agent, nor any Lender has any obligation to disclose any of such interests to the Borrowers, New Holdings or any of their respective Affiliates. To the fullest extent permitted by law, each of the Borrowers and New Holdings hereby waives and releases any claims that it may

84

have against the DIP Agent or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 10.23.    Joint and Several Liability. All Loans, upon funding, shall be deemed to be jointly funded to and received by each of the Borrowers. Each of the Borrowers shall be jointly and severally liable under this Agreement for all Obligations, regardless of the manner or amount in which proceeds of Loans are used, allocated, shared or disbursed by or among the Borrowers, or the manner in which the DIP Agent and/or any Lender accounts for such Loans or other extensions of credit on its books and records. Each of the Borrowers shall be liable for all amounts due to the DIP Agent and/or any Lender from any of the Borrowers under this Agreement, regardless of which of them actually receives Loans or other extensions of credit hereunder or the amount of such Loans and extensions of credit received or the manner in which the DIP Agent and/or such Lender accounts for such Loans or other extensions of credit on its books and records. The Obligations of each of the Borrowers under this Agreement shall, to the fullest extent permitted by law, be unconditional irrespective of (i) the validity or enforceability, avoidance, or subordination of the Obligations of any Borrower or of any promissory note or other document evidencing all or any part of the Obligations of any Borrower, (ii) the absence of any attempt to collect the Obligations from any Borrower, or any other security therefor, or the absence of any other action to enforce the same, (iii) the waiver, consent, extension, forbearance, or granting of any indulgence by the DIP Agent and/or any Lender with respect to any provision of any instrument evidencing the Obligations of any Borrower, or any part thereof, or any other agreement executed as of the Closing Date or thereafter executed by any Borrower and delivered to the DIP Agent and/or any Lender, (iv) the failure by the DIP Agent and/or any Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the Obligations of any Borrower, (v) [reserved], (vi) [reserved], (vii) [reserved], or (viii) any other circumstances which might constitute a legal or equitable discharge or defense of a Guarantor or of any Borrower (in each case, other than the defense of repayment in full of the Obligations (other than any contingent obligations not then due). With respect to any Obligations of any Borrower arising as a result of their joint and several liability hereunder with respect to any Loans or other extensions of credit made to one or the other hereunder, each of the Borrowers waives, until the Obligations shall have been paid in full (other than contingent indemnification obligations not then due) and this Agreement shall have been terminated, any right to enforce any right of subrogation or any remedy which the DIP Agent and/or any Lender had as of the Closing Date or may have thereafter against one or the other, any endorser or any guarantor of all or any part of the Obligations, and any benefit of, and any right to participate in, any security or collateral given to the DIP Agent and/or any Lender to secure payment of the Obligations or any other liability of the other Borrower to the DIP Agent and/or any Lender. Upon any Event of Default, the DIP Agent may proceed directly and at once, without notice, against any of the Borrowers to collect and recover the full amount, or any portion of the Obligations, without first proceeding against one or the other or any other Person, or against any security or collateral for the Obligations. Each of the Borrowers consents and agrees that the DIP Agent shall be under no obligation to marshal any assets in favor of any Borrower or against or in payment of any or all of the Obligations. Notwithstanding anything to the contrary in the foregoing, none of the foregoing provisions of this Section 10.23 shall apply to any Person released from its Obligations as a Borrower in accordance herewith.

SECTION 10.24.    Acknowledgment and Consents to Bail-In of EEA Financial Institutions. Solely to the extent any Lender that is an EEA Financial Institution is a party to this Agreement and notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

85

(ii)        a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)       the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

## ARTICLE XI

## SUPERPRIORITY CLAIMS, COLLATERAL SECURITY, ETC.

SECTION 11.01.    <u>Grant of Security</u>.  To secure the prompt payment and performance of any and all obligations hereunder and under the Loans, each Loan Party, hereby pledges, assigns and grants to the DIP Agent, for the benefit of the Lenders, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, effective as of the date of the Interim Order and subject in each case to the DIP Orders and any limitations and exclusions set forth therein, a valid and automatically perfected lien and security interest in all personal and real properties, whether now owned or at any time hereafter acquired by such Loan Party or in which such Loan Party now has or at any time in the future may acquire any right, title or interest including, without limitation (each such capitalized term used but not defined herein shall have the meaning set forth in the Uniform Commercial Code) (collectively, the "**Collateral**"):

(a)        all Accounts;

(b)        all Chattel Paper;

(c)        all Documents;

(d)        all Equipment;

(e)        all General Intangibles;

(f)        all Instruments;

(g)        all Inventory;

(h)        all Investment Property, including the Pledged Debt and Pledged Equity;

(i)        all books and records pertaining to the Collateral;

(j)        all Goods and Fixtures;

(k)        all Deposit Accounts, including the Proceeds Account and all cash, Money and cash equivalents deposited therein and any rights with respect thereto;

(l)        all Letter-of-Credit Rights;

(m)        all Commercial Tort Claims described on <u>Schedule 11.01</u> or on any supplement thereto received by the DIP Agent;

(n)        the Securities Accounts, Commodity Accounts and all cash, Money, Securities and other assets or investments deposited therein and any security entitlements and other rights with respect thereto;

86

(o)    all IP Rights, all embodiments or fixations thereof and related documentation, and all books and records describing or used in connection therewith;

(p)    all motor vehicles and other assets subject to certificates of title;

(q)    all Real Property; and

(r)    to the extent not otherwise included, all Proceeds, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing;

*provided* that, notwithstanding anything to the contrary in any motion in connection with the Chapter 11 Cases, the DIP Orders, this Agreement or any other Loan Document, "Collateral" shall not include, and thus no security interest is granted in, any "Excluded Assets" (as defined in the DIP Orders).

Subject to the DIP Orders, the DIP Liens granted herein shall be (a) junior and subordinate in all respects to, but only to, the Carve-Out and other Senior Permitted Liens; and (b) except as expressly set forth in clause (a), senior in priority to any and all other claims, liens and security interests against the Loan Party or any of their assets including, without limitation, the Liens permitted under Section 7.01 (other than 7.01(a)).

Unless otherwise defined in this Agreement, terms defined in Article 1, 8 or 9 of the Uniform Commercial Code are used in this Article XI as such terms are defined in such Article 1, 8 or 9 (and, if defined in more than one article of the Uniform Commercial Code, the terms shall have the meaning specified in Article 9 of the Uniform Commercial Code).

SECTION 11.02.    <u>Administrative Priority</u>.  Each Loan Party agrees that all Obligations hereunder shall constitute an allowed Superpriority Claim against it, pursuant to Section 364(c)(1) of the Bankruptcy Code; provided, however, that such Superpriority Claims shall be junior and subordinate in all respects to, but only to, the Carve-Out.

SECTION 11.03.    <u>No Filings Required</u>.  The DIP Liens securing the Obligations shall be deemed valid and perfected and duly recorded by entry of the Interim Order.  The DIP Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the DIP Lien granted by or pursuant to the Interim Order or this Agreement.

SECTION 11.04.    <u>Grants, Rights and Remedies</u>.  The DIP Liens and Superpriority Claims granted by or pursuant to the DIP Orders, this Agreement or any other Loan Document are independently granted.  The DIP Orders, this Agreement and each other Loan Documents supplement each other, and the grants, priorities, rights and remedies of Agent and Lenders hereunder and thereunder are cumulative; provided, however, that in the event of a conflict between the DIP Orders and any Loan Document, the DIP Orders shall control.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code, but subject to Section 8.02 and the DIP Orders, as the case may be, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lenders (or the DIP Agent on behalf of the Lenders) shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court.

SECTION 11.05.    <u>No Discharge; Survival of Claims</u>.  Each Loan Party agrees that (a) the Obligations shall not be discharged by the entry of an order confirming the Plan of Reorganization or conversion into a Chapter 7 case and hereby waives any such discharge, unless all Commitments to make Loans hereunder have been terminated and the Obligations (other than contingent indemnification obligations not yet due and payable) have been indefeasibly paid in full, in cash, or otherwise satisfied on or before the effective date of such plan, and (b) it shall not propose or support any plan of reorganization or liquidation that is not conditioned upon termination of all Commitments, the indefeasible payment in full, in cash, or other satisfaction acceptable to the Lenders, of all

87

Obligations, and the release of the DIP Agent and the Lenders in full from all claims of the Loan Parties and their estates, in each case, as of the effective date of such plan.

SECTION 11.06.    Prohibition on Surcharge; Etc..    No Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out.  Upon the termination of this Agreement and the dismissal of the Cases, the Bankruptcy Court will retain jurisdiction over the Collateral for the purpose of enforcing this Article XI.

SECTION 11.07.    Marshalling Obligations.  The DIP Agent and the Lenders shall not be subject to any equitable remedy of marshalling.  The DIP Agent and the Lenders shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Lenders with respect to the proceeds, products, offspring or profits of any of the Collateral.

## ARTICLE XII

## GUARANTY

SECTION 12.01.    The Guarantee.  Each Guarantor hereby jointly and severally guarantees to each Lender and the DIP Agent and their respective successors and assigns the prompt payment and performance in full when due (whether at stated maturity, by acceleration or otherwise) of the principal of and interest on the Loans made by the Lenders to the Borrowers, and all other amounts from time to time owing to the Lenders or the DIP Agent by the Borrower hereunder or under any other Loan Document, and all other Obligations of the Borrower to the DIP Agent, any Lender or Agent-Related Person hereunder, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**").  Each Guarantor hereby further agrees that if the Borrowers shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, each Guarantor will promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

SECTION 12.02.    Obligations Unconditional.  The obligations of each Guarantor under Section 12.01 are absolute and unconditional irrespective of the value, genuineness, validity, regularity or enforceability of this Agreement, the other Loan Documents or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, to the fullest extent permitted by applicable Law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 12.02 that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute and unconditional as described above:

(i)    at any time or from time to time, without notice to such Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)    any of the acts mentioned in any of the provisions hereof or of the other Loan Documents or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be modified, supplemented or amended in any respect, or any right hereunder or under the other Loan Documents or any other agreement or instrument referred to herein or therein shall be waived or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with; or

88

(iv)    any Lien or security interest granted to, or in favor of, the DIP Agent or any Lender or Lenders as security for any of the Guaranteed Obligations shall fail to be perfected or any Collateral is released or otherwise compromised or liquidated for less than fair value.

The Guarantors hereby expressly waive diligence, presentment, demand of payment, notice of acceleration, notice of intent to accelerate, protest and all notices whatsoever (except as expressly required hereby) and any requirement that the DIP Agent or any Lender exhaust any right, power or remedy or proceed against the Loan Parties hereunder or under the other Loan Documents or any other agreement or instrument referred to herein or therein, including the DIP Orders, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations.

SECTION 12.03.    Reinstatement.  The obligations of each Guarantor under this Article XII shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrowers in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and each of the Guarantors agrees that it will indemnify the DIP Agent and each Lender on demand for all reasonable costs and expenses (including reasonable fees and expenses of counsel) incurred by the DIP Agent or any Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

SECTION 12.04.    Subrogation.  Until such time as the Guaranteed Obligations (including with respect to all "claims" (as defined in Section 101(5) of the Bankruptcy Code) against any Loan Party arising in connection with, or any Collateral securing the Guaranteed Obligations (including rights of subrogation (whether contractual, under Section 509 of the Bankruptcy Code or otherwise) contribution, and the like) shall have been indefeasibly paid in full, each Guarantor hereby waives all rights of subrogation or contribution, whether arising by contract or operation of law (including any such right arising under the Bankruptcy Code) or otherwise by reason of any payment by it pursuant to the provisions of this Article XII.

SECTION 12.05.    Remedies.  Subject to the last paragraph of Section 8.02 and the DIP Orders, each Guarantor agrees that, as between such Guarantor and the Secured Parties, the obligations of the Borrowers hereunder may be declared to be forthwith due and payable as provided in Section 8.01 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.01) for purposes of Section 12.01 notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrowers and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrowers) shall forthwith become due and payable by such Guarantor for purposes of Section 12.01.

SECTION 12.06.    Continuing Guarantee.  The guarantee in this Article XII is a continuing irrevocable guarantee of payment and performance (and not of collection), and shall apply to all Guaranteed Obligations prior to the indefeasible payment in full of the Borrowers' obligations hereunder.  Each Guarantor waives any right to require that any resort be had by the DIP Agent or any Lender to any security held for the payment of the Guaranteed Obligations or to any balance of any credit on the books of the DIP Agent or any other Secured Party in favor of any Borrower or any other Person.

SECTION 12.07.    [Reserved].

SECTION 12.08.    General Limitation on Guarantee Obligations.  In any action or proceeding involving any state or non-U.S. corporate law, or any state or Federal or non-U.S. bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 12.01 would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 12.01, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Lender, the DIP Agent or other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

89

SECTION 12.09.    Waivers.  As used in this paragraph, any reference to "the principal" includes the Borrowers, and any reference to "the creditor" includes the DIP Agent and each of the Lenders.  In accordance with Section 2856 of the California Civil Code (a) each Guarantor waives any and all rights and defenses available to such Guarantor by reason of Sections 2787 to 2855, inclusive, 2899 and 3433 of the California Civil Code, including without limitation any and all rights or defenses any Guarantor may have by reason of protection afforded to the principal with respect to any of the Guaranteed Obligations, or to any other guarantor of any of the Guaranteed Obligations with respect to any of such guarantor's obligations under its guaranty, in either case pursuant to the antideficiency or other laws of the State of California limiting or discharging the principal's indebtedness or such guarantor's obligations, including without limitation Section 580a, 580b, 580d, or 726 of the California Code of Civil Procedure; and (b) each Guarantor waives all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a Guaranteed Obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580d of the Code of Civil Procedure or otherwise; and even though that election of remedies by the creditor, such as nonjudicial foreclosure with respect to security for an obligation of any other guarantor of any of the Guaranteed Obligations, has destroyed Guarantor's rights of contribution against such other guarantor.  No other provision of this guaranty shall be construed as limiting the generality of any of the covenants and waivers set forth in this paragraph.  As provided in Section 10.15(a), this Agreement shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of New York.  The foregoing waivers are included solely out of an abundance of caution, and do not affect or limit in any way the parties' choice of New York law to govern this Agreement and the Guaranteed Obligations.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

1709895.02-NYCSR03A - MSW

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**NEW TRIDENT HOLDCORP, INC.**, as a Borrower and the Borrower Representative

By: _____
     Name: David Smith
     Title:  Chief Financial Officer

**TRIDENT CLINICAL SERVICES HOLDINGS, INC.**, as a Borrower,

By: _____
     Name: David Smith
     Title:  Chief Financial Officer

**SCHRYVER MEDICAL SALES AND MARKETING, LLC**, as a Borrower,

By: _____
     Name: David Smith
     Title:  Chief Financial Officer

**TRIDENT HOLDING COMPANY, LLC**, as New Holdings,

By: _____
     Name: David Smith
     Title:  Chief Financial Officer

*[Signature Page to DIP Credit Agreement]*

AMERICAN DIAGNOSTICS SERVICES, INC.,
COMMUNITY MOBILE DIAGNOSTICS, LLC,
COMMUNITY MOBILE ULTRASOUND, LLC,
DIAGNOSTIC LABS HOLDINGS, LLC,
JLMD MANAGER, LLC,
KAN-DI-KI, LLC,
MAIN STREET CLINICAL LABORATORY, INC.,
MDX-MDL HOLDINGS, LLC,
METROSTAT CLINICAL LABORATORY - AUSTIN,
INC.,
MX HOLDINGS, LLC,
MX HOLDINGS, LLC,
RELY RADIOLOGY HOLDINGS, LLC,
SYMPHONY DIAGNOSTIC SERVICES NO. 1, LLC,
TRIDENT CLINICAL SERVICES HOLDINGS, LLC,
TRIDENTUSA FOOT CARE SERVICES, LLC,
TRIDENTUSA MOBILE CLINICAL SERVICES, LLC,
TRIDENTUSA MOBILE INFUSION SERVICES, LLC,
U.S. LAB & RADIOLOGY, INC., each as Guarantor

By: _____

    Name: David Smith
    Title:   Chief Financial Officer

*[Signature Page to DIP Credit Agreement]*

**SILVER POINT FINANCE, LLC,**
as DIP Agent

By: _____

Name: Michael A. Gatto

Title: Authorized Signatory

*[Signature Page to DIP Credit Agreement]*

**SPCP GROUP, LLC,**
as Lender

By: _____

Name: Michael A. Gatto

Title: Authorized Signatory

*[Signature Page to DIP Credit Agreement]*